### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **(1) DUSTIN J. DENUNZIO,** ) | **Criminal No:  14-CR-10284-NMG** |
| **(2) ANTHONY GATTINERI, and** ) | |
| **(3) CHARLES A. LIGHTBODY,** ) | **ORAL ARGUMENT REQUESTED** |
| ) | |
| **Defendants.** ) | |
| ) | |
| ) | |
| ) | |
| ) | |

### MEMORANDUM OF LAW IN SUPPORT OF
### DUSTIN DENUNZIO'S AND ANTHONY GATTINERI'S MOTION TO SEVER

Defendants Dustin DeNunzio and Anthony Gattineri respectfully submit this memorandum of law in support of their motion to sever pursuant to Federal Rule of Criminal Procedure 14. For the reasons explained below, Mr. DeNunzio and Mr. Gattineri should be tried separately from Mr. Lightbody. Though Mr. Lightbody does not join this memorandum of law, Mr. Lightbody's counsel is in agreement that a joint trial would unconstitutionally prejudice Mr. Lightbody for the reasons stated in Section II of the Argument section below.

### PRELIMINARY STATEMENT

The prosecution's case against Dustin DeNunzio, Anthony Gattineri, and Charles Lightbody is highly atypical. Although the three defendants are jointly charged with conspiring to defraud billionaire casino mogul Steve Wynn regarding a local real estate deal, the prosecution lacks any meaningful evidence against Mr. DeNunzio and Mr. Gattineri. Instead, the prosecution's theory of guilt depends upon evidence that is admissible <u>only</u> against Mr. Lightbody: namely, out-of-court hearsay statements, not in furtherance of any conspiracy, that

1

Mr. Lightbody made to his friends, family members, and others between December 2012 and the summer of 2013 regarding his supposed ownership of land that Wynn agreed to purchase from a company called FBT Everett Realty LLC.  This is the first reason why Mr. DeNunzio and Mr. Gattineri must be tried separately from Mr. Lightbody: Mr. Lightbody's out-of-court statements, if deemed credible by a jury, on their face directly implicate Mr. DeNunzio and Mr. Gattineri in the charged conspiracy and wire fraud offenses, and the introduction of those out-of-court statements at a joint trial would therefore cause egregious prejudice to Mr. DeNunzio and Mr. Gattineri that even the most carefully crafted cautionary and limiting instructions could not ameliorate.

There is also a second, independently sufficient reason why a joint trial of all three defendants is constitutionally intolerable.  Were Mr. Lightbody's out-of-court statements admitted at a joint trial, even pursuant to limiting instructions, Mr. DeNunzio and Mr. Gattineri would have the absolute right (as well as the compelling need) to impeach the credibility of Mr. Lightbody's out-of-court statements by informing the jury not only of Mr. Lightbody's penchant and reputation for boasting and exaggeration, but also of his multiple recent convictions for grand larceny and identity theft, information which would be admissible *per se* for impeachment purposes under Federal Rules of Evidence 609(a)(2) and 806.[1]  This, however, would result in egregious prejudice to Mr. Lightbody, because the jury would hear "bad character" evidence that the prosecution could not otherwise admit against him in its case-in-chief.  At a joint trial, therefore, the fundamental trial rights of the three defendants would be incurably in conflict.

The challenges joint trials typically pose ordinarily can be avoided with carefully crafted jury instructions.  In this case, however, jury instructions are not a salve.  Under the unique

---

[1] The Government disclosed these specific prior convictions to Mr. DeNunzio's and Mr. Gattineri's defense counsel as part of automatic pre-trial discovery.

circumstances presented by this case, a joint trial involving all three defendants will (1) with respect to an essential, threshold factual element of the prosecution's case, cause Mr. DeNunzio and Mr. Gattineri to suffer pervasive and severe prejudice and (2) force the Court to choose between the fundamental trial rights of Mr. DeNunzio and Mr. Gattineri and the equally fundamental, though conflicting, trial rights of Mr. Lightbody.   Under these circumstances, a constitutionally fair trial involving all three defendants is not possible.   The only way to ensure that each defendant receives a constitutionally fair trial is severing the trial of Mr. DeNunzio and Mr. Gattineri from the trial of Mr. Lightbody.

## RELEVANT FACTS

The following relevant facts are not in dispute.

## I.    The Defendants' Minority Ownership of FBT Everett Realty LLC

Mr. DeNunzio and Mr. Gattineri hold minority membership interests in a single-purpose entity called FBT Everett Realty LLC.   During the time period relevant to this case, FBT owned a single asset: a 33-acre plot of industrial land in the town of Everett, Massachusetts (the "Everett Parcel").   FBT purchased the Everett Parcel in October 2009 for just over $8 million.

FBT originally was to be a 50/50 partnership between successful real estate developer Paul Lohnes and a local businessman named Gary DeCicco.   A few weeks before FBT purchased the Everett Parcel, however, Mr. DeCicco brought in Anthony Gattineri ass a third contributing partner.   Mr. Gattineri, a graduate of Bentley College, has a hard-earned reputation as a successful businessman and entrepreneur, including in the residential and commercial real estate spaces.

Shortly after bringing Mr. Gattineri in as the third contributing partner, Mr. DeCicco unilaterally decided to sell a portion of his ownership interest in FBT to his friend Charles

Lightbody, with whom neither Mr. Lohnes nor Mr. Gattineri had any prior business or personal relationship. The Indictment describes Mr. Lightbody as a "convicted felon and known associate of the New England Famly of La Cosa Nostra." Indictment, at ¶ 15. By contrast, neither Mr. Lohnes nor Mr. Gattineri has any criminal record nor association (alleged or otherwise) with organized crime.

In late 2011, Mr. DeNunzio — a Florida native who graduated in 1999 from Harvard University, where he was an All-American wrestler — became FBT's fourth equity member when he was given a 3% membership interest in the company in exchange for his agreement to manage FBT's day-to-day operations. Like Mr. Lohnes and Mr. Gattineri, Mr. DeNunzio had no prior business or personal relationship with Mr. Lightbody, has no criminal record, and has no association (alleged or otherwise) with organized crime.

Subsequently, in a series of separate transactions in 2011 and early 2012, Mr. DeCicco sold off his remaining interests in FBT to Mr. Gattineri and Mr. Lightbody. As a result, by no later than April 2012, the membership interests in FBT were approximately as follows:

| | |
|---|---|
| PAUL LOHNES: | 51% |
| ANTHONY GATTINERI: | 34% |
| CHARLES LIGHTBODY: | 12% |
| DUSTIN DENUNZIO: | 3% |

## II.   FBT's Sale of the Everett Parcel to Wynn Resorts Limited LLC

Essentially as soon as it purchased the property, FBT began marketing the Everett Parcel to major commercial real estate developers, including "big box" retailers like WalMart. Shortly after the Commonwealth of Massachusetts legalized casino gambling in November 2011, major casino companies, including Wynn Resorts Limited LLC, began to express interest in the Everett Parcel as a potential site for a hotel casino development. For various reasons, this led to FBT's

4

members to discuss whether Mr. Lightbody would agree to relinquish his membership interest in FBT in exchange for fair compensation.

As the Indictment acknowledges, on or about December 12, 2012, Mr. DeNunzio and Mr. Lightbody informed FBT's attorney at Davis Malm & D'Agostine that Mr. Lightbody had agreed to sell his entire FBT membership interest to Mr. Gattineri for $1.7 million plus interest pursuant to a promissory note, thus making Mr. DeNunzio, Mr. Gattineri, and Mr. Lohnes FBT's sole equity holders. *See id.*, at ¶¶ 24-26, 28. The Indictment further acknowledges that FBT's attorney promptly began preparing the formal paperwork memorializing the Gattineri/Lightbody buyout agreement. *See id.*, at ¶¶ 17, 25.[2] Moreover, it is undisputed that, months prior to the return of the Indictment, Mr. Gattineri timely paid Mr. Lightbody all of the money due under the promissory note.

Shortly thereafter, FBT and Wynn came to terms on a deal for the Everett Parcel. As stated in the Indictment, "[o]n December 19, 2012, Wynn and FBT entered into an Option Agreement whereby Wynn agreed to pay FBT $100,000 per month for the right" — but not the obligation — "to purchase [a 100% fee simple interest in] the Everett Parcel for $75 million in the event Wynn was awarded a Category 1 destination resort casino license [by the Massachusetts Gaming Commission]."[3] Indictment, ¶ 12. In September 2014, the Massachusetts Gaming Commission awarded Wynn a Category 1 license. On January 3, 2015, several months after the defendants were indicted, Wynn chose to exercise his option and took title to the Everett Parcel.

---

[2] As stated in the Indictment, this formal buyout paperwork was ink-signed by Mr. Lightbody and Mr. Gattineri no later than January 28, 2013, reflecting that the buyout was effective as of December 14, 2012. *Id.*, at ¶ 31.

[3] In early 2014, the option's strike price was revised to $35 million.

### III.    The Government's Supposed "Evidence" That the Buyout Agreement Was a Sham

So what is the Government's fraud theory?  The Indictment charges that, nearly a month after the option agreement between FBT and Wynn was executed, Mr. DeNunzio sent to Wynn's general counsel an email that identified Mr. DeNunzio, Mr. Gattineri, and Mr. Lohnes as "the people who have [a present equity] interest in FBT Everett Realty LLC." *Id.*, at ¶ 47.  According to the Government, this representation was factually (and materially) false because the buyout agreement between Mr. Lightbody and Mr. Gattineri was a sham and, in truth, Mr. Lightbody maintained a "financial interest[ ] in FBT." *Id.*, at ¶ 19.  The parties' dispute over this threshold factual issue — namely, whether the buyout agreement between Mr. Lightbody and Mr. Gattineri was bona fide or a sham — is one of the pivotal issues in the case.  Indeed, if the Government cannot prove beyond a reasonable doubt that the buyout agreement was a sham, the defendants will be entitled to acquittals.[4]

The overwhelming majority of the "evidence" that the Government intends to present in support of its "sham buyout" theory are statements that Mr. Lightbody, in his personal capacity and not in furtherance of the charged conspiracy, made between December 2012 and the summer of 2013 to his friends, family members, and others regarding his supposed ownership stake in FBT.  If believed, Mr. Lightbody's out-of-court statements arguably indicate that the buyout agreement between Mr. Lightbody and Mr. Gattineri was, as the Government charges, a sham.

One of these hearsay statements is apparently so crucial to the prosecution's case that it is *explicitly* identified in the Indictment itself: a statement that Mr. Lightbody made on December

---

[4] The Indictment's conspiracy count charges that the "objective of the conspiracy" was to "obtain money from Wynn . . . on the basis of false representations and concealment of material facts concerning the financial interests in the Everett Parcel." *Id.*, at ¶ 15.  Similarly, the wire fraud count is expressly based on the email that Mr. DeNunzio sent to Wynn's general counsel identifying FBT's present equity owners. *Id.*, at ¶ 47.

11, 2012 to a friend serving time in prison — someone whom neither Mr. DeNunzio nor Mr. Gattineri know — over a recorded phone call. According to the Indictment, on that recorded phone call, Mr. Lightbody agreed with his friend that he was "going to . . . 'double blind' and 'triple blind' his [membership] interest in the Everett Parcel." Indictment, at ¶ 22. The Government contends this is an admission by Mr. Lightbody that his buyout agreement with Mr. Gattineri was a sham intended to deceive Wynn about the equity holders of FBT. In addition, defense counsel have identified a dozen or more recorded phone calls from 2013 between Mr. Lightbody and others, including family members, that the Government will almost certainly seek to introduce against Mr. Lightbody in support of its "sham buyout" theory. In those phone calls, Mr. Lightbody routinely boasted that he continued to have a stake in FBT and asserted that he would be getting a cut of the Everett Parcel sale proceeds if the Wynn deal closed, perhaps even as much as $20 million. The Government also will presumably seek to introduce against Mr. Lightbody representations that he made to First Ipswich Bank in early 2013 in support of a residential mortgage application that had nothing to do with FBT. Specifically, despite the existence of the buyout agreement, Mr. Lightbody represented to the bank that one of his assets was a 12% financial interest in the Everett Parcel, the fair market value of which corresponded to the strike price to which Wynn had agreed.

To be clear, Mr. Lightbody's out-of-court hearsay statements are not credible, and Mr. Lightbody had his own personal reasons to boast and lie to his friends, his family members, and his local bank about his supposed continuing financial interest in the Everett Parcel.[5] More importantly, however, Mr. Lightbody's inculpatory out-of-court statements are not admissible against Mr. DeNunzio and Mr. Gattineri. Furthermore, it is not the case that the evidence

---

[5] The Government clearly believes that Mr. Lightbody's out-of-court statements are trustworthy and intends to use those statements against Mr. Lightbody at trial.

admissible against Mr. Lightbody is only incrementally more incriminating than the evidence admissible against Mr. DeNunzio and Mr. Gattineri.  Rather, the evidence admissible against Mr. Gattineri and Mr. DeNunzio is extremely weak on, *inter alia*, the core threshold factual question of whether the buyout agreement between Mr. Lightbody and Mr. Gattineri was legitimate.  This heightens the risk that, in adjudicating the charges against Mr. DeNunzio and Mr. Gattineri, the jury will be unduly influenced by prejudicial out-of-court statements, not subject to adversarial testing, that have been admitted only against Mr. Lightbody.

## ARGUMENT

Although there a presumption in favor of joinder, "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," then the court should grant a severance. *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  Both conditions for severance are met here for two independently sufficient, related reasons.

First, with respect to the essential question of whether the 2012 buyout agreement between Mr. Lightbody and Mr. Gattineri was a sham, the Government's evidence is a series of out-of-court statements of Mr. Lightbody that are not admissible against Mr. DeNunzio and Mr. Gattineri but will cause unavoidable and catastrophic prejudice to them.

Second, if Mr. Lightbody's out-of-court statements are admitted at a joint trial, even with a limiting instruction, Mr. DeNunzio and Mr. Gattineri will have the absolute right to impeach the credibility of Mr. Lightbody's statements, including by showing that Mr. Lightbody has a reputation for and extensive history of dishonesty, and, in fact, has several prior convictions for grand larceny and identity theft within the past ten years. *See* Fed. R. Evid. 609(a).  Under Federal Rule of Evidence 806, Mr. DeNunzio and Mr. Gattineri have the right to introduce Mr.

Lightbody's reputation and prior convictions to impeach the credibility of his incriminating out-of-court statements. This Court cannot constitutionally limit these impeachment rights, because abridging a defendant's right to impeach the credibility of an unavailable declarant "is analogous to a situation where a trial court limits a defendant's attempt to cross-examine a witness on a key issue of credibility."[6] *Smith v. Fairman*, 862 F.2d 630, 638 (7th Cir. 1988). And yet, just as Mr. DeNunzio and Mr. Gattineri have an absolute right to impeach Mr. Lightbody as part of presenting a complete defense, Mr. Lightbody has the absolute right to keep that prejudicial character evidence out. What this all means is that the absolute trial rights of the defendants conflict with each other in a way that cannot be resolved at a joint trial.

## I.   THE PERSONAL, OUT-OF-COURT STATEMENTS OF MR. LIGHTBODY ARE INADMISSIBLE AGAINST MR. DENUNZIO AND MR. GATTINERI BUT, IF ADMITTED AT A JOINT TRIAL OF ALL THREE DEFENDANTS, WILL UNFAIRLY AND INCURABLY CAUSE PREJUDICE TO MR. DENUNZIO AND MR. GATTINERI.

The critical, threshold factual question for the jury is whether the buyout agreement between Mr. Lightbody and Mr. Gattineri was a sham. If the answer is "no," then the Government's entire theory of criminality fails on its face and the defendants will be entitled to acquittals.

---

[6] Consistent with the Supreme Court's holding in *United States v. Bruton*, an instruction cautioning the jury not to consider Mr. Lightbody's statements against Mr. DeNunzio and Mr. Gattineri would not be a constitutionally sufficient substitute to Mr. DeNunzio and Mr. Gattineri showing the jury all of the reasons — including prior convictions for crimes of dishonesty — why Mr. Lightbody's facially incriminating out-of-court statements are not, in fact, worthy of belief. *Cf. United States Bruton*, 391 U.S. 123, 137 (1968) ("[I]n the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination.").

**A.      The Government's Primary Evidence That Mr. Lightbody Maintained an Equity Interest in FBT Post-January 2013 Are Out-of-Court Statements of Mr. Lightbody That Are Inadmissible Against Mr. DeNunzio and Mr. Gattineri.**

In seeking to prove that the buyout agreement between Mr. Lightbody and Mr. Gattineri, was a sham that was designed to conceal Mr. Lightbody's equity interest in FBT, the Government's primary evidence will be out-of-court statements, not in furtherance of the charged conspiracy, that Mr. Lightbody made to friends, family members, and others between December 2012 and the summer of 2013. The Government believes that, on their face, these statements are essentially confessions by Mr. Lightbody that, as the Government now charges, the buyout deal he struck with Mr. Gattineri was for appearance purposes only.

Mr. Lightbody's out-of-court statements undoubtedly are admissible against Mr. Lightbody under Federal Rule of Evidence 801(d)(2)(A) (statement of an opposing party). But they are not admissible against Mr. DeNunzio or Mr. Gattineri, either as non-hearsay or under a hearsay exception.[7] Notably, in light of the allegations in the Indictment and the voluminous discovery produced by the Government, it is undisputed that there are no statements by either Mr. DeNunzio or Mr. Gattineri that indicate that the buyout deal was a sham. The absence of any such evidence underscores the prejudicial impact to Mr. DeNunzio and Mr. Gattineri that would result from a joint trial.

---

[7] During prior discussions with defense counsel, the Government has asserted that the tape recorded prison phone call identified in Paragraph 22 is admissible against all three defendants as a statement in furtherance of the charged conspiracy. The Government, however, has not advanced any actual legal basis in support of its assertion. Instead, the Government has told defense counsel that the prison phone call is admissible under Federal Rule of Evidence 801(d)(2)(E) because "this is how organized crime works," a *non sequitur* that ignores that neither Mr. DeNunzio nor Mr. Gattineri are organized crime members and that the Indictment does not charge an organized crime conspiracy. Rather than guess at what admissibility arguments the Government might choose to advance in its opposition brief, Mr. DeNunzio and Mr. Gattineri will address such arguments in their reply brief.

**B.     At a Joint Trial, Carefully Crafted Limiting and Cautionary Instructions Will Not Be Sufficient to Protect Mr. DeNunzio and Mr. Gattineri from Experiencing Catastrophic Prejudice.**

Joint trials often pose special evidentiary problems, including the scenario where evidence admissible against one defendant is not admissible against the other defendants.  Courts, however, often find that limiting and cautionary instructions are sufficient to protect defendants from any risk of spillover prejudice.  For example, in *United States v. Gianelli*, 585 F. Supp. 2d 186 (D. Mass. 2008) (Gorton, J.), all ten defendants were jointly charged with racketeering. Defendant Feghi was also individually charged with money laundering, and several other defendants were individually charged with arson and extortion.  Feghi moved for a severance, arguing that the prosecution's evidence on the arson and extortion counts, not admissible against her, would cause spillover prejudice to her on the money laundering count.  *Id.* at 194-95.  This Court correctly denied that motion, finding that a "carefully crafted jury instruction" could cure "[a]ny risk of the suggested prejudice" and agreeing with the prosecution that a properly instructed jury "will have no difficulty separating evidence or arson and extortionate transactions from evidence of money laundering."  *Id.*

But the risk of prejudice that exists here is far different than the run-of-the-mill spillover risk presented in cases like *Gianelli*.  In *Gianelli* and the scores of similar cases, the jury is instructed to limit its consideration of evidence that is admitted against one defendant but is logically irrelevant (and therefore inadmissible) with respect to a different charge against another defendant.  A jury can reliably follow such an instruction, because ignoring logically irrelevant evidence is something that lay jurors do in their everyday lives.  By contrast, in this case Mr. Lightbody's out-of-court statements are logically relevant and indeed central to the key discrete issue that is common to all three defendants — namely, whether the buyout agreement between Mr. Lightbody and Mr. Gattineri was a sham — but are inadmissible against Mr. DeNunzio and

Mr. Gattineri because they are incompetent hearsay.  In other words, were all three defendants to be jointly tried, the Court would effectively be instructing the jury that, in answering the crucial threshold factual question that is common to all the three defendants, the jury may consider <u>all</u> of Mr. Lightbody's out-of-court statements against Mr. Lightbody but may consider <u>none</u> of those statements against Mr. DeNunzio and Mr. Gattineri.  This Court cannot realistically expect a lay jury to engage in the counter-intuitive "mental gymnastics of considering an incriminating statement against only one of [three] defendants in a joint trial." *Frazier v. Cupp*, 394 U.S. 731, 735 (1969).  This case, therefore, presents precisely the scenario that the Supreme Court warned of in *Richardson v. Marsh*, 481 U.S. 200, 207 (1987), when it stated that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."

Even assuming *arguendo* that Mr. Lightbody's incriminating out-of-court statements are not "testimonial" for Confrontation Clause purposes, they nevertheless present the exact same danger to Mr. DeNunzio's and Mr. Gattineri's constitutional fair trial rights as a testimonial confessionary statement would.  In *United States v. Bruton*, 391 U.S. 123, 131 (1968), the Supreme Court concluded that it is too "overwhelming [a] task" for a lay jury to consider an out-of-court confessionary statement "in determining the guilt or innocence of the declarant and then [to] ignor[e] it in determining the guilt or innocence of [the] codefendants of the declarant."   In his concurring opinion, *id.* at 138, Justice Stewart similarly recognized that such confessionary statements "are at once so damaging, so suspect, and yet so difficult to discount, that jurors cannot be trusted to" to follow "whatever [limiting and cautionary] instructions the trial judge might give."

Mr. Lightbody's out-of-court statements pose an identical danger: on their face, Mr. Lightbody's hearsay statements essentially constitute a confession that the buyout agreement between him and Mr. Gattineri and arranged by Mr. DeNunzio was, as the prosecution charges, a complete sham. Because this would directly implicate Mr. Gattineri and Mr. DeNunzio in the alleged conspiracy and wire fraud scheme, Mr. Ligthbody's out-of-court statements are both highly prejudicial and impossible for a lay juror to truly "compartmentalize." As in *Bruton*, this Court cannot have sufficient confidence that a lay jury would be able to abide by whatever limiting and cautionary instructions it might give at a joint trial of all three defendants. At best, limiting and cautionary instructions would be "a procedural nicety that substitutes a form of fairness for the substance of fairness." *United States v. W.R. Grace*, 439 F. Supp. 2d 1125, 1131 (D. Mont. 2006) (granting severance).

In *Bruton*, the Supreme Court made clear that "[a]n important element of a fair trial is that a jury consider only relevant and *competent* evidence bearing on the issue of guilt or innocence." 391 U.S. at 131 (emphasis added). In affirming this fundamental trial right, the *Bruton* Court held that a jury cannot be trusted to "determine that a confession is true insofar as it admits that A has committed criminal acts with B and at the same time effectively ignore the inevitable conclusion that B has committed those same criminal acts with A." *Id*. After two decades of severance case law, the Supreme Court in *Richardson v. Marsh*, 481 U.S. at 207, affirmed that jurors are human and cannot be expected to understand and competently follow limiting and cautionary instructions in all contexts. Those same conclusions hold true here. The risk of constitutionally unfair prejudice here is unavoidable, and even the most carefully crafted jury instructions are not capable of ameliorating this prejudice. This Court should treat Mr.

Lightbody's out-of-court statements just as it would a classic "*Bruton* issue" and order a severance.

## II.    AT A JOINT TRIAL OF ALL THREE DEFENDANTS, ONE OF MR. DENUNZIO'S AND MR. GATTINERI'S MOST FUNDAMENTAL TRIAL RIGHTS WOULD NECESSARILY CONFLICT WITH ONE OF MR. LIGHTBODY'S MOST FUNDAMENTAL TRIAL RIGHTS.

A related yet independently sufficient reason why severance is required is because the admission of Mr. Lightbody's out-of-court statements at a joint trial, even pursuant to limiting and cautionary instructions, would trigger an irresolvable conflict between the defendants' fundamental trial rights.  Specifically, in the event that Mr. Lightbody's out-of-court statements about his equity stake in FBT were admitted at a joint trial, Mr. DeNunzio and Mr. Gattineri would have the absolute right to impeach the credibility of those statements.[8]  *See* Fed. R. Evid. 806 ("When [an out-of-court] statement . . . has been admitted in evidence, the declarant's credibility may be attacked . . . by any evidence that would be admissible for those purposes of the declarant had testified as a witness.").   Under Federal Rule of Evidence 609(a)(2), one method of impeachment that would be absolutely available to Mr. DeNunzio and Mr. Gattineri would be to attack Mr. Lightbody's character for truthfulness, including by introducing Mr. Lightbody's 2007 convictions for grand larceny and identity theft.  *See* Fed. R. Evid. 609(a)(2).

---

[8] This would be true even if the jury were instructed that Mr. Lightbody's out-of-court statements, though incriminating against all three defendants, are not substantive evidence against Mr. DeNunzio and Mr. Gattineri.  The Supreme Court and courts of appeals have held that a limiting instruction is not a constitutionally adequate substitute for a defendant's right to cross-examine or to impeach prejudicial hearsay statements that directly incriminate him.  *Cf. Bruton*, 391 U.S. at 137 (holding that "limiting instructions [are not] an adequate substitute for petitioner's constitutional right of cross-examination"); *Fairman*, 862 F.2d at 638.  In *Fairman*, the court of appeals held that abridging a defendant's right to impeach the credibility of an unavailable declarant's incriminating hearsay statements is "analogous" to abridging the defendant's right to cross-examine a prosecution witness who provides incriminating evidence from the stand.

And yet, Federal Rule of Evidence 404(b), not to mention basic constitutional fair trial requirements, would also entitle Mr. Lightbody to preclude those prior convictions from being introduced against him at trial.

At a joint trial, there would therefore be a clear, irresolvable conflict between the defendants' fundamental trial rights. On the one hand, Mr. DeNunzio and Mr. Gattineri would have the right and the need to show the jury that Mr. Lightbody's out-of-court statements to his friends, family members, and residential mortgage broker regarding his supposed equity stake in FBT cannot be credited. On the other hand, Mr. Lightbody would be manifestly prejudiced if the jury learns that, in 2007, he committed multiple grand larceny and identity theft offenses. This conflict would be unavoidable at a joint trial. The Court could not impinge upon Mr. DeNunzio's and Mr. Gattineri's right to impeach Mr. Lightbody's out-of-court statements, as this would violate not only the plain language of the Federal Rules of Evidence, but also their constitutional right to present a complete defense. *See United States v. Perez*, 299 F. Supp. 2d 38, 42 (D. Conn. 2004) (holding that a court may not abridge a defendant's absolute right, under Federal Rule of Evidence 609(a)(2), to impeach his co-defendant's out-of-court declaration by introducing the co-defendant's prior crimes of dishonesty). At the same time, if the jury were to hear the inflammatory evidence of Mr. Lightbody's past crimes of dishonesty, the prejudice to Mr. Lightbody would be devastating and could not plausibly be cured with a curative instruction. *See Bruton* and *Fairman*, *supra*.

In *Perez*, *supra*, the district court was presented with an essentially identical problem. Co-defendant Gonzalez, had made out-of-court statements that, according to the prosecution, helped to prove the existence of the conspiracy in which co-defendant Perez was charged with participating. *Perez*, 299 F. Supp. 2d at 41-42. Perez's defense strategy was to impeach the

credibility of Gonzalez's out-of-court statements by introducing, pursuant to Federal Rule of Evidence 609, Gonzalez's prior convictions.   *Id.*   The district court held that Perez had a "'specific trial right,'" that the court could not permissibly abridge, to impeach Gonzalez's out-of-court statements in this fashion.   *Id.* at 42 (quoting *Zafiro*, 506 U.S. at 539).[9]   The district court agreed, however, that allowing the jury to hear the otherwise inadmissible details of Gonzalez's prior convictions would unfairly prejudice Gonzalez.   *Id.*   The district court held that the only way to accommodate Perez's and Gonzalez's conflicting trial rights was to grant a severance.   *Id.* at 42-44.   The Court should reach that same conclusion here.

---

[9] Indeed, the district court reached this conclusion even though, in its view, Gonzalez's statements did not specifically "implicate Perez."   *Id.*

## CONCLUSION

For the foregoing reasons, Mr. DeNunzio and Mr. Gattineri respectfully request that this Court grant their motion to sever.  Mr. DeNunzio and Mr. Gattineri also respectfully request oral argument on their motion.

Respectfully submitted,

/s/ Aaron M. Katz
Joshua S. Levy (BBO #563017)
Aaron M. Katz (BBO #662457)
Ropes & Gray LLP
Prudential Center
800 Boylston St.
Boston, MA 02199
Phone: (617) 951-7000
Fax: (603) 951-7050
Joshua.Levy@ropesgray.com
Aaron.Katz@ropesgray.com

*Attorneys for Dustin DeNunzio*

/s/ Michael J. Connolly
Michael J. Connolly (BBO #638611)
Laura B. Angelini (BBO #658647)
Hinckley, Allen & Snyder LLP
Prudential Center
28 State Street
Boston, MA 02109
Phone: (617) 345-9000
Fax: (617) 345-9020
mconnelly@hinckleyallen.com
langelini@hinckleyallen.com

*Attorneys for Anthony Gattineri*

Dated: March 20, 2015

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1, I hereby certify that counsel for Defendants have in good faith attempted to confer with counsel for the Government to resolve or narrow the issues presented by this motion, and that the disputed issues remain unresolved.

/s/  Joshua S. Levy
Joshua S. Levy

## CERTIFICATE OF SERVICE

I, Joshua S. Levy, hereby certify that, on March 20, 2015, true and accurate copies of the foregoing were served on counsel for the Government through ECF.

/s/ Joshua S. Levy
Joshua S. Levy

18