UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No.: 14-cr-10284-NMG |
| | ) | |
| v. | ) | |
| | ) | |
| (1) DUSTIN J. DENUNZIO, | ) | |
| (2) ANTHONY GATTINERI, and | ) | |
| (3) CHARLES A. LIGHTBODY | ) | |
| | ) | |
| Defendants | ) | |

## OPPOSITION TO DENUNZIO'S AND GATTINERI'S MOTION TO SEVER

The United States, by and through the undersigned attorneys, respectfully opposes

Defendants Dustin DeNunzio's and Anthony Gattineri's Motion to Sever (Docket No. 71).

DeNunzio and Gattineri have not met their heavy burden of making a strong and specific showing

of prejudice warranting severance notwithstanding the substantial benefits and economies of a

joint trial.   First, much of the government's evidence – which far exceeds DeNunzio's and

Gattineri's limited recitation of the "Relevant Facts" – is admissible against all of codefendants

and, to the extent it is not, the jury will have no trouble compartmentalizing it.   Second,

codefendant Charles Lightbody's criminal convictions are admissible in a trial of *any* of the three

defendants, who are specifically charged with conspiring to conceal Lightbody's financial interest

in the Everett Parcel to Wynn Resorts, Ltd. (Wynn) and the Massachusetts Gaming Commission

(the MGC) because Lightbody is a convicted felon and organized crime associate.   Therefore,

even if DeNunzio and Gattineri had standing to vicariously assert Lightbody's right to a fair trial,

their intent to use Lightbody's convictions to impeach his out-of-court statements cannot justify

severance.

1

## RELEVANT FACTS

DeNunzio's and Gattineri's recitation of relevant undisputed facts is both inaccurate and conspicuously devoid of any reference to their own false statements to investigators as well as the emails, phone records, testimony and other documents which form the crux of the government's case against them.   While Lightbody's conversations with third parties are certainly among the evidence the government intends to introduce at trial, they are not the "vast majority" of the evidence against the defendants.

For example, the government expects that emails, witness testimony and other documents will demonstrate that the defendants lied to investigators assigned to the Investigations and Enforcement Bureau (IEB) of the MGC about the October 2009 purchase of the real property in Everett and Boston, Massachusetts (the Everett Parcel) by FBT Everett Realty LLC (FBT). Specifically, Lightbody's involvement in FBT and the purchase of the Everett Parcel was not a post-closing surprise, and Gary DeCicco did not "unilaterally decide[] to sell a portion of his ownership interest in FBT to [Lightbody]."   *See* Docket No. 72, at 3.   Instead, according to emails, DeNunzio was working to facilitate Lightbody's securing financing for his initial $650,000 contribution to FBT as early as September 2, 2009, over a month prior to the closing.   In fact, DeNunzio's relationship with Lightbody dates back to at least January 2009.[1]

In addition to certain calls between Lightbody and an imprisoned New England La Cosa Nostra (NELCN) soldier (Prisoner 1), the government expects that emails, witness testimony and other documents will demonstrate that Lightbody did not agree to exit FBT in the summer of 2012,

---

[1]  The government has only obtained telephone records dating back to January 1, 2009. Accordingly, it is possible that Lightbody and DeNunzio had a relationship even before 2009. Regardless, his claim that before the October 2009 closing he had "no prior business or personal relationship with [] Lightbody," set forth in Docket No. 72 at 4, is false.

2

contrary to the statements they made in their interviews with IEB investigators.   Specifically, there are no emails among the FBT members which contemplate Lightbody's exit from FBT in July 2012 (when FBT first began to entertain the idea of a casino on the Everett Parcel) or in August 2012.   Instead, DeNunzio emailed Lightbody several times in August 2012, sharing with him versions of a letter of intent between FBT and a real estate investment fund interested in locating a casino on the Everett Parcel.   Further, phone records and emails will demonstrate that Lightbody was involved in securing approval for a telephone poll of Everett residents in September 2012, that Lightbody and DeNunzio were in close contact in the days leading up to the poll and particularly on the day of the poll, and that DeNunzio reached out to Lightbody when the poll results came back negative and the deal fell apart.

In fact, emails, phone records and witness testimony will demonstrate that, through mid-November 2012, while FBT was negotiating a letter of intent and then option agreements with Wynn, DeNunzio included Lightbody with Gattineri on "FBT Partner" emails, called Lightbody to consult with him about the negotiation of the Wynn letter of intent, involved Lightbody in obtaining electricity to the Everett Parcel, and sent Lightbody sketches of a casino layout. Tellingly, in an October 9, 2012 email that FBT failed to produce in response to a grand jury subpoena, DeNunzio reported to another individual that FBT consisted of *four* real estate investors, including himself.   This is consistent with other evidence which demonstrates that Lohnes, Gattineri, DeNunzio and Lightbody were members of FBT at the time DeNunzio sent the email.

It was not until December 10, 2012, when a reporter from the <u>Boston Business Journal</u> (the <u>BBJ</u>) contacted Wynn representatives with questions about the Everett Parcel, that the defendants realized they needed to take affirmative steps to hide Lightbody's interest in the Everett Parcel.

The reporter asked about DeCicco's interest in the land and his criminal history, but the defendants knew it was only a matter of time before someone discovered Lightbody's criminal history, which could negatively impact FBT's negotiations with Wynn and Wynn's ability to win the MGC's approval for a casino license.

While Lightbody's December 2012 calls with Prisoner 1 are telling evidence that the defendants conspired to hide Lightbody's interest in FBT after the <u>BBJ</u> inquiry by falsely telling others that he had agreed to transfer his interest to Gattineri, they are not the only evidence of the secret agreement.   For example:

- In December 2012, DeNunzio told FBT's lawyer that Lightbody had agreed to transfer his FBT interest to Gattineri.   When FBT's lawyer asked DeNunzio for Lightbody's cell phone number so that the lawyer could confirm this with Lightbody, DeNunzio told the lawyer that he did not have the number but would have Lightbody call FBT's lawyer.   Phone records reflect hundreds of calls between DeNunzio and Lightbody before December 2012, indicating that DeNunzio did not want FBT's attorney to call Lightbody without giving DeNunzio and Lightbody a chance to get their story straight.

- A search warrant executed on November 27, 2013 revealed that while Gattineri had 4,680 emails in his email account dated between January 1, 2012 and July 1, 2012, he had only 6 spam emails in his account in the key time period between July 1, 2012 and February 1, 2013.

- On December 11, 2012, while the coconspirators were scrambling to "fix" the problem the <u>BBJ</u> article highlighted for them, Gattineri emailed DeNunzio, "Are we in need of talking today if so let me know.   I can try and break lose [sic] later and meet later but I have a hospital board function at 5:30."   Less than 30 minutes later, DeNunzio replied, "I will see what the plan is for today and let you know ASAP."   Shortly thereafter, Gattineri replied, "OK.  **Anything we do that's hot we meet in person**."[2]   (Emphasis supplied).

---

[2] This email was discovered during the execution of the search warrant on DeNunzio's email account; it was not in Gattineri's email account when the search warrant was executed and it was not produced by FBT in response to a grand jury subpoena.

- On December 16, 2012, DeNunzio forwarded the <u>BBJ</u> article to Lightbody but did not copy anyone else on the email.   This email also was not produced by FBT and was not located in DeNunzio's email account during the execution of the search warrant on the account.

- On December 19, 2012, DeNunzio forwarded an email from a Wynn representative with a partially executed (buyer's side only) copy of the Option Agreement to Gattineri and Lightbody.   This email was likewise not produced by FBT or found in DeNunzio's email account.

- On January 16, 2013, FBT's casino consultant emailed DeNunzio, Gattineri, Lohnes and FBT's attorney a summary of the casino license applicants, including Wynn.   DeNunzio forwarded the email to Lightbody, but that email was not produced by FBT or recovered pursuant to the search warrant for DeNunzio's email account.

Even after DeNunzio represented to Wynn on January 17, 2013 that "the people who have interest in FBT Everett Realty LLC" were DeNunzio, Lohnes and Gattineri, there is evidence in addition to Lightbody's conversations that he retained an interest in the Everett Parcel.   For example:

- While the Memorandum of Transfer and Promissory Note purporting to transfer Lightbody's interest to Gattineri in exchange for $1.7 million were dated December 14, 2012, Lightbody and Gattineri did not execute the documents until late January 2013, *after* DeNunzio made the representation to Wynn that there were only three individuals with interest in FBT.

- In April 2013, Gattineri submitted a personal financial statement to a bank which indicated that, as of March 2013, Gattineri's interest in the Everett Parcel was identical to his interest in the Everett Parcel in March 2012.   If in fact Lightbody transferred his interest to Gattineri in exchange for a $1.7 million note in 2012, there should have been an increase in the value of Gattineri's assets by $1.7 million, plus interest, with a corresponding liability of the same amount based on the debt owed to Lightbody.

- On May 7, 2013, DeNunzio sent an email to Gattineri and Lohnes regarding, *inter alia*, a construction company (Feeney) parking its trucks at the Everett Parcel. DeNunzio wrote, "This is a favor to Feeney from [Lohnes]. . . **No other partner** has an issue with Feeney."   (Emphasis added).   In an email earlier that day summarizing "meetings 5/7/13," DeNunzio's employee wrote the following notes "Regarding Paul/Anthony email": "'none of the other partners care if Finey [sic] is

on the property. – Even though you are the only one with an issue we will get him off.'"   DeNunzio's employee also made a note to "**Keep any reference to other partners as minimal as possible**."   (Emphasis added)

- In late May 2013, DeNunzio sent Gattineri and Lohnes three emails related to the Everett Parcel.   Within two minutes, and often within seconds, after sending the emails to Gattineri and Lohnes, DeNunzio sent the same emails to Lightbody. Notably, the emails to Gattineri and Lohnes were found in DeNunzio's email account when the search warrant was executed but the emails to Lightbody were not among the seized emails.

- On June 22, 2013, the date of the referendum vote on the Everett host community agreement related to the casino, phone records show near constant contact between and among Lightbody, DeNunzio, Gattineri and Lohnes.   In addition to multiple phone calls and texts between DeNunzio and Lightbody during the day, there was a call between Gattineri and Lightbody at approximately 8 p.m. that night.

In July 2013, when the IEB investigators began asking the defendants about the ownership of and financial interests in the Everett Parcel, the coconspirators took several steps to further conceal their fraud.   For example:

- During his first interview with IEB investigators on July 9, 2013, DeNunzio failed to disclose that Lightbody and Russo would benefit financially from an FBT land deal with Wynn.   While he later told IEB investigators that Lightbody was once an owner of FBT, he stated that Lightbody transferred his interest to Gattineri in the summer of 2012,[3] lied about the details of Lightbody's involvement in FBT, and falsely denied having Lightbody's cell phone number.   DeNunzio did not disclose Russo's interest in the Everett Parcel to the IEB until December 2013.

- After his first meeting with the IEB investigators, DeNunzio further backdated the Memorandum of Transfer and Promissory Note from December 2012 to August 2012, for the purpose of presenting the backdated documents to the IEB investigators as "evidence" that the transfer was in the summer of 2012.

- On July 10, 2013, the IEB contacted Gattineri to set up an interview.   Within minutes, Gattineri called DeNunzio and then DeNunzio called Lightbody. DeNunzio told Lightbody that investigators had reached out to Lohnes and Gattineri, and that they might be calling DeCicco.   DeNunzio told Lightbody to call Deccico and tell him not to meet with investigators.   DeNunzio then instructed Lightbody to tell DeCicco "you know unfortunately you know you [*i.e.* Lightbody]

---

[3] The defendants admit this statement, which was recorded, is not true.   *See* Docket No. 72, at 5.

were bought out a long time ago and really don't have anything to do with it."

- Lightbody in fact called DeCicco later that day to tell him about the IEB investigation, and when DeCicco asked, "Did they get you yet?" Lightbody responded, "No cause . . . I'm not on anything. . . I'm not on anything so they're fuckin not gonna find me anywhere you know what I mean?"

- Also on July 10, 2013, DeNunzio and Lightbody met at a Dunkin Donuts in Everett, and Lightbody executed the Memorandum of Transfer and Promissory Note that had been backdated to August 2012.   Later that evening, DeNunzio's employee brought the documents to Gattineri's house, where he signed them.

- On July 10, 2013, before he signed the backdated documents, Gattineri met with IEB investigators.   Despite emails evidencing Gattineri's incredible attention to detail in other business and real estate matters, including his purchase of DeCicco's interest in FBT, Gattineri was unable to recall the any of the terms of his purported deal with Lightbody, except that they had purportedly signed the documents in the summer of 2012.[4]

In addition to the evidence related to the Everett Parcel, there is substantial evidence that DeNunzio, Lightbody and Russo conspired to hide Lightbody's interest in yet another investment. Specifically, DeNunzio, Lightbody and Russo arranged to purchase the King Arthur's strip club in Chelsea, but conspired to hide Lightbody's interest from Chelsea city officials in order to obtain their support for the transfer of the business, including the liquor and entertainment licenses.   The evidence of this scheme, which includes recorded meetings and calls (including calls between Lightbody and DeNunzio), as well as emails, bank records and witness testimony, is evidence of DeNunzio's and Lightbody's motive, intent and modus operandi and will therefore be admissible against them at trial pursuant to Rule 404(b) of the Federal Rules of Evidence.

---

[4] The defendants admit this statement, which was recorded, is not true.   *See* Docket No. 72, at 5, n. 2.

## ARGUMENT

Defendants must make a "strong showing of prejudice" in order to demonstrate that severance is necessary.   *United States v. Smolar*, 557 F.2d 13, 21 (1st Cir. 1977) (quoting *Sagansky v. United States*, 358 F.2d 195 (1st Cir. 1966)).   As the Supreme Court observed in *Zafiro v. United States*, 506 U.S. 534, 537 (1993):

> There is a preference in the federal system for joint trials of defendants who are indicted together.   Joint trials play a vital role in the criminal justice system.   They promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

(Internal quotation marks and citations omitted).   The First Circuit has repeatedly endorsed the general rule that "persons who are indicted together should be tried together," because "[t]his practice helps both to prevent inconsistent verdicts and to conserve resources (judicial and prosecutorial)".   *United States v. O'Bryant*, 998 F.2d 21, 25 (1st Cir. 1993).   The presumption in favor of joint trials is particularly strong in a conspiracy case such as this one: "In the context of conspiracy, severance will rarely, if ever, be required."   *United States v. Brandon*, 17 F.3d 409, 440 (1st Cir. 1994) (internal quotation marks and citation omitted); *United States v. Perkins*, 926 F.2d 1271, 1280 (1st Cir. 1991) ("Co-conspirators are customarily tried together absent a strong showing of prejudice.").

A defendant in a multi-defendant conspiracy case can succeed in obtaining a separate trial only by making "a strong and specific showing of prejudice."   *United States v. Rose*, 104 F.3d 1408, 1415 (1st Cir. 1997).   "The prejudice shown must be greater than that inherent in trying multiple counts and multiple defendants together."   *Id.*   Put another way, "[t]o obtain severance, [a defendant] must show actual prejudice resulting from the joinder . . . not merely that he would have a better chance of acquittal if" severance were granted.   *United States v. L'Allier*, 838 F.2d

234, 241 (7th Cir. 1988).   "Actual prejudice means that the defendant could not have a fair trial without severance."   *United States v. Balzano*, 916 F.2d 1273, 1281 (7th Cir. 1990).   The moving defendants simply cannot meet this significant burden.

DeNunzio and Gattineri posit two grounds for severance.   First, they argue that the only evidence that the 2012 buyout agreement between Lightbody and Gattineri is a sham is Lightbody's out-of-court statements which are not admissible against DeNunzio and Gattineri.   Second, they argue that they will be forced to impeach Lightbody's statements with his larceny and identity theft convictions, causing conflict between the codefendants' trial rights.   Because both arguments fail under the weight of the government's evidence and applicable law, the Court should decline to sever this case.

### A.  Lightbody's Statements Are Admissible Against DeNunzio And Gattineri.

DeNunzio and Gattineri allege that Lightbody's statements to friends, family members, and others regarding the conspiracy, which the government intends to introduce at trial, are admissible only against Lightbody.   However, it is well established that statements by a coconspirator to another coconspirator or to a third party are not hearsay and may be admissible against other coconspirators if those statements were made during and in furtherance of the conspiracy.   *See* F. R. E. 801(d)(2)(E); *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (quoting Rule 801(d)(2)(E)); *United States v. Piper*, 298 F.3d 47, 53 (1st Cir. 2002) ("The black-letter principle is that statements made in the course of a discussion between a coconspirator and a third party who is a stranger to the conspiracy are admissible under Rule 801(d)(2)(E), provided that they meet the Rule's foundational requirements.").   There is no dispute that Lightbody's statements at issue were made during the conspiracy, and the evidence demonstrates that the statements were made in furtherance of the conspiracy.

9

It is well established that "a coconspirator's statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy." *Piper*, 298 F.3d at 54. The "in furtherance" element is not a particularly high hurdle. "To be deemed 'in furtherance,' a statement 'need not be necessary or even important to the conspiracy, or even made to a coconspirator, as long as it can be said to advance the goals of the conspiracy in some way.'" *Id.* (quoting *United States v. Martinez-Medina*, 279 F.3d 105, 117 (1st Cir. 2002)). The rationale underlying the "in furtherance" limitation was a "desire to strike a balance between the need for coconspirators' statement to combat undesirable criminal activity which is inherently secretive, and the need to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence." *United States v. Fahey*, 769 F.2d 829, 838 (1st Cir. 1985).

Under these principles, many of Lightbody's statements regarding the defendants' scheme to conceal his interest in the land from Wynn and the MGC served to further the goals of the conspiracy.

### 1. Prisoner 1 Was A Member Of The Conspiracy.

Many of Lightbody's statements are included in recorded conversations between Lightbody and Prisoner 1. For purposes of the coconspirator exception to the hearsay rule, if the government can establish by a preponderance of the evidence that both Lightbody and Prisoner 1 were members of the conspiracy with DeNunzio and Gattineri and that their statements were in furtherance of the conspiracy, those statements (Lightbody's and Prisoner 1's) are admissible against DeNunzio and Gattineri under the coconspirator exception to the hearsay rule. *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977). With the evidence set forth herein, the government will easily meet its burden of demonstrating the existence of a conspiracy between

10

Lightbody, DeNunzio and Gattineri.   The government also anticipates that the evidence will demonstrate by a preponderance Prisoner 1's membership in that conspiracy.

Specifically, the government anticipates offering evidence that Prisoner 1 is a member of the NELCN, and that Lightbody regularly provided money to Prisoner 1.   Consistent with the nature of the relationship between an organized crime associate and "made member," the calls demonstrate that Lightbody consulted with Prisoner 1 about and kept Prisoner 1 informed of his criminal activities, from which criminal activities Prisoner 1 stood to gain financially.   In fact, during the conspiracy, Prisoner 1 became very familiar with the growing casino industry and had done considerable reading about the casino industry nationally.   As set forth below, Prisoner 1 provided assistance to the conspiracy by obtaining information about a Wynn competitor and passing it along to Lightbody, who gave the information to DeNunzio, who in turned shared the information with Wynn.   By definition, Prisoner 1 is therefore a member of the conspiracy charged in the Indictment.   Further, while it is the government's position that DeNunzio and Gattineri aligned themselves with Lightbody because of his relationship to the NELCN, *inter alia*, their knowledge of Prisoner 1's involvement in their conspiracy is not required.   *See United States v. Trinidad-Acosta*, 773 F.3d 298, 311 (1st Cir. 2014) ("[E]ach coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it.") (citations and quotations omitted).

### 2.   The Statements Were In Furtherance Of The Conspiracy.

In his calls with Prisoner 1, Lightbody shared details of the potential casino deals, explained the problem posed by his criminal past to the Wynn deal, described the plan to hide his interest, and updated Prisoner 1 on the fraud scheme.   It is well established that these statements by Lightbody to a coconspirator were in furtherance of the fraud scheme and therefore admissible

against all of the defendants.   *See, e.g.*, *United States v. Crocker*, 788 F.2d 802, 805 (1st Cir. 1986) (statements of coconspirators which identify participants and reveal intent to promote conspiracy's objectives are in furtherance of conspiracy); *United States v. Ciresi*, 697 F.3d 19, 30 (1st Cir. 2012) (statements which kept coconspirator "abreast of current developments and problems facing the group" were in furtherance of conspiracy); *United States v. Handy*, 668 F.2d 407, 408 (8th Cir. 1982) (statements which help identify role of one coconspirator to another were in furtherance of the conspiracy).

Even if the Court determines that Prisoner 1 was not a member of the conspiracy, the most incriminating statements Lightbody makes to Prisoner 1 would nonetheless be admissible against DeNunzio and Gattineri.   Specifically, in several of the calls between Prisoner 1 and Lightbody, Lightbody updated Prisoner 1 on the casino deals and Prisoner 1 provided advice and assistance to the conspiracy.   For example, during a December 5, 2012 call with Lightbody, Prisoner 1 explained that he had learned that Wynn, who had previously owned the Golden Nugget casino in New Jersey, had some regulatory problems there because of his connections to organized crime. Prisoner 1 highlighted this issue because one of the MGC Commissioners had previously worked in casino enforcement with the New Jersey State Police, and therefore was perceived to be a stumbling block for Wynn.   Lightbody responded, "Well, the funny thing about it, that's why I left my name off, cause I didn't (inaudible) Anthony's name in there."   During the December 11, 2012 call cited in the Indictment (Docket No. 3, ¶ 22), Lightbody explained to Prisoner 1 that a newspaper (*i.e.* the BBJ) was asking about DeCicco being a felon and detailed the defendants' plan for "buying [Lightbody] out," and Prisoner 1 instructed, "You need to move on. You need to double blind it."   Lightbody replied, "Exactly," and Prisoner 1 explained, "You need to triple

blind it actually."   Lightbody told Prisoner 1, "Well that's what I'm doing."[5]

In another example, in a February 21, 2013 call, Prisoner 1 gave Lightbody the contact information to request a copy of the Environmental Notification Form (ENF) for Caesars Resort at Suffolk Downs (Caesars), Wynn's competitor for the Region 1 casino license.   Prisoner 1 had already obtained a copy of the ENF, and described it to Lightbody in detail.   On February 28, 2013, Lightbody reported to Prisoner 1 that he had obtained a copy of the Caesars ENF, and that he "just sent it to my guys cause they're sending to Wynn and his guys."   In fact, emails revealed that DeNunzio had an employee send the ENF to Wynn's lawyers in or around March 2013.

These kinds of statements to non-conspirator associates which have some purpose or benefit to the conspiracy are not mere idle chatter.   *See e.g. United States v. Hickey*, 596 F.2d 1082, 1090 (1st Cir. 1979) (bank robber's statements to associate describing robbery were "in furtherance" of conspiracy because they placated associate and induced him to get rid of clothing used in robbery); *United States v. Shores*, 33 F.3d 438, 448 (4th Cir. 1994) (statements made to third party are "in furtherance" if they are designed to get third party to join or act to assist it in accomplishing its objectives); *United States v. Mayberry*, 896 F.2d 1117, 1120 (8th Cir. 1990) (explanatory statements which inform others of activities of conspiracy are "in furtherance" if construed as seeking assistance or cooperation).   Lightbody obtained advice and assistance from Prisoner 1 in furtherance of the conspiracy to hide and eventually realize his interest in the land. Because they were clearly in furtherance of the conspiracy, they are therefore admissible against DeNunzio and Gattineri regardless of Prisoner 1's membership in the conspiracy.

---

[5]  Even if the Court determined that Prisoner 1 was not a coconspirator, his statements are admissible as context for Lightbody' coconspirator statements.   *United States v. Mubayyid*, 658 F.3d 35, 72 (1st Cir. 2011)

Likewise, at least some of Lightbody's conversations with individuals other than Prisoner 1 will also be admissible as coconspirator statements.   For example, Lightbody and Russo had lunch with an Everett public official on or about January 25, 2013, after Lightbody supposedly had agreed to transfer his interest in FBT to Gattineri.   During the lunch, Lightbody discussed the casino as if he still had a financial interest in it, and told the public official something to the effect of, "Your buddy Jamie's [Russo] going to be okay with this deal," or "He's going to be fine," or "He's going to make some money."   Lightbody also stated, "I'm going to take care of everyone," which the Everett public official understood may have been a reference to him/her.   Lightbody's statements were clearly in furtherance of the conspiracy, because they evidenced his intent to share the proceeds of the casino deal with the Everett public official, in exchange for assistance with the casino bid and concealment of Lightbody's continued interest in the land.

### 3.  A Proper Jury Instruction Will Cure Any Possible Risk Of Prejudice.

Because many of the Lightbody statements are admissible against DeNunzio and Gattineri (and would be admissible even if this Court severed the case against them from Lightbody's) the fact that some of Lightbody's conversations may not be admissible against DeNunzio and Gattineri does not warrant severance, especially in light of the significant additional evidence against them.   *See, e.g., United States v. Floyd*, 740 F.3d 22, 37 (1st Cir. 2014) (where record contains ample additional evidence against defendant, admission of codefendant's confession implicating defendant did not warrant severance).   Indeed, to overcome the presumption in favor of trying together those who are indicted together, a defendant "must demonstrate prejudice so pervasive that it would be likely to effect a miscarriage of justice."   *United States v. DeLeon*, 187 F.3d 60, 63 (1st Cir. 1999) (citations omitted).   "This requirement means more than establishing

14

that the defendant might have [] a better chance of acquittal in a separate trial." *Id.*   Given the overwhelming weight of inculpatory evidence admissible against DeNunzio and Gattineri, they simply have not met their burden in this case.[6]

To the extent the Court should find there is any potential for prejudice, such risk can be cured with appropriate limiting instructions to the jury.   *See Zafiro*, 506 U.S. at 539-40; *DeLeon*, 187 F.3d at 64 (affirming denial of severance because court instructed jury to consider charges and evidence against each defendant individually).   Given that some of the statements are admissible against them and given the significant additional evidence of the conspiracy, DeNunzio and Gattineri have not demonstrated that this is among the rarest of cases where a proper instruction cannot be relied on to cure any possible risk of prejudice.   Accordingly, the Court should deny the Motion to the extent it is grounded on Lightbody's statements to third parties.

## B.  Lightbody's Criminal Convictions Are Intrinsic Evidence Which Would Be Admissible Even In A Trial Of DeNunzio And Gattineri Alone.

Recognizing the weakness of their claim that Lightbody's out-of-court statements require severance, DeNunzio and Gattineri alternatively argue that severance is warranted because the admission of Lightbody's statements would "trigger an irresolvable conflict between the defendants' fundamental trial rights."   Specifically, DeNunzio and Gattineri claim they would have the right to impeach Lightbody's credibility with his prior convictions for larceny and

---

[6] Although DeNunzio and Gattineri reference *Bruton v. United States,* 391 U.S. 123 (1968) and *Richardson v. Marsh*, 481 U.S. 200 (1987), there is no *Bruton* issue when a statement falls within the coconspirator exception to the hearsay rule.   *United States v. Sanchez-Berrios*, 424 F.3d 65, 76 (1st Cir. 2005) (citations omitted).   Moreover, to the extent any of Lightbody's statements are not admissible against DeNunzio and Gattineri, they are not inculpatory on their face, and are in fact only incriminating when linked to the other evidence in this case.   It is clear that such statements do not trigger the application of *Bruton*.   *United States v. Rodriguez-Duran*, 507 F.3d 749, 769 (1st Cir. 2007).

identity theft, but that Rule 404(b) and Lightbody's fair trial rights would entitle Lightbody to preclude the convictions.   As an initial matter, to the extent DeNunzio and Gattineri are asserting Lightbody's constitutional rights, the Court should deny the Motion because such rights are personal, and they simply have no standing to assert Lightbody's "fair trial right."   *See United States v. Johnson*, 267 F.3d 376, 380 (5th Cir. 2001) (right to assistance of counsel is personal right and defendants lack standing to challenge order prohibiting codefendant from communicating with counsel); *United States v. Hourani*, 172 F.3d 50 (Table), 1999 WL 16472, *1 (6th Cir. 1999) (defendant lacked standing to assert codefendant's constitutional rights to conflict-free representation); *United States v. Escobar*, 50 F.3d 1414, 1422 (8th Cir. 1995) (*Miranda* rights are personal, and defendants have no standing to assert violation related to codefendant statements).

Even if they had standing to challenge the admissibility of Lightbody's convictions, the Motion would fail.   The Indictment charges that the defendants conspired to conceal Lightbody's financial interest in FBT and the Everett Parcel *because he is a convicted felon and known associated of the NELCN.*   Lightbody's criminal past and mob connections are therefore intrinsic to the fraud scheme, and such evidence would be admissible in a trial of *any* of the defendants. Accordingly, DeNunzio's and Gattineri's desire to use this evidence to impeach Lightbody's out-of-court statements creates no conflict between the defendants and cannot form the basis for severance.

Evidence that is "intertwined" with the criminal conduct at issue is admissible as intrinsic to the crime.   *See United States v. Epstein*, 426 F.3d 431, 439 (1st Cir. 2005) (tax return which failed to indicate money obtained from illegal acts was part and parcel of case); *see also United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005) ("Evidence of acts other than conduct related to the offense is intrinsic when the evidence of the other act and the evidence of the crime charged

are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged.") (internal quotations and citations omitted). As set forth above and in the Indictment, the evidence of Lightbody's convictions and association with organized crime is embedded in the overall conspiracy because it explains the defendants' motive for concealing Lightbody's interest in FBT and the Everett Parcel from Wynn and the MGC.   Because it is probative of the crime charged, his convictions would be admitted regardless of which of the three defendants is on trial.   This was not the case in *United States v. Perez*, 299 F.Supp.2d 38 (D. Conn. 2004), cited by DeNunzio and Gattineri (Docket No. 72, at 15-16).   In *Perez*, the convictions with which one defendant intended to impeach a codefendant's out-of-court statements were *otherwise inadmissible*.

Further, because Lightbody's background is intrinsic to the fraud scheme, Rule 404(b) is not implicated.   "The prohibition against 'other acts' evidence typically refers to evidence that is extrinsic to the crime charged and introduced for the purpose of the purpose of showing propensity." *United States v. Gobbi*, 471 F.3d 302, 311 (1st Cir. 2007).   *See also United States v. Villarman-Oviedo*, 325 F.3d 1, 11 (1st Cir. 2003) (Rule 404(b) is "not implicated at all" when evidence is "intrinsic to the crime charged in the indictment") (citation omitted).

Because Lightbody's criminal convictions would be admissible at a trial of DeNunzio and Gattineri alone, their intent to use his convictions to impeach his out-of-court statements does not warrant severance.

17

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants Dustin DeNunzio's and

Anthony Gattineri's Motion to Sever.

Respectfully submitted

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

Date:    April 3, 2015          By:    */s/Kristina E. Barclay*
                                      KRISTINA E. BARCLAY
                                      Assistant U.S. Attorney
                                      DAVID RUBIN
                                      Special Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Date: April 3, 2015               */s/Kristina E. Barclay*
                                  Kristina E. Barclay
                                  Assistant United States Attorney

18