UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**(1) DUSTIN J. DENUNZIO,**<br>**(2) ANTHONY GATTINERI, and**<br>**(3) CHARLES A. LIGHTBODY,**<br><br>**Defendants.** | Criminal No: 14-CR-10284-NMG<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DUSTIN DENUNZIO'S AND ANTHONY GATTINERI'S MOTION**
**TO DISMISS (OR STRIKE) COUNT ONE AND COUNT TWO IN PART**

Count One and Count Two charge Defendants with conspiracy to commit wire fraud and wire fraud, respectively. As the Court recognized in its Order on the Motion to Sever, each count is based on two distinct predicates: (1) that Defendants concealed material information regarding Charles Lightbody from Wynn, and (2) that Defendants concealed material information regarding Charles Lightbody from the Massachusetts Gaming Commission. As explained below, well-established United States Supreme Court and First Circuit precedent preclude the Government's theory that Defendants' alleged concealment of material information from the Gaming Commission implicates the federal wire fraud statute. Accordingly, by and through their counsel, Dustin DeNunzio and Anthony Gattineri respectfully move to dismiss in part Count One and Count Two of the Indictment due to facial legal invalidity. *See Sanabria v. United States*, 437 U.S. 54, 69 n.23 (1978) (implicitly recognizing a district court's authority to dismiss a criminal count in part); *United States v. Alberti*, 568 F.2d 617, 621 and n.2 (2d Cir. 1977) (same).

1

**QUESTION PRESENTED**

The instant motion raises a pure question of law regarding the scope of the federal wire fraud statute that this Court can resolve without a trial.  *See* Fed. R. Crim. P. 12(b)(1).  The question of law is the following:

> Does a landowner's alleged scheme to conceal from the Massachusetts Gaming Commission the identity of one of his supposed co-owners implicate the federal wire fraud statute, where the purpose of the alleged scheme is to ensure that the Gaming Commission awards to Wynn Resorts Limited a casino gaming license and thereby that Wynn purchases the landowner's land?

For the reasons explained below, under well-established Supreme Court and First Circuit precedent, the answer to this question is "no."  Count One and Count Two of the Indictment should therefore be dismissed in part.[1]

**RELEVANT BACKGROUND**

**I.      Relevant Undisputed Facts**

This case relates to a real estate transaction between publicly-traded casino company Wynn Resorts Limited ("Wynn") and a local real estate holding company called FBT Everett Realty LLC ("FBT").

In October 2009, FBT purchased a 33-acre parcel of land in Everett, Massachusetts (the "Everett Parcel").  In 2011, the Commonwealth of Massachusetts passed the "Expanded Gaming Act," which legalizes casino gaming on non-tribal land.  Soon after the Act's passage, Wynn began preparations to submit an application for the one available "Region A" license, including exploring potential physical sites for its proposed casino resort.

---

[1] District courts sometimes refer to the partial dismissal of a count, on the grounds that one of several alternative theories of criminality is legally invalid, as "stri[king] portions of the indictment, as if they were surplusage . . . ." *Alberti*, 568 F.2d at 621.  This is merely a semantic difference, *id.*, because in either case the district court precludes the prosecution from presenting the legally invalid theory to the jury at trial.

2

In October 2012, after deciding against a potential site in Foxborough, Wynn approached FBT regarding the Everett Parcel. In November 2012, Wynn and FBT signed a non-binding memorandum of understanding. On December 19, 2012, Wynn and FBT entered into an option agreement giving Wynn an exclusive option, good for two years, to purchase the Everett Parcel in fee simple at a net price of $65 million. As memorialized in the option agreement, it was understood and intended by the parties that Wynn would exercise its option to purchase the Everett Parcel, if at all, only in the event that the Massachusetts Gaming Commission awarded Wynn the Region A license. It was clear and understood by all parties to the transaction that FBT and its members would have absolutely no involvement in Wynn's casino operation or entitlement to any portion of the Wynn casino's revenue stream.

On January 14, 2013, Wynn submitted to the Massachusetts Gaming Commission its application for the Region A license.

On January 17, 2013, in response to a request from Wynn, Defendant Dustin DeNunzio sent Wynn's general counsel an e-mail under the subject line "Equity Holders in FBT – Everett, MA" identifying himself, Mr. Gattineri, and local real estate developer Paul Lohnes as "the three people who have interest in FBT Everett Realty LLC." Prior to this January 17, 2013 exchange, Wynn had never asked Mr. DeNunzio or anyone else at FBT to provide Wynn with the names of FBT's equity holders or agents, nor was FBT or its members under any affirmative duty to provide that information to Wynn.

The Government alleges that nearly six months later, in July 2013, Mr. DeNunzio, Mr. Gattineri, and Defendant Charles Lightbody advised Massachusetts Gaming Commission investigators during voluntary interviews that, although Mr. Lightbody at one time held a 12.5%

equity interest in FBT, Mr. Lightbody had agreed prior to the execution of the option agreement between FBT and Wynn to relinquish his equity interest in FBT to Mr. Gattineri.[2]

On October 1, 2014, a federal grand jury handed up a two-count indictment against Defendants. Count One charges Defendants with conspiracy to commit wire fraud, and Count Two charges Defendants with a substantive wire fraud offense. Each count is based on the same core allegation that Mr. Lightbody in fact "retained a financial interest in the Everett Parcel" and/or "in FBT," which Defendants "conceal[ed] from Wynn and the [Massachusetts Gaming Commission], in order to obtain money from Wynn for the Everett Parcel." Indictment, ¶¶ 15-17, 19; *see also id.*, § 46 (incorporating the conspiracy allegations into the wire fraud count).

In November 2014, the Massachusetts Gaming Commission awarded Wynn the Region A casino license. On January 2, 2015, Wynn exercised its option to purchase the Everett Parcel in fee simple from FBT. Wynn has owned the land since that day and is now actively developing the land as a casino resort.

## II.   The Conspiracy and Wire Fraud Charges

The best way to understand Count One and Count Two is that each sets forth two distinct theories of wire fraud. The first theory is straightforward enough: Defendants concealed Mr. Lightbody's alleged "financial interest" in FBT and/or the Everett Parcel *from Wynn* in order to induce Wynn to purchase the Everett Parcel. The second theory, by contrast, is more circuitous: Defendants conspired to conceal Mr. Lightbody's financial interest *from the Massachusetts Gaming Commission* so that the Gaming Commission would award Wynn the Region A casino license, in which event Wynn would then exercise its option to purchase the Everett Parcel from

---

[2] The Gaming Commission investigators were not in privity with Wynn, nor were they acting as Wynn's agents.

FBT.[3]   Under this second theory of criminality, the jury could convict Defendants even if it were to conclude that Defendants neither (1) fraudulently concealed *from Wynn* information that was material *to Wynn* nor (2) contemplated or intended any financial or economic injury *to Wynn*.

As explained below, the Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12 (2000), and the First Circuit's decision in *United States v. Christopher*, 142 F.3d 46 (1st Cir. 1998), collectively make clear that this second theory of criminality does not come within the federal wire fraud statute.  The jury therefore could not validly convict Defendants on Count One or Count Two on the basis of this second theory of criminality.  Accordingly, Count One and Count Two should be dismissed to the extent they are based upon that legally invalid theory of criminality (*i.e.*, dismissed in part), or struck in part.[4]

## APPLICABLE LAW

The federal wire fraud statute is implicated where a person, knowingly and willfully, has "devised . . . any scheme or artifice to defraud" or to "obtain money or property by means of false or fraudulent . . . representations." 18 U.S.C. § 1343.  With respect to the instant motion, two cases that explain the scope of the wire fraud statute are particularly significant: *United*

---

[3] The Court's Order on the Motion to Sever recognizes that the Indictment advances these two distinct theories of criminality.  *Cf.* Order on Motion to Sever, Doc. Rec. No. 123, at 1-2 (May 12, 2015) (recognizing that the Indictment alleges that Defendants concealed material information from two distinct entities, Wynn and the Gaming Commission); *id.* at 4 (describing the Government's "conten[tion] that defendants knew discovery of Lightbody's criminal history would mean that Wynn would either 1) pass on the Everett Parcel as its choice for a casino location or 2) be deemed unsuitable [by the MGC] for a casino license and fail to gain approval of the MGC").

[4] To be clear, the instant motion to dismiss does not ask this Court to decide, either expressly or by implication, whether Defendants' interactions with the Gaming Commission are irrelevant to the charge that Defendants concealed material information from Wynn in order to defraud Wynn of money.  That evidentiary relevance question is wholly distinct from the question of whether this second theory of criminality states a federal wire fraud offense.

5

*States v. Cleveland*, 531 U.S. 12 (2000), and *United States v. Christopher*, 142 F.3d 46 (1st Cir. 1998). As explained below, *Cleveland* and *Christopher* collectively preclude the Government from obtaining valid convictions on the basis of the theory that Mr. DeNunzio and Mr. Gattineri concealed information from the Massachusetts Gaming Commission in order to ensure Wynn's receipt of the Region A casino license and therefore its purchase of the Everett Parcel from FBT.

**I.     *Cleveland v. United States*, 531 U.S. 12 (2000)**

The Supreme Court's decision in *Cleveland* holds that a state gaming license is not "property" in the hands of the state's gaming agency within the meaning of the federal wire fraud statute, and therefore that a scheme to obtain a gaming license by means of false representations to the state's gaming regulators does not constitute federal wire fraud.

In *Cleveland*, a limited partnership called Truck Stop Gaming ("TSG") filed with the Louisiana State Police an application for a license to commercially operate video poker machines at a truck stop located just outside New Orleans. 531 U.S. at 15. TSG's application, which was submitted by mail, identified Alex and Maria Goodson "as the sole beneficial owners" of TSG. *Id.* at 16. The Louisiana State Police, acting as the state's gaming regulatory authority, determined that TSG met the state's "suitability requirements designed to ensure that licensees have good character and fiscal integrity" and issued TSG the license. *Id.* For the next four years, pursuant to the duly issued license, TSG operated video poker machines at its truck stop. *Id.*

Several years later, federal investigators discovered that "the true owners of TSG" in fact were Carl Cleveland and Roger Goodson. *Id.* at 16. Investigators discovered that Cleveland and Goodson had "concealed their ownership interests [in TSG from state gaming regulators] . . . because they had tax and financial problems that could have undermined their suitability to

6

receive a poker license." *Id.* at 16-17. Cleveland and Roger Goodson shortly thereafter were indicted on several counts of federal mail fraud, as well as several "conspiracy counts predicated on the mail fraud."[5] *Id.* at 17. The charges alleged "that Cleveland and Goodson had violated [the mail fraud statute] by fraudulently concealing [from the Louisiana State Police] that they were the owners of TSG . . . ." *Id.*

A jury subsequently found Cleveland and Goodson guilty. On appeal, a unanimous Supreme Court threw out Cleveland's and Goodson's convictions. The Supreme Court concluded that, although Cleveland and Goodson had lied to the Louisiana gaming regulators in order to obtain a license to commercially operate video poker machines, such a scheme does not implicate the federal wire fraud statute because a state gaming license is not "property in the hands of the victim," (*i.e.*, the state's gaming agency). *Id.* at 22-27. The Supreme Court explained that even though the issuance of the video poker license plainly had economic value to Cleveland and Goodson — the license, after all, is what enabled Cleveland and Goodson to set up a profitable gaming establishment at their truck stop — that fact was irrelevant under the federal wire fraud statute. *Id.* The Supreme Court also cautioned that the wire fraud statute does not "arm federal prosecutors with power to police false statements" made "to state and local [licensing] authorities." *Id.* at 26.

## II.   *United States v. Christopher*, 142 F.3d 46 (1st Cir. 1998)

The First Circuit's decision in *Christopher* holds that "[i]f . . . the role of a government regulator is to protect the monetary interests of [private party], a scheme to mislead [a state]

---

[5] It is well established that case law construing the mail fraud statute is directly applicable to the wire fraud statute as well. *See United States v. Fermin Castillo*, 829 F.2d 1194, 1198 (1st Cir. 1987).

7

regulator in order to *get at* the protected funds" of the private party implicates the federal wire fraud statute. 142 F.3d at 54 (emphasis added).

In *Christopher*, the defendant, Charles Christopher, made false statements to California, Arizona, and Rhode Island insurance regulators regarding the nature of Resolute Holding Company's proposed leveraged buyouts of two insurance companies. *Id.* at 47. Specifically, Christopher, who served as Resolute's vice president, falsely told the state regulators that Resolute would not finance the acquisitions with the acquired companies' own assets. On the basis of those false representations, Resolute received the state regulators' permission to acquire two insurance companies. The acquisitions proved disastrous. The acquired companies went into receivership, and their policyholders collectively lost the more than $26 million that Christopher had "siphoned . . . from [the acquired companies'] coffers . . . ." *Id.* at 54. In sum, the acquired insurance companies and their policyholders sustained the very economic injuries against which the insurance regulators' leveraged buyout rules — rules that Christopher intentionally subverted with his false representations to the regulators — were designed to protect them. *Id.*

Christopher subsequently was charged with and convicted of eleven counts of wire fraud. On appeal, Christopher argued that he did not violate the wire fraud statute because the entities that suffered financial loss — the companies Resolute had acquired — were not the recipients of Christopher's false representations. According to Christopher, "the scheme must deceive the same person whom it deprives of money or property." *Id.* at 52-53. Although the First Circuit disagreed with Christopher that the wire fraud statute "requires that the party deprived of money . . . be the same party who is actually deceived," *id.* at 54, the First Circuit agreed that, at a minimum, the wire fraud statute is implicated only if "the deception . . . in fact cause[d or was

intended to cause] the loss," *id.* at 53, and that a wire fraud charge cannot be "based on misrepresentations that did not cause [or were not intended to cause] relevant harm . . . ." *Id.* Christopher's convictions satisfied these statutory requirements, and therefore was valid, because "the causal connection between the deception [of the regulators] and the acquired companies' *loss* of property [was] obvious."[6] *Id.* (emphasis added).

## LEGAL ANALYSIS

The Government is clearly aware that, under the Supreme Court's decision in *Cleveland*, it cannot base *federal* conspiracy and *federal* wire fraud charges on an allegation that Defendants concealed material information from the *Massachusetts Gaming Commission* so that Wynn would be awarded the Region A casino license. This is why the Government has tried to artfully plead around *Cleveland* by alleging instead that Defendants' ultimate goal in deceiving the Gaming Commission was to "obtain money from Wynn in exchange for the Everett Parcel." Indictment, ¶ 15; *see also id.*, ¶ 16. The problem, however, is that in swerving to avoid the Supreme Court's decision in *Cleveland*, the Government has crashed into the First Circuit's holding in *Christopher*.

Under *Christopher*, misrepresentations made to a state regulatory authority implicate the federal wire fraud statute only where the defendant's intent is to "get at" private party funds that the regulator is charged with "protect[ing]," 142 F.3d at 54, circumstances that are not alleged in the Indictment and indisputably do not exist here. This combination of *Cleveland* and

---

[6] The First Circuit repeatedly used terms making clear that Christopher's intent was to steal money from the acquired companies. *See, e.g.*, *id.* at 54 (holding that the jury "could reasonably have concluded that [Christopher's] scheme was designed to *deprive* and did in fact *deprive* the [acquired] companies of property" (emphases added)); *id.* at 54-55 (holding that Christopher's "fraudulent representations [to the insurance regulators] were a means to *take* money from [the acquired companies' coffers] . . . and to use those funds for improper purposes concealed from the regulators" (emphasis added)).

9

*Christopher* is fatal to the Government's theory that Defendants' alleged concealment of material information from the Gaming Commission is a legally valid predicate for wire fraud and conspiracy to commit wire fraud charges.[7]

I.  **Because the Gaming Commission's Regulatory Role Was Not to Protect Wynn or Its Corporate Funds, the Government Cannot Simultaneously Plead Around *Cleveland* and Satisfy the Requirements of *Christopher*.**

Under *Cleveland*, a wire fraud charge (or a conspiracy charge predicated on wire fraud) cannot be based on an allegation that Defendants lied to the Gaming Commission in order to improve Wynn's chances of obtaining the Region A casino license. To differentiate its prosecution of Defendants from the flawed prosecution in *Cleveland*, the Government inserted an additional step to its description of the scheme: the Indictment alleges that Defendants wanted Wynn to receive a Region A license because, with that license safely in hand, Wynn would then exercise its option to purchase the Everett Parcel from FBT.[8] Characterizing Defendants' ultimate goal as the receipt of purchase money from Wynn, rather than Wynn's receipt of the Region A license from the Gaming Commission, however, merely introduces a different, fatal legal flaw into the Indictment: the lack of any allegation that Defendants concealed information

---

[7] Ultimately, the factual question of whether Defendants' alleged concealment of information from the Gaming Commission influenced or was capable of influencing its decision to award Wynn the Region A casino license is completely beside the point. Even assuming (counterfactually) that Defendants' alleged concealment of information from the Gaming Commission had been the but-for cause of the Gaming Commission's decision to award Wynn the Region A casino license, *Cleveland* and *Christopher* still would have applied with full force to the facts of this case.

[8] This is, of course, what the Indictment means when it alleges that Defendants "conceal[ed] from . . . the [Gaming Commission] the financial interests of [Mr.] Lightbody . . . to obtain money from Wynn in exchange for the Everett Parcel." Indictment, ¶ 15; *cf.* Order on Motion to Sever, Doc. Rec. No. 123, at 4 (referring to the Government's contention that Defendants concealed information from the Gaming Commission out of concern that Wynn would "be deemed unsuitable for a casino license and fail to gain approval of the MGC").

10

from the Gaming Commission in order to **_deprive_** Wynn of money or property (*i.e.*, in order to cause Wynn financial injury).

The First Circuit's decision in *Christopher* provides the controlling legal principal here. Under *Christopher*, where there is a lack of "convergence" between the state regulator from whom material information allegedly was concealed (here, the Gaming Commission) and the private party whose money or property the defendant sought (here, Wynn), the prosecution must prove that the defendant's intent was to deceive the regulator in order to "get at" the private party's funds that the regulator was there to protect. 142 F.3d at 54. This is why *Christopher* described the defendant's scheme as intended to "deprive" the acquired companies of money, designed to "take" the acquired companies' money, causing the acquired companies' financial "loss" that the deceived regulators were specifically there to guard against.

*Christopher*'s requirements cannot be met here. The Massachusetts Gaming Commission was not the guardian of Wynn's corporate bank account, nor was its role to "protect" Wynn from purchasing the Everett Parcel after being awarded a Region A casino license. To the contrary, the Massachusetts Gaming Commission's decision to award the Region A casino license to Wynn was expressly *based upon* Wynn exercising its option to purchase the Everett Parcel and building a lavish resort casino on it. In other words, with the Region A license in hand, Wynn's final purchase of the Everett Parcel from FBT was precisely what the Massachusetts Gaming Commission and Wynn *wanted*. By contrast, in *Christopher*, the defendant's false statements to the insurance regulators enabled his company, Resolute, to do precisely what the insurance regulators *did not want* — Resolute leveraging its acquisition of the two insurance companies with the insurance companies' own funds — and caused precisely the financial harm that the

11

insurance regulators and the acquired companies' steadfastly had sought to avoid — a cataclysmic financial loss to the acquired companies' policyholders.

II.   **The Supreme Court and the Courts of Appeals Have Held Repeatedly That the Wire Fraud Statute Requires the Prosecution to Prove That the Defendant Intended to Cause Financial Injury to the Victim, and Not Merely to Obtain Money From a Third Party.**

Even assuming the truth of the Indictment's allegation that Defendants concealed information from the Gaming Commission for the purpose of helping Wynn obtain the Region A casino license that was a prerequisite to Wynn exercising its option, this is not remotely equivalent to a scheme to deceive the Gaming Commission in order to "deprive" Wynn of money, to "take" money from Wynn, or to subject Wynn to "loss." The words "deprive," "take," and "loss" — the words the First Circuit used in *Christopher* to describe the defendant's intent vis-a-vis the insurance companies' money — mean an intent to cheat or steal from the victim, or otherwise to cause the victim some financial injury. Without proof of such intent, the prosecution has not proven a federal wire fraud scheme.

This black letter point of law is precisely what Judge Sutton, writing for a unanimous panel, reiterated just last year in *United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014). In *Sadler*, the defendant indisputably had used false representations to induce a third party to engage in business transactions. The Sixth Circuit reversed the defendant's wire fraud conviction, however, because the prosecution failed to prove that the defendant intended to cause any financial or economic *injury* to the third party. Judge Sutton explained that the wire fraud statute "punishes [only] one kind of scheme — schemes intended to deprive [people] of their money or property" and that, under "the conventional meaning of deprive," the prosecution must prove that the defendant's "purpose [was] to injure" the victim with respect to money or property. *Id.* at 590 (internal citations and quotation marks omitted).

12

*Sadler*'s holding is not a novel one. To the contrary, it has been settled for more than 100 years, since the Supreme Court's decision in *Durland v. United States*, 161 U.S. 306 (1896), that the mail and wire fraud statutes require the prosecution to prove at least "that some *actual harm or injury* [to the victim] was contemplated by the [alleged] schemer." *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970) (emphasis added). In *McNally v. United States*, 483 U.S. 350, 358 (1987), the Supreme Court further confirmed that the prosecution's burden to prove that the defendant acted with the intent "to defraud" the victim — that is, to injury the victim with respect to money or property — applies even where the prosecution proceeds under the statute's "false representations" clause. The *McNally* Court expressly rejected the government's argument that the mail and wire fraud statutes "do[ ] not limit schemes to defraud to those aimed at causing *deprivation* of money or property." *Id.* (emphasis added). The First Circuit recognized the same in *United States v. Pimental*, 380 F.3d 575, 584-85 (1st Cir. 2004). In *Pimental*, Judge Gertner, writing for a unanimous panel, quoted *McNally* for the proposition that the mail and wire fraud statutes require proof that the defendant intended "to 'wrong[ ] one in his property rights . . . .'" In other words, as the Second Circuit succinctly stated in *Regent Office Supply*, for a scheme to implicate the federal wire fraud statute, its purpose "'must be to injure'" a third party with respect to money or property; that the defendant used false representations in order to obtain money from a third party does not alone suffice.[9] 421

---

[9] In *Regent Office Supply*, the defendant's wire fraud conviction was based on a showing that, in order to induce prospective customers to purchase office supplies, the company's sales agents would falsely represent to prospective customers that they "had been referred to the customer by a friend of the customer" and desperately needed to sell off inventory for a sensitive personal reason, such as the death of a friend. *Id.* at 1176. The Second Circuit held that, even where the defendant made a false representation to his prospective sales target in order to induce a sale, the defendant has not acted with the requisite intent to "defraud" where the false representation was "not directed to the quality, adequacy or price of [the] goods to be sold, or otherwise to the [essential] nature of the bargain . . . ." *Id.* at 1179.

13

F.2d at 1181 (quoting *Horman v. United States*, 116 F. 350, 352 (6th Cir. 1902)); *see also United States v. Shellef*, 507 F.3d 82, 107-08 (2d Cir. 2007) (holding that "schemes [intended to] do no more than cause their [supposed] victims to enter into transactions they would otherwise avoid" do not violate the federal mail and wire fraud statutes).

Here, the Indictment does not allege that Defendants made misrepresentations to the Massachusetts Gaming Commission in order to **injure** Wynn with respect to money or property. At most, the Indictment alleges that Defendants (i) concealed material information from the Gaming Commission (ii) in order to influence the Gaming Commission's suitability and licensing determinations in a manner favorable to Wynn (iii) knowing that Wynn would purchase the Everett Parcel from FBT if and only if it were awarded the Region A casino license. As demonstrated above, this string of allegations fails to state an essential element of a federal wire fraud offense: an intent to "deprive" Wynn of money or property.

The only theory of wire fraud in this case that is facially consistent with *Cleveland*, *Christopher*, and the panoply of wire fraud cases discussed above — and therefore the only basis on which the Government could even theoretically obtain valid convictions on Count One and Count Two — is that Defendants concealed *from Wynn* information that was material *to Wynn* with the intent to "deprive" money *from Wynn*.[10] The Government's alternative theory that Defendants violated the federal wire fraud statute by concealing *from the Massachusetts Gaming Commission* information that was material to the *Gaming Commission's* decision to award Wynn the Region A gaming license is legally invalid. That basic and fatal legal invalidity is not cured

---

[10] The Government's theory that Defendants committed conspiracy to commit wire fraud and wire fraud by concealing *from Wynn* information regarding Charles Lightbody's supposed "financial interests" in FBT and/or the Everett Parcel has its own set of fatal factual and legal flaws that will preclude valid convictions. Defendants recognize, however, that a trial may be necessary in order for these fatal flaws to be exposed.

merely because Wynn's decision to purchase the Everett Parcel from FBT turned on the Gaming Commission awarding Wynn the Region A casino license. Count One and Count Two should thereby be dismissed (or struck) in part.

## CONCLUSION

For the foregoing reasons, Mr. DeNunzio's and Mr. Gattineri's motion to dismiss (or strike) Count One and Count Two in part should be GRANTED.

Respectfully submitted,

/s/ Aaron M. Katz
Joshua S. Levy (BBO #563017)
Aaron M. Katz (BBO #662457)
Ropes & Gray LLP
Prudential Center
800 Boylston St.
Boston, MA 02199
Phone: (617) 951-7000
Fax: (603) 951-7050
Joshua.Levy@ropesgray.com
Aaron.Katz@ropesgray.com
*Attorneys for Dustin DeNunzio*

/s/ Michael J. Connolly
Michael J. Connolly (BBO #638611)
Laura B. Angelini (BBO #658647)
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109
Phone: (617) 345-9000
Fax: (617) 345-9020
mconnolly@hinckleyallen.com
langelini@hinckleyallen.com

*Attorneys for Anthony Gattineri*

Dated: May 22, 2015

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1, I hereby certify that counsel for Defendants have in good faith attempted to confer with counsel for the Government to resolve or narrow the issues presented by this motion, and that the disputed issues remain unresolved.

/s/ Aaron M. Katz
Aaron M. Katz

## CERTIFICATE OF SERVICE

I, Aaron M. Katz, hereby certify that, on May 22, 2015, true and accurate copies of the foregoing were served on counsel for the Government through ECF.

/s/ Aaron M. Katz
Aaron M. Katz