UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No.: 14-cr-10284-NMG |
| | ) | |
| v. | ) | |
| | ) | |
| (1) DUSTIN J. DENUNZIO, | ) | |
| (2) ANTHONY GATTINERI, and | ) | |
| (3) CHARLES A. LIGHTBODY | ) | |
| | ) | |
| Defendants | ) | |

## GOVERNMENT'S OMNIBUS OPPOSITION TO MOTIONS TO DISMISS

The United States, by and through the undersigned attorneys, respectfully opposes Dustin

DeNunzio's and Anthony Gattineri's Motion to Dismiss (or Strike) Count One and Count Two in

Part (Document No. 143) (the MGC Motion) and their Motion to Dismiss Counts One and Two of

the Indictment (Document Nos. 145) (the Wynn Motion).   Recognizing that their lies to the

Massachusetts Gaming Commission about Charles Lightbody's financial ties to land in Everett are

powerful evidence of their intent to defraud Wynn Resorts Limited, the defendants in their MGC

Motion ask this Court to strike the allegations about those lies from the Indictment, and

presumably to preclude the government from offering evidence of their deception at trial, relying

on *Cleveland v. United States*, 531 U.S. 12 (2000) and *United States v. Christopher*, 142 F.3d 46

(1st Cir. 1998).   However, the defendants admit that the Indictment survives *Cleveland*, and it

survives the *actual* holding of *Christopher*.   Further, because intent to harm is not an element of

wire fraud – at least in the First Circuit – the Court should deny both the MGC and Wynn Motions

to the extent they are premised on the Indictment's alleged failure to allege such intent.   As set

forth below, the Indictment in this case sufficiently alleges a wire fraud conspiracy and substantive

wire fraud charges against the defendants, and the Court should therefore deny both the MGC

1

Motion and the Wynn Motion.

## I.      THE INDICTMENT[1]

The Indictment charges Dustin DeNunzio, Anthony Gattineri, and Charles Lightbody with conspiring to conceal Lightbody's financial interest in a parcel of land in Everett, Massachusetts (the Everett Parcel) from Wynn Resorts Limited (Wynn) and from the Massachusetts Gaming Commission (the MGC), in order to obtain money from Wynn.   Docket No. 3, ¶¶ 1-45.   The Defendants are also charged in one substantive wire fraud count.   *Id.*, ¶¶ 46-47.

Relevant to the Motions, the Indictment alleges that Wynn owned and operated casinos in Nevada and Macau, China, that Wynn held a Nevada state gaming license and a city casino license in Macau, and that Wynn was subject to ongoing regulation by both Nevada and Macau gaming authorities in order to maintain its licenses.   *Id.*, ¶ 1.   The Indictment further alleges that the MGC was a five-member board responsible for, *inter alia*, evaluating applications for resort casino licenses in Massachusetts.   *Id.*, ¶ 2.   The Investigations and Enforcement Bureau (the IEB) of the MGC ensured compliance with all state legislation and regulations promulgated by the MGC and, among other things, the IEB was responsible for investigating the suitability of gaming license applicants and all parties in interest to the gaming license.   *Id.*, ¶ 3.

FBT Everett LLC (FBT) was a Massachusetts Limited Liability Company that held title to a parcel of land in Everett, Massachusetts (the Everett Parcel).    Together with other individuals, defendants Dustin DeNunzio, Anthony Gattineri, and Charles Lightbody had

---

[1] The "Relevant Undisputed Facts" contained in the memorandum of law in support of the MGC Motion (Docket No. 144, at 2-4) and the "Relevant Background" facts contained in the memorandum of law in support of the Wynn Motion (Docket No. 146, at 2-4) are not entirely undisputed, nor do they comprise all of the relevant facts.   Rather than address each inaccuracy or omission, the government has set forth herein the facts as alleged in the Indictment, which the Court must take as true when a defendant seeks dismissal of an indictment.   *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015).

financial interests in the Everett Parcel.   *Id.* ¶ 5-8.   The Indictment alleges that the MGC would not award a destination resort casino license if it determined that Lightbody, a convicted felon and known associate of the New England La Cosa Nostra (the NELCN), would profit from the award of such license.   *Id.*, ¶ 10.

The Indictment further alleges that, in July 2012, FBT began courting various casino operators and investment banks with the goal of entering into an option agreement for the sale of the Everett Parcel, contingent on the award of a Category 1 resort casino license to the purchaser. *Id.*, ¶ 11.   On December 19, 2012, Wynn and FBT entered into an Option Agreement whereby Wynn agreed to pay FBT $100,000 per month for the right to purchase the Everett Parcel for $75 million in the event Wynn was awarded a Category 1 destination resort casino license.   Beginning in or about December 2012 and continuing until at least September 2014, Wynn paid FBT $100,000 per month pursuant to the Option Agreement.   *Id.*, ¶ 11.   Wynn submitted its Phase 1 application to the MGC, together with a $400,000 non-refundable license fee, proposing a casino on the Everett Parcel, on January 14, 2013.   *Id.*, ¶ 12.

In the meantime, the defendants knew that, because of Lightbody's criminal history and NELCN associations, his financial interest in the Everett Parcel would adversely impact FBT's negotiation of an option agreement for the Everett Parcel and Wynn's ability to secure a license for a casino located on the Everett Parcel.   Thus, beginning at least as early as December 2012, the defendants conspired to conceal Lightbody's interest in the land from Wynn and the MGC.   *Id.*, ¶ 15.

In order to conceal Lightbody's financial interest in the property, the defendants arranged for Lightbody's name to be removed from FBT ownership documents, and arranged for those documents to be backdated to a date before the December 19, 2012 execution of the Option

Agreement between Wynn and FBT.   *Id.*, ¶ 16.   On January 17, 2013, DeNunzio sent an email to

Wynn's General Counsel falsely stating that DeNunzio, Gattineri and Paul Lohnes were the only

people who had interest in FBT.   *Id.*, ¶ 18.   More than a week *after* sending that email, DeNunzio

arranged for Lightbody and Gattineri to execute a Memorandum of Transfer and Promissory Note,

both backdated to December 14, 2012, purporting to transfer Lightbody's interest in FBT to

Gattineri in exchange for a $1.7 million note.   *Id.*, ¶ 17.

Subsequently, in July 2013, IEB began conducting its suitability investigation of the Wynn

casino proposal.   On July 9, 2013, when questioned by IEB investigators about who had a

financial interest in the Everett Parcel, DeNunzio did not disclose that Lightbody and another

individual had financial interests in the Everett Parcel.   *Id.*, ¶¶ 19, 33, 34.   On July 10, 2013, a

day after he was interviewed by the IEB investigators, DeNunzio further backdated the December

14, 2012 Memorandum of Transfer and Promissory Note to August 15, 2012, and arranged for

Lightbody and Gattineri to execute the documents.   *Id.*, ¶¶ 17, 38-40.   On and after July 10, 2013,

DeNunzio, Gattineri and Lightbody all falsely told the IEB investigators that Lightbody

transferred his interest in the Everett Parcel to Gattineri in 2012, and that no individuals other than

DeNunzio, Gattineri and Lohnes would benefit financially from the sale of the Everett Parcel to

Wynn.   *Id.*, ¶¶ 19, 37, 41, 43.

## II.   ARGUMENT

The elements of wire fraud are "(1) a scheme or artifice to defraud using false or fraudulent

premises; (2) the defendant's knowing or willing participation in the scheme or artifice with the

intent to defraud; and (3) the use of the interstate wires in furtherance of the scheme."   *United

States v. Appolon*, 715 F.3d 363, 367 (1st Cir. 2013).   The false or fraudulent representation must

also be material.   *Id.*

4

While the federal mail and wire fraud statutes require that the object of the fraud constitute "property" in the hands of the victim, there is no requirement "that the party deprived of money or property be the same party who is actually deceived."   *Cleveland v. United States*, 531 U.S. 12, 26 (2000);[2]  *United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998).   As detailed below, there is also no requirement that the government plead or prove that the party deceived be tasked with protecting the money or property of the person deprived, and no requirement that the government plead or prove that the defendants intended to harm Wynn.   For these reasons, the Court should deny the Motions.

### A.  The Government Is Not Required To Prove That The MGC Was Charged With Protecting Wynn Or Its Money.

Relying on *Cleveland* and *Christopher*, the defendants argue in support of their MGC Motion (Docket No. 144 at 10-12) that the Indictment should be dismissed because the MGC was not tasked with protecting Wynn or its corporate funds, and therefore they cannot be guilty of defrauding Wynn based on lies they told to the MGC.   Numerous courts, including the First Circuit, have rejected the so-called "convergence" theory under which the victim whose property is obtained must be the target of the false representations in a federal mail or wire fraud

---

[2] The defendants admit that the Supreme Court's decision in *Cleveland* does not bar the instant prosecution, whether premised on the lies the defendants told to Wynn or on the lies they told the MGC.   Docket No. 144, at 9.   In a prosecution for mail fraud, the defendants in *Cleveland* were accused of fraudulently concealing their ownership of a business in applications sent to state regulators for a poker machine license; the license was ultimately issued to the business and renewed several times.   531 U.S. at 16-17.   The Court held that a state or municipal license is not "property" in the hands of the issuing agent, and vacated the defendant's conviction.   *Id.* at 20. The Indictment admittedly does not run afoul of the *Cleveland* decision: whereas the defendants in *Cleveland* made misrepresentations to the regulatory authority in order to *obtain a poker machine license for their business*, in this case the defendants made misrepresentations to both the regulatory authority *and* to Wynn (the applicant for the casino license) in order to *obtain money from Wynn*.   Because the property the defendants sought to obtain was money from Wynn and not a gaming license, *Cleveland* does not bar the instant prosecution.

prosecution.   *See, e.g., Christopher*, 142 F.3d at 54 ("Nothing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived."); *United States v. McMillan*, 600 F.3d 434, 446 (5th Cir. 2010) (person who loses money in mail fraud scheme does not have to be party deceived by defendant's scheme); *United States v. Seidling*, 737 F.3d 1155, 1161 (7th Cir. 2013) (mail fraud statute does not require convergence between misrepresentations and defrauded victims); *United States v. Blumyer*, 114 F.3d 758, 768 (8th Cir. 1997) ("[A] defendant who makes false representations to a regulatory agency in order to forestall regulatory action that threatens to impede the defendant's scheme to obtain money or property from others is guilty" of mail fraud.); *United States v. Kennedy*, 64 F.3d 1465, 1476 (10th Cir. 1995) (holding that the plain language of the mail fraud statute "requires only the devising of a *scheme* for obtaining money or property by means of false or fraudulent pretenses, representations, or promises—not the making of misrepresentations to any particular individuals") (emphasis in original).   Neither the First Circuit nor any other court rejecting the convergence theory has required that the target of the false representations be responsible for protecting the money or property of the victim whose property is obtained.   *Id.*

The defendants' argument that the government must prove that the MGC was tasked with protecting Wynn or its money rests entirely on their manipulation of an illustrative example given by the First Circuit in *Christopher* into "controlling legal principal."   Docket No. 144, at 11.   The defendant in *Christopher* was convicted of wire fraud based on lies made to state insurance regulators in order to purchase two insurance companies.   The First Circuit declined to adopt the "convergence" theory, in part because "[n]othing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived."   142 F.3d at 54.   The Court noted further that "[t]he phrase 'scheme or artifice . . . for obtaining money or

6

property by means of false or fraudulent pretenses, representations, or promises,'" as used in 18 U.S.C. § 1341, "is broad enough to include a wide variety of deceptions intended to deprive another of money or property."   *Id.*   Accordingly, the Court declined to read into the wire fraud statute "an invariable requirement that the person deceived be the same person deprived of the money or property by the fraud."   *Id.*   The Court then provided an example to illustrate that convergence cannot be not required:

> If, *for example*, the role of a government regulator is to protect the monetary interests of others, a scheme to mislead the regulator in order to get at the protected funds will affect "property rights" as required . . .

*Id.* (emphasis added).

The defendants take this "example" from the *Christopher* decision and twist into the "holding" of the case.   *See* Docket No. 144, at 7 (omitting the phrase "for example" from the quote above and referring to it as the "holding" of the case), 9 ("Under *Christopher*, misrepresentations made to a state regulatory authority implicate the federal wire fraud statute only where the defendant's intent is to 'get at' private party funds that the regulator is charged with protecting"), 11 ("Under *Christopher* . . . the prosecution must prove that the defendant's intent was to deceive the regulator in order to 'get at' the private party's funds that the regulator was there to protect.").   However, nothing in *Christopher* or any other controlling decision requires the government to allege or prove that the MGC was "the guardian of Wynn's corporate bank account," or that its role was to "protect Wynn from purchasing the Everett Parcel after being awarded a Region A casino license."   Docket No. 144 at 11.

While "convergence" issues typically arise in cases where a state licensing or regulatory agency is charged with, *inter alia*, protecting the fraud victim's funds money or property, none of

the relevant decisions is predicated on that fact.   *See, e.g., Christopher*, 142 F.3d at 54; *McMillan*, 600 F.3d at 446; *Blumyer*, 114 F.3d at 768.   Moreover, courts have rejected "convergence" arguments in cases where the party deceived was not tasked with protecting the victim's funds.

For example, Judge O'Toole denied a motion to dismiss mail fraud counts of an indictment in *United States v. Gaw*, 2014 WL 2435269, Criminal No. 13-10194-GAO (D. Mass. May 30, 2014).   Like the MGC, the Massachusetts Registry of Motor Vehicles (the RMV) is a state agency tasked with issuing a limited number of licenses – the MGC issues casino licenses and the RMV issues vehicle inspection licenses.   The defendants in *Gaw* were charged with defrauding service station owners seeking vehicle inspection licenses of money and property by submitting forged documentation to the RMV.   *Id.*, at *1.   The Court rejected the defendant's *Cleveland* argument that the inspection licenses were not property in the hands of the RMV, because the indictment expressly alleged "that the defendant participated in a scheme 'to obtain money and property, *that is money from service station owners seeking inspection licenses,'*" and the fraud statutes do not require "that the party deprived of money or property be the same party who is actually deceived." *Id.*, at *2 (emphasis in original) (internal citations and quotations omitted).   Quoting *Christopher*, Judge O'Toole did not predicate his decision on the RMV's role vis-à-vis the service station owners; indeed, the RMV is not tasked with protecting funds.   The defendants' reading of *Christopher* is simply wrong.   *See also Seidling*, 737 F.3d at 1161 and n. 2 (upholding mail fraud conviction where defendant filed false actions against victims with small claims courts, which were not directly communicated to victims; government is not required to prove defendant intended to obtain money or property from same persons he deceived) (citing *Christopher*, 142 F.3d at 54); *Kennedy*, 64 F.3d at 1476 (upholding mail fraud conviction where government did not prove victim investors were same investors to whom defendants lied about investment).

Like the indictment in *Gaw*, the Indictment in this case withstands *Cleveland* and

*Christopher*.   It alleges that the defendants participated in a scheme "to obtain money from Wynn

in exchange for the Everett Parcel," by concealing Lightbody's financial interests in the Everett

Parcel from the MGC and Wynn.   Docket No. 3, ¶ 14.   The government has alleged and will

prove that the purpose and intended result of the defendants' fraud related to money.   Nothing

more is required.   *Christopher*, 142 F.3d at 54-55.

### B.  Intent To Harm Is Not An Element Of Wire Fraud.

The defendants claim in both Motions that the Indictment should be dismissed because it

does not allege any harm to Wynn.   *See* Docket No. 144, at 12-15 (arguing in support of the MGC

Motion that the Indictment does not allege "an essential element of a federal wire fraud offense,"

specifically "that the defendants made misrepresentations to the MGC in order to injure Wynn

with respect to money or property."); Docket No. 146, at 7-10 (arguing in support of the Wynn

Motion that "the Indictment does not identify any intent to harm Wynn with respect to its purchase

of the Everett Parcel").   Because intent to injure or harm is not an element of the federal wire

fraud statute, this argument fails too.

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or

otherwise infamous crime, unless on . . . Indictment of a Grand Jury."   U.S. Const. amend. V.

The Sixth Amendment then grants certain rights to persons charged with crimes by the federal

government, including the right "to be informed of the nature and cause of the accusation."   *Id.*

Rule 7(c) of the Federal Rules of Criminal Procedure requires that an Indictment "be a plain,

concise, and definite written statement of the essential facts constituting the offense charged," and

"must give the official or customary citation of the statute, rule, regulation, or other provision of

law that the defendant is alleged to have violated."

Considering these principles, courts have held that "an Indictment is sufficient if it, first contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Cianci*, 378 F.3d 71, 81 (1st Cir. 2004) (*quoting Hamling v. United States*, 418 U.S. 87, 117 (1974)).   "Although it is generally the better practice, these elements need not always be set forth *in haec verba*.   Indictments 'must be read to include facts which are necessarily implied by the specific allegations made.'"   *United States v. Barbato*, 471 F.2d 918, 921 (1st Cir. 1973) (citation omitted).

Applying these legal principles to the Indictment in this case, the allegations made against the defendants are more than sufficient.   The Indictment adopts the "better practice" mentioned by the First Circuit in *Barbato* and tracks the statutory language *in haec verba* directly from 18 U.S.C. §§ 371 and 1343.   Docket No. 3, ¶¶ 13, 14, 46; *Barbato*, 471 F.2d at 925.

The defendants' assertion that intent to harm is an element of the federal wire fraud statute that must be pled in the Indictment is simply wrong.   The elements of wire fraud are as set forth herein, *supra*, and include "the defendant's knowing or willing participation in the scheme or artifice with the intent to defraud."   *Appolon*, 715 F.3d at 367.   Citing "black letter point of law" from the Sixth Circuit in support of their position in the MGC Motion as well as Second Circuit cases in the Wynn Motion, the defendants entirely ignore the First Circuit, which has repeatedly rejected the defendants' argument that a fraud conviction requires proof of an intent to harm a victim.   *See, e.g.*, *United States v. Kenrick*, 221 F.3d 19, 29 (1st Cir. 2000) (*en banc*) (intent element of "scheme or artifice to defraud" as used in bank fraud statute does not require intent to harm) (abrogated on other grounds by *Loughrin v. United States*, 134 S.Ct. 2384, 2389-90 (2014)); *United States v. Foley*, 783 F.3d 7, 19 (1st Cir. 2015) ("an ultimate purpose of either causing some

financial loss to another or bringing about some financial gain to oneself is not the essence of fraudulent intent") (internal quotations and citations omitted); *United States v. Prosperi*, 686 F.3d 32, 46 (1st Cir. 2012) (government's position that many fraud defendants do not specifically intend to harm their victims, but are held responsible for foreseeable consequences of their actions "is a fair summary of an important legal proposition").   In fact, none of the cases cited by the defendants and which carry precedential weight in the First Circuit support their position that intent to injure is an essential element of wire fraud.   *See Durland v. United States*, 161 U.S. 306, 314 (1896) (mail fraud statute in effect in 1896 "include[d] everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future."); *McNally v. United States*, 483 U.S. 350, 358 (1987) (mail fraud statute protects only property rights, not intangible right to honest services); *United States v. Pimental*, 380 F.3d 575 (1st Cir. 2004) (government need only prove defendant "attempt[ed] to 'wrong[] one in his property rights by dishonest methods or schemes'") (quoting *McNally*, 483 U.S. at 358).

Even the Second and Sixth Circuit cases cited in the Motions do not support the defendants' position that the Indictment must be dismissed because it does not allege that they intended to injure Wynn.   *See United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014) (reversing wire fraud conviction where government failed to prove *at trial* that defendant intended to deprive anyone of property); *United States v. Regent Office Supply Co., Inc.*, 421 F.2d 1174, 1180 (2d Cir. 1970) (reversing mail fraud conviction where government failed to prove *at trial* that falsity of representations was capable of affecting customer's understanding of bargain or of influencing assessment of value of bargain to him and no injury was shown); *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (reversing conviction and dismissing indictment in "no-sale" wire fraud case; where defendants performed exact services customers paid for, government

cannot prove intent to defraud without demonstrating that defendants intended some harm to customers); *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (dismissing indictment in "no-sale" wire fraud case; where government argued that defendant's lies induced victim to sell something it otherwise would not have sold to defendant, indictment must allege "discrepancy between benefits reasonably anticipated and actual benefits received") (internal citations and quotations omitted); (*United States v. Kurtz*, 2008 WL 1820903 (W.D.N.Y. 2008) (dismissing indictment in "no-sale" wire fraud case; where government argued that victim was denied right to control to whom it sold product, indictment must allege that property of which victim was deprived was "right to define the sale of its property").   The Indictment in this case makes clear that this is not a "no-sale" theory wire fraud case, where victim got the product it paid for, but would not have bought the product absent the fraud.   Here, the Indictment clearly alleges that the defendants conspired to conceal Lightbody's financial interest in the Everett Parcel from Wynn and the MGC because they knew Lightbody's interest in the property would adversely impact FBT's negotiation of an option agreement for the Everett Parcel and Wynn's ability to secure a license for a destination resort casino located on the Everett Parcel.   Docket No. 3, ¶ 16.[3]

Regardless, the government is not required to plead or prove intent to harm in the First Circuit in any wire fraud case.   While intent to harm is not an element of wire fraud, "proof of contemplated or actual harm to the victim or others is one means of establishing the necessary

---

[3] Moreover, while not relevant at the motion to dismiss stage, it is not true that there was "nothing about the ownership composition of FBT that can reasonably be said to have been capable of affecting the essential nature of the transaction between FBT and Wynn, or diminishing the value of what Wynn bargained for."   Docket No. 146, at 9.   In fact, as set forth in more detail below, Wynn did not ultimately purchase the Everett Parcel for $75 million.   After Wynn and the MGC learned that the defendants had concealed from them Lightbody's financial interest in the Everett Parcel, the defendants were forced to sell the Everett Parcel to Wynn for only $25 million.   The $50 million price reduction is clear evidence that the defendants' lies bore on whether Wynn would have agreed to purchase the land had it known Lightbody retained his financial interest.

intent to defraud."   *United States v. Welch*, 327 F.3d 1081, 1105 (10th Cir. 2003) ("intent to inflict economic harm on or injure the property rights of another is not an element of federal mail or wire fraud," but proof of harm may be relevant to prove intent to defraud).   However, whether the government can prove that the defendants had the requisite intent to defraud – through evidence of an intent to harm or otherwise – is a challenge to the government's substantive case, rather than an attack on the facial validity of the Indictment.   When a defendant moves to dismiss an indictment, a court must "take the facts as alleged in the indictment as true, mindful that 'the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense.'" *Ngige*, 780 F.3d at 502.   The Indictment sufficiently alleges wire fraud, in that it contains the elements of the offense and informs the defendants of the charges against which they must defend, and protects them from future prosecutions for the same offense.   Nothing more is required. *Cianci*, 378 F.3d at 81.

### C.  The Indictment Sufficiently Alleges Materiality.

The defendants also allege in the Wynn Motion that the Indictment "fail[s] to set forth a viable scheme to defraud because the so-called 'material fact' that the Defendants concealed from Wynn (i.e., Lightbody's alleged ownership interest in the Everett Parcel) could not have influenced Wynn's decision to purchase the Everett Parcel."   Docket No. 146, at 10.   However, the question at the motion to dismiss stage is not whether the scheme alleged in the Indictment was viable – that is, whether the government can prove its case at trial.   *Guerrier*, 669 F.3d at 4.   The question is whether the Indictment sufficiently alleges the crime charged.   *Id.*   Because the Indictment specifically alleges that the defendants devised a scheme to defraud and for obtaining

money and property "by means of material false and fraudulent pretenses, representations, and promises," the defendant's argument fails.   Docket No. 3 at ¶¶ 13, 46.

    While entirely irrelevant at this stage of the proceedings, the government notes that the defendants' recitation of "undisputed facts" does not include the key fact that the MGC and Wynn learned of the defendants' fraud scheme in the summer of 2013, well before Wynn finalized the purchase of the Everett Parcel.   In fact, the MGC and Wynn learned of the scheme during the MGC's suitability investigation of Wynn's application for the Region A casino license, and the fraud scheme became a major focus of the suitability investigation.   Ultimately, *because* Lightbody's financial interest in the Everett Parcel and the defendants' lies to the MGC and Wynn were material, FBT was forced to accept only $25 million for the Everett Parcel, instead of the $75 million Wynn originally agreed to pay FBT for the land.   By reducing the sales price, Wynn proposed to the MGC that none of the people with financial interests in the Everett Parcel – including the defendants – would benefit financially from the award of a casino license.   The MGC, still concerned that Lightbody would benefit financially *at all* from the sale of the Everett Parcel, ordered the named partners of FBT to execute affidavits certifying that there were no secret partners.   Thus, the defendants' argument that "whether or not Lightbody held an interest in FBT quite obviously had no bearing whatsoever on whether Wynn would purchase the Everett Parcel" is simply wrong.   Docket No. 146, at 11.   Wynn purchased the parcel, but it paid $50 million less than it would have paid absent the defendants' fraud.   The price reduction and the MGC's insistence on affidavits are only part of the evidence which will demonstrate that the defendants' misrepresentations were material.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should deny the Motion.


                         Respectfully submitted

                         CARMEN M. ORTIZ
                         UNITED STATES ATTORNEY

Date:    June 22, 2015          By:   */s/Kristina E. Barclay*
                         KRISTINA E. BARCLAY
                         Assistant U.S. Attorney
                         DAVID RUBIN
                         Special Assistant U.S. Attorney

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


Date: June 22, 2015                */s/Kristina E. Barclay*
                         Kristina E. Barclay
                         Assistant United States Attorney