# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**v.**<br><br>**(1) DUSTIN J. DENUNZIO,**<br>**(2) ANTHONY GATTINERI, and**<br>**(3) CHARLES A. LIGHTBODY,**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Criminal No:  14-CR-10284-NMG**

**ORAL ARGUMENT REQUESTED**

**Leave to File Granted on June 30, 2015**

## REPLY TO THE GOVERNMENT'S OMNIBUS OPPOSITION
## TO THE TWO PENDING MOTIONS TO DISMISS

The two pending motions to dismiss present two entirely distinct questions of law that must be considered separately from one another.  The Government's omnibus opposition brief does not squarely address the questions of law that the motions present.  Instead, the Government's brief variously conflates, misapprehends, and elides the questions presented. Contrary to the Government's arguments, neither motion challenges the admissibility of evidence or the formal linguistic sufficiency of the Indictment; neither motion asks the Court to strike allegations that lie outside the Indictment's discrete charging paragraphs; and neither motion asks this Court to revisit the so-called "convergence" issue that the First Circuit resolved nearly 20 years ago.  Instead, each motion asks the Court merely to decide a narrow question of

law, ripe and capable of pre-trial resolution, regarding the meaning and scope of the wire fraud statute's "scheme to defraud" element. [1]

The question of law presented by the first motion to dismiss, Doc. Rec. 143, is whether the Government has proven a "scheme to defraud" Wynn Resorts Limited of "money or property" if it proves that Defendants willfully made to the Massachusetts Gaming Commission misrepresentations capable of influencing the Gaming Commission's decision on Wynn casino license application but *fails to prove* that Defendants made any material misrepresentations to Wynn itself.  Put another way, is the Government entitled to a jury charge instructing the jury that it may return a guilty verdict even if it *does not find* that Defendants made any material misrepresentations to Wynn?  The applicable case law — including Supreme Court and First Circuit precedent — dictates that the answer is "no," because although making material misrepresentations to the Gaming Commission regarding FBT's ownership roster (if proven) might constitute an actionable offense under Massachusetts state law, it does not constitute a "scheme to defraud" Wynn of "money or property" under the federal wire fraud statute.  And this is true regardless of whether those misrepresentations to the Gaming Commission were designed to achieve the condition precedent (Wynn's receipt of the Region A license) that would lead Wynn to complete its purchase of the Everett Parcel from FBT.

The question presented by the second motion to dismiss, Doc. Rec. 145, is completely different.  The question presented by the second motion is whether, even if proven, Defendants' alleged misrepresentations to Wynn regarding the ownership roster of FBT could possibly have constituted a "scheme to defraud" within the meaning of the wire fraud statute.  The answer to

---

[1] Both motions to dismiss *assume* the truth of the Government's allegation that Charles Lightbody maintained a secret equity interest in FBT through 2013.  Defendants, of course, maintain that this allegation has no merit, and they intend to vigorously dispute it at trial should any portion of the Indictment survive the two motions to dismiss.

this question is "no" as well, because undisputed facts show that, once Wynn secured the Region A casino license, whether or not a convicted felon was a partial indirect owner of the Everett Parcel was wholly immaterial to Wynn's agreement to exercise its option to purchase the property.

Defendants Dustin DeNunzio and Anthony Gattineri respectfully submit this reply brief in order to correct the most glaring legal and logical errors contained in the Government's omnibus opposition brief.  This reply brief first addresses the question presented by the motion to dismiss filed at Docket Record 143.  This brief then proceeds to address the question presented motion to dismiss filed at Docket Record 145.  At no point will this reply brief conflate the separate and distinct legal issues presented by the two motions to dismiss.

* * * * * * * * * * * * * * * * * * * *

**REPLY IN SUPPORT OF MOTION TO DISMISS FILED AT DOCKET RECORD 143**

I.    **Evidence That Defendants Made Material Misstatements to the Massachusetts Gaming Commission Regarding FBT's Ownership Roster Is Insufficient to Establish the Requisite "Scheme to Defraud" Wynn Resorts Limited Out of Money.**

To establish a violation of the wire fraud statute, the prosecution must prove that the defendant knowingly and willfully engaged "in a scheme or artifice to defraud [a third party of money or property] using false or fraudulent pretenses."  *United States v. Appolon*, 715 F. 3d 363, 367 (1st Cir. 2013).  The Government agrees that, in light of the Supreme Court's holding in *Cleveland v. United States*, 531 U.S. 12 (2000), in order to make out a violation of the wire fraud statute, it is required to prove that Defendants engaged in a scheme to defraud Wynn Resorts Limited of money or property.

The question presented by the motion to dismiss is whether the Government has established the requisite "scheme to defraud" Wynn of money or property so long as it proves the following the three facts: (1) Defendants made material misrepresentations to the Gaming Commission regarding the ownership roster of FBT, (2) Defendants made those misrepresentations to the Gaming Commission in order to ensure the success of Wynn's application for the Region A casino license, and (3) Defendants wanted Wynn's application to be successful because they expected that, if Wynn received the Region A license, Wynn would purchase the Everett Parcel from FBT.  The Government believes that the answer to this question is "yes," on the theory that this set of facts would establish that Defendants sought to "obtain money" from Wynn "by means of" false representations to the Gaming Commission.  The Government's belief, however, is based on a fundamental misconstruction of the wire fraud statute, one that already has been rejected on several occasions by the Supreme Court and is inconsistent with First Circuit law.

In *McNally v. United States*, 483 U.S. 350, 359-60 (1987), the Supreme Court held that Congress added the federal wire fraud statute's second clause — "or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" — not to set forth an independent method of violating the statute, but rather to make clear that the statutory phrase "scheme to defraud . . . reache[s] false promises and misrepresentations as to the future . . . ."  The Supreme Court reaffirmed this aspect of *McNally* just last year in *Loughrin v. United States*, explaining once again that the mail/wire fraud statute "set[s] forth just one offense — using the [mails or wires] to advance a scheme to defraud."  134 S. Ct. 2384, 2391 (2014).

A "scheme to defraud" under the wire fraud statute is not established merely by proof that the defendant made a false representation to Party A (here, the Gaming Commission) in

order to set in motion a chain of events (here, the issuance of the Region A casino license to Wynn) that the defendant hoped would culminate in an arm's length economic transaction with Party B (here, Wynn's purchase of the Everett Parcel).  The prosecution instead must prove that the defendant engaged in a scheme to *deprive* Party B of its money or property.  The Sixth Circuit made this clear last year in *United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014) (holding that the wire fraud statute "punishes [only] one kind of scheme — schemes intended to deprive [a third party] of [its] money or property"), and that principle of law is also plainly evident in the First Circuit's decision in *United States v. Christopher*, 142 F.3d 46, 54-55 (1st Cir. 1998) (referring repeatedly to the fact that the defendant "deprived" the insurance companies' policyholders of money, "siphoned" and "divert[ed]" the policyholders' money for "his own purposes," caused the policyholders' economic "loss," and "arranged for each company to get far less than he promised from the acquisition"); *id.* (affirming the verdict because "[b]ased on the indictment and instructions, the jury could not have convicted Christopher had it not found that his fraudulent representations [the insurance regulators] were a mean *to take* money [from the victims] and to use those funds for improper purposes" (emphasis added)).

II.   **Lying to the Gaming Commission So That Wynn Would Receive the Lucrative "Region A" Casino License and Purchase the Everett Parcel Is Not the Same Thing as an Actionable "Scheme to Defraud" Wynn Out of Money or Property.**

Even *assuming* that Defendants' alleged misrepresentations to the Gaming Commission could have influenced the Gaming Commission's decision on Wynn's license application, and therefore could have influenced whether Wynn proceeded with its purchase of the Everett Parcel, proof that Defendants made material misrepresentations to the Gaming Commission does not

constitute proof that Defendants engaged in a "scheme to *deprive*" Wynn of money or property.[2] This is because, as Judge Sutton has explained, the "conventional meaning of 'deprive'" is to "'injure.'"   *Sadler*, 750 F.3d at 590.   No ordinary English speaker would say that, if Wynn receives the Region A casino license and then purchases the Everett Parcel at a price Wynn determined was fair market value, Wynn has been "deprived" of money simply because Charles Lightbody might receive 12.5% of the purchase price.

The Government's response to this common sense point is essentially three-fold.  First, the Government argues that it does not actually need to prove a "scheme to deprive" Wynn of money, but merely needs to prove that the "purpose and intended result of the defendant's fraud *related* to money."  Gov't Opp. Br., at 9 (arguing that "nothing more is required").  Inexplicably, the Government cites *Christopher* for this proposition, even though the *Christopher* decision expressly states that the victim must be "*deprived* of the money or property by the fraud."  142 F.3d at 54.  The Government's argument that the wire fraud statute encompasses any "fraud" that is somehow "related to money" is not only unmoored from 18 U.S.C. § 1343's statutory language, but also demonstrably conflicts with Supreme Court precedent: If the Government's argument were right, then *Cleveland v. United States* necessarily would have come out the other way.  After all, in *Cleveland*, the defendants' fraudulent misrepresentations to the state gaming regulator clearly were "related" to their plan to make money from their video poker establishment.

---

[2] Although not relevant to this motion to dismiss, it is worth noting that in a letter dated October 17, 2014 and released to the public, the Gaming Commission's General Counsel, Catherine Blue, stated that FBT's ownership roster had no bearing whatsoever on Wynn's eligibility to receive the Region A casino license.  *See* Letter to Charles Baker, Esq., October 17, 2014, *available at* http://massgaming.com/wp-content/uploads/Letter-to-Charles-Baker-III-10-17-14.pdf.

Second, the Government argues that, under First Circuit law, the "scheme to defraud" element does not require it to prove that Defendants acted with an intent to *deprive* Wynn of money (*i.e.*, cause Wynn some economic "harm" or "injury"). Gov't Opp. Br., at 10. In support of this argument, the Government relies on a First Circuit decision, *United States v. Kenrick*, 221 F.3d 19 (2000), that involved the *bank fraud* statute, *not* the mail or wire fraud statute. As an initial matter, last year, in *Loughrin*, the Supreme Court held that the bank fraud statute, while patterned in part after the mail/wire fraud statute, was passed for a different purpose and, therefore, case law interpreting one cannot reflexively be applied to the other. *Lougrin*, 134 S. Ct. at 2391. Indeed, highlighting the "notable textual differences" between the bank fraud and the mail/wire fraud statute, the *Loughrin* Court held specifically that *McNally*'s holding regarding the mail/wire fraud statute's "scheme to defraud" requirement could not be engrafted on to the bank fraud statute. *Loughrin* makes clear that *McNally*, and not bank fraud precedents, apply in the wire fraud context. *Loughrin* is therefore fatal to the Government's reliance on *Kenrick*. And, in any event, *Kenrick* did not address whether, let alone hold that, a defendant commits a federal fraud offense if he makes a false statement to Party A in order to set in motion a chain of events that will culminate in an arm's length economic transaction with Party B, without any intent to cause Party B economic harm.[3] Rather, the question in *Kenrick* was

---

[3] The Government also quotes selectively from a portion of *United States v. Foley*, 783 F.3d 7, 19 (1st Cir. 2015), an inapposite decision that rejected a defendant's objection at trial to the relevance of evidence showing that he intended to inflict economic harm on his wire fraud victim. Even more off point is the decision *United States v. Prosperi*, 686 F.3d 32, 46 (1st Cir. 2012), which involved a challenge to the length of the defendant's sentence and did not even consider the scope of the wire fraud statute. Finally, the Government reliance on Judge O'Toole's brief opinion in *United States v. Gaw*, No. 13-10194, 2014 U.S. Dist. LEXIS 73803 (May 30, 2014),is also misplaced. In *Gaw*, the defendants abused their positions of trust and authority at the Registry of Motor Vehicles to create a "black market" for state-issued vehicle inspection licenses, manipulating unwitting gas station owners into forking over between $50,000 and $75,000 for licenses that the RMV was supposed to be granting gas station owners for free. *Id.* at *1-4. In a

whether the district court correctly instructed the jury that it could convict the defendant of bank fraud so long as it found beyond a reasonable doubt that the defendant willfully filed deceptive false mortgage applications with the bank "in order to obtain . . . money" from the bank, a set of instructions that did not accommodate the defendant's preferred defense that he fully intended to pay back the fraudulently obtained loans. *Id.* at 27 (answering that question in the affirmative). *Kenrick* simply has no application here.

Third, the Government argues that Defendants are alleged to have made material misrepresentations regarding FBT's ownership roster "from the MGC *and* Wynn." Gov't Opp. Br., at 9 (emphasis added). This argument, however, completely elides the question presented in the motion to dismiss. The question that the motion to dismiss presents is whether the Government can obtain a conviction if it *fails to prove* that Defendants made *to Wynn* any misrepresentations that were material *to Wynn*.

In sum, the Court should hold that, to convict Defendants of a "scheme to defraud" Wynn of money or property, it is not enough for Government to prove that (1) Defendants made material misrepresentations to the Gaming Commission regarding the ownership roster of FBT, (2) Defendants made those misrepresentations to the Gaming Commission in order to ensure the success of Wynn's application for the Region A casino license, and (3) Defendants wanted Wynn's application to be successful because they expected that, if Wynn received the Region A license, Wynn would purchase the Everett Parcel from FBT. The Court should hold that those facts alone, even if proven, do not constitute a "scheme to defraud" Wynn of money.

* * * * * * * * * * * * * * * * * * * *

---

single brief paragraph, Judge O'Toole swiftly rejected the defendant's argument that those circumstances could not be charged as a "traditional mail fraud." *Id.* at *5-6.

**REPLY IN SUPPORT OF MOTION TO DISMISS FILED AT DOCKET RECORD 145**

**I.     The Undisputed Facts Do Not Conform to the Allegations In The Indictment**

As stated above, the Government cannot obtain a legally valid conviction based on the theory that Defendants made a material misrepresentation to the Gaming Commission.  Instead, the Government must prove beyond a reasonable doubt, *inter alia*, that Defendants made a material misrepresentation *to Wynn*.

Whether the Indictment sufficiently states the formal elements of wire fraud is beside the point.  The reason why the motion to dismiss should be granted is because, even *assuming* that Defendants misrepresented to Wynn in January 2013 and thereafter that the then-present owners of FBT were Mr. DeNunzio, Mr. Gattineri, and Paul Lohnes, undisputed facts demonstrate that the Government cannot prove beyond a reasonable doubt that this misrepresentation was *material* to Wynn.

**A.     This Court Is Allowed to Take Undisputed Facts Into Consideration In Adjudicating the Motion to Dismiss**

To be sure, the Indictment alleges that Defendants made a "material" misrepresentation to Wynn regarding FBT's ownership roster.  But the Government cannot defeat the motion to dismiss simply by pointing to the allegations in the Indictment.  As the Seventh Circuit explained in *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988), Federal Rule of Criminal Procedure 12(e) "allows the court to consider factual issues in its disposition of [a motion to dismiss]" in a criminal case.  Accordingly, even if the Indictment is facially sufficient, if the undisputed facts show that "there is no case to prove," the indictment should be dismissed.  *Id.* In *Risk*, the indictment charged the defendant with illegally structuring bank deposits.  The Seventh Circuit affirmed the district court's decision to dismiss the indictment prior to trial because undisputed facts showed that, contrary to the allegation in the indictment, the

defendant's bank deposits did not in fact total over $10,000, which meant that the prosecution could not prove an essential element of the charged offense.  *Id.*

**B.      Undisputed Facts Demonstrate That Lightbody's Ownership Status Was Not Material to Wynn's Decision to Purchase the Everett Parcel.**

Here, numerous undisputed facts show that Lightbody's status as an owner or non-owner of FBT were not material to Wynn's decision to purchase the Everett Parcel, but only one even needs to be mentioned: On January 2, 2015, after being awarded the Region A casino license and after the Indictment put it on clear notice of the allegation that Charles Lightbody maintains a hidden ownership interest in FBT, Wynn purchased the Everett Parcel from FBT.  Thus, the undisputed facts demonstrate that Wynn was fully prepared to purchase the Everett Parcel believing that Charles Lightbody, as an interest-holder in the property, would benefit from the transaction.

The option agreement between FBT and Wynn was struck before Wynn ever asked FBT to provide any information about its ownership roster.  That agreement was structured in such a way that Wynn had no obligation to purchase the Everett Parcel.  Wynn structured the agreement so that, before it had to decide whether to pay FBT "money in exchange for the Everett Parcel," Indictment, ¶ 15, it would know the outcome of its application for the Region A casino license. With the Region A license in hand, Charles Lightbody's status as an owner or non-owner of FBT had no rational bearing on the economic value of the Everett Parcel to Wynn, nor did it have any impact on Wynn's decision to move forward with its purchase of the Everett Parcel.

The Government's only answer to this is that, after the local Boston newspapers created a firestorm in the fall of 2013 by publishing stories about Lightbody's rumored hidden ownership interest in FBT, the Gaming Commission and Wynn jointly came up with a "solution" to force FBT to agree to a severe price reduction for the Everett Parcel.  The Gaming Commission

effectively threatened FBT that if it did not reduce the purchase price for the Everett Parcel from $75 million to $35 million, it would not award Wynn the Region A license, an outcome that would leave FBT high and dry.  The Gaming Commission's threats had no obvious statutory or regulatory basis, and it therefore appears that the Gaming Commission's members were acting *ultra vires*.[4]  But, as Wynn's General Counsel confirmed in public testimony before the Gaming Commission on December 13, 2013, Wynn was all too happy to engage in this dance, because it enabled the company to obtain the Everett Parcel for $40 million less than it originally had agreed.

The element of "'materiality is tested at the time the alleged false statement was made.'" *Arroyo-Perez v. Demir Group Int'l*, 762 F. Supp. 2d 371, 373 (D.P.R. 2011) (quoting *United States v. McKenna*, 327 F.3d 830, 839 (9th Cir. 2003)).  The $40 million discount that Wynn, with the help of the Gaming Commission, wrenched out of FBT in December 2013 is not proof that Lightbody's ownership status was "material" to Wynn's decisions with respect to the Everett Parcel in January 2013, which is when Mr. DeNunzio sent Wynn's general counsel the allegedly false information about FBT's ownership roster.  Instead, the December 2013 "price drop" shows that Wynn was able to exploit a local political controversy to its financial benefit, engineering what Wynn's general counsel called a "cure" that enabled it to obtain the Everett Parcel for under half of its fair market value.  *See* Sworn Gaming Commission Testimony of Wynn General Counsel Kim Sinatra, at pages 80-81 (Dec. 13, 2013), *available at* http://massgaming.com/wp-content/uploads/Transcript-12-13-13-Part-Two.pdf.   As a matter of law, that cannot satisfy the element of materiality.

---

[4] Nothing in the Massachusetts Expanded Gaming Act, or the regulations promulgated thereunder, provide the Gaming Commission the authority to deny a license application because the license applicant (here, Wynn) plans to purchase real estate from an individual that the Gaming Commission disfavors (here, Lightbody).

## CONCLUSION

For the foregoing reasons, and the reasons stated in their opening brief, Mr. DeNunzio and Mr. Gattineri respectfully request that this Court grant their respective motions. Mr. DeNunzio and Mr. Gattineri also respectfully request oral argument on both motions.

Respectfully submitted,

/s/ Aaron M. Katz
Joshua S. Levy (BBO #563017)
Aaron M. Katz (BBO #662457)
Ropes & Gray LLP
Prudential Center
800 Boylston St.
Boston, MA 02199
Phone: (617) 951-7000
Fax: (603) 951-7050
Joshua.Levy@ropesgray.com
Aaron.Katz@ropesgray.com

*Attorneys for Dustin DeNunzio*

/s/ Michael J. Connolly
Michael J. Connolly (BBO #638611)
Laura B. Angelini  (BBO #658647)
Hinckley, Allen & Snyder LLP
Prudential Center
28 State Street
Boston, MA 02109
Phone: (617) 345-9000
Fax: (617) 345-9020
mconnelly@hinckleyallen.com
langelini@hinckleyallen.com

*Attorneys for Anthony Gattineri*

Dated: July 7, 2015

12

51500905_1

## **LOCAL RULE 7.1 CERTIFICATION**

Pursuant to Local Rule 7.1, I hereby certify that counsel for Defendants have in good faith attempted to confer with counsel for the Government to resolve or narrow the issues presented by this motion, and that the disputed issues remain unresolved.

/s/  Aaron M. Katz_____
Aaron M. Katz

## **CERTIFICATE OF SERVICE**

I, Aaron M. Katz, hereby certify that, on July 7, 2015, true and accurate copies of the foregoing were served on counsel for the Government through ECF.

/s/ Aaron M. Katz_____
Aaron M. Katz

13