UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Criminal No. 14-10284-NMG


UNITED STATES OF AMERICA


v.


DUSTIN J. DENUNZIO
ANTHONY GATTINERI
CHARLES A. LIGHTBODY

**MEMORANDUM AND ORDER RE:
DEFENDANTS' MOTION TO COMPEL AND
REQUEST FOR EVIDENTIARY HEARING
(DOCKET ENTRY # 168)**

**August 14, 2015**

**BOWLER, U.S.M.J.**

Defendants Dustin J. DeNunzio ("defendant DeNunzio"),
Anthony Gattineri ("defendant Gattineri") and Charles A.
Lightbody ("defendant Lightbody") (collectively "defendants")
move to compel two categories of exculpatory evidence under Brady
v. Maryland, 373 U.S. 83 (1963) ("Brady").  (Docket Entry # 168).
The government opposes production.  (Docket Entry # 178).

The first category consists of purportedly exculpatory
material evidencing that Wynn Resorts, Ltd. ("Wynn") knew that
defendant Lightbody, a convicted felon, held an ownership
interest in a parcel of land in Everett, Massachusetts.
Defendants reason that if Wynn knew about defendant Lightbody's
interest before it signed an option agreement, then defendant
Lightbody's interest was not material to its decision to purchase
the property.  The Indictment charges inter alia that, as part of
a conspiracy, defendants concealed defendant Lightbody's

financial interest from Wynn via materially false representations transmitted through wire communications from December 2012 through July 2013.  Defendants therefore move to compel documents and information relating to Wynn's knowledge of defendant Lightbody's historical and continued interest in the Everett parcel.[1]

The second category concerns any evidence and information regarding an alleged incident that occurred in the fall of 2013 and involved Joseph Flaherty ("Flaherty") and Stephen Matthews ("Matthews"), both former members of the Massachusetts State Police.  Defendants maintain that unidentified "members of the Massachusetts State Police and/or the Massachusetts Attorney General's Office" allowed Flaherty and Matthews "access to files concerning an ongoing *joint* state and federal investigation of the Defendants."  (Docket Entry # 168) (emphasis added).  The files were housed at a secure location "where wiretaps are performed" in the Massachusetts Attorney General's Office. (Docket Entry # 181-2).  The location is "often referred to as the wiretap room."  (Docket Entry # 181-2).  Defendants submit that Flaherty and Matthews worked for Wynn and that their access to the wiretap room made them "part of the investigatory team in this matter."  (Docket Entry # 168).  Because allowing these

---

[1]  Although the parties' dispute centers upon production of the historical interest, the motion is not limited to Wynn's knowledge of defendant Lightbody's historical interest because it seeks "all evidence and information in its possession, custody or control relating to Wynn's knowledge of Lightbody's alleged ownership interest in the Everett Parcel."  (Docket Entry # 168).

individuals, as members of the investigatory team, access to the wiretap room "probably amounts to a violation of Massachusetts criminal law," evidence relating to the incident is exculpatory, according to defendants.  (Docket Entry # 168).  Defendants additionally argue that allowing Flaherty and Matthews, as civilians and private investigators, access to the wiretap room "raises serious concerns" and likewise probably amounts to a violation of Massachusetts criminal law, particularly in light of Flaherty's acknowledgment that he worked for Wynn in October and November 2013.  (Docket Entry ## 169, 181, 178-2).  Defendants also "request an evidentiary hearing on the apparent agency relationship between Matthews and Flaherty and the joint state/federal investigation team."  (Docket Entry # 169).

BACKGROUND[2]

The Indictment charges defendants with wire fraud in violation of 18 U.S.C. § 1343, aiding and abetting wire fraud in violation of 18 U.S.C. § 2 and conspiracy to commit wire fraud in violation of 18 U.S.C. § 1371.[3]  As set out in the Indictment, from December 2012 to July 2013 defendants conspired to conceal defendant Lightbody's ownership interest in the Everett parcel from Wynn and the Massachusetts Gaming Commission ("MGC") "to obtain money from Wynn for the Everett Parcel."  (Docket Entry # 3, ¶ 16).  Defendants purportedly knew that defendant Lightbody's

---

[2]  Facts are culled from affidavits, grand jury testimony, the Indictment and other submissions by the parties.

[3]  It also includes forfeiture allegations under 18 U.S.C. § 981 and 28 U.S.C. § 2461.

financial interest in the Everett parcel, given his criminal history, would adversely impact negotiations by FBT Everett, LLC ("FBT"), which held title to the parcel, for "an option agreement" and "Wynn's ability to secure" a casino license. (Docket Entry # 3, ¶ 16).  The Indictment further states that defendants obtained money by transmitting materially false representations in an email to Wynn's General Counsel that only defendant DeNunzio, defendant Gattineri and another individual had interests in FBT.  (Docket Entry # 3, ¶¶ 19, 30, 47).

Beginning in December 2012, defendants had defendant Lightbody's name "removed from FBT ownership documents" even though he "retained a financial interest" in the parcel.  (Docket Entry # 3, ¶ 17).  At the same time, defendant DeNunzio "asked FBT's attorney to draft paperwork" reflecting a transfer of defendant Lightbody's ownership interest to defendant Gattineri "in exchange for a $1.7 million promissory note."  (Docket Entry # 3, ¶ 17).  Between December 1 and 19, 2012, defendant DeNunzio "asked FBT's attorney to tell Wynn's representatives that" defendant Lightbody "no longer had an interest or was transferring his interest" in the Everett parcel to FBT.  (Docket Entry # 3, ¶ 26).

On December 19, 2012, Wynn and FBT entered into the option agreement.  (Docket Entry # 3, ¶ 12).  The agreement required Wynn to pay FBT $100,000 each "month for the right to purchase the Everett Parcel" in the event MGC awarded Wynn a "destination resort casino license."  (Docket Entry # 3, ¶ 12).

During this time period, Wynn was working with a public affairs consulting group known as ML Strategies, LLC ("ML Strategies"), "a wholly-owned subsidiary of Mintz Levin." (Docket Entry ## 169-4, 169-5).  ML Strategies, which had worked with Wynn for a number of years,[4] served as a general advisor to Wynn's "effort to secure a license . . . in Massachusetts for a destination casino."  (Docket Entry # 169-4).  Before signing the option agreement, ML Strategies helped Wynn identify potential sites for a casino, including a location in Foxboro, Massachusetts.  Wynn "withdrew from that location" when it became clear that the Foxboro community and Foxboro officials were not interested in a casino.  (Docket Entry # 169-4).

In or around the fall of 2012, Steven Tocci ("Tocci"), president of ML Strategies, explored a number of other locations for Wynn.  "[S]ometime in the fall of 2012," he became interested in the Everett parcel and reached out to Wynn regarding the location.  (Docket Entry # 169-4).  Wynn instructed Tocci to query Everett officials in order to avoid "go[ing] through the same experience that [Wynn] had in Foxboro."  (Docket Entry # 169-4).  Having received a receptive response, Tocci believed the site "was worth a visit by the Wynn folks."  (Docket Entry # 169-4).  Accordingly, Matt Maddox ("Maddox") of Wynn, accompanied by Tocci, "took a quick look at the site" and the surrounding area.

---

[4]   The government does not specifically challenge a recitation in defendants' brief of an audio file of an interview with ML Strategies' President wherein he stated that Wynn retained him "roughly seven years ago."  (Docket Entry # 169, p. 8).

Later in the fall, Tocci and Maddox returned to the site and met with defendant DeNunzio and Paul Lohnes ("Lohnes"), another owner,[5] at or near the property.  Meeting with two of the owners at or near the property demonstrates that Wynn was seriously considering locating a casino on the Everett parcel.  At the time of the meeting, Tocci understood that defendant DeNunzio and Lohnes owned the property because "they said it at that meeting" and Maddox or someone else had "looked at the Registry of Deeds records" and found out "the owners of the property."  (Docket Entry # 169-4).  Tocci additionally understood that defendant Gattineri was the third owner of the property.  (Docket Entry # 169-4).

James Michael Flood ("Flood"), an employee of the DeNunzio Group,[6] stated that he and defendant DeNunzio met with two representatives of Wynn (Maddox and Kim Sinatra) at the Everett parcel in the fall of 2012.  Flood testified that defendant DeNunzio told "'the Wynn folks'" that, "'we have a partner who has a checkered past, but we're in the process of getting him out of the property.'"  (Docket Entry # 169, p. 14).[7]

"Towards December" 2012, Tocci acknowledged "there was an inquiry from a reporter from the *Boston Business Journal*" to

---

[5]  (Docket Entry # 169-5, p. 17).

[6]  Defendants represent that Flood "was employed by the DeNunzio Group, the Manager of FBT."  (Docket Entry # 169).

[7]  The government does not challenge the accuracy of defendants' recitation (Docket Entry # 169, p. 14) of Flood's testimony before the grand jury.

Nancy Sterling ("Sterling") of ML Strategies asking whether she was "'aware of other possible owners'" of the property.  (Docket Entry # 169-5).  Sterling relayed the information to Tocci, which led Bob Havern ("Havern") of ML Strategies to find out if there was any truth to the matter.  According to Tocci, Havern reported that there was "'no truth to it'" and there were "'only three owners.'"[8]  (Docket Entry # 169-5).  Tocci does not remember any specific names mentioned as part of the inquiry.  (Docket Entry # 169-5).  He did not consider the matter "all that serious at that point, because" he knew the Registry of Deeds had been checked and it listed the "three people."  (Docket Entry # 169-5).  He also stated that, "[I]f it was something, we should find out if there's anything else we needed to know."  (Docket Entry # 169-5).

On the same day or a day later, Tocci advised Wynn that, "'There's something going on.  I'm not sure exactly what it is.'" (Docket Entry # 169-5).  The day after the reporter's inquiry, Tocci spoke with Mayor DeMaria about various matters and mentioned that a reporter from the *Boston Business Journal* had contacted ML Strategies about the ownership of the Everett parcel.  (Docket Entry ## 169, 169-5).  More specifically, Tocci told Mayor DeMaria that a reporter "'was chasing around about the

---

[8]   In June 2014, the Investigations and Enforcement Bureau of MGC ("IEB") interviewed Mayor Carlo DeMaria ("Mayor DeMaria") of the City of Everett, according to defendants.  During the interview, Mayor DeMaria stated that Havern "asked if we knew" defendant Lightbody.  (Docket Entry # 169, p. 12).  The government does not question the accuracy of defendants' recitation of the Mayor's statement set out in their brief.

land deal'" and that, "'If there is anybody in that deal who has any kind of a criminal background, I know Wynn, and they're not going forward.'"  (Docket Entry # 169, p. 9).[9]  Mayor DeMaria then asked Tocci, "'Who are you talking about?'" and, when Tocci replied that he did not know, Mayor DeMaria "said, 'Was it Lightbody?'"[10]  (Docket Entry # 169, p. 9).  Tocci replied that he did not "'know the name.'"  (Docket Entry # 169, p. 9).  Tocci also stated this was the first time he had heard the name Lightbody and that, after the conversation and the publication of a December 14, 2012 article in the *Boston Business Journal*, Tocci focused on negotiating a host agreement.  (Docket Entry # 169-5). Tocci's grand jury testimony reads that, "It was clear to us that there were still three owners, the registered owners, and we had a very tight timeline . . . to negotiate a host agreement, and . . . carry on an election . . .."  (Docket Entry # 169-5).  At another point during his grand jury testimony, Tocci explained that "sometimes" he does not "place a lot of trust in newspaper articles."  (Docket Entry # 169-5).

On January 14, 2013, after Wynn signed the option agreement, it submitted an application to MGC along with a non-refundable $400,000 license fee to locate a destination resort casino on the Everett parcel.  (Docket Entry # 3, ¶ 13).  On January 17, 2013,

_____

[9]  Defendants' brief recites the conversation (Docket Entry # 169) and the government does not challenge the accuracy of defendants' transcription.  Tocci also recounted the conversation to the grand jury.  (Docket Entry # 169-5).

[10]  The conversation took place before Wynn executed the December 19, 2012 option agreement.

defendant DeNunzio emailed Wynn's General Counsel and "falsely"
stated that defendants DeNunzio and Gattineri and another
individual, presumably Lohnes,[11] "were the only people who had
[an] interest in FBT." (Docket Entry # 3, ¶ 19). As further
stated in the Indictment, defendant DeNunzio nonetheless knew
that defendant Lightbody, along with another individual referred
to as John Doe, had financial interests in FBT. (Docket Entry #
3, ¶ 19). "[O]n or about January 28, 2013," defendant DeNunzio
arranged for defendants Lightbody and Gattineri "to execute a
Memorandum of Transfer and Promissory Note" backdated to December
14, 2012, reflecting a transfer of defendant Lightbody's interest
in FBT to defendant Gattineri. (Docket Entry # 3, ¶¶ 17, 18).

On July 2, 2013, Lieutenant Kevin Condon ("Condon") of the
Massachusetts State Police, a member of the IEB (Docket Entry #
178, n.1), first learned about a possibility that an undisclosed
principle in FBT "had a substantial criminal record."[12] (Docket
Entry # 169-3). At this point in time, the IEB was conducting a
suitability investigation of Wynn as an applicant for a gaming
license. (Docket Entry # 3, ¶¶ 3, 18). A few days later on July
9, 2013, IEB investigators interviewed defendant DeNunzio "about
who had a financial interest in the Everett Parcel." (Docket
Entry # 3, ¶¶ 34, 35). On July 10 and 11, 2013, defendant

---

[11]   (Docket Entry # 169-5, p. 17).

[12]   Defendants do not dispute the government's statement
that Condon was part of the IEB. The government also represents
that the IEB learned about defendant Lightbody's interest in July
2013.

DeNunzio made a number of false statements to IEB investigators about defendant Lightbody's financial interest in the Everett parcel.  (Docket Entry # 3, ¶ 38).

In late summer 2013, MCG brought the ownership issue to the attention of Wynn and Tocci.  (Docket Entry ## 169-4, 169-5).  Tocci testified that Lightbody's name "came up because he was identified as having a loan due him from one of the partners of the land" and "it was an actual note."  (Docket Entry # 169-5).

In late September 2014, state Indictments issued charging defendants with concealing defendant Lightbody's interest in FBT from MGC investigators.[13]  On October 1, 2014, a grand jury returned the two count Indictment in this case.

## DISCUSSION

Citing <u>Brady</u>, defendants move to compel the government to produce exculpatory information that Wynn was aware of defendant "Lightbody's historic ownership interest in the Everett Parcel."  (Docket Entry # 169).  According to defendants, such awareness undermines any claim by Wynn that defendant "Lightbody's ownership status was *material* to its decision to purchase the Everett Parcel."  (Docket Entry # 169) (emphasis added).  They

_____

[13]   The government disputes defendants' statements (Docket Entry # 169, p. 5) that the federal and state Indictments "'were the culmination of a joint criminal investigation by the U.S. Attorney's Office . . . and the IEB of the Massachusetts Gaming Commission.'"  (Docket Entry # 178, n.1).  The government does not dispute the existence of the state Indictments or defendants' description of them as charging defendants with impeding the IEB and the MGC by making false statements about defendant Lightbody's ownership of FBT and tampering with documents used in an official MGC proceeding.

submit that if Wynn knew about defendant Lightbody's historical interest in the property and that he was "in the process of being bought out," then Wynn's failure to "engage in any meaningful due diligence to confirm that information" shows that it did not consider defendant Lightbody's ownership interest material to its decision to enter into the option agreement and purchase the property from FBT. (Docket Entry ## 168, 169, 181). Defendants further contend that Wynn's knowledge is exculpatory because it could "impeach any claims by Wynn" that defendant Lightbody's ownership status was material to its decision to purchase the property. (Docket Entry # 169).

Defendants also argue that if Wynn was aware of defendant Lightbody's ownership interest but feigned ignorance, it "would reveal an outrageous corruption" underscored by the fact that Wynn used the state's investigation "to obtain a $40 million reduction" of the agreed upon purchase price of the Everett parcel. (Docket Entry # 169). Defendants maintain that Wynn's awareness of defendant Lightbody's historic ownership interest, gleaned through Flaherty's and Matthews' unauthorized access to the wire room, would likewise be highly exculpatory and negate defendants' guilt. (Docket Entry # 169).

The government argues that Wynn's knowledge of defendant Lightbody's *historical* ownership interest is neither exculpatory nor material to the defense because the relevant time period is

from December 2012 to July 2013, when defendants concealed defendant Lightbody's continued interest in the property from Wynn and MGC, as charged in the Indictment.  The government also disputes any contention that IEB investigators and MGC were working as part of a joint investigative team with the United States Attorney's Office.  The government additionally points out that it produced the IEB interviews of Tocci and Mayor DeMaria as well as all relevant grand jury transcripts.

A.   <u>Materiality of Wynn's Knowledge of Defendant Lightbody's Interest</u>

<u>Brady</u> requires the prosecutor "to disclose material evidence in his possession that is favorable to the defendant." <u>Drumgold v. Callahan</u>, 707 F.3d 28, 38 (1st Cir. 2013).  "Evidence is favorable to the accused if it is either exculpatory or impeaching in nature and material if there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different." <u>United States v. Cruz-Feliciano</u>, 786 F.3d 78, 87 (1st Cir. 2015) (internal quotation marks omitted); <u>see</u> <u>U.S. v. Bulger</u>, 928 F.Supp.2d 305, 324 (D.Mass. 2013) (materiality "is 'traditionally assessed from the vantage point of appellate review'" and "[c]ourts consider evidence material if its disclosure has a 'reasonable probability' of affecting the outcome at trial").  "[E]xculpatory evidence includes evidence that casts doubt on the credibility or

12

accuracy of any witness the government anticipates calling at
trial or any evidence the government expects to proffer at
trial." United States v. Moon, 2012 WL 2178923, at *2 (D.Mass.
June 13, 2012) (citing United States v. Bagley, 473 U.S. 667, 678
(1985), and Giglio v. United States, 405 U.S. 150, 154 (1972)).

The Indictment sets out charges of wire fraud and conspiracy
to commit wire fraud.  "The elements of a wire fraud conviction
under 18 U.S.C. § 1343 are:  (1) a scheme or artifice to defraud
using false or fraudulent pretenses; (2) the defendant's knowing
and willing participation in the scheme or artifice with the
intent to defraud; and (3) the use of the interstate wires in
furtherance of the scheme." United States v. Appolon, 715 F.3d
362, 367-368 (1st Cir.), cert. denied, 134 S.Ct. 335 (2013).
Notably, "[t]he false or fraudulent representation must be
material" although the government does not have to show that "the
decisionmaker actually relied on the falsehood." Id.  A "'false
statement is material if it has a natural tendency to influence,
or [is] capable of influencing, the decision of the
decisionmaking body to which it was addressed.'" United States
v. Blastos, 258 F.3d 25, 29 (1st Cir. 2001) (quoting Neder v.
United States, 527 U.S. 1, 16 (1999)).

In the fall of 2012, Wynn was preparing an application for a
resort destination casino license located on the Everett parcel.
Massachusetts law required MGC to deny a gaming license if the

applicant was a convicted felon or has a close associate "that would not qualify for a license."  Mass. Gen. L. ch. 23K, § 16. Defendant Lightbody was a convicted felon and, purportedly unbeknownst to Wynn, had a financial interest in the Everett parcel at the time Wynn entered into the option agreement and when Wynn purchased the Everett parcel.  (Docket Entry # 3, ¶¶ 7, 15, 16).  From the perspective of Wynn as a casino applicant, the fact that a convicted felon had a financial interest in the Everett parcel would have a natural tendency to influence Wynn's decision to execute the option agreement and to continue the $100,000 monthly payments "[b]eginning in or about December 2012 and continuing until at least September 2014."  (Docket Entry # 3, ¶ 12).  If Wynn knew about defendant Lightbody's financial interest and proceeded to execute the option agreement or make the monthly payments, then such evidence would tend to negate a finding that defendants' misrepresentation or concealment of that fact was material.  Wynn's knowledge or the extent of its knowledge of defendant Lightbody's interest at the time it signed the option agreement necessarily depends upon what it knew in the weeks preceding the agreement.  The knowledge Wynn acquired at and after it met with the two owners (defendant DeNunzio and Lohnes) at or near the property in the fall of 2012 (Docket Entry # 169-4, pp. 11-12) through July 2013, as charged in the

Indictment,[14] thus directly impacts a required element in the government's case.  It is therefore material under Brady because there is a reasonable probability that evidence of defendant Lightbody's interest, if disclosed to Wynn or MGH during this relevant time period, will affect the outcome at trial.

B.  Possession, Custody or Control

In order to comply with Brady, the "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." Kyles v. Whitley, 514 U.S. 419, 437 (1995); accord United States v. Misla-Aldarondo,  478 F.3d 52, 66 n.8 (1st Cir. 2007) (quoting same language in Kyles and emphasizing the words "in the case"); United States v. Hampton, 2015 WL 3794750, at *6 (D.Mass. June 18, 2015) (quoting Kyles, 514 U.S. at 437).  The government's disclosure duty, however, "only extend[s] to information in its possession, custody, or control." United States v. Hall, 434 F.3d 42, 55 (1st Cir. 2006).  Simply stated, "'while a prosecutor must disclose information maintained by government agents even if the prosecutor herself does not possess the information, this duty does not extend to information possessed by government agents not working with the prosecution.'" United States v. Rivera-Rodriguez, 617 F.3d 581, 595 (1st Cir. 2010) (quoting

---

[14]  The Indictment sets the time of the conspiracy as "continuing through in or about July 2013." (Docket Entry # 3, ¶ 14).

United States v. Hall, 434 F.3d at 55, and omitting internal citations).

Here, David Rubin, Esq. ("Attorney Rubin"), a special assistant United States Attorney in this prosecution, examined a number of grand jury witnesses on behalf of the government. (Docket Entry ## 169-2, 169-4, 169-5).  He entered an appearance in this case as "additional counsel for the United States" in December 2014.  (Docket Entry # 48).  Attorney Rubin is also listed as a prosecutor in the state prosecution on a grand jury transcript along with Patrick Hanley, Esq. of the Gaming Enforcement Division of the Massachusetts Attorney General's Office.  (Docket Entry # 169-3).  To state the obvious, Attorney Rubin was and is a member of the prosecution team in this case. The government therefore has an obligation to disclose exculpatory information of Wynn's knowledge of defendant Lightbody's interest known by Attorney Rubin even if acquired in the course of his involvement in the state investigation.  See generally United States v. Bender, 304 F.3d 161, 164 (1st Cir. 2002) ("individual prosecutor has a duty to find any evidence favorable to the defendant that was known to those acting on the government's behalf" including "other members of the prosecuting team"); United States v. Osorio, 929 F.2d 753, 761 (1st Cir. 1991) ("prosecutor charged with discovery obligations cannot avoid finding out what 'the government' knows, simply by

16

declining to make reasonable inquiry of those in a position to have relevant knowledge" and prosecutor failed to discover impeachment evidence from others in his office); <u>Freeman v. United States</u>, 284 F.Supp.2d 217, 227 (D.Mass. 2003) (under <u>Brady</u> "prosecutor has a duty to find any evidence favorable to the defendant that is known by the prosecution team, which includes their fellow attorneys and the police or FBI agents investigating the crime, that is, those acting on the government's behalf in the case against the accused").

Beyond disclosing exculpatory evidence of Wynn's knowledge known to Attorney Rubin (or other member of the federal prosecution team), the government's duty does not require disclosure of information possessed by a separate sovereign conducting its own investigation and not acting on behalf of the federal government.  See <u>Moreno-Morales v. United States</u>, 334 F.3d 140, 146-147 (1st Cir. 2003).  In <u>Moreno-Morales</u>, the Puerto Rico Senate was conducting an independent investigation and "not acting on behalf of the federal government."  <u>Id.</u> at 146.  Thus, even though "federal prosecutors may have observed some of the questioning and may have reopened their investigation as a result of what they learned in the hearings, the notes of the Senate hearings were under seal and there [was] no evidence that they were turned over to federal prosecutors."  <u>Id.</u>  "Principles of federalism" therefore led the court to conclude that, "'the

17

state's knowledge and possession of potential impeachment evidence cannot be imputed to a federal prosecutor for purposes of establishing a <u>Brady</u> violation.'"   <u>Id.</u> at 146-147.

Here too, the Commonwealth is a separate sovereign conducting its own investigation.  Moreover, the evidence presented is not sufficient to impose an affirmative duty on the federal prosecutors in this case to inquire and uncover exculpatory evidence of Wynn's knowledge of defendant Lightbody's interest in the Everett parcel that remains in the possession of state investigators who were not acting on behalf of the prosecution in this case.  The fact that the Indictment identifies overt acts involving IEB investigators[15] or that the state Indictments based on similar misconduct issued around the time of the Indictment in this case does not mean that IEB investigators were acting on behalf of the federal prosecutors in this case.

Defendants next submit that Flaherty and Matthews "were in effect made a part" of the prosecution team inasmuch as they "were given access to sensitive, confidential files" in the wire room.  (Docket Entry # 168).  <u>Brady</u> undeniably extends to "members of the prosecuting team, including police investigators

---

[15]   As pointed out by defendants, the Indictment identifies overt acts that defendants DeNunzio and Lightbody made false statements to IEB investigators in early July 2013 about the latter's financial interest in the Everett parcel.

working for the prosecution." United States v. Bender, 304 F.3d
at 164 (dicta); accord Kyles v. Whitley, 514 U.S. at 438
(prosecutor "has a duty to learn of any favorable evidence known
to the others acting on the government's behalf in the case,
including the police").  Who qualifies as a police investigator
working for the prosecution, however, is debatable.  See Lopez v.
Massachusetts, 480 F.3d 591, 595 n.4 (1st Cir. 2007) ("Brady
applies even if evidence is known only to police investigators,
but who counts in the latter category could be debated") (citing
United States v. Bender, 304 F.3d at 164, and United States v.
Osorio, 929 F.2d at 760-62).  Here, Flaherty, a retired member of
the state police, worked for Mintz Levin on behalf of Wynn from
October 18 to November 13, 2013.[16]  Matthews denies that he
worked for Mintz Levin, ML Strategies or Wynn.  Even assuming
that they were seen in the wire room on a single occasion in the
fall of 2013 (Docket Entry ## 181-1, 181-2) at a time when
Flaherty was working for Mintz Levin on behalf of Wynn[17] (Docket
Entry # 178-2) or were in the wiretap room in March 2014 on
another matter (Docket Entry ## 178-1, 178-2), these facts do
not, without more, establish that they were members of the

_____

[16]  By letter dated July 6, 2015, Wynn's attorney denied
that Wynn employed the investigators.

[17]  Flaherty denies that he performed "any work for Wynn at
the Massachusetts Attorney General's Office."  (Docket Entry #
178-2).

federal team or working on behalf of the federal government in its prosecution of *this* case.

Defendants also seek an evidentiary hearing to ascertain "the apparent agency relationship between Matthews and Flaherty and the joint state/federal investigation team."[18] (Docket Entry # 169). A criminal defendant does not have an "'absolute or presumptive right to insist that the district court take testimony on every motion.'" United States v. Connolly, 504 F.3d 206, 219 (1st Cir. 2007) (quoting United States v. Panitz, 907 F.2d 1267, 1273 (1st Cir. 1990)). "The test for granting an evidentiary hearing in a criminal case" is "substantive:  did the defendant make a sufficient threshold showing that material facts were in doubt or dispute?" United States v. Panitz, 907 F.2d at 1273. Although an agency relationship is relevant, the prosecutor's "'duty does not extend to information possessed by government agents not working with the prosecution.'" United States v. Rivera-Rodriguez, 617 F.3d at 595 (whereas "'prosecutor must disclose information maintained by government agents . . ., this duty does not extend to information possessed by government agents not working with the prosecution'").

In the case at bar, there is not enough evidence to create a dispute that Flaherty and Matthews were working with the federal government in its prosecution in this case. Assuming for purposes of argument that they were observed in the wiretap room

---

[18] Defendants do not provide any law to support the request.

on a single occasion in the fall of 2013 at a time when Flaherty
was performing work for Minz Levin on Wynn's behalf and were in
the wiretap room on another matter in March 2014, these facts do
not create a sufficient dispute that they were acting on behalf
of the federal government in this case.  It is also worth noting
that the wiretap room likely houses wiretap evidence in numerous
investigations and there is no indication that it houses only
wiretap evidence relative to a single proceeding, i.e., the IEB
investigation of defendants.[19]

C.  Alleged Incident

        Separately, defendants submit that the access of Flaherty
and Matthews, as civilians or private investigators, to the
wiretap room raises serious questions about the integrity of the
investigation and the prosecution of this case.  According to
defendants, allowing private investigators working for the
victim, Wynn, access to the wiretap room, which houses
confidential files, falls under Brady and likely amounts to a
violation of Massachusetts criminal law.  Assuming that the
conduct, if true, violates Massachusetts Attorney General's
Office rules restricting access to the wiretap room or
contravenes a general order of the state police regarding

---

        [19]  John J. Walsh, a former detective lieutenant of the
Massachusetts State Police, attests that during his 38 year
career with the Massachusetts State Police, he "worked on
*numerous* state and federal narcotics investigations *in which*
electronic surveillance known as *wiretaps were used*" and that
"strict rules and laws" govern "all aspects of wiretaps,
including who may have access to the wiretap room."  (Docket
Entry # 181-1, ¶ 2) (emphasis added).

dissemination of confidential official business, defendants do
not show how the information is exculpatory under Brady.  Bad act
or character evidence of a witness is generally not admissible,
Fed.R.Evid. 404, there is no criminal conviction of Flaherty or
Matthews relative to their presence, if any, in the wiretap room,
see Fed.R.Evid. 609, and the conduct, if any, does not appear
geared toward untruthfulness on the part of either Flaherty or
Matthews, see Fed.R.Evid. 608; United States v. Bunchan, 580 F.3d
66, 71 (1st Cir. 2009) ("Rule 608(b) only permits inquiry into
prior conduct if the conduct is probative of the witness's
character for truthfulness or untruthfulness").  It is also well
settled that, "[I]nadmissible evidence is by definition not
material, because it never would have reached the jury and
therefore could not have affected the trial outcome." U.S. v.
Ranney, 719 F.2d 1183, 1190 (1st Cir. 1983).  In addition, there
is no showing or indication that the files in the wiretap room
housed information relating to Wynn's knowledge of defendant
Lightbody's interest in the Everett parcel such that the evidence
would support the premise that Wynn or MCG knew about defendant
Lightbody's interest during the above described fall 2012 through
July 2013 time period.  In any event, that information, if any,
is subject to production if known to Attorney Rubin as a member
of the federal prosecution team.

D.  Production

      In sum, information known to Attorney Rubin regarding Wynn's

knowledge of defendant Lightbody's financial interest in the
Everett parcel from the time of the fall 2012 meeting with
defendant DeNunzio and Lohnes at or near the property to July
2013 is subject to production as exculpatory evidence to the
extent it is encompassed in the applicable requests made by
defendants in the motion (Docket Entry # 168, pp. 5-6).  The
record fails to provide an adequate basis to require the
government to produce the categories "relating to the Alleged
Incident" (Docket Entry # 168, pp. 4-5).  Defendants' request for
documents made by state and federal officials "during all
interviews of James Michael Flood" (Docket Entry # 168, p. 6),
however, is not subject to production.  Brady only "applies to
material that was known to the prosecution but unknown to the
defense." United States v. Bender, 304 F.3d at 164; see United
States v. Rodriquez, 162 F.3d 135, 147 (1st Cir. 1998)
("government has no Brady burden when the necessary facts for
impeachment are readily available to a diligent defender, as they
were here").  Flood was an employee of the DeNunzio Group and was
at the meeting with defendant DeNunzio representing FBT in the
fall of 2012.  Defendants therefore know or have easy access to
any information Flood might have given during the interviews.

    In order to allow defendants sufficient time to use the
exculpatory material effectively in preparing and presenting
their case, see United States v. Van Anh, 523 F.3d 43, 51 (1st

Cir. 2008), the government is directed to disclose such information 21 days prior to trial, which is currently set to commence on November 2, 2015.  See <u>United States v. Tsarnaev</u>, 2013 WL 6196279, at *1 (D.Mass. Nov. 27, 2013) ("<u>Brady</u> information need only be disclosed 'in adequate time for the information to be used effectively by the defense at trial'") (quoting <u>United States v. Brassard</u>, 212 F.3d 54, 56 (1st Cir. 2000)).

<u>CONCLUSION</u>

In accordance with the foregoing discussion, the motion to compel (Docket Entry # 168) is **ALLOWED** in part and **DENIED** in part.

    /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge