## NINTH AMENDMENT TO OPTION AGREEMENT

This Ninth Amendment to Option Agreement (this "**Amendment**") is made this 26th day of November, 2013 ("**Amendment Effective Date**"), by and between FBT Everett Realty, LLC, a Massachusetts limited liability company ("**Seller**") and Wynn MA, LLC, a Nevada limited liability company ("**Purchaser**").

## R E C I T A L S:

A.    Seller and Purchaser are parties to that certain Option Agreement dated December 19, 2012, respecting certain land off Horizon Way in Everett, Middlesex County, Massachusetts (as more particularly described in said Agreement), as amended by that certain First Amendment to Option Agreement between Seller and Purchaser dated as of March 28, 2013, that certain Second Amendment to Option Agreement between Seller and Purchaser dated April 29, 2013, that certain Third Amendment to Option Agreement between Seller and Purchaser dated August 12, 2013, that certain Fourth Amendment to Option Agreement between Seller and Purchaser dated September 12, 2013, that certain Fifth Amendment to Option Agreement between Seller and Purchaser dated October 17, 2013, that certain Sixth Amendment to Option Agreement between Seller and Purchaser dated October 24, 2013, that certain Seventh Amendment to Option Agreement between Seller and Purchaser dated November 13, 2013, and that certain Eighth Amendment to Option Agreement between Seller and Purchaser dated November 21, 2013 (collectively, the "**Agreement**").  For purposes of this Amendment the term "**Property**" shall mean any real property Purchaser acquires from Seller.

B.    Following the execution of the Agreement, the Division of Investigation/Enforcement of the Massachusetts Gaming Commission (the "**MGC**") informed Purchaser that members of Seller had failed to cooperate and/or provided unsatisfactory testimony to the MGC and, as a result, the terms of the current Agreement are not acceptable.

C.    To satisfy the concerns of the MGC and Purchaser's internal compliance policies, Purchaser commissioned an appraisal of the fair market value of the Property with the following assumptions:  (i) that the Property would not be used for gaming purposes and (ii) the environmental conditions of the Property would be suitable for general commercial use.  Based on the foregoing assumptions, the appraisal valued the Property at Thirty Five Million Dollars ($35,000,000).

D.    Seller and Purchaser agree that the Response Actions necessary to bring the Property into regulatory compliance and make the Property suitable for general commercial purposes are the Response Actions outlined in the Phase III Scope of Work (as hereinafter defined) and the estimated cost of such work is approximately Ten Million Dollars ($10,000,000).

E.    Seller does not agree that Seller or its members have failed to cooperate and/or provided unsatisfactory testimony to the MGC nor does Seller or its members by entering into this Amendment admit any facts or liability regarding any allegation stated by the MGC or Purchaser regarding Seller or its members.

F.     As a result, Seller and Purchaser have agreed to amend the Agreement on the terms and conditions set forth below including, without limitation, to reduce the Purchase Price to Thirty Five Million Dollars ($35,000,000).

**NOW, THEREFORE**, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller hereby agree as follows:

1.     **Recitals; Definitions**.  The foregoing Recitals are hereby incorporated as if fully set forth herein.  Capitalized terms not otherwise defined herein shall have the respecting meanings set forth in the Agreement.

2.     **Approval of MGC**.  Seller acknowledges that Purchaser will be required to present the terms of this Amendment to the MGC.  If the MGC approves the terms of the Agreement, as amended, the following subparagraphs (a) and (b) shall be in effect: (a) Purchaser hereby releases Seller from any and all past or present claims, obligations, actions, causes of action, rights, damages, costs, expenses, duties, liabilities, demands, damages, and compensation of any nature whatsoever, in law or in equity, which Purchaser ever had, previously had, or now has against Seller for all matters, whether known or unknown, arising out of or related to the Agreement.  In order induce Purchaser to provide the foregoing release to Seller, Seller hereby represents and warrants to Purchaser that upon amendment of the Agreement as provided herein Seller is not aware of any default or breach of this Agreement by Seller or Purchaser.  (b) Seller hereby releases Purchaser from any and all past or present claims, obligations, actions, causes of action, rights, damages, costs, expenses, duties, liabilities, demands, damages, and compensation of any nature whatsoever, in law or in equity, which Seller ever had, previously had, or now has against Purchaser for all matters, whether known or unknown, arising out of or related to the Agreement.   In order induce Seller to provide the foregoing release to Purchaser, Purchaser hereby represents and warrants to Seller that upon amendment of the Agreement as provided herein Purchaser is not aware of any default or breach of this Agreement by Purchaser or Seller. If the MGC does not make a separate determination regarding the terms of the Agreement, but does issue a positive determination of suitability for Purchaser to be eligible for a Gaming License for development of a casino resort on the Property pursuant to the terms of this Agreement as amended hereby, or if the MGC issues a negative determination of suitability for Purchaser to be eligible for a Gaming License for development of a casino resort on the Property pursuant to the terms of this Agreement as amended hereby for any reason other than or in addition to the terms of the Agreement, the above shall also be in effect.

3.     **Purchase Price**.  Section 2.5 of the Agreement is hereby deleted and replaced with the following: "2.5     **Purchase Price**.  The purchase price for the Property to be paid to Seller at Closing shall be Thirty Five Million Dollars ($35,000,000)."

4.     **Environmental Obligations**.  The provisions of Section 5.7 of the Agreement, entitled "Seller's Environmental Obligations," are hereby deleted in their entirety and replaced with the following:

"5.7   **Environmental Matters**.

2

679643.10

WLV 000163

USAO_CASINO_00035738

5.7.1   The obligations and liabilities of Seller specified in this Section 5.7 shall be individually and collectively defined as "Seller's Environmental Obligations." Seller shall, during the Option Period and subject to Section 5.7.4, at Seller's sole cost and expense, comply with the applicable provisions of the Massachusetts Contingency Plan, 310 CMR 40.0000, *et seq.* (MCP) with respect to any Releases of Oil (petroleum products), Hazardous Materials and PCBs at, under and from the Property ("OHM Releases") as provided herein.   Any capitalized terms used in this Agreement with respect to Seller's Environmental Obligations (as defined herein) not otherwise defined herein shall have the meaning ascribed to them in the MCP.

5.7.2   Seller has prepared and filed with the Massachusetts Department of Environmental Protection ("DEP") a Phase III Remedial Action Plan dated August 30, 2013 ("Seller's Phase III").   Seller and Purchaser have agreed upon the particular Response Actions consistent with the selected remedial alternative in Seller's Phase III and have specified and delineated those Response Actions in Schedule 1 attached hereto and incorporated herein ("Phase III Scope of Work"). The Phase III Scope of Work will constitute the Response Actions that either (a) will be completed by Seller prior to Closing as provided herein or (b) will be the subject of an escrow as provided in Section 5.7.6 herein. In all events Seller's monetary obligation for the Phase III Scope of Work shall not exceed the amount of Ten Million Dollars ($10,000,000). Seller and Purchaser have also agreed on the form of an Activity and Use Limitation ("AUL") which shall be a Permitted Exception, attached as Schedule 2. Seller shall not amend, modify or change Seller's Phase III, the Phase III Scope of Work or the AUL without Purchaser's prior written consent.

5.7.3   Seller shall, subject to Section 5.7.4, timely (a) complete and submit to DEP a Phase IV Implementation of the Selected Remedial Action Alternative Report (Phase IV Report) for the Phase III Scope of Work; (b) implement the Phase III Scope of Work, and, (c) provide Purchaser with the information in connection with the Phase III Scope of Work necessary for Purchaser to complete and submit a Phase V Completion Statement and AUL at the appropriate time. Purchaser shall have the right to review and approve the Phase IV Report, the AUL and any other MCP submittals prior to submission to DEP and Seller shall consult with Purchaser and Purchaser's environmental consultants so as to ensure that the Phase IV Report and any other MCP submittals are approved by Purchaser. Purchaser shall have the right to review and approve, in advance, any Response Actions and any submissions or documents relating thereto, including any AUL.   Seller and Seller's environmental consultant shall consult and share all information, investigation results, samples and other data with Purchaser's consultant on a timely basis, and Purchaser and Purchaser's consultant shall be notified, timely in advance, of the schedule for, and shall have the right to attend, any site work or meetings with the DEP or other regulatory officials. Purchaser's review and approval as required under this Section 5.7.3 shall not be withheld, conditioned or delayed arbitrarily or without reason.

5.7.4   Seller shall in good faith use its best efforts to extend the MCP deadlines for the completion of Seller's Environmental Obligations specified in Section 5.7.3 so as to allow the deferral of additional Response Actions and the implementation of the Phase

679643.10

WLV 000164

USAO_CASINO_00035739

III Scope of Work until after the Closing hereunder. Seller shall request to extend the MCP deadlines on or before March 1, 2014. Purchaser shall cooperate with Seller to obtain such extensions of time from DEP as may be required. If Purchaser is required by DEP or the MCP deadlines (as they may be extended) to proceed with any of Seller's Environmental Obligations prior to Closing hereunder, such of Seller's Environmental Obligations performed prior to Closing shall be subject to Purchaser's prior review and approval. For avoidance of doubt, Purchaser shall have the right to approve the scopes of work, contractors, contracts and any other agreements or documents related to the implementation of the activities specified in Section 5.7.3, including, without limitation, the Phase III Scope of Work, and the costs thereof. The Response Actions and undertakings specified in the Phase III Scope of Work performed by Seller shall be subject to Purchaser's inspection and acceptance and any related costs shall be subject to Purchaser's prior review and approval. Purchaser's review and approval as required under this Section 5.7.4 shall not be withheld, conditioned or delayed arbitrarily or without reason.

5.7.5   Subject to the provisions herein provided, Purchaser agrees to accept the Property at Closing in its then current environmental condition and, upon Closing, Purchaser shall be solely responsible for and shall perform, subject to Section 5.7.6, for any and all Response Actions under the MCP or other applicable State or Federal laws or regulations for OHM Releases at, under or from the Property. The obligations of this provision shall survive the Closing.

5.7.6   The parties have allocated Ten Million Dollars ($10,000,000) of the Purchase Price to pay for the cost of the activities specified in Section 5.7.3 and satisfaction of Seller's Environmental Obligations. Upon the Closing under the Agreement, Ten Million Dollars ($10,000,000) of the Purchase Price shall be placed in escrow with the Escrow Agent (or another escrow agent mutually acceptable to the parties) to reimburse the payment of response costs incurred by Purchaser solely related to undertaking the activities specified in Section 5.7.3 following the Closing hereunder, including ("Phase III Response Costs"); provided, however, to the extent Seller completes any of the activities specified in Section 5.7.3 prior to Closing (subject to and in accordance with Section 5.7.4 above), at Closing, the Ten Million Dollars ($10,000,000) shall be reduced by the cost of any such work completed by Seller and approved by Purchaser prior to Closing as provided in Section 5.7.4 above (the "Phase III Response Funds"). As an example, if the cost of the Phase III Scope of Work completed by Seller and approved by Purchaser as provided above prior to Closing is Two Million Dollars ($2,000,000), then, at Closing, Eight Million Dollars ($8,000,000) of the Purchase Price shall be placed into escrow as the Phase III Response Funds. The Phase III Response Funds shall be promptly released from escrow to Purchaser or its designee on a requisition basis as Phase III Response Costs are incurred by Purchaser. In the event that the cost to Purchaser of the activities specified in Section 5.7.3 exceeds the Phase III Response Funds, Purchaser shall be responsible for such excess costs. In the event any Phase III Response Funds remain in escrow following the completion of the activities specified in Section 5.7.3 ("Excess Funds"), such Excess Funds shall be released to Seller (except as provided in Section 5.7.7 below).

4

WLV 000165

USAO_CASINO_00035740

5.7.7    Subject to the terms hereof, Seller shall retain for its benefit any and all obligations and undertakings of Pharmacia Corporation, et al, under the Judgment dated June 5, 2006 in a Civil Case entitled Mystic Landing LLC v. Pharmacia Corporation, et al., bearing Civil Action No. 04-10180-NMG, in the United States District Court for the District of Massachusetts (the "Pharmacia Judgment"), particularly, without limitation, the right to secure collection of funds due under the Pharmacia Judgment for Response Costs paid by Seller or used by Purchaser from the Phase III Response Funds.  Purchaser agrees to cooperate and assist Seller as reasonably necessary to facilitate collection of the Pharmacia Judgment. Such cooperation shall include, without limitation, providing full and complete documents regarding the Phase III Scope of Work undertaken by Purchaser and the Response Costs incurred by Purchaser.  Purchaser agrees to provide any other instrument reasonably requested by Seller to effectuate Seller's ability to secure amounts due under the Pharmacia Judgment (provided Purchaser shall not thereby be required to incur or assume any cost, expense, obligations or liability).  Seller may, at its option, agree to liquidate the Pharmacia Judgment, in which event Seller shall retain the liquidated sum received on account thereof and Purchaser shall retain the Phase III Response Funds (including any Excess Funds).  Purchaser agrees to reasonably cooperate with Seller in facilitating an agreement to liquidate the Pharmacia Judgment by, among other things, from and after the Closing Date, providing a release of all liability to Pharmacia for OHM Releases at and under the Property (but not including off site impacts of OHM Releases from the Property) and by performing as required under Section 5.7.5 above, provided that such release shall be in form and substance reasonably satisfactory to Purchaser.  To the extent Seller recovers costs from the Pharmacia Judgment, by an agreement to liquidate or otherwise, which were deducted from the Phase III Response Funds pursuant to Section 5.7.6 above, such reimbursed costs shall be paid to Purchaser.

5.      **Representations of Seller**.  To induce Purchaser to execute, deliver and perform its obligations under the Agreement, Seller hereby represents the following on and as of the Amendment Effective Date and on and as of the Closing Date:

Schedule 3 is a true and accurate list of (i) each person with a legal or beneficial ownership interest, direct or indirect, in Seller (a "Beneficiary"), (ii) the percentage interest in Seller of each such Beneficiary, and (iii) the address of each Beneficiary.  Neither Seller nor any Beneficiary has made, or has any agreement, whether oral or written, to make, any payments to any other person or entity from the proceeds of the Agreement including, without limitation, any of the option payments made pursuant to Section 2.2 or any portion of the Purchase Price.

6.      **Office Structure.**  Seller shall have the right, but not the obligation, to remove the existing office structure from the Property prior to Closing at Seller's sole cost and expense.

7.      **Ring Road.**  The provisions of Section 5.3 and Section 8.1.10 are hereby deleted in their entirety.

8.      **Title.**  Notwithstanding any provision of the Agreement, Seller shall have no obligation to cure any Defects to Title identified by Purchaser other than Mortgages and Taxes or other monetary liens.  Regarding Purchaser's objection to rights of DDRC noted as Items 17 and

5

WLV 000166

USAO_CASINO_00035741

23 in the Title Commitment, the parties agree the Seller shall have no obligation to cure such defects, but Purchaser shall have a right to terminate this Agreement based upon such objections, in which event no Break Fee shall be due as proved in Section 8.7(f).

9.     **Seller's Deposits.**  The provisions of Section 9.2.9 and Section 9.2.10 of the Agreement are hereby deleted.

10.    **Termination; Break Fee.**  The parties agree that "for cause" as set forth in Section 8.7 shall no longer include subsections: (d) (ii), (iii) and (iv), (g), and (h).

11.    **Ratification.**  The Agreement, as amended hereby, shall continue in full force and effect in accordance with its terms, and all references in the Agreement shall mean the Agreement, as modified by this Amendment.  To the extent there are any inconsistencies between this Amendment and the Agreement, the provisions of this Amendment shall control.

12.    **Counterparts; Entire Agreement.**  This Amendment may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.  A signature sent via facsimile shall be accepted as an original signature.

**IN WITNESS WHEREOF,** Seller and Purchases have made, executed and delivered this Amendment as of the date first written.

**SELLER:**                                     **PURCHASER:**

**FBT EVERETT REALTY, LLC**            **WYNN MA, LLC**
**By: The DeNunzio Group LLC**         **By:  Wynn Resorts, Limited**

By: _____          By: _____
Name: Dustin J. DeNunzio                   Name: _Lim Sinclm_
Its: Manager                               Its: _Secretary_

The undersigned Guarantor of Purchaser's obligations under the Option Agreement hereby assents to the foregoing Ninth Amendment To Option Agreement and confirms its assent to the prior amendments to the Option Amendment (First through Eighth) as identified in Recital A of this Ninth Amendment.

**GUARANTOR:**

**WYNN RESORTS, Limited**

By: _____
Name: _Lim Sinclm_
Its: _SVP_

6

679643.10

WLV 000167

USAO_CASINO_0003574

## SCHEDULE 1

### PHASE III SCOPE OF WORK

Reference is made to the figure attached hereto and incorporated herein.

### Southern Peninsula

The recommended remedial alternative presented in the GEI Phase III report is in-situ soil solidification/stabilization (ISS) in an area where low-pH groundwater has resulted in the mobilization of certain heavy metals. In order to better define the extent of the area requiring remediation, additional soil borings/groundwater monitoring wells will be installed within Areas A (8 wells) and B (6 wells), as shown on the attached figure, followed by the sampling and analysis of groundwater for dissolved RCRA 8 metals and pH. For the purpose of determining the area in which ISS will occur, Area A will be divided into 8 subareas, and Area B will be divided into 6 subareas. Each subarea will include one of the additional monitoring wells shown on the attached figure. Well installations will extend to the top of the naturally occurring material, and wells will be screened wholly within the fill material.

The areal extent of ISS will include all those locations (including any of the subareas described above) where groundwater pH is measured at or below 3.75, or where dissolved constituents are identified above the Upper Concentration Limits (UCLs) specified in the MCP. The vertical extent of ISS will range from the bottom of the tunnel muck layer to at least one foot into the underlying natural silty deposits; this interval is expected to extend from approximately 4 feet below the existing ground surface to approximately 15 feet below the existing ground surface. The solidified mass should have an unconfined compressive strength (UCS) of 150 pounds per square inch (psi) or less measured 28 days after treatment.

### CES-2 Area

The Phase III report also recommends ISS in Area C as shown on the attached figure (the area of monitoring well CES-2), where significantly elevated arsenic concentrations have been detected in soil and groundwater. However, the remediation of this area will instead comprise the excavation and off-site disposal of soils from the portion of the site depicted as the remediation area within Area C on the attached figure. The vertical extent of excavation will range from the bottom of the tunnel muck layer to at least one foot into the underlying natural silty deposits; this interval is expected to extend from approximately 6 feet below the existing ground surface to approximately 15 feet below the existing ground surface. Confirmatory soil sampling will consist of the collection of up to 25 soil samples, with each soil sample submitted for testing being comprised of homogenized soil collected over an interval of approximately 2 to 3 feet. Residual soil arsenic concentrations must be below the concentration identified in GEI's Phase III RAP as posing an acute risk to construction workers (2,684 milligrams per kilogram (mg/kg)), and average residual concentrations of all contaminants must be below the UCLs.

### A-5 Area

As indicated in the Phase III report, the remediation of the A-5 Area delineated on the attached figure, where elevated concentrations of arsenic have been detected in soil, will consist

WLV 000168

USAO_CASINO_00035743

of the excavation and off-site disposal of soil from the existing ground surface to at least one foot into the underlying peat material; the top of the peat material is expected to occur at approximately 8 feet below the existing ground surface. Additional assessment of soils in the A-5 area will be required to further identify the extent of soils requiring excavation and disposal. The additional assessment will consist of the advancement of up to 12 borings with soil samples collected at 2- to 4-foot intervals up to 12 feet deep, with samples submitted for testing being homogenized soil collected over an interval of approximately 2 to 3 feet. After the additional assessment has been completed, if the sampling results (a) exceed the concentration identified in GEI's Phase III RAP as posing an acute risk to construction workers (2,684 milligrams per kilogram (mg/kg)) or (b) cause average residual concentrations to exceed UCLs, those soils must be excavated for off-site disposal with confirmatory sampling after excavation and off-site disposal demonstrating that the above standard has been met.

### AUL

An Activity and Use Limitation (AUL) will be implemented to restrict the future use of the Site.

WLV 000169

USAO_CASINO_00035744



9

WLV 000170

USAO_CASINO_00035745

## SCHEDULE 2

### AUL

1.      Activities and Uses Consistent with the AUL Opinion. The AUL Opinion provides that a condition of No Significant Risk to health, safety, public welfare or the environment exists for any foreseeable period of time (pursuant to 310 CMR 40.000) so long as any of the following activities and uses occur on the Property:

(i.)     Any activities and uses consistent with use of the Property for commercial or industrial uses that do not involve disturbance of soil at a depth greater than three feet beneath the ground surface except in accordance with the applicable Obligations and Conditions set forth in Paragraph 3;

(ii.)    Landscaping and routine maintenance of landscaping and paved surfaces that do not involve direct contact with or disturbance of soil at a depth greater than three feet beneath the ground surface;

(iii.)   Construction, excavation, utility, landscaping and maintenance uses and activities to support any uses or activities allowed pursuant to this Paragraph or otherwise consistent with the AUL Opinion provided that, if such uses or activities involve direct contact with, or disturbance of, soil at a depth greater than three feet beneath the ground surface, such uses or activities are conducted in accordance with the applicable Obligations and Conditions set forth in Paragraph 3.

(iv.)    Such other activities or uses that, in the Opinion of an LSP, shall present no greater risk of harm to health, safety, public welfare or the environment than the activities and uses set forth in this Paragraph 1; and

(v.)     Such other activities and uses not identified in Paragraph 2 as being Activities and Uses Inconsistent with the AUL.

2.      Activities and Uses Inconsistent with the AUL Opinion. Activities and uses that are inconsistent with the objectives of this Notice of Activity and Use Limitation, and that if implemented at the Property may result in a significant risk of harm to health, safety, public welfare or the environment, are as follows:

(i.)     Residential uses, dormitories, nursing homes and assisted living facilities;

(ii.)    Uses of site soils for cultivation of fruits and vegetables destined for human consumption;

(iii.)   Elementary or secondary schools, kindergartens, preschools or daycare facilities;

(iv.)    Active recreational use such as the use of playgrounds or athletic fields;

10

679643.10

WLV 000171

USAO_CASINO_00035746

(v.)     Construction, excavation, utility, landscaping and maintenance uses and activities that would result in direct contact with or disturbance of soils at a depth greater than three feet beneath the ground surface, except such uses or activities as described in Paragraph 1 conducted in accordance with the applicable Obligations and Conditions set forth in Paragraph 3; and

(vi.)    Any other activity that may disturb soils at a depth greater than three feet beneath the ground surface, other than in accordance with the applicable Obligations and Conditions set forth in Paragraph 3.

3.     Obligations and Conditions.  If applicable, obligations and/or conditions to be undertaken and/or maintained at the Property to maintain a condition of No Significant Risk as set forth in the AUL Opinion shall include the following:

(i.)     A written Health and Safety Plan ("HASP") must be prepared by a Certified Industrial Hygienist or other qualified individual appropriately trained in worker health and safety procedures and requirements prior to commencement of planned (non-emergency) intrusive construction activity, and such activity must be conducted in compliance with the HASP.

(ii)     A written Soil Management Plan ("SMP") must be prepared by an LSP and implemented prior to the commencement of planned (non-emergency) intrusive activity that will result in direct contact with or disturbance of soil at a depth greater than three feet beneath the ground surface, or that will result in a net lowering of the ground surface at the completion of the activity, and such activity must be conducted in compliance with the SMP.

11

WLV 000172

USAO_CASINO_00035747

## SCHEDULE 3

| NAME | ADDRESS | PERCENTAGE OWNERSHIP INTEREST |
|---|---|---|
| Paul Lohnes | 75 Cambridge Parkway Suite 100 Cambridge, MA 02142 | 50.31% |
| Anthony Gattineri | 22 McCall Road Winchester, MA 01890 | 46.69% |
| The DeNunzio Group, LLC, which is wholly-owned by Dustin J. DeNunzio | 305 Cambridge Street Suite 3 Cambridge, MA 02141 | 3% |

679643.10

WLV 000173

USAO_CASINO_00035748