UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No.: 14-cr-10284-NMG |
| | ) | |
| v. | ) | |
| | ) | |
| (1) DUSTIN J. DENUNZIO, | ) | |
| (2) ANTHONY GATTINERI, and | ) | |
| (3) CHARLES A. LIGHTBODY | ) | |
| | ) | |
| Defendants | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENANTS' MOTION FOR A PRETRIAL PROFFER OR PRETRIAL _PETROZZIELLO_ HEARING REGARDING ADMISSION OF LIGHTBODY STATEMENTS**

Defendants have moved for a pre-trial _Petrozziello_ hearing as to statements made by Charles Lightbody to Darin Bufalino or to any other person that the government contends are admissible against all Defendants. Not only have Defendants failed to justify why the long-standing procedure of conditional admission of such evidence should be ignored in this case, but they fail to recognize that the Court has already preliminarily ruled that, at least with respect to the Bufalino statements, they meet the requirement of being in furtherance of the charged conspiracy. [1] In this memorandum, the government will principally focus on supporting the admission against all Defendants of certain additional statements made by co-defendant Charles

---

[1] Previously, in the context of denying Defendants DeNunzio's and Gattineri's Motion to Sever, the Court held that Lightbody's recorded conversations with Prisoner 1 were admissible against all Defendants under Fed. R. Evid. 801(d)(2)(E). _See_ Docket No. 123, 12. As for additional statements made by Lightbody to "friends, family members and a local bank which [defendants] characterize as boasts and lies made solely for personal benefit," the Court went on to say that "[t]he government does not contend that those additional statements qualify as co-conspirator statements." _Id._ However, the government can find no such concession in the record and its response indicated that "at least some of Lightbody's conversations with individuals other than Prisoner 1 will also be admissible as coconspirator statements." _See_ Docket No. 83, 14. If the absence of particularizing all those statements created a misimpression, the government respectfully requests that the Court reconsider the statements being proffered in this memorandum.

Lightbody to others than Bufalino or DeNunzio either as co-conspirator statements under Federal

Rule of Evidence 801(d)(2)(E) or on other non-hearsay grounds.

## I.       A PRE-TRIAL *PETROZIELLO* HEARING IS NOT REQUIRED

Because Defendants have offered no sound reason for the Court to deviate from the

routine procedure in the First Circuit for provisionally admitting co-conspirator statements under

*United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977), their motion should be denied.

As a predicate to admitting statements of a co-conspirator as nonhearsay under Fed. R.

Evid. 801(d)(2)(E), the trial court must conclude merely that "it is more likely than not the

declarant and the defendant were members of a conspiracy when the hearsay statement was

made, and the statements was in furtherance of the conspiracy." *Id.* at 23.  The Supreme Court

has explicitly held that the court may look to an alleged co-conspirator's own statements for

evidence of his or her participation in the conspiracy.  *See Bourjaily v. United States*, 483 U.S.

171, 181 (1987).  The amended text of Rule 801(d)(2)(E) requires at least some evidence that is

independent of the proffered statements themselves.  *See* Fed. R. Evid. 801(d)(2)(E); *see also*

*United States v. Garcia-Torres*, 280 F.3d 1, 5 (1st Cir. 2002).  In this Circuit "the trial court is

not required to decide the *Petroziello* question prior to admitting hearsay statements under Rule

801(d)(2)(E), but routinely admits the statements provisionally subject to its final *Petroziello*

determination at the close of all the evidence." *United States v. Geronimo*, 330 F.3d 67, 75 (1st

Cir. 2003).  Moreover, "a district court may, but need not make a pretrial determination as to

provisional admissibility of the proffered statements." *United States v. Isabel*, 945 F.2d 1193,

1199 (1st Cir. 1991).

As noted above, this Court has previously examined the proffered statements from

Lightbody to Bufalino and concluded that they were made in furtherance of the conspiracy.

Defendants' belated arguments to the contrary add nothing to diminish the Court's reasoning. For example, Defendants' suggestion that Lightbody is merely narrating past events – *e.g.,* "that's why I left my name off," "well, that's what I'm doing" (in response to the suggestion to "double blind it" – is an insupportably strained and narrow interpretation that ignores the fact that Lightbody is reporting on the activities of the conspiracy and seeking advice from Bufalino. *See United States v. Shores*, 33 F.3d 438, 448 (4th Cir. 1994) (statements made to third party are "in furtherance" if they are designed to get third party to join or act to assist it in accomplishing its objectives); *United States v. Mayberry*, 896 F.2d 1117, 1120 (8th Cir. 1990) (explanatory statements which inform others of activities of conspiracy are "in furtherance" if construed as seeking assistance or cooperation).  As this Court has previously concluded, "the several conversations are not 'mere idle chatter' that cannot be construed in further of the alleged conspiracy.  Instead, they appear to involve an exchange of advice and assistance related to, and serve to benefit, the purported conspiracy."  Docket No. 123, at 11.

Unlike the cases relied on by Defendants involving multiple co-conspirators and "voluminous" evidence of the conspiracy*, see United States v. Andrus*, 775 F.2d 825, 835 (7th Cir. 1985), here there is one co-conspirator's statements at issue, relatively few co-conspirator statements, offered for their truth, and a manageable amount of evidence of the conspiracy. Indeed, Defendants claim that Lightbody's statements on their face are either not credible or actually supportive of their position.  As such, there is little risk of a mistrial should the government fail to prove by a preponderance of evidence that the statements are not admissible under Fed. R. Evid. 801(d)(2)(E).

## II.    ADDITIONAL STATEMENTS THE GOVERNMENT INTENDS TO INTRODUCE

The government seeks to introduce under the Federal Rules of Evidence the following additional statements of Defendant Lightbody generally described below:

- Beginning in the Fall of 2012 through May 2013, in effort to secure refinancing on some real properties, Lightbody orally and in writing provided information at various times to Paul Simms, a loan officer at First Ipswich Bank confirming that he had 13.5% interest stake in the Everett Parcel, and that the pending purchase deal with Wynn could potentially increase his stake in value to almost $10 million.[2]

- On June 27, 2013, during an intercepted call between Lightbody and Jamie Russo, whose 3% interest in the Everett deal was also concealed by the conspirators, they discussed William Thibeault (the former owner of the Everett Parcel who was suing the present owners), and had the following exchange:

    CL:    Fucking maggot.  Now he wants to be a rat on top of being a scum bag fucking robbing everyone.  Now he wants to be a rat to boot.  But like I told Dustin

    JR:    (UI).

    CL:    It don't make a difference.  He's going to tell everybody anyways because he doesn't want the thing to happen.  He's going to tell everyone I'm involved anyway.

    JR:    Right.

    CL:    And my story is going to stay the same.  I'm not involved.

- On July 2, 2013, during an intercepted call between Lightbody and Russo, after discussing the King Arthur purchase, they discuss the Thibeault litigation and what DeNunzio should say [falsely] about the ownership of the Everett Parcel:

    CL:    (UI) Hey, and the other thing is Billy Thibeault wants, wants to depose everybody now.

    JR:    Really?

    CL:    Yea, we were laughing, we know what he's doing.  He's trying to

---

[2] Defendants have a filed Motion *in Limine* for an instruction limiting this evidence to Lightbody. *See* Docket No. 299.

intimate us, he's trying to fucking do what he does to everyone. Fight em off with money and power, you know what I mean?

JR:     So who's he deposing? Gary, you?

CL:     Everybody.  Me, Gary, um, Dustin, Paul, Anthony, but like Dustin said, he goes, he said to the lawyer, he said to the lawyer, why you want to depose Charlie and Gary?  They have nothing to do with it.  So I told him, you know, I just don't want your name on there, I go, Dustin, all you have to say was I was part of Gary's fucking percentage, because I gave Gary the money.

JR:     Right.

CL:     You know and then once you fucking, Gary didn't come up with the money to perform, well Anthony, it's black and white. Gary took his percentage, and he lost his percentage, which means I lost my percentage.

- On July 2, 2013, during an intercepted call between Lightbody and Gary DeCicco (a former co-owner of the Everett Parcel), they discussed concerns about Defendant Anthony Gattineri:

CL:     Well he's a maggot.

GD:     He, he's just an absolute asshole.  I know people that have known him for 30 years and they told me, they said there's not a decent bone in the guy's body.   And if the fucking shit hits the fan over on that property, he will be the first one to rat anything or anybody…

CL:     Oh yeah.

- On July 10, 2013, after IEB investigators had begun interviewing owners of the Everett Parcel, Defendant Dustin DeNunzio told Lightbody in an intercepted call to contact DeCicco and warn him that he would be contacted by the investigators. This exchange followed:

DD:     Yeah and just say I just said what I told 'em is everything you know it was a split everybody went their separate ways it was all good you know that was it.

CL:     Right.  Alright sounds good I'll let him know.

Lightbody then called DeCicco, gave him the head's up about the investigation, and this exchange followed:

CL:     Yeah he said today that's what he said and then they already contacted

Anthony and Paul to go set up meetings with them so they must be doing background checks on the property owners you know?

GD:    Did they get you yet?

CL:    No cause I'm not it I'm not on anything

GD:    No well they shouldn't they shouldn't if they contact me I'm just gonna tell 'em listen I wasn't interested I'll see ya later

CL:    Yeah

GD:    Tell 'em don't bother me you want to call my lawyer call him

CL:    Right yeah yeah cause they said ah because I'm not I'm not on anything so they're fuckin not gonna find me anywhere you know what I mean?

- On July 2, 2013, in an intercepted call between Lightbody and Michael DiPlatzi, a friend and business associate, the following exchanges occurred:

MD:    How many partners you got in there Charlie?

CL:    Two.

MD:    Oh, just two?  Oh alright.

CL:    Yeah, just two, yeah.

MD:    You'll be off and fucking you'll be off and running if you get that.

CL:    Oh, forget it.  You kidding me?  It's fucking retarded.

MD:    What will you do?

CL:    What will I do?  Buddy, that's not even the money maker.  The money maker is the other thing I bought around the corner.

MD:    Which one?

CL:    King Arthur's.

MD:    Oh you ended up buying that?

CL:    Yeah, that's the fucking money maker right there.  The fuckin, forget about the casino, you'll make more money in the strip joint than you will in the casino.

Later in the conversation they discuss the tax consequences of the sale of Everett Parcel:

MD:     Yeah but let me ask you a question, why would you, if you, if you sold the land, why would you even want the [UI] to having a fucking, uh a business [referring to Lightbody purchasing the King Arthur's, as described above]?

CL:     Uh because it's like anything else, buddy.  It's like you, I mean how much money, you know, if you've got $10 million, you want $20 million.  If you want 20 you want 30.  But, because I'll tell you the truth, I'm 1031-ing all my money.  I got a deal with my partner that we're looking at right now, it's fucking, it like you know it's in a whole different league.  You know what I mean?  My partner, my partner's got all the money.  My partner owns, he's owns, we own 25%, he owns 50%.  So he wants, he wants to take his profit and my profit and buy a building for $200 million.

MD:     Ok.

CL:     Now you're in a whole different league.

MD:     Right. [UI]

CL:     So basically what makes you want to get the money, I'm not even going to be able to touch it because the tax revenue is so high it's crazy. . .You know what I mean? . . . To, to, to, to take that money, to take $50 million out of a project you're going to have to pay, [UI] you'll have to pay $20 million of fucking taxes.  You know, it doesn't make much sense to take the money.  It's scary but it's the truth.

MD:     Oh I know.

CL:     We're looking at a project here; we could make 15 or 20% on a 200 million dollar building that you'll pull $15 million a fucking year out of there.

MD:     Right.  [UI] What do you do with that kind of money though?

CL:     I don't know buddy, truthfully.  I'll let you know when I get my hands on it.

- On July 15, 2013, in an intercepted call between Lightbody and Michael Flood, who worked for DeNunzio, they discuss Flood picking up the back-dated agreement and memorandum of transfer from Attorney Paul Feldman and then getting Lightbody's signature:

  MF:   Yeah, yeah I've been up there before it's, it's, it's a pretty sick area. Ummmm, all right well that's cool! I've got to get ahhhh, your signature on another document from, from Feldman ummm, ahhh they got to change some stuff around or something to that effect. Uhhh, but your- are you gonna be back down tomorrow?

  CL:   What is it for?

  MF:   Ummm, I, I think it's that same document um, they needed to uh, jimmy up a, a case number um, that was on there from a previous date.

  CL:   Oh, all right, so yeah it's nothin' major. I'll, I'll get it signed.  I'll be back tonight.

  MF:   OK. OK.

  CL:   So, I'll be around all day tomorrow.  You want to meet me in the morning? I can meet you in morning?

  MF:   OK.  Yeah, I still got to go ummm, I've got to go to Feldman's and get the document and I got to track down ummm, our buddy Anthony to get his signature on it, as well ummm.

  CL:   OK.

  MF:   So, so that should be fine, uh to catch up tomorrow to grab that. If for whatever reason, it's an urgent thing, ummm, I'll drive up; I'll shoot up there and ah meet you

  CL:   If it's urgent, I'll drive right back.  I could be there in an hour and a half.

  MF:   That's all right you don't got to come back.  I, I mean I'd rather I go up there than you come down here.  It's no sweat.

  CL:   Yup [chuckling] no problem I'll do whatever you guys need me to do
  .
  MF:   All right that sounds good.  I will ahhhh, I'll let you know.

  CL:   All right, great.  Thank you, buddy!

### III.     LEGAL PRINCIPLES AND THEIR
###          APPLICATION TO THE PROFFERED STATEMENTS

It is well established that statements by a coconspirator to another coconspirator or to a third party are not hearsay and may be admissible against other coconspirators if those statements were made during and in furtherance of the conspiracy.  Fed.R.Evid. 801(d)(2)(E) (Rule 801(d)(2)(E)); *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (quoting Rule 801(d)(2)(E)); *United States v. Piper*, 298 F.3d 47, 53 (1st Cir. 2002) ("The black-letter principle is that statements made in the course of a discussion between a coconspirator and a third party who is a stranger to the conspiracy are admissible under Rule 801(d)(2)(E), provided that they meet the Rule's foundational requirements.").  "A coconspirator's statement is considered to be in furtherance of the conspiracy as long as it be can said to advance the goals of the conspiracy in some way."  *Piper*, 298 F.3d at 54.  As this Court acknowledged in its ruling on the Motion to Sever, "[t]o establish that a co-conspirator statement is in furtherance of the conspiracy is relatively easy."  *See* Docket No. 123, 10.

Though the "in furtherance" requirement is generally construed broadly, *see, e.g.*, *United States v. Flemmi*, 402 F.3d 79 (1st Cir. 2005), the limitation is not entirely without force.  If statements constitute mere "idle chatter" or "narratives of past events," they are probably not admissible under the Rule.  *See United States v. Ciresi*, 697 F.3d 19, 29 (1st Cir. 2012).  The critical distinction is between comments that are somewhat isolated or offhand, particularly those made to acquaintances with little or no connection to the conspiracy, and those that advance, even tangentially, one or more of the conspiracy's purposes.

### A.   Lightbody's statements to Simms were made in furtherance of the conspiracy and are admissible under Rule 801(d)(2)(E).

Paul Simms, Vice President of Commercial Lending at First Ipswich Bank, had previously handled commercial loans for Lightbody at a different bank.  In September 2012, Lightbody reached out to Simms, and told him that he was looking to obtain two refinancing loans for properties he owned, in the amount of $300,000 each.  On September 24, 2012, Lightbody provided the bank with a signed personal financial statement, listing only one item in the personal real estate investment section.  Lightbody had neglected to list his ownership interests in multiple properties because they were not under his individual name.  As part of the loan evaluation process, Simms and Lightbody discussed Lightbody's ownership stakes in those properties.  Lightbody informed Simms, both verbally and in a handwritten list, that he had a 13.5% stake in the Everett land and, based on Lightbody's professed interest, Simms calculated that Lightbody's Everett stake was worth around $1.5 million.

Based on the information that Lightbody provided to him, Simms made a spreadsheet detailing Lightbody's property interests—a spreadsheet that included the Everett Parcel.  This information was used by Simms and First Ipswich to evaluate Lightbody's global cash flow and to get an overall picture of Lightbody's investment position.  In addition, in December of 2012 Lightbody told Simms about the pending agreement with Wynn to purchase the Everett parcel, and stated that his 13.5% interest stake in the land could potentially increase in value to almost $10 million.[3]   All of this information was included in the official loan offering sheets prepared by Simms and presented to the bank's President and approved on February 4, 2013.  Simms would testify that the list of Lightbody's investments—particularly his professed interest in the

---

[3] The purchase price for the Everett Parcel per the December 2012 Option Agreement between Wynn and FBT was $75 million.  Lightbody's interest, if he owned 13.5% of the property, would have been $10,125,000.

Everett property—was a critical portion of the loan evaluation process at the bank.  Simms

estimates that these loans closed in May of 2013.

Lightbody's representations to Simms about his interest in the Everett parcel and about

the impending deal with Wynn were indisputably material to the ultimate success of his loan

application.  Obviously, the more valuable and secure Lightbody's assets were, the more likely

the bank was to approve his application—an application requesting loans that were in excess of

half a million dollars.  As Lightbody expressed to Simms, he stood to make a great deal of

money on the Everett parcel deal with Wynn; however, Lightbody also knew that a deal that size

and with many procedural hurdles would take a significant amount of time.  Obtaining a sizable

loan and refinancing some of his other existing properties in the short term provided him

financial flexibility and security while he and his partners waited for the Wynn deal to go

through.    The primary goal of the conspiracy—making a significant profit on the parcel while

hiding Lightbody's interest—was served by ensuring financial security of each of the partners in

the interim period.

Given that the statement "need not be necessary or even important to the conspiracy, or

even made to a coconspirator, as long as it be said to advance the goals of the conspiracy in some

way," *United States v. Martinez-Medina*, 279 F.3d 105, 117 (1st Cir. 2002),  Lightbody's

representations to Simms to secure the loans meet that criteria for admission.  The loans gave

him significant financial breathing room while he awaited the culmination of the Wynn purchase.

This financial "bridge" that Lightbody received advanced the ultimate goal of profiting

handsomely from the land deal by allowing him and his partners the financial flexibility needed

to wait out the purchase completion and to keep Lightbody's interest under wraps.

That the necessary representations to Simms of his ownership were otherwise contrary to

the plan of the conspiracy to conceal is of no matter.  In making these statements to Simms, it is reasonable to believe that Lightbody thought that these internal bank documents would not be disclosed for any reason to the public or to those who could torpedo the Wynn deal.  Even if the documents might damage the conspiracy's goals if discovered, Lightbody made these statements with the intention of securing a loan that would serve the conspiracy's ultimate end.  It has never been suggested that because there was a mere *risk* that  statements to third parties could fall into the wrong hands, thereby potentially damaging the conspiracy's chances of success, such statements should be inadmissible under the "in furtherance" prong of the coconspirator test.  For example, in *Ciresi*, a coconspirator in a bribery scheme made statements to an individual he thought was interested in participating in the operation.  697 F.3d at 28.  The individual was eventually revealed to be a government informant.  Certainly, revealing the inner workings of a bribery scheme to a government informant ultimately frustrated the goals of the conspiracy.  At the time, however, the coconspirator was making statements that he believed were in the overall interest of the scheme.  *See id*.  The Court held that these statements were admissible under Rule 801(d)(2)(E) despite the fact that they did not, in fact, help the defendants achieve their goal.  It was enough that "the statement *itself* was made in furtherance of the common scheme."  *See id.* (emphasis added).

The statements were also clearly not "idle chatter" or "narrative statements."  Information that is intended for inclusion in a formal financial document, upon which a $600,000 loan depends, can hardly be considered casual or offhand.  Lightbody would have known that this information would be confidentially memorialized and considered in the process of approving a major financial transaction.

**B.      Lightbody's statements to Russo and DeCicco are admissible as non-hearsay.**

Jamie Russo also had an undisclosed interest in the Everett parcel whereby he would get 3% of the proceeds of the sale to Wynn.  Defendants concealed this information from both Wynn and the Massachusetts Gaming Commission until December 2013.  In the June 27, 2013 intercepted call between Russo and Lightbody, they discussed their concern that William Thibeault, who was suing the owners of the Everett parcel, would divulge Lightbody's hidden interest in the property.  Lightbody says, "He's [Thibeault] is going to tell everyone I'm involved anyway," and then Lightbody says, "my story is going to stay the same.  I'm not involved." Later, in a July 2, 2013 call, they discuss the false story that DeNunzio should tell Thibeault's lawyer: "Dustin, all you have to say was I was part of Gary's fucking percentage, because I gave Gary the money…. Gary took his percentage, and he lost his percentage, which means I lost my percentage."

In the calls between Lightbody and DeCicco, a former owner of the Everett parcel, convicted felon and associate of Lightbody, they discuss the likelihood of Gattineri "ratting." The second call is precipitated by DeNunzio' s instruction to Lightbody to warn DeCicco about the IEB investigators and Lightbody tells DeCicco that the investigators are not going to find his name.

Such statements are not being offered for their truth as much as they inform Russo and DeCicco as coconspirators – or at least as associates – of actions relevant to the object and operation of the conspiracy and Lightbody's intention to give a false story.[4]  These kinds of

---

[4] To the extent these statements are viewed for the truth of their content, these kinds of statements to non-conspirator associates which have some purpose or benefit to the conspiracy are not mere idle chatter.  *See e.g. United States v. Hickey*, 596 F.2d 1082, 1090 (1st Cir. 1979) (bank robber's statements to associate describing robbery were "in furtherance" of conspiracy because they placated associate and induced him to get rid of clothing used in robbery); *United*

statements are admissible as non-hearsay, because they are not offered to establish the truth of the matter asserted.  Fed. R. Evid. 801(c).  The hearsay rule does not exclude evidence of out-court statements offered to establish the "knowledge or state of mind of the declarant, *United States v. Figueroa*, 818 F.2d 1020, 1026 (1st Cir. 1987), or to establish that the declarant engaged in a verbal act, such as giving of a "directive" to do something.  *United States v. Cintolo*, 818 F.2d 980, 997-98 & n.8 (1st Cir. 1987).  "Verbal acts are simply one example of many out-of-court statements offered for something other than their truth.  So long as out-of-court statements are not offered for their truth, they are not hearsay and it is unnecessary to fit such statements into one particular category."  *United States v. Murphy*, 193 F.3d 1, 5 (1st Cir. 1999) (finding that instructions given by one conspirator to another were not offered for truth).

In addition, the statement which shows their concern that Gattineri would be a "rat" is non-hearsay and relevant evidence of the existence of the conspiracy itself.  *See Anderson v. United States*, 417 U.S. 211, 228 (1974)(out-of-court statements which are not offered for their truth are not hearsay, and, as such, are admissible if relevant to prove the conspiracy, regardless whether the requirements of the co-conspirator hearsay exception rule are met).  *See also United States v. Munson*, 819 F.2d 337 (1st Cir. 1987)(statements of coconspirators not offered for the truth admissible "as long as they were relevant in some way to prove the conspiracy charged").

### C.  Lightbody's statements to Diplatzi are admissible as coconspirator statements under Rule 801(d)(2)(e).

Michael Diplatzi was a longtime business associate of Lightbody, and his co-owner in an

---

*States v. Shores*, 33 F.3d 438, 448 (4th Cir. 1994) (statements made to third party are "in furtherance" if they are designed to get third party to join or act to assist it in accomplishing its objectives); *United States v. Mayberry*, 896 F.2d 1117, 1120 (8th Cir. 1990) (explanatory statements which inform others of activities of conspiracy are "in furtherance" if construed as seeking assistance or cooperation).

auto body property.  In a July 2, 2013 intercepted call, Lightbody tells Diplatzi that he has two

partners in the Everett land deal, and also talks about how they are planning to reinvest the

profits from sale into other real estate to avoid tax consequences ("1031-ing the money").

Lightbody's representations to Diplatzi regarding his financial position and the upcoming

windfall he expected to come from the execution of the Wynn casino deal were material to the

ongoing maintenance of the business relationship with Diplatzi, and these representations painted

Lightbody as a desirable future investment partner.  The success and maintenance of current and

future business relationships were of the utmost importance to Lightbody, as these relationships

afforded him financial security in the months before the Wynn deal was set to close.  As such,

these statements were made in furtherance of the ultimate goal of the conspiracy, which was to

make a significant profit from the sale of the Everett property to Wynn while concealing

Lightbody's interest.

> **D.     Lightbody's and Flood's statements concerning obtaining signatures on
> backdated documents are  admissible as nonhearsay and coconspirator
> statements.**

In July 2013, the Investigation and Enforcement Bureau  ("IEB") began conducting its

suitability investigation of the Wynn casino proposal.  On July 9, 2013, when questioned by IEB

investigators about who had a financial interest in the Everett Parcel, DeNunzio did not disclose

that Lightbody and another individual had financial interests in the Everett Parcel.  Indictment,

¶¶ 19, 33, 34.  On July 10, 2013, a day after he was interviewed by the IEB investigators,

DeNunzio further backdated the December 14, 2012 Memorandum of Transfer and Promissory

Note to August 15, 2012, and arranged for Lightbody and Gattineri to execute the documents.

Id., ¶¶ 17, 38-40.  Michael Flood was an employee of DeNunzio tasked by DeNunzio to pick up

the documents from the FBT attorney and obtain the signatures of Lightbody and Gattineri.

The conversation in the intercepted call between Lightbody and Flood relates directly to carrying out this step of concealment to further the conspiracy, *e.g.,* " I've got to get your signature on another document from, from Feldman . . . . it's that same document um, they needed to uh, jimmy up a, a case number um, that was on there from a previous date."  Where Flood was acting on instructions from DeNunzio, Flood's statements clearly were in furtherance of the conspiracy by informing Lightbody what needed to be done to execute the backdated documents.

At a minimum, Flood's statements about what he is seeking to do are nonhearsay verbal acts.  As for his statements explaining that he retrieved the documents from Feldman and they need to "jimmy up a case number" because he was carrying out DeNunzio's instructions, such statements are admissible as co-conspirator statements even if Flood himself was not a conspirator.  As DeNunzio's employee, Flood's the statements to Lightbody were within the scope of his relationship under Rule 801(d)(2)(D) or Flood was authorized to make those statements by DeNunzio under Rule 801(d)(2)(C).  As such, Flood was acting as the authorized agent of DeNunzio in trying to arrange the signing of the backdated documents.

Even if Flood were not deemed to be a member or authorized agent of the charged conspiracy, the Court would easily find by a preponderance of evidence that he knowingly participated in a joint venture with Defendants to produce documents that would mollify the IEB concerning Lightbody's ownership.  As such, his statements are admissible against all Defendants.  There is substantial authority that statements admitted under Rule 801(d)(2)(E) are not limited to unlawful combinations.  *See United States v. Gewin*, 471 F.3d 197,201 (D.C. Cir. 2006)(recognizing that the Rule, based on concepts of agency and partnership law "embodies the long-standing doctrine that when two are more individuals are acting in concert toward a

common goal, the out-of-court statements of one . . . are admissible against the others, if made in furtherance of the common goal."); *United States v. Russo*, 302 F.3d 37,45 (2d Cir. 2006)("Indeed, the objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all."); *United States v. Saimento-Rozo*, 676 F.2d 146, 149 (5th Cir. 1982)("nor need the agreement or conspiracy be criminal in nature; it may be in the form of joint venture); *United States v. Coe*, 718 F.2d 830, 835-36 (7th Cir. 1983); *United States v. Layton*, 855 F.2d 1388, 1399 (9th Cir. 1988).  *Cf. Earle v. Benoit*, 850 F.2d 836, 841 n.6 (1st Cir. 1988)("Although most of the cases discussing the co-conspirator evidentiary exception are criminal, the exception is equally applicable in civil cases.").

## III.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for a pre-trial *Petrozziello* hearing and admit the above-referenced statements against all Defendants.

Respectfully submitted

CARMEN M. ORTIZ
United States Attorney

Date:  March 14, 2016              By:    */s/S. Theodore Merritt*
                                          KRISTINA E. BARCLAY
                                          S. THEODORE MERRITT
                                          Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Date: March 14, 2016                      */s/ S. Theodore Merritt*
                                          Assistant United States Attorney