UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,      )
        Plaintiff,             )
                              )
vs.                            )
                              )  Criminal Action
DUSTIN J. DeNUNZIO, ANTHONY    )  No. 14-10284-NMG
GATTINERI and CHARLES A.       )
LIGHTBODY,                     )
        Defendants.            )
                              )
                              )
```


**MOTIONS HEARING**


BEFORE THE HONORABLE NATHANIEL M. GORTON
UNITED STATES DISTRICT COURT JUDGE


UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
Boston, Massachusetts 02210
March 28, 2016
11:07 a.m.


\*   \*   \*   \*


CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5205
Boston, MA 02210
(617) 261-0555

APPEARANCES:

For the Plaintiff:

UNITED STATES ATTORNEY'S OFFICE
(By: AUSA Kristina E. Barclay and
     AUSA S. Theodore Merritt)
     John J. Moakley Courthouse
     One Courthouse Way, Suite 9200
     Boston, MA 02210


For the Defendant DeNunzio:

ROPES & GRAY LLP
(By: Joshua S. Levy, Esq., and
     Aaron M. Katz, Esq.)
     Prudential Tower
     800 Boylston Street
     Boston, MA 02199-3600

-and-

TODD FOSTER LAW GROUP
(By: Todd Foster, Esq.)
     1881 West Kennedy Boulevard
     Tampa, FL 33606


For the Defendant Gattineri:

HINCKLEY, ALLEN & SNYDER LLP
(By: Michael J. Connolly, Esq., and
     Laura B. Angelini, Esq.)
     28 State Street
     Boston, MA 02109-1775


For the Defendant Lightbody:

RANKIN & SULTAN
(By: Charles W. Rankin, Esq.)
     151 Merrimac Street
     Second Floor
     Boston, MA 02114-4717

```
 1                      P R O C E E D I N G S
 2                (The following proceedings were held in open court
 3      before the Honorable Nathaniel M. Gorton, United States District
 4      Judge, United States District Court, District of Massachusetts,
 5      at the John J. Moakley United States Courthouse, 1 Courthouse
 6      Way, Boston, Massachusetts, on March 28, 2016.
 7                The defendants, Dustin J. DeNunzio, Anthony Gattineri
 8      and Charles A. Lightbody, are present with counsel.  Assistant
 9      United States Attorneys Kristina E. Barclay and S. Theodore
10      Merritt are present.)
11                COURTROOM DEPUTY CLERK LOVETT:  This is Criminal
12      Action 14-10284, the United States versus Dustin J. DeNunzio,
13      Anthony Gattineri and Charles A. Lightbody.  Will counsel
14      please identify themselves for the record.
15                MS. BARCLAY:  Good morning, your Honor.  Kristina
16      Barclay for the United States.
17                THE COURT:  Ms. Barclay.
18                MR. MERRITT:  Good morning, your Honor.  Theodore
19      Merritt also on behalf of the United States.
20                THE COURT:  Mr. Merritt.
21                MR. LEVY:  Good morning, your Honor.  Joshua Levy on
22      behalf of Dustin DeNunzio, who is in the courtroom and
23      present, your Honor.
24                THE COURT:  Mr. Levy.
25                MR. KATZ:  Your Honor, Aaron Katz for Dustin
```

 1     DeNunzio.

 2              THE COURT:  Mr. Katz.

 3              MR. CONNOLLY:  Good morning, your Honor.  Michael

 4     Connolly on behalf of Anthony Gattineri, who is also in the

 5     courtroom.

 6              THE COURT:  Mr. Connolly, good morning to you.

 7              MR. RANKIN:  Good morning, your Honor.  Charles

 8     Rankin for Mr. Lightbody.

 9              THE COURT:  And Mr. Rankin.

10              MS. ANGELINI:  Good morning, your Honor.  Laura

11     Angelini also on behalf of Mr. Gattineri.

12              THE COURT:  Ms. Angelini, good morning to you.  We're

13     here --

14              MR. FOSTER:  Sir.

15              THE COURT:  Oh, yes.  I'm sorry.

16              MR. FOSTER:  That's okay.  It's my first time here.

17     My name is Todd Foster and I'm also here for Mr. DeNunzio.

18              THE COURT:  Mr. Foster, good morning to you.

19              MR. FOSTER:  Thank you.

20              THE COURT:  We are here on the defendants' motion in

21     limine to preclude the government from making inaccurate

22     statements regarding the Massachusetts Expanded Gaming Act and

23     also the motions of defendants Gattineri and DeNunzio for

24     pretrial proffer and determination with respect to alleged

25     co-conspirator hearsay statements under *Petrozziello*.

1          I am aware that on Friday, the defendant Lightbody

2    filed a motion to continue the trial or to sever his case from

3    the other defendants.  I believe the government has just

4    within the last hour or so responded to that.

5          The Court is not going to make any ruling on that

6    motion today, although I will hear counsel if they wish to

7    supplement their papers at an appropriate time, but we are

8    here with respect to those substantive so-called in limine

9    motions at first, and then we'll deal with the matter of

10   whether we go to trial on April 11th later in the proceedings.

11         So, as I have said, this is a hearing on two of the

12   18 motions in limine filed in this case.  The first is the

13   motion in limine of all three defendants to preclude the

14   government from making inaccurate statements regarding the

15   Massachusetts Expanded Gaming Act, and the second is the

16   motion of the defendants Gattineri and DeNunzio for a pretrial

17   proffer and determination with respect to alleged

18   co-conspirator hearsay statements under *Petrozziello*.

19         With respect to the latter motion, although

20   defendants identified only three recorded conversations by

21   defendant Lightbody in their motion, the government's

22   opposition memorandum identified 15 other recorded

23   conversations which it intends to offer in evidence at trial.

24         Because defendants only submitted a response several

25   hours ago, the government has not had time to review the

1    defendants' arguments with respect to those 15 other

2    conversations.  If defense counsel wish to address them during

3    oral argument, they will be permitted to do so.

4          Further, on Friday evening, defendant Lightbody filed

5    a motion to continue or to sever the trial, as I have said,

6    and we will deal with that at the appropriate time after we

7    hear arguments with respect to the in limine motions.

8          The format for today's oral argument is as follows:

9    Each side will have roughly 20 minutes or so to supplement

10   their respective arguments, although I may break in from time

11   to time to allow the other side to respond with respect to a

12   specific issue.

13         The defendants are the moving parties and, therefore,

14   will go first.  Counsel should assume that I have read the

15   briefs with the exception of the one filed by defense counsel

16   this morning and that I am familiar with the arguments.

17         Before we proceed with oral argument, I will give my

18   preliminary inclinations and pose a few questions for each

19   side to address during the course of these arguments.

20         First, with respect to the motion in limine to

21   preclude the government from making inaccurate statements

22   regarding the Massachusetts Expanded Gaming Act.  Because the

23   government has responded that it does not intend to make the

24   anticipated characterizations of the statutory provisions, I

25   will deny the motion without prejudice, understanding that the

1    defendants may renew that motion at trial, if necessary.

2          I find persuasive the government's argument that the

3    Gaming Commission could have ultimately considered Mr.

4    Lightbody's criminal history in its decision to award the

5    casino license, however.  So, I will not foreclose the

6    government from making that argument at trial.

7          With respect to the individual provisions, I find

8    defendants' argument that Mr. Lightbody was not a, quote,

9    "applicant, affiliate or close associate," as those terms are

10   defined in Section 12(a) of the act persuasive.  Although

11   their statutory analysis applying canons of interpretation to

12   the form "party in interest to the gaming license," quote,

13   unquote, is less so.

14         In Section 14 of the act, I fail to see why Mr.

15   Lightbody would not qualify as having a, quote, "financial

16   interest in the business of a gaming license or applicant,"

17   unquote.

18         I agree with defendants' construction with respect to

19   Sections 16, 18 and 31, but disagree with their interpretation

20   of the term, quote, "business association," in Section 4.

21   Taking the statute as a whole, it seems to be crafted to

22   provide the Gaming Commission with very broad powers to

23   inspect and review applicants and, accordingly, I find the

24   defendants' limiting interpretation of Section 14(b)(3)(i)

25   unpersuasive.

1          With respect to the three -- turning to the

2     *Petrozziello* ruling.  With respect to the three telephone

3     conversations of defendant Lightbody on which the Court has

4     already ruled when it addressed the first motion to sever, the

5     Court maintains its earlier ruling.  Defendants will, however,

6     be permitted to play for the Court excerpts of the tapes, not

7     their entirety, to provide the Court with some context of

8     those conversations if they feel it is necessary.  The Court

9     will also hear oral argument with respect to those

10    conversations.

11         With respect to the other conversations, the Court

12    will decline to rule formally on the statements until the

13    close of the government's case in chief.  At this point I am

14    inclined to find that they are admissible either as

15    co-conspirator statements or as statements made against penal

16    or pecuniary interest.

17         I hasten to remind the government, however, that

18    failure to meet its burden to provide extrinsic evidence of

19    the existence of a conspiracy and the declarant's involvement

20    in that conspiracy will lead to a ruling at the end of the

21    government's case in chief that the statements were not

22    adequately proven to fall within the hearsay exception, which

23    would likely result in a mistrial.

24         Now to my questions for counsel.  I'll start by

25    posing the questions to the defendants, who will go first, and

1    I don't know how defendants expect to divide up this argument,

2    but I'll leave that to you as long as it's within the time

3    constraints that I have suggested.

4           I would like the defendants to address the following

5    two questions with respect to the motion in limine on the

6    Massachusetts Expanded Gaming Act:

7           First, Chapter 23(k), Section 14 -- in Chapter 23(k),

8    Section 14, why would someone who has a, quote, "financial

9    interest in the business of a gaming license or applicant,"

10   unquote, not include a person who entered into an option

11   agreement with the applicant to provide him monthly payments

12   and condition the ultimate exercise of that option and the

13   sale of property for $75 million upon the applicant's receipt

14   of a gaming license?

15          Second, the Gaming Commission held a public meeting

16   to address its concern with respect to the possibility that

17   one or more undisclosed owners of the Everett parcel had a

18   criminal background and the Commission voted to resolve those

19   concerns by requiring the members of FBT Realty LLC to swear

20   under oath that no such owners would receive proceeds from the

21   sale of the land.  Why does that not indicate that the

22   Commission believed that it had the authority to consider the

23   criminal records of the land owners in its decision to award a

24   casino license?

25          And, third, and last for the defendants, with respect

1     to the motion in limine on co-conspirator hearsay statements

2     as statements against pecuniary and penal interests.  In their

3     memorandum of law in support of their motion, defendants point

4     out that Mr. Lohnes had requested that Mr. Lightbody hide his

5     interest in FBT Realty in a blind LLC in the spring of 2012 in

6     order to make the land more attractive to potential

7     developers.  Why, then, were the recorded statements which the

8     government argues are admissible under Federal Rule of

9     Evidence 804(b)(3) not made against Mr. Lightbody's pecuniary

10    interest in hiding his ownership of the Everett parcel from

11    potential developers?

12         The defendants have the floor for a period of time.

13    Who will speak first?  Mr. Levy.

14         MR. LEVY:  Yes, your Honor.  With permission of the

15    Court, I'll take the lead on this argument.  Mr. Connolly is

16    going to take the lead on *Petrozziello*, but I will certainly

17    leave them time to chime in at the end for things I missed

18    covering.

19         So, I thank the Court for laying out your concerns on

20    this issue, and I will try and address them as I go through my

21    argument, certainly, your Honor.

22         We appreciate the hearing, first of all, because this

23    is a critical issue in the case.  It goes to the heart of

24    materiality concerning these supposed false statements on

25    January 17th, 2013 to Wynn Enterprises.

1            In the government's view of what the gaming statute
2    permits or what it required of people like Charles Lightbody,
3    who is a member of FBT and of FBT, it's been a moving target
4    throughout this investigation.  It was a different standard at
5    the time of the search warrant and Title IIIs.  It was a
6    different standard in the indictment and it was a different
7    standard in response to the motion to suppress, and now we
8    take -- we'll take the win on the denying with prejudice --
9    without prejudice, excuse me, the fact that the government is
10   not saying now that Mr. Lightbody or FBT is an affiliate, a
11   vendor, a business associate, doesn't qualify under any of
12   those, but the government is still pressing, your Honor, the
13   central theme in their case, that the MGC would not -- this is
14   Paragraph 10 -- would not award a category one destination
15   resort license if it determined that Lightbody would profit
16   from the award of such a license.
17           That, we submit, your Honor, after reading the
18   statute, is wrong, and I want to address the Court's concern
19   about Section 14, which the papers focus on Section 12, and
20   the Court is now directing your analysis to Section 14.  So,
21   let me take Section 14 first, your Honor.
22           Section 14 of the gaming statute says that -- your
23   Honor, it says that the Commission shall require anyone with a
24   financial interest in a gaming establishment or with a
25   financial interest in the business of the gaming license or

1    applicant for a gaming license who is -- or who is a close

2    associate, and it defines gaming establishment in Section 2, I

3    believe, your Honor, and it's in alphabetical order, all the

4    definitions, gaming establishment is defined as, "The premises

5    approved under a gaming license, which includes the gaming

6    area or any other non-gaming structure related to the gaming

7    area and may include, but is not limited to, hotels,

8    restaurants and other amenities."

9         So, that section that your Honor is focused on talks

10   about an interest in the casino once it's running.  After the

11   license had been granted, you're now allowed -- you've been

12   picked by the MGC in phase one and phase two to open your

13   casino.  Anyone who is going to have a financial interest in

14   the ongoing operations of the casino needs to go through the

15   suitability analysis, but there's no evidence and no

16   contention from the government that FBT, any of the

17   individuals who own portions of FBT, was going to have any

18   interest in the gaming establishment.

19        So, I think Section 14 -- the reason the government

20   didn't cite it, it doesn't apply to this situation where

21   there's some 35 acres of land.  They're going to complete the

22   deal.  Wynn Enterprise is going to take that land, build their

23   $2 billion casino development and reap the $800 million a year

24   that they predict they're going to reap in casino revenues.

25   FBT has nothing to do with the operations at all, and that's

1    why Section 14, your Honor, we don't think is applicable here.

2            And the case is premised on the fact that the Gaming

3    Commission, had they known about Charley Lightbody, would have

4    been able to deny Wynn the license, and I'm happy to take any

5    questions, if I'm misreading 14 or reading it differently than

6    you, your Honor, but I think it's tied to the operations of

7    the gaming establishment.  It's pretty clear from the statute.

8            So, Section 12(b)(iii) is the hook the government is

9    going after there and they're saying that empowered the

10   Commission to consider the qualifications of --

11           THE COURT:  That's the savings clause.

12           MR. LEVY:  What's that?

13           THE COURT:  That's the so-called savings clause.

14           MR. LEVY:  Yes.  And I don't think that's a fair

15   reading of this statute because you need to consider

16   12(b)(iii) in context with overall Section 12.  Section 12,

17   the heading is, "The applicant, applicant investigation and

18   evaluation," and Section 12(a) contains seven factors that the

19   Gaming Commission, through the IEB -- this is about the IEB's

20   investigation.  And I have a copy of it, your Honor.  If you

21   would like, I can hand one up of Section 12.  Does the Court

22   have one?

23           THE COURT:  That's fine.

24           MR. LEVY:  Do you have a copy?

25           MS. BARCLAY:  Yes.

1          MR. LEVY:  If I may, your Honor, approach?

2          THE COURT:  Yes.

3          MR. LEVY:  I'm handing you Section 12 and Section 16.

4          (Attorney Levy hands documents to the Court.)

5          MR. LEVY:  Your Honor, so Section 12(a) lists the

6     seven criteria that upon the receipt of the application of the

7     gaming license, the Commission is supposed to instruct the

8     IEB, the Investigations Examinations Bureau, to conduct this

9     investigation, and then 12(b) talks about what the IEB is

10    supposed to do with its determination, and it's got three

11    Roman numerals and it talks about if the application has

12    failed to satisfy any of those three.

13          And, your Honor, I don't -- I'm not a big quoter of

14    Latin canons, but these canons of interpretation are straight

15    from the Massachusetts Supreme Judicial Court about how to

16    interpret a Massachusetts statute, and the ejusdem generis

17    talks about when a general provision follows specific, the

18    general is read in connection with the specific, and the

19    noscitur a sociis canon talks about coupling of words together

20    are supposed to be read to make sense, and what they're

21    talking about in Section 12(b)(iii) is the fact that if the

22    applicant can't overcome some factor -- and it's designed not

23    to tie the hands of the Gaming Commission and the IEB to only

24    those things enumerated in Section 12(a).  It is a savings

25    clause, your Honor, as it relates to the analysis of the

1    applicant.  It's not a savings clause to authorize the IEB to

2    go outside an evaluation of the applicant and consider things

3    that have nothing to do with the reputation, business

4    practice, integrity, financial stability of the applicant.

5    So, it is an expansion of the IEB's mandate as it relates to

6    the overall structure of Section 12, which talks about an

7    investigation of the applicant.

8           Now, the government has raised a concern here that

9    the Gaming Commission is -- if you just assume that there were

10   false statements made for the sake of this discussion, your

11   Honor, during the IEB process, and the Gaming Commission has a

12   concern about undermining the integrity of its process, the

13   statute provides in Section 31 the remedy for false statements

14   made in connection with an IEB investigation.  It provides for

15   a felony punishable up to five years.  That's the remedy if

16   you think someone has lied to the Commission during the

17   investigation, and that remedy is actually being pursued here.

18          These three individual defendants, your Honor, are

19   also under indictment in state court under that provision for

20   lying to the IEB, but that doesn't -- not every lie, even if

21   you accept -- and we certainly -- that's what trials are for,

22   but for purposes of today, if you assume there's a lie, not

23   every lie turns into a wire fraud.

24          What this case boils down to is would it be legally

25   permissible for the Gaming Commission to deny the license to

1    Steve Wynn under the authority set forth in the Mass Gaming

2    Act?  Section 12 is actually about the IEB's duties and its

3    procedures.  It's not about the authority of the Gaming

4    Commission.

5          So, to go to your second question, your Honor, at the

6    hearing in December 2013 -- this is critical to understanding

7    the Gaming Commission's own actions.  First of all, you have,

8    as we submitted in our reply, your Honor, the two lawyers

9    hired by the Gaming Commission from New Jersey with expertise

10   in gaming experience.  They submit their analysis of the

11   gaming statute and they say there's -- unfortunately, even

12   though we don't want people like this to profit from the sale

13   of land, there's nothing we can do under the Gaming Act.

14   That's their analysis of what the gaming statute allows them

15   to do about conduct by a non-applicant party, someone who is

16   not a business associate, not a vendor, not an applicant.

17   Those two lawyers said we can't do anything about it in terms

18   of denying Wynn a license.

19         So, what does the Gaming Commission do in December

20   2013?  They don't make these conditions around FBT a condition

21   of the suitability finding on Wynn.  They actually have a

22   separate hearing on December 13th, and they -- right at the

23   beginning of the hearing, Commissioner McHugh says, This is

24   not a suitability hearing.  We're outside the analysis in the

25   Mass Gaming Act, Section 12 factors, and we're going to do

1    something that came up in the investigation, but we're going

2    to wait three days to do our suitability hearing on Wynn's

3    application.  This, on the record, is not a suitability

4    hearing, and that's, your Honor, when they go through this

5    effort to address concerns that Mr. Lightbody might still be

6    involved and might still -- might profit from this land sale,

7    and then they -- when they announce their suitability

8    decision, which I have a copy of here, your Honor, there are

9    two conditions placed on the suitability decision, and if I

10   may approach, your Honor, with this document.

11            THE COURT:  Yes.

12            (Attorney Levy hands document to the Court.)

13            MR. LEVY:  Your Honor, this is dated December 27,

14   2013.  If I may open it to the relevant page for the Court,

15   which is Page 9, under the conclusion, your Honor, the

16   suitability -- it says, "Based upon the testimony provided the

17   Commission at the hearing as well as exhibits, et cetera, the

18   Commission by unanimous vote finds that the applicant has

19   satisfied its burden of proving by clear and convincing

20   evidence its standards for suitability.  This finding,

21   however, is conditioned upon the following."

22            It's got two conditions.  None of them relate to FBT.

23   One is about Wynn's operations in Macau and the fact that they

24   need to provide further information on that, and the second is

25   you need to provide the Commission with any notice of change

1    in ownership structure.

2            This document references what the IEB found on FBT

3    and, essentially, it's a moot matter as presented to the

4    Commission.  The Commission is not deciding anything about

5    Steve Wynn's suitability in this hearing.  They are being

6    presented by the IEB, we've resolved the situation that came

7    up that we had a hearing about on December 13th, and that's

8    where the price drop, your Honor, that's where the statement

9    by the owners that no one else is going to profit, and the IEB

10   has not ever presented to the Commission the legal question,

11   do you have the authority to deny Wynn the license.  That

12   might have come up had Wynn said, We're not going to do

13   anything about this.  We're going to stand down and, you know,

14   we're proceeding with our application.  We're not going to

15   address the IEB's concerns.

16           I submit to this Court that under this statute, the

17   Mass Gaming Act, the Gaming Commission did not have the

18   authority to deny Wynn the license solely because of the

19   conduct of FBT.

20           Now, had Wynn acted improperly in the Commission's

21   view in dealing with it, perhaps, but they did not have the

22   authority based on the information that was available as of

23   the time of the suitability decision to deny Wynn the license.

24   There's no authority to deny Wynn the license for conduct of a

25   party that's not a vendor, business associate or qualifier.

1          So, your Honor, that's the textural analysis, and

2     this is an issue that -- the government has been a moving

3     target on what the statute requires.  It's been a moving

4     target on what the interest is.  Sometimes in the papers they

5     talk about an ownership interest.  Sometimes they talk about

6     just an interest.  It's very unclear exactly what the theory

7     of the case is from the government, but nailing down the state

8     law issue and going through the textural analysis and having

9     an assessment of whether or not there is a legal basis for the

10    Gaming Commission to deny Wynn the application based on the

11    conduct of FBT, we think is critical.  We don't think they

12    should be allowed to tell the jury what they've alleged in

13    Paragraph 10 of the indictment, that the Gaming Commission

14    would not grant this license, because the Gaming Commission

15    never weighed in on that and the statute does not permit the

16    Gaming Commission to deny this license to Steve Wynn based on

17    the conduct of FBT, even assuming all the government's

18    allegations are true.

19          THE COURT:  All right.  I need to hear from the

20    government in response to your argument, Mr. Levy.  It's going

21    to be Ms. Barclay?

22          MS. BARCLAY:  Yes, your Honor.  Thank you.

23          THE COURT:  I have a couple of questions.  They may

24    not be directly on point, but I should get them out there for

25    you in this regard so that you can answer them at some point.

1        Am I correct that the government does not plan to

2   construe any of the provisions of the Massachusetts Expanded

3   Gaming Act referenced by the defendants in the manner

4   contested by their motion, with the exception of the paramount

5   policy objective of the act, that is Section 1, and the later

6   what I described as "savings clause" that talks about any

7   other reason in Section 12(b)(iii)?

8        MS. BARCLAY:  That is correct, your Honor.

9        THE COURT:  Okay.  And the second question is:  How

10  did the Gaming Commission first learn of Mr. Lightbody's

11  alleged continuing interest in the Everett parcel?

12       MS. BARCLAY:  In July of 2013, the FBI provided to

13  the investigators with the Investigations and

14  Enforcement Bureau of the Gaming Commission information

15  gleaned from the jail calls between Darin Bufalino and Charles

16  Lightbody.

17       THE COURT:  All right.  You may proceed.

18       MS. BARCLAY:  They provided that and then the IEB

19  conducted its own investigation.

20       Your Honor, the defense's attempt to portray the

21  Gaming Act as the central theme in our case in Paragraph 10 as

22  being the, you know, crux of the indictment here is a classic

23  red herring.  This is a wire fraud case, and your Honor has

24  said in denying the motion to suppress and in denying the

25  motions to sever and dismiss, that the government has to prove

1    the elements of wire fraud.  We don't have to prove that

2    anyone violated the Gaming Act per se.  The Gaming Act is not

3    a predicate to this wire fraud case and the government doesn't

4    need to prove every paragraph of the indictment, including

5    Paragraph 10, although, as we submitted in our papers, the

6    government believes that the evidence at trial will establish

7    that the Gaming Commission would not have awarded the license

8    to Wynn if it had determined that Lightbody would have

9    profited from the award of the casino license.

10         The question is whether Lightbody's interest in the

11   Everett parcel in light of his criminal history and his

12   organized crime connections have the capacity to influence the

13   Gaming Commission as materiality relates to the Commission

14   itself, whether it had the capacity to influence the

15   Commission's decision to award the license to Wynn.  Nothing

16   more is required under the gaming statute -- I'm sorry --

17   under the wire fraud statute.

18         Whether his -- Lightbody's interest was material to

19   the Gaming Commission and to Wynn, those are questions of fact

20   that a jury will need to decide next month when we try this

21   case.  They're not questions of law and they're certainly not

22   questions of state law.

23         The defendants' argument that the Gaming Commission

24   didn't have the authority to deny Wynn a casino license based

25   on Lightbody's hidden ownership interest is simply wrong.  I

1    think it's important to step back here and take a look at the

2    statute and the big picture.

3         A casino license in Massachusetts is a privilege.

4    It's not a right.  The Gaming Commission did not have to award

5    any casino license and it could deny a license for any reason

6    if it meant ensuring public confidence in the integrity of the

7    gaming license process, and that's in Section 1, Paragraph 1

8    of Chapter 23(k), a part of the statute that the defendants

9    have not reached at all in their pleadings.

10        The statute opens with this mandate and the

11   defendants do not mention it at all because it basically gives

12   the Commission broad authority to do whatever would ensure

13   public confidence in the integrity of the gaming licensing

14   process in Massachusetts.

15        In addition, as your Honor has pointed out, Section

16   12(b)(iii) or little "i" three of the act specifically

17   provides that the Gaming Commission can deny an application if

18   the applicant cannot overcome any reason why it would be

19   injurious to the interest of the Commonwealth to award the

20   license.

21        The government's position is this is not limited by

22   the canons of statutory construction to factors about the

23   applicant, but even if it were, your Honor, had the Gaming

24   Commission pointed this issue out to Wynn and said, this

25   guy -- we have a lot of concerns about him and we don't want

1    him to -- we think that him getting $10 million of your money

2    is going to be injurious to the interests of the Commonwealth,

3    and Wynn had said, We don't care, then, surely, that would

4    have fallen under this narrow reading of the statute that

5    defendants are asking the Court to use here.

6         I just point out, your Honor, the fact that there's a

7    provision in the statute for a criminal charge, a felony of up

8    to five years for lying to the Gaming Commission.  I point out

9    here that the defendants were charged with that, but the

10   Gaming Commission also accepted the resolution -- a proposed

11   resolution from Wynn here when the IEB pointed out, Look, this

12   is an issue.  We see this as a very big issue and a potential

13   -- it could potentially affect your suitability.  Wynn -- they

14   negotiated the price downward and the Gaming Commission held a

15   hearing specifically on this issue and they conditioned Wynn

16   going on to the suitability hearing on the fact that the price

17   was reduced.  They asked the three people who claim to be

18   owners in getting the money from the property to swear that

19   they were the only ones getting the property, and then they

20   asked IEB to turn over all their materials to law enforcement

21   agencies in connection with this issue, and then they went on

22   to the suitability decision -- or the suitability hearing.

23        And while Mr. Levy has pointed out Page 9 of the

24   suitability decision to you, we would also point out Page 7,

25   which we cited in our brief, your Honor, where it -- the

1    Commission specifically references the hearing that it had on

2    the FBT issue and it said that the Commission voted four to

3    zero to accept the proposed resolution submitted by Wynn to

4    address the issues raised in the IEB report relative to

5    Lightbody having a hidden interest in this property.  They

6    wouldn't have gotten to the suitability process or gone any

7    further, necessarily, except that they fixed the solution here.

8          So, the question is:  Would it have had?  You know,

9    it doesn't actually have to affect the decisionmaker for

10   materiality, but it's the government's position that there's

11   enough evidence here that the jury could find that it had the

12   capacity to affect the decisionmaker.

13         While the act itself, your Honor, may not

14   specifically prohibit Lightbody from profiting from the award

15   of the casino, the government has not alleged that the act

16   goes that far.  It certainly permitted the Commission to

17   consider his interest in its assessment of Wynn's application.

18   Wynn knew this, the defendants knew this, and the defendants'

19   lawyers during the Wynn transaction knew this, and the Gaming

20   Commission ultimately did this.

21         The Gaming Commission has never said that nothing

22   about FBT or its members was relevant to its decision on

23   Wynn's license application.  That's a flat-out incorrect

24   statement.  In fact, they said that they approve this

25   resolution subject to the following three conditions, and then

1    they went on to the suitability issue.

2            Your Honor, I just want to address the email that Mr.

3    Levy referenced in his oral argument about the contractors to

4    the Gaming Commission who -- I think he said that it was their

5    analysis that this was not material to the Gaming Commission.

6            Mr. Levy and his associates have actually interviewed

7    this person.  And so, they know at this point that this was a

8    position that was -- it was a possible solution to this issue.

9    The Gaming Commission -- the IEB looked at this, said, No,

10   this isn't right.  This isn't what the statute provides, and

11   they rejected it, and that's exactly what the IEB's ultimate

12   report to the Commission was.  This is a concern to the

13   Commission.  The Commission thought it was a concern and they

14   accepted the Wynn proposed resolution of that concern.

15           And unless your Honor has any further questions for

16   the government, I'm --

17           THE COURT:  I'll give Mr. Levy a very brief rebuttal

18   before we go on to the other issue.  I think you want to save

19   some time for Mr. Rankin.  You used a good portion of your

20   allocated time, but I'll give you a short rebuttal.

21           MR. LEVY:  Your Honor, very quickly.  The delegation

22   of authority of the Gaming Commission is not unlimited.  There

23   are constitutional principles about the delegation of powers

24   within Massachusetts law and Supreme Judicial Court.  So,

25   there's not unlimited authority there.  Limited authority is

1    set forth in the gaming statute.

2         Second, your Honor, I encourage the Court to read

3    this suitability decision.  In nowhere did that section Ms.

4    Barclay was talking about does the Gaming Commission say that

5    the approval of Wynn's suitability is conditioned on these.

6    There's a difference between the IEB and the Gaming

7    Commission, and the Gaming Commission never weighed in on

8    whether this problem with FBT would affect Wynn's suitability

9    or not.

10        We agree with the government that this is about

11   whether or not legally the MGC could consider these factors

12   about FBT.  We submit under a careful reading of that statute,

13   they could not.  They were limited -- the Gaming Commission

14   was limited to concerning the applicant and the substance,

15   your Honor.  Thank you.

16             THE COURT:  All right.  Thank you.

17             Mr. Rankin, you're going to address -- or am I not

18   correct?

19             MR. RANKIN:  Mr. Connolly is going to address the

20   *Petrozziello* issue, your Honor.

21             THE COURT:  Mr. Connolly.

22             MR. KATZ:  Your Honor, just briefly, before Mr.

23   Connolly starts, I wanted to address the Court's question

24   about penal interest, since we view that as a different issue

25   and I had agreed to take that.

```
 1              THE COURT:  Mr. Katz?

 2              MR. KATZ:  Mr. Katz, correct.

 3         We put in a ten-page filing this morning.  We think

 4    that it addresses the penal interest issue.

 5         The point I would leave with the Court -- I think two

 6    points from our brief.  You can go back to the brief and read

 7    it.

 8         The first is that Charley Lightbody's out-of-court

 9    statements that the government is trying to put in under the

10    penal interest exception are in many respects provably 100

11    percent inaccurate based on undisputed facts, and 804(b)(3) as

12    the second of the two prongs the government has to meet says

13    there needs to be corroborating circumstances that clearly

14    indicate the trustworthiness of the out-of-court statements,

15    and here when many of the statements that the government is

16    seeking to put in can be shown to be false based on undisputed

17    facts, those corroborating circumstances are missing.

18         The second point I would make is that the question

19    under the penal interest provision of the Federal Rule of

20    Evidence is not whether the government can take the statement

21    now and use it to support its case.  The question is whether

22    at the time the statement was made, the declarant would have

23    been aware, aware, that by making the statement, he was

24    subjecting himself to a great risk of criminal prosecution,

25    that the statement had so great a tendency to subject him to
```

criminal prosecution, that he would not have made it had it not been true.

There is nothing unlawful about putting an interest in an LLC in another LLC.  There's nothing illegal about making that LLC that holds your LLC interest anonymous. People do it all the time.

The government also is aware that this idea was discussed in the FBT partnership, mainly by Paul Lohnes, before casinos even came knocking on FBT's door, was as early as March of 2012, when they were still looking at Wal-marts and Lowes, and things like that, that they were looking to do this.  There's nothing illegal about wanting to put Lightbody's interest in an LLC for, for example, not wanting bad publicity.  Paul Lohnes is -- he's a Winchester resident. He's very well-known.  He's someone who donates to charities. Charley Lightbody is a guy from Revere.

Now, he does have felony convictions in his background, no doubt about it.  The government keeps calling him an LCN member, a known associate of the LCN.  They don't have any evidence to prove that and we think that would be clear at trial, but Paul Lohnes had valid reasons for not wanting to be associated with, you know, frankly, a guy from Revere who didn't run in the same social circles as Paul Lohnes.  There's no way that Charley Lightbody in August of 2012 and even in December of 2012 would have anticipated that

1    by making statements to Darin Bufalino about putting his LLC

2    interest in another LLC, he was going to be subjecting himself

3    to a subsequent federal wire fraud prosecution, and there's, I

4    think, a very instructive case we cite in our brief, which is

5    the *Lozado* case, Tenth Circuit, where in that case the

6    declarant told an arresting police officer that, "The

7    ammunition in the car is mine.  The ammunition in the car is

8    mine."  And it later came to be found out that he was also an

9    illegal drug addict.  And so, by admitting that the ammunition

10   was his, he was admitting to a violation of 18 U.S.C.

11   922(g)(3), which makes it a felony offense for a drug addict

12   to be in possession of ammunition.

13          And what the Court said was, when he said that,

14   there's no way that he reasonably would have expected that by

15   taking ownership, telling the officer that the ammunition was

16   his, he was subjecting himself to criminal prosecution because

17   §922(g) prosecutions are rare and there's no evidence that

18   someone in the declaration's position would have been aware

19   that that was even a criminal offense, and there's no way that

20   anyone in Charley Lightbody's position would have realized

21   that by talking about putting an interest in an LLC in another

22   LLC, he was potentially committing a wire fraud, and I think

23   it's noteworthy that the alleged conspiracy didn't even begin

24   until on or about mid December of 2012.  So, you have to put

25   in Charley Lightbody's mind looking around a corner that we're

going to do this in preparation for a scheme to defraud Wynn
that doesn't even exist yet.  Wynn is not even on the radar
scene yet.

And, remember, the allegation in this case is not a
failure to disclose.  It is a misrepresentation of fact.  FBT
had no obligation under the law, none, to provide Wynn with
the roster of its LLC owners.  It didn't have an obligation to
tell the Gaming Commission that.  There's nowhere in any
Gaming Commission application where FBT's owners have to be
listed in the Gaming Commission.  And so, there's no way that
Charley Lightbody meets that awareness that 804(b)(3)
requires, but I would refer the Court to our brief.  We cite
many, many caselaw -- cases from the First Circuit and
elsewhere that we think resolve this issue.

THE COURT:  I want to hear the government's response
to that before we go on.

MR. MERRITT:  I'll take that, your Honor.

First of all, the Court I think correctly regarded
the statements as being not just against his penal interest,
but against his pecuniary interest.

And as to the argument that in -- and to state the
arc, these begin in August of 2012.  In the jail calls to Mr.
Bufalino, it is true that they had already discussed, through
Mr. Lohnes saying, I don't want his name on the documents.

There will be testimony that in -- beginning with the

1    OCH-ZIFF transaction which started in around August, that the

2    other defendants knew that as a convicted felon, that he could

3    not -- that Lightbody could not have an interest in any

4    potential sale to a casino developer and that started with

5    OCH-ZIFF.

6         Now, it's pointed out that the charged conspiracy in

7    the indictment begins in December of 2012, but it's Hornbook

8    law that if there is evidence of a conspiracy to conceal, even

9    if it's not the charged one, if there's evidence of a

10   conspiracy, then if the statements meet the other criteria

11   that they're in furtherance of that conspiracy, then they can

12   be admissible as a co-conspirator statements.  That's *United*

13   *States vs. Lara*, 181 F.3d, 183.

14        So, whether it predates the Wynn particular

15   conspiracy is really not important.  What the question is:

16   Was there an agreement to conceal Mr. Lightbody's status

17   beginning when those statements were made?

18        Mr. Lightbody says that in his first phone call on

19   August 16th.  He says, "So I'll take my name off.  I got no

20   problem and now it actually works out because these casinos,

21   they see my name in there and they ain't going to like it.

22   So, I'll never show up on it, which is such a good thing."

23        So, it's clear from Mr. Lightbody's statements, which

24   are attributable to the other defendants, that they know that

25   this is an issue, and that also goes to the point that it's

1    claimed that Mr. Lightbody would have no idea that making such

2    a statement would be against his penal interest.

3            Well, it doesn't take a lot to figure out, your

4    Honor, that if you're going to be concealing from a potential

5    buyer what you're convicted -- that you're a convicted felon

6    or even if directly asked, misrepresenting it, that could

7    potentially be fraud and, in fact, that's what it turned out

8    to be, and that was the whole point of their venture.

9            So, I think it's a stretch to say that Mr. Lightbody

10   could not have known that he could potentially ever be

11   prosecuted for something when we're talking about lying or

12   concealing to get money.  That's fraud.  He had a lot of

13   experience with fraud.

14           So, I think the Court was correct in its initial

15   inclination that these statements would meet 804(b)(3).

16           THE COURT:  Thank you.

17           MR. KATZ:  30 seconds, your Honor.

18           THE COURT:  Defendants have about five minutes left.

19           MR. KATZ:  30 seconds.

20           THE COURT:  Go ahead.

21           MR. KATZ:  The caselaw is very clear.  If, for

22   example, Charley Lightbody was talking about a piece of land

23   that had -- that someone else thought had oil under it and he

24   says to Darin Bufalino, We're going to conceal that we had run

25   a test and found out it did not have oil on it, which is a

1   good thing because this buyer for some reason thinks it has

2   oil on it and they're going to pay me $10 million.  That is

3   not a fraud.  A failure to disclose that information is not a

4   fraud.  The law in the First Circuit and elsewhere is very

5   clear about this.

6          So, the question is not whether these conversations

7   took place or whether concealing is a sharp business practice.

8   It's whether Charley Lightbody at the time would have had an

9   awareness that had so great a tendency to subject himself to

10  criminal prosecution, that he would not have said it

11  otherwise.  We don't think that standard is anywhere close to

12  being met, your Honor.

13         THE COURT:  All right.  Mr. Connolly.

14         MR. CONNOLLY:  Thank you, your Honor.

15         Your Honor, on the -- there's two groups of alleged

16  co-conspirator hearsay statements that I want to talk about

17  very quickly.

18         The first group is the three Charley Lightbody/Darin

19  Bufalino telephone calls which the Court referenced earlier

20  on, and then briefly I'll address just a select few of the

21  additional recordings which were mentioned in the government's

22  opposition to our motion for a pretrial *Petrozziello* hearing.

23         Your Honor, the government offers basically two legal

24  grounds for offering the Bufalino/Lightbody calls.  Number

25  one, they say that Mr. Bufalino was a member of the conspiracy

1    and, therefore, both the statements by Mr. Lightbody and by

2    Mr. Bufalino are in furtherance of the conspiracy and,

3    therefore, should be admitted against all defendants.

4         The way in which the government proposes to prove

5    that Mr. Bufalino is a member of the conspiracy, your Honor,

6    is what is so troubling and what presents the risk of

7    catastrophic prejudice to the defendants that can't possibly

8    be erased by limiting instructions to the jury at the

9    conclusion of the case.

10        The way the government proposes to prove that Mr.

11   Bufalino was a member of the conspiracy is through the

12   purported expert testimony of Detective Lieutenant Johnson of

13   the state police who testified in the Whitey Bulger case, and

14   what the government has said in opposition to our motion to

15   exclude Detective Lieutenant Johnson from testifying is that

16   Johnson will be offered to testify, quote, "for the limited

17   purpose of establishing that Bufalino was a member of the

18   conspiracy charged in the indictment."

19        The way in which Mr. Johnson will arrive at that

20   conclusion is based upon his conversations in other cases

21   involving other individuals and other criminal charges that

22   he's aware of the practices of people who are involved in the

23   Mafia and those who seek to ingratiate themselves to members

24   of the Mafia, and what he will testify, according to the

25   government, is that individuals will often form relationships

1    with NELCN members and close associates, sometimes in order to

2    avoid any LCN extortion and that such relationships are

3    mutually beneficial to both parties.  The government further

4    says the NELCN member or associate often receives funds and,

5    in return, the individual receives protection from the

6    extortion practices.

7         The government then argues such testimony is relevant

8    to establish that Bufalino is an unindicted co-conspirator for

9    the purposes of admitting the jail calls.  In other words, the

10   government proposes to bootstrap in evidence from a witness

11   who has no percipient knowledge in this case whatsoever.  He's

12   going to be testifying based upon purely inadmissible and

13   irrelevant hearsay that this is the way people ingratiate

14   themselves to mobsters.

15        Your Honor, I want to underscore, this is a case

16   where there's no evidence whatsoever that Mr. DeNunzio or Mr.

17   Gattineri, both of whose last name ends in a vowel, had any

18   knowledge of who Mr. Bufalino was, had any criminal record

19   themselves, had any conceivable connection to LCN, but by

20   injecting this issue in and seeking to make this individual a

21   member of the conspiracy, that will result in catastrophic

22   prejudice which, particularly given the ethnic background of

23   those defendants, cannot be erased from the trial, which is

24   why we urge the Court to rule on this pretrial.

25        As I've said, Johnson has had no involvement in this

1    case.  He's simply being offered as a witness to testify that

2    in his opinion, Mr. Bufalino was a member of the conspiracy,

3    but, your Honor, under the Supreme Court's decision in

4    *Bourjaily*, the Supreme Court held, "Preliminary questions

5    concerning the admissibility of evidence shall be determined

6    by the Court."

7          The government can't offer a witness to testify to

8    what is essentially a 104 legal ruling.  That's -- it's

9    improper.  It's improper expert testimony.  It's improper fact

10   witness testimony.

11         So, for that reason, the Court cannot find, I

12   respectfully submit, that Mr. Bufalino was a member of the

13   conspiracy.  Should that be the case, then the government is

14   limited to offering Mr. Lightbody's statements as being in

15   furtherance of the conspiracy and, as your Honor said, there

16   are three, and I'd like to go through each of them quickly.

17         The first is during the call that occurred on

18   December 5th, 2012, when Mr. Bufalino talks about how Wynn

19   Resorts had past problems in New Jersey and one of the Gaming

20   Commission commissioners previously worked in New York State

21   Police and that is perceived as a stumbling block.  Mr.

22   Lightbody responds to that by saying, "That's why I left my

23   name off."

24         Now, under the First Circuit's decision in Ceressi,

25   it is black and white settled law, that statements of past

1    conduct are not, as a matter of law, in furtherance of a
2    conspiracy.
3           What Mr. Lightbody is talking about is what he did in
4    the past.  It's a reference to the documentation which was
5    prepared in draft form about an LLC, but it can't be construed
6    legally as in furtherance of the conspiracy given that it
7    refers to prior conduct.
8           The same is true as to the next statement offered by
9    the government.  That was the one made on December 11th, 2012
10   call between Lightbody and Bufalino where Bufalino refers to
11   the Boston Business Journal article regarding Gary DeCicco, a
12   then former member of FBT, and it talks about the defendant's
13   plan to buy out Charley Lightbody, and Bufalino responds, "You
14   need to move on.  You need to double blind it.  You need to
15   triple blind it, actually."  And Lightbody says, "That's
16   exactly what I'm doing."
17          Well, the "blinding" is a reference to -- the only
18   conceivable "blinding" in this case, given the evidence that's
19   been disclosed in discovery, is to the LLC, which was prepared
20   in draft form, which was prepared between June and July of
21   2012.  This, again, is a clear reference to past conduct,
22   which under *Ceressi* is inadmissible.
23          The third Bufalino/Lightbody statement, your Honor,
24   occur on two phone calls in February of 2013, one on the 21st
25   and one on the 28th, and that's a reference to the fact that

1   Mr. Bufalino has seen reference in public documentation to an

2   environmental filing made by Caesar's in connection with

3   another application for the area one -- the area A casino

4   license, and Lightbody talks about -- or Bufalino, rather,

5   talks about how slick the design is of the proposed casino at

6   that location.  A week later Lightbody tells Bufalino that he

7   got a copy of it on a CD that he never even looked at, and

8   passed it along to his guys so that they could pass that along

9   to Wynn.

10          The problem with that, your Honor, is that doesn't

11  further any goal of the conspiracy.  That's just two guys

12  having idle chatter about some fact that is, frankly,

13  irrelevant to the alleged goal of the conspiracy and, frankly,

14  it's inconceivable that it could have had any importance to

15  Wynn, which has its own environmental expert and other design

16  and architectural experts engaged in this case, and it's

17  inconceivable that there could be some benefit to Wynn from

18  some public filing being passed along by members of FBT.  So

19  that, too, cannot be considered as a furtherance of the

20  conspiracy.

21          Finally, your Honor, let me address three of the

22  statements that are set forth in the government's opposition

23  to our 801(d)(2)(E) motion.  Two of them are inadmissible for

24  the same reason.

25          The reason is that the government is offering

1  statements involving the economic well-being of Charley

2  Lightbody in regard to relationships that have nothing to do

3  with the conspirators in this case.  The first is the series

4  of exchanges between Charley Lightbody, on the one hand, and

5  Paul Simms, who works for First Ipswich Bank, in connection

6  with a bank loan.  The government says that between the fall

7  of 2012 and May of 2013, Lightbody makes certain statements

8  about his assets, including about his investment in FBT, but,

9  your Honor, the government seeks to make the connection to

10  801(d)(2)(E) by saying, Well, this loan, should Mr. Lightbody

11  get it, will give him economic sustenance and, therefore,

12  that's in furtherance of the goal of the conspiracy.

13          Well, under that rationale, your Honor, any economic

14  benefit that Mr. Lightbody gets from any third party --

15  literally a job at McDonalds, under the government's theory,

16  would fit it in under 801(d)(2)(E).  For the same reason, the

17  statements that are offered between Mr. Lightbody and Mike

18  DePlatzi should not be admitted.  In connection with those

19  statements -- those statements concern Lightbody talking about

20  his investments and how he's going to handle them for tax

21  reasons and he's boosting how he's going to with his partner

22  get involved in $200 million building.

23          The government argues that there, too, this is in

24  furtherance of the conspiracy because Mr. DePlatzi is a

25  business partner of Mr. Lightbody and, therefore, Mr.

1    Lightbody impressing Mr. DePlatzi with his economic

2    wherewithal will further the goals of the conspiracy because

3    it will foster a good business relationship with Mr. DePlatzi.

4         Your Honor, the law does not tolerate such a loose

5    reading of 801(d)(2)(E) and what is recognized as goals of a

6    conspiracy.  Mr. Lightbody's ability to pay his daily living

7    bills is not a goal of the conspiracy.

8         Thirdly, your Honor, I want to reference the

9    telephone call between Gary DeCicco and Charley Lightbody

10   which occurred on July 2, 2013.  Now, the government is

11   contending for the first time that Mr. DeCicco is also a

12   member of the conspiracy.  This is the third person, your

13   Honor, that the government has identified as a member of the

14   conspiracy, not in connection with its initial discovery

15   disclosures, but in connection with responding to evidentiary

16   arguments being made by the defense.

17        Mr. DeCicco had nothing to do with the conspiracy in

18   this case.  Mr. DeCicco was economically kicked out of the FBT

19   partnership months before the alleged conspiracy in this case

20   occurred, and Mr. DeCicco has a well-known to the government

21   long-standing beef with Mr. Gattineri because Mr. DeCicco

22   essentially lied to Mr. Gattineri when he got into the

23   partnership, stole money from them, and Mr. Gattineri kicked

24   him out of the partnership.

25        What the government wants to offer as a

1    co-conspirator statement is -- and I'm going to read this,

2    your Honor, and I apologize in advance.  I'm going to include

3    the profanity that's part of the statement.  In this call Mr.

4    Lightbody says, "Well, he's a maggot."  That's referring to

5    Mr. Gattineri.  Mr. DeCicco responds, "He's -- he's just an

6    absolute asshole.  I know people that have known him for 30

7    years and they told me, they said, There's not a decent bone

8    in the guy's body, and if the fucking shit hits the fan over

9    on that property, he will be the first one to rat anything or

10   anybody."  And Charley Lightbody says, "Oh, yeah."

11         Your Honor, it's not made by -- the statement by

12   DeCicco -- he's not a member of the conspiracy.  It's not in

13   furtherance of the conspiracy.  It is obviously highly

14   prejudicial, but it's -- it's amazingly ambiguous.  There is

15   no context that could tie the reference to the word "rat" to

16   anything involved in this case.  There isn't a shred of

17   evidence in this case, your Honor, that Mr. DeCicco has any

18   knowledge whatsoever of Mr. Lightbody's alleged hidden

19   ownership interest in FBT.  The only reason to inject that

20   statement into the record would be to prejudice Mr. Gattineri

21   and the other defendants in this case.  Thank you, your Honor.

22         THE COURT:  Thank you, Mr. Connolly.

23         The government will respond -- actually, Mr. Connolly

24   anticipated some of the questions that the Court has for the

25   government, but before you respond, Mr. Merritt, I will ask

1    some of them that I had prepared before Mr. Connolly's

2    argument.

3           First of all, are the 18 conversations included in

4    the defendants' memorandum of law and the government's two

5    opposition memoranda the sum total of all recorded statements

6    made by Mr. Lightbody which the government intends to offer in

7    evidence?

8           (Discussion off the record.)

9           MR. MERRITT:  Well, excluding actual tape recordings

10   that were made with the investigators, the IEB, I believe they

11   are.

12          (Discussion off the record.)

13          THE COURT:  Okay.

14          MR. MERRITT:  Yes, I think so, your Honor.

15          THE COURT:  Actually, Mr. Connolly recognized two of

16   the conversations I was going to ask you about.

17          With respect to the July 2nd, 2013 statements by

18   Lightbody to Jamie Russo, the government did not address in

19   its memorandum the fact that the statement involves totem-pole

20   hearsay.  How does the government expect to introduce each

21   level of hearsay?  That's the first question.

22          The second one is with respect to the July 15th, 2013

23   conversation between Mr. Lightbody and Michael Flood, what

24   extrinsic evidence does the government expect to provide to

25   prove that Mr. Flood was either a co-conspirator, Mr.

1   DeNunzio's agent or authorized by Mr. DeNunzio to make those

2   statements?

3           And, finally, with respect to the August 22nd, 2012

4   conversation between the defendant Lightbody and Mr. Bufalino,

5   does the government allege that the defendants attempted to

6   hide Lightbody's interest in the Everett parcel from the hedge

7   fund with which FBT initially signed an option agreement?  And

8   if not, then at the time the statements were made, why would

9   it have been against Mr. Lightbody's pecuniary or penal

10  interests to have discussed his partial ownership of the

11  Everett parcel with Mr. Bufalino?

12          MR. MERRITT:  Well, let me take the last question

13  first, your Honor.  I believe the government will have the

14  evidence to show that they were considering the fact that Mr.

15  Lightbody was a convicted felon as being something that would

16  be a negative factor when they're dealing with OCH-ZIFF.

17  That's in August of 2012.  So, when he's making those

18  statements to Mr. Bufalino regarding that the casino people

19  aren't going to like to see my name on there, it's already

20  known to him and his co-defendants that that is a problem.

21  So, it will be our position that they're already concealing or

22  had the intent to conceal the fact that he is a hidden owner.

23          With respect to Mr. Flood and his statements, I

24  think, as we point out, your Honor, there's only a couple of

25  statements in there which are actually being offered for their

1    truth.  Certainly, the fact that he's going to do signatures

2    and getting all that, those are verbal acts.

3           With respect to him saying that he retrieved these

4    documents from Feldman and that they needed to jimmy up the

5    case, I think the testimony of Mr. Flood would be that he was

6    an employee of the DeNunzio group, that in fact he had been

7    instructed by DeNunzio to do these things and was given those

8    statements and, therefore, he was operating within the scope

9    of his authority, both as an employee and as a specific agent.

10   Even if he's not an indicted co-conspirator, I think the

11   caselaw is also supported that the fact that he's acting as a

12   joint venturer in this particular effort to backdate these

13   documents would also be a basis for which his statements would

14   go in.

15          Going back to some of Mr. Connolly's arguments, I

16   think he has a very narrow reading of what, "statements in

17   furtherance of the conspiracy" are.  Essentially, they have to

18   be something that advances the conspiracy in some way rather

19   than inhibits the conspiracy, the success of the conspiracy,

20   and I think the Court was correct in its finding in previous

21   ruling that -- in the motion to sever, that the statements

22   that he's exchanging with Bufalino are to get advice and he's

23   getting advice back and forth and keeps him posted as to what

24   the activities are of this concealment conspiracy.

25          So, when Mr. Lightbody says, "I'm keeping my name

1    off," and Mr. Bufalino says, "Well, that's good because in

2    Jersey they got into a problem when they found out there was

3    something wrong," those are all the kinds of statements that

4    are in furtherance of a conspiracy.  It doesn't matter if Mr.

5    Bufalino is a member of that conspiracy.

6           And concerning the question that the government is

7    going to be calling Lieutenant Johnson, I think in our -- our

8    position was -- in response to their motion in limine is that

9    we feel confident enough that these statements will be

10   regarded as in furtherance of the conspiracy such that we

11   don't think we're going to call Lieutenant Johnson to

12   establish some of the things that Mr. Connolly was referring

13   to, which I think goes -- at least it seems to me, goes a long

14   way to allaying some of his concerns about anything being

15   overly or unfairly prejudicial.

16          And with respect to the statements against -- or made

17   to the bank people, Mr. Simms, Mr. DePlatzi, I think we would

18   rest, your Honor, more primarily that those statements are

19   against his interest when made as opposed to necessarily being

20   co-conspirator statements.  I think there is a ground that his

21   continued financial security while they're waiting for the

22   Wynn money to eventually show up is something that furthers

23   the overall objective of the conspiracy so that they can keep

24   holding out, but I think they're admissible as statements

25   against pecuniary and penal interest to the same degree.

1          (Discussion off the record.)

2          MR. MERRITT:  And with respect to the statements made

3     to Russo, what's going on there, your Honor, if I correctly

4     recall, is that these are not all statements that are being

5     offered for their truth.  They're discussing what story they

6     should be giving.  In fact, DeNunzio calls Lightbody to talk

7     about this is -- you know, this is the kind of story you

8     should get to DeCicco and tell him that he shouldn't even

9     speak with investigators, and then they talk about, Well, what

10    would he say, anyway?  So, it's clear that they know that Mr.

11    DeCicco has something that he could say that would be harmful

12    to the conspiracy and, in fact, that's why they're talking

13    about it.

14          Now, going back to the question about where they're

15    talking about Mr. Gattineri being a rat, that is obviously not

16    being offered for the truth.  It's being offered to prove, in

17    fact, that there was a conspiracy, and that's -- we cite in

18    our brief, that's *Anderson*.  That's First Circuit case *US vs.*

19    *Munson,* that has a non-hearsay purpose that actually proves

20    that there was something that they were concerned about him

21    ratting about, and the fact that the word "rat" doesn't come

22    out of Mr. Lightbody's mouth I think is irrelevant because, in

23    fact, he affirms that.  He acknowledges that when Mr. DeCicco

24    says he's the first one to rat, he goes, "Yeah, I know."  So,

25    it doesn't really matter who used that term.  The important

```
 1    thing is that the conversation is relevant and probative
 2    evidence that there was some kind of conspiracy.
 3              THE COURT:  All right.  Thank you.
 4              MR. MERRITT:  Thank you.
 5              MR. CONNOLLY:  Your Honor --
 6              THE COURT:  You have about 30 seconds rebuttal time
 7    left, Mr. Connolly.
 8              MR. CONNOLLY:  Thank you.  I'll abide by that, your
 9    Honor.
10              I don't know if I understood Mr. Merritt correctly in
11    saying that Detective Lieutenant Johnson will not be offered
12    as a witness if the government is able to make the factual
13    showing to get the -- to prove that Darin Bufalino was a
14    member of the conspiracy.  As I understand it, the way that
15    they intend to do that is through the testimony of a guard
16    assigned to the prison where Mr. Bufalino was located to
17    testify to his knowledge --
18              THE COURT:  I didn't hear him saying that he felt he
19    had to get Bufalino as a member of the conspiracy to get those
20    statements in.  Did you say --
21              MR. MERRITT:  No.  I said I think we're able to show
22    that those were statements made in furtherance of the
23    conspiracy.
24              THE COURT:  Yes, that's what I thought.
25              MR. CONNOLLY:  Well, then can we assume from that
```

1    that the government is not going to offer evidence that Mr.

2    Bufalino is a member of the LCN, which is our primary concern

3    underlying this motion, not our only one, but our primary, our

4    most serious concern?

5            THE COURT:  Well, I don't know that you can assume

6    anything at this stage, Mr. Connolly.  The government is under

7    the burden of -- as you know, with respect to *Petrozziello*, of

8    making its proof during its case in chief and if it doesn't,

9    risking a mistrial.

10           So, to the extent that it is going to run that risk,

11   it's better to be very careful how it does it, but I'm not

12   going to tell them or make them declare to you what their

13   evidence is going to be in that regard.

14           (Discussion off the record.)

15           MR. CONNOLLY:  Thank you, your Honor.

16           THE COURT:  All right.  Thank you, counsel.  That

17   ends the conversation about the pending motions, but we have

18   not discussed at all the most recent motion filed and that is

19   to continue this trial because of Mr. Lightbody's current

20   status of health.  I have not read the government's response

21   that was apparently filed just before I came on the bench.  Do

22   you wish to inform the Court as to what the position of the

23   government is?  Mr. Merritt.

24           MR. MERRITT:  Yes, your Honor.

25           As the Court knows, this was filed late Friday, and

1    we did try to respond as quickly as possible.  Even though,

2    apparently, the evidence that they rely on, the doctor's

3    analysis, which was a letter of March 3rd --

4            THE COURT:  I understand it was three weeks before

5    that letter was referred to the Court.  Is there any reason

6    why it took three weeks to get me that information, Mr.

7    Rankin?

8            MR. RANKIN:  Yes, your Honor.  After I received the

9    letter, probably on the 4th, I sent it to the government

10   asking if they would agree to a motion to continue or sever.

11   The government -- Mr. Merritt requested an opportunity to

12   speak with Dr. Takvorian directly and I think it took probably

13   about ten days for that to happen given the doctor's schedule.

14   Last Friday, I think, a week ago, Mr. Merritt said that they

15   were -- after speaking with Dr. Takvorian, they weren't able

16   to agree to it, and we filed the motion on Friday.  So, that's

17   the explanation for the period of time.

18           THE COURT:  Mr. Merritt.

19           MR. MERRITT:  Well, we spoke to the doctor on March

20   15th, just for the record, your Honor, and, in fact, that's

21   incorporated into our response.

22           There's two grounds that have been offered.  One is

23   that there may be a physical or health reason from that

24   perspective, and I don't think that one is a serious ground,

25   your Honor.  The only one that -- I guess the leading factor

they call is that there's a risk of infection based on his

prior chemotherapy.

Well, I think, your Honor, it's clear from when the

Court reads our response fully, that that's something that is

more of a theoretical risk, even according to the doctor, and

he suggested to me that that means you shouldn't be going to

Fenway Park, you know, you should wash your hands as much as

possible, that kind of thing.

Well, in fact, Mr. Lightbody pretty much as soon as

he finished up his chemotherapy -- and this is in our

response -- made a trip down to Florida to the Hard Rock Café

Casino where he was seen gambling, which is perfectly

legitimate.  He returned there again.

So, he's not -- I would suggest the fact that he was

able to go to those kinds of places and has continued to work,

apparently, during the interim and feel free to travel around

wherever he wants, I don't think the so-called risk of

infection is a sufficient risk to his health or serious

health, that that would require a continuance.

THE COURT:  Is the government seeking an independent

examination?

MR. MERRITT:  Well, not -- I think on the question of

that, I don't think it's necessary because I don't think

they've even come close to making the kind of showing that

there is a serious risk to his health or possible death by the

1   physical aspect.

2          Now, they have raised the issue that they claim that

3   he is suffering from what's called chemo-brain, which can tend

4   to cause people to have more cloudy memories, and such, and

5   that -- it's very hard for us to make a quantitative or

6   qualitative analysis of that.  In fact, the doctor himself

7   said it's not a very -- something you could measure

8   objectively.

9          I would suggest, your Honor, that just his reporting

10  these things would not be significant to establish the kind of

11  fairly high bar -- get over the high bar that he's unable to

12  appreciate the consequences or what's going on in court or to

13  be able to assist in his defense.

14         If the Court thinks there is some further credible

15  reason to explore that, then we think under -- I believe it's

16  §4241, that he should be ordered to undergo an examination for

17  mental incompetence and get a report made to the Court as

18  promptly as possible, but I don't think at this point his --

19  purely his affidavit and the general notion that there is such

20  a thing as chemo-brain would be enough to show that he's

21  legally incompetent to --

22         THE COURT:  And the alternative of severance?

23         MR. MERRITT:  Well, we're opposed to severance, your

24  Honor.

25         THE COURT:  Because?

1          MR. MERRITT:  Well, I guess we're opposed to

2     severance because we don't think there's a reason to continue

3     it, but I think, I guess, for judicial economy and the fact

4     that, you know, much of all the evidence would have to be done

5     twice and it's not a question of prejudice.  It's just a

6     question of whether or not we're going to have to have two

7     trials with the same subject matter.

8          THE COURT:  All right.  Anything else in that regard,

9     Mr. Rankin?

10         MR. RANKIN:  I think Mr. Merritt put his finger on

11    the issue that's the more serious one and that is whether Mr.

12    Lightbody's mental acuity is adequate to stand trial at this

13    point.

14         The doctor's letter does suggest that he's

15    experiencing symptoms of chemo-brain.  The government's filing

16    indicates that he said that essentially to Mr. Merritt.  In

17    our motion we said that if the government requested an

18    examination, Mr. Lightbody is prepared to undergo that.

19         I think it's not a question of does Mr. Lightbody

20    know who the prosecutors are, what the charge is, what the

21    defense lawyer's role is, what the Court's role is.  It's

22    whether the fogginess or cloudiness will hamper his ability to

23    hear what's going on, digest it, confer with counsel, perhaps

24    testify in his own behalf.  All of those things I think are

25    very much influenced by whether he's suffering from this

1    condition and whether a delay at least as to him would be

2    warranted.  So, that would be our request, that we take the

3    step of having an examination done by a physician or mental

4    health professional of the government's choosing and see what

5    that yields.

6            THE COURT:  Mr. --

7            MR. LEVY:  Your Honor, very briefly on the

8    continuance, your Honor.

9            On behalf of Mr. DeNunzio, and I believe I speak for

10   Mr. Connolly, we are very eager to try this case.  These two

11   individuals have never been in trouble with the law.  This has

12   been hanging over them, scheduled in November, scheduled in

13   March, now scheduled in April.  Frankly, we -- so, we are

14   eager to go to trial as soon as possible.  We're geared up two

15   weeks out.  So, I just wanted to have that on the record, your

16   Honor.

17           THE COURT:  All right.  Thank you.  I'll take these

18   matters under advisement.  Thank you, counsel.

19           MR. MERRITT:  Thank you, your Honor.

20           COURTROOM DEPUTY CLERK LOVETT:  All rise.

21           (Adjourned, 12:21 p.m.)

22

23

24

25

1          C E R T I F I C A T E

2          I, Catherine A. Handel, Official Court Reporter of the

3    United States District Court, do hereby certify that the

4    foregoing transcript, from Page 1 to Page 53, constitutes to the

5    best of my skill and ability a true and accurate transcription of

6    my stenotype notes taken in the matter of Criminal Action No.

7    14-10284-NMG, United States of America versus Dustin J. DeNunzio,

8    et al.

9

10
     March 29, 2016        /s/Catherine A. Handel
11   Date                  Catherine A. Handel, RPR-CM, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25