UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No.: 14-cr-10284-NMG |
| ) | |
| (1) DUSTIN J. DENUNZIO, ) | **UNDER SEAL** |
| (2) ANTHONY GATTINERI, and ) | |
| (3) CHARLES A. LIGHTBODY ) | |
| ) | |
| Defendants ) | |

## GOVERNMENT'S MOTION IN *LIMINE* TO ADMIT EVIDENCE RELATING TO 1031 EXCHANGE

The United States hereby moves *in limine* to permit the introduction of evidence contained in Michael Flood's notebook which shows in June 2013 the defendants were seeking legal advice as to how to roll their profits -- including Lightbody's -- from the Wynn Resorts sale into a 1031 exchange. Although this page from the Flood notebook was originally purported to be protected by the attorney-client privilege, the Court should permit the government to introduce this crucial evidence because whatever privilege existed has been either been waived or vitiated by the crime fraud exception.[1]

I. **BACKGROUND FACTS**

On July 15, 2013, agents with the Federal Bureau of Investigation approached Michael Flood at the corner of Washington Street and State Street in Boston, Massachusetts. At the time, Flood worked for Defendant Dustin DeNunzio. Based on Court-authorized intercepts of Charles Lightbody's cellular telephone and physical surveillance, investigators had reason to believe that Flood had just retrieved documents from an assistant to attorney Paul Feldman. The

---

[1] The government did not file this motion in *limine* earlier because it was not until Defendants filed their witness and exhibit lists which included attorneys and attorney emails, respectively, that the government thought to review and use this evidence.

1

investigators further had reason to believe that those documents were prepared for the purpose of hiding the fact that Lightbody maintained a current interest in the Everett Parcel from Wynn Resorts and the Investigations and Enforcement Bureau of the Massachusetts Gaming Commission. When agents retrieved the documents from Flood's vehicle pursuant to the automobile exception to the Fourth Amendment warrant requirement, they noticed a blue notebook (the notebook) open in the vehicle. The notebook contained the phrase "pick up doc from Feldman for AG and CL to sign, call Charlie and find out where they are and where we can meet to get signatures." Agents seized the notebook in addition to the documents.

During the morning of July 16, 2013, an analyst for the FBI emailed a scanned copy of the contents of the notebook to the two Assistant United States Attorneys who were at that time assigned to the investigation, Kristina E. Barclay and Seth Kosto. Barclay reviewed the contents of the notebook, and discussed same with the case agents. Among other things, Barclay noted a reference to "1031," an IRS mechanism which Lightbody had mentioned on intercepted calls as a means for him and his partners to defer taxes on the casino proceeds. *See* Exhibit 1.[2] On July 17, 2013, a lawyer for Flood met with Barclay and asked for a copy of the notebook. Barclay emailed him the scanned copy of the notebook. Later that day, after being advised by Flood's attorney that some of the entries in the notebook might contain privileged information, Barclay instructed the investigative team not to review the notebook again, and to collect all copies of the notebook, segregate them and treat them as they would any potentially privileged information. On July 18, 2013, Flood's lawyer emailed Barclay the entire notebook, with Bates Numbers DCG01 – DCG50, so that it would be easier to discuss any privilege issues. On July 19, 2013, Flood's lawyer informed Barclay that pages DCG021, DCG022 (Exhibit 1), DCG031, DCG032

---

[2] Barclay also noted a reference a reference to "Charlie 'loans' money to LLC" (the word loan was actually in quotes in the notebook) in connection with "KA." *See* Exhibit 2.

and DCG034 (Exhibit 2) of the Bates numbered version of the notebook he produced were privileged. Barclay then removed the pages from the Bates numbered version of the notebook, and the investigative team only used and referred to the "redacted" version of the notebook thereafter. In grand jury, Flood testified that he made notes and kept the notebook as part of his job for the DeNunzio Group.

Attorney Paul Feldman, who has represented FBT Everett Realty LLC (FBT) since at least October 2009, proffered with the government in August 2014 and testified in the grand jury in September 2014. Before proffering, the government was informed by Feldman's attorney, Bruce Singal, in Feldman's presence, that Feldman secured a waiver of attorney-client privilege from attorney Thomas Butters on behalf of FBT and Dustin DeNunzio for a number of different topic areas, including communications with DeNunzio regarding the 1031 exchange mechanism.[3] In grand jury, Feldman did assert the attorney client privilege as to some questions but did not as to questions about the 1031 exchange. Feldman testified that he had more than one conversation with DeNunzio about the 1031 exchange, beginning in early 2013. DeNunzio asked whether they could use the 1031 mechanism to avoid capital gains taxes on the proceeds from the Wynn Resorts casino deal. Feldman testified as to the information he provided to DeNunzio about the 1031 exchange over the course of those communications, which included information about turning the ownership in the land over from an LLC to a tenants in common, which Feldman referred to as a "TIC". Feldman did not disclose that these discussions about the 1031 exchange involved Lightbody's interest. *See* Grand Jury transcript, attached as Exhibit 4.

On March 14, 2016, Defendants filed their list of proposed exhibits (Docket No. 344) and their list of proposed witnesses (Docket No. 345). Defendants' exhibit list includes a

---

[3] As indicated in the excerpt from the FBI 302, attached as Exhibit 3, Singal also indicated that the other principals of FBT had not waived their privilege.

3

number of emails between one or more Defendants and attorney Feldman which the government had not previously seen because they had been marked privileged by a taint team. Their witness list includes at least six attorneys who have previously represented Defendants, including Feldman and Steve Miller.[4]

The bottom half of Exhibit 1, a page from the notebook, includes the term "1031", and then the following: "Nominee Trust owns the property w/TIC and the beneficiaries being **CL/PL/AG**." (Emphasis added). Further in the notes is the following: "Record title must be changed from FBT LLC." Based on the surrounding pages of the notebook, it appears this discussion occurred on or about June 19, 2013. The email attached as Exhibit 5 reflects that DeNunzio met with Feldman on June 19, 2013 "to talk about 1031 exchanges." It is evident that the notebook page attached as Exhibit 1 relates either to the June 19, 2013 meeting with Feldman or a separate discussion without attorneys present. Regardless, the notes related to the 1031 mechanism and demonstrate that Lightbody was still a member of FBT – and an undisclosed owner of the Everett Parcel – as late as June 19, 2013.

## II. ARGUMENT

### A. The Evidence Related to the 1031 Reference in the Notebook Should be Admitted Under the Crime-Fraud Exception to the Attorney-Client Privilege.

The crime-fraud exception is a well-established qualification to the general rule that confidential communications between an attorney and client are protected from disclosure. *See Clark v. United States*, 289 U.S. 1, 15 (1933); *United States v. Gorski*, 807 F.3d 451, 460 (1st Cir. 2015); *In re Grand Jury Proceedings*, 417 F.3d 18, 21 (1st Cir.2005). It withdraws the

---

[4]In their Memorandum in support of Motion in *Limine* to Preclude Introduction of Uncharged Allegations of a "King Arthur Conspiracy, Defendants acknowledge that DeNunzio waived any privilege attendant to conversations with attorney Steve Miller regarding the King Arthur's. *See* Docket No. 290, n.2.

4

protection typically accorded to lawyer-client communications when a client seeks to employ legal representation to commit or facilitate a crime or fraud. *In re Grand Jury Proceedings*, 417 F.3d at 22; *United States v. Rakes*, 136 F.3d 1, 4 (1st Cir. 1998) ("Thus, the attorney-client privilege is forfeited inter alia where the client sought the services of the lawyer to enable or aid the client to commit what the client knew or reasonably should have known to be a crime or fraud.").

The party invoking the crime-fraud exception "must make a *prima facie* showing: (1) that the client was engaged in (or was planning) criminal or fraudulent activity when the attorney-client communications took place; and (2) that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity." *Gorski*, 807 F.3d at 860 (quoting *In re Grand Jury Proceedings (Gregory P. Violette)*, 183 F.3d 71, 75 (1st Cir.1999)). The First Circuit has clarified that this language establishes a "reasonable cause standard." *In re Grand Jury Proceedings*, 417 F.3d at 24. This standard may be met by "something less than a mathematical (more likely than not) probability that the client intended to use the attorney in furtherance of a crime or fraud." *Gorski*, 807 F.3d at 860.

Here, the allegations in the indictment itself alleging that the defendants conspired to and did execute a wire fraud scheme by concealing Lightbody's hidden ownership from Wynn Resorts and the Massachusetts Gaming Commission sufficiently meet the reasonable cause standard that the defendants were engaged in criminal activity when they discussed 1031 exchanges with Feldman. *See Gorksi*, 860 F.3d at 861 (finding that district court "correctly noted that the indictment provides a reasonable basis to believe that Gorski and/or Legion was engaged in criminal or fraudulent activity."). Secondly, there is also more than reasonable cause to believe that the 1031 discussion with Feldman on June 19, 2013 concerned a mechanism to

facilitate and conceal the profits due to Lightbody based on his hidden interest as a "beneficiary" of the nominee trust. This communication squares with Lightbody's statement in the intercepted call on July 2, 2013 with a friend, where he states in discussing the sale of the Everett parcel:

> But, because I'll tell you the truth, I'm 1031-ing all my money. I got a deal with my partner that we're looking at right now, it's fucking, it like you know it's in a whole different league. You know what I mean? My partner, my partner's got all the money. My partner owns, he's owns, we own 25%, he owns 50%. So he wants, he wants to take his profit and my profit and buy a building for $200 million.

The confluence of the allegations in the Indictment and the content of the notes show more than a *prima facie* case that whatever attorney client privilege was asserted for the notebook page should no longer be deemed valid under the crime-fraud exception.

**B.  DeNunzio and FBT's Waiver of the Attorney-Client Privilege Concerning 1031 Discussions Constitutes Subject Matter Waiver**

The notebook page evidence is also not protected by any attorney-client privilege because by waiving the privilege for Feldman to testify about 1031 discussions, any privilege as to any communications about the subject matter is effectively waived.

It is well settled that a defendant asserting the attorney-client privilege is required to make four showings: (1) that he was or sought to be a client of the attorney; (2) that the attorney, in connection with the document, acted as a lawyer; (3) that the document relates to facts communicated for the purpose of securing a legal opinion, legal services, or assistance in a legal proceeding; and (4) that the privilege has not been waived. *United States v. Wilson*, 798 F.2d 509, 512 (1st Cir.1986); *see also United States v. Bay State Ambulance and Hosp. Rental Serv.*, 874 F.2d 20, 27-8 (1st Cir. 1989). The party asserting the privilege bears the burden of proving its existence. *Wilson*, 798 F.2d at 512–13. The attorney client privilege "applies only to the extent necessary to achieve its underlying goals . . . ." *In re Grand Jury Subpoena (Custodian of*

*Records, Newparent, Inc.)*, 274 F.3d 563, 571 (1st Cir.2001). The privilege "must be narrowly construed because it comes with substantial costs and stands as an obstacle of sorts to the search for truth." *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16 (1st Cir. 2003); *see also United States v. Nixon*, 418 U.S. 683, 709–10 (1974).

### 1. Broadness of Subject Matter Waiver

"Under principles of subject-matter waiver, the waiver of privilege applies as to the entire subject matter, not a narrowly defined subset of documents." *United States v. Gorski*, 2014 WL 4656576, *5 (D. Mass. 2014); *see, e.g., In re Sealed Case*, 676 F.2d 793, 809 (D.C.Cir.1982) (explaining that waiver of attorney-client privilege in an attorney client communication extends "to all other communications relating to the same subject matter"). A subject matter waiver applies to situations in which "fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." *Bear Rep. Brewing Co. v. Central City Brewing Co.*, 275 F.R.D. 43, 48 (D. Mass. 2011). Fairness concerns arise when a party has made the communication an issue in the case, or attempts to "benefit from the disclosure by, for example, using it as part of an advice-of-counsel defense." *Trustees of Boston Univ. v. Everlight Elec. Co., Ltd.*, 2015 WL 3407555, *6 (D. Mass. 2015).

The First Circuit has held that a party cannot wield "the attorney-client privilege as both a sword and a shield." *In re Keeper of the Records*, 348 F.3d 16, 24 (1st Cir. 2003). An advice of counsel defense is a "paradigmatic example" of the problem. *Id.* A party "cannot put attorney-client communications at issue by raising the defense and then assert the privilege to shield any unfavorable evidence." *In re PolyMedica Corp. Sec. Lit.*, 235 F.R.D. 28, 32. (D. Mass. 2006).

Here, by affirmatively waiving the privilege about 1031 discussions between Feldman

and DeNunzio and FBT, DeNunzio can hardly make a selective invocation of the privilege regarding the notes of the discussion of that subject matter.[5] Of course, the possibility exists that the notebook entry on June 19, 2013 may refer to some other meeting before or after the Feldman meeting, but that raises the question whether any attorney client privilege was properly asserted in the first place.

For the reasons set forth above, there is no question that FBT and DeNunzio waived any privilege attendant to the 1031 discussion to which the notes allegedly relate. Moreover, even if Gattineri or Lohnes was present for the 1031 discussion, neither of them can personally assert that the conversation was privileged because Feldman's client, according to his billing records, was FBT. "The default assumption is that the attorney only represents the corporate entity, not the individuals within the corporate sphere, and it is the individuals' burden to dispel that presumption." *In re Grand Jury Subpoena*, 274 F.3d at 571.

Gattineri or Lohnes can only overcome this presumption if he can establish (1) he approached Feldman for the purpose of seeking legal advice; (2) when he approached Feldman he made it clear that he was seeking legal advice in his individual, rather than in his representative, capacity; (3) counsel saw fit to communicate with him in his individual capacity, knowing that a possible conflict could arise; (4) his conversations with counsel were confidential; and (5) the substance of his conversations with counsel did not concern matters within the company or the general affairs of the company. *Id.*, 274 F.3d at 571. The fact that Flood took notes regarding the 1031 discussion is an insurmountable hurdle for Gattineri and Lohnes. Even if the 1031 discussion was a communication with Feldman in their individual capacities, the conversation could not have been confidential because Flood was there.

---

[5] For the same reason, DeNunzio's email to Feldman laying out the 1031 discussion points of the meeting is also covered by subject matter waiver.

8

Accordingly, neither Gattineri nor Lohnes can assert any individual privilege for the 1031 discussion memorialized in Flood's notes.

## III. CONCLUSION

For the foregoing reasons, the Court should permit the government to introduce evidence relating to Flood's notes and DeNunzio's email concerning 1031 exchange discussions with Feldman.

                                                Respectfully submitted

                                                CARMEN M. ORTIZ
                                                United States Attorney

Date:  March 28, 2016                By:     */s/S. Theodore Merritt*
                                                   KRISTINA E. BARCLAY
                                                   S. THEODORE MERRITT
                                                   Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed under seal was served on all counsel of record.

Date: March 28, 2016                               */s/ S. Theodore Merritt*
                                                   Assistant United States Attorney