1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3

4
     * * * * * * * * * * * *    14CR10284-NMG
5    UNITED STATES OF AMERICA*
                              *
6    VS.                      *    APRIL 12, 2016
                              *    9:14 A.M.
7    DUSTIN J. DeNUNZIO,      *
     et al                    *
8                             *    BOSTON, MA
     * * * * * * * * * * * *

9

10
          BEFORE THE HONORABLE NATHANIEL M. GORTON
11
                    DISTRICT JUDGE
12
                   (Jury Trial)
13
                    **VOLUME II**
14

15

16   **APPEARANCES**:

17

18   FOR THE GOVERNMENT:    KRISTINA E. BARCLAY, AUSA
                            S. THEODORE MERRITT, AUSA
19                          United States Attorney's Office
                            One Courthouse Way
20                          Suite 9200
                            Boston, MA 02210
21
     FOR THE DEFENDANT,
22   DUSTIN J. DeNUNZIO:    JOSHUA S. LEVY, ESQ.
                            TODD FOSTER, ESQ.
23                          AARON M. KATZ
                            Ropes & Gray LLP
24                          Prudential Tower
                            800 Boylston Street
25                          Boston, MA 02199-3600

1

2      **APPEARANCES** (Cont'd):

3

4      FOR THE DEFENDANT,
       ANTHONY GATTINERI:        MICHAEL J. CONNOLLY, ESQ.
                                 Hinckley, Allen and Snyder, LLP
5                                28 State Street
                                 Boston, MA  02109
6

7      FOR THE DEFENDANT,
       CHARLES A. LIGHTBODY:  CHARLES W. RANKIN, ESQ.
                                 Rankin & Sultan
8                                151 Merrimac Street
                                 Second Floor
9                                Boston, MA  02114-4717

10

       Court Reporter:           Debra D. Lajoie, RPR-FCRR-CRI-RMR
11                               Kelly Mortellite, RMR-CRR
                                 Lee A. Marzilli, RMR-CRR
12                               One Courthouse Way
                                 Boston, MA  02210
13

14                    Proceeding reported and produced by
                           computer-aided stenography

15

16

17

18

19

20

21

22

23

24

25

## I N D E X

**GOVERNMENT WITNESS**                                          **PAGE**

Michael Kradolfer
Direct Examination by Ms. Barclay                                99
Cross-examination by Mr. Rankin                                 121

Mark Schwartz
Direct Examination by Mr. Merritt                               150


## E X H I B I T S

**NO.**                          **FOR ID**        **IN FULL**

1                                                   105
2-12 and 163 and 164                                109
19                                                  157
20                                                  158
21                                                  166
170                                                 167
22                                                  169

1    12 APRIL 2016 -- 9:14 A.M.

2        (The jury is not present for the following)

3        THE COURT:  May I see counsel at sidebar,

4    please.

5        (Discussion at sidebar)

6        THE COURT:  Good morning, counsel.

7        We have had a problem with one of the jurors.

8    After impanelment, Juror No. -- seated in Seat No. 3,

9    Mr. John ████████, that's Juror No. 17, expressed to my

10   Deputy Clerk great dissatisfaction for having been

11   seated on the jury, how can he possibly do this, he has

12   kids at home, he's got a job, he won't be able to

13   serve, there's no way he can do it.

14       And he was very belligerent in front of the rest

15   of the jury and then continued it downstairs saying,

16   What if I don't show up?  What can happen?  And she

17   politely said that you'd better show up, which he has

18   done today, but he is still in a very bad mood.  What I

19   propose to do is to have him in my lobby with the court

20   reporter to find out what his problem is.  If counsel

21   want to be present, that's okay, but I thought maybe at

22   first I would do it by myself and then come back and

23   report to counsel as to what the issue is.

24       What's the pleasure of counsel?

25       MR. CONNOLLY:  That sounds reasonable.

1          MS. BARCLAY:  That's fine, Your Honor.

2          MR. RANKIN:  I'd prefer to be present,

3    Your Honor.

4          THE COURT:  At the first -- at the instant?

5          MR. RANKIN:  Yes.

6          THE COURT:  All right.  I don't want to

7    intimidate him, so I would suggest one counsel from

8    each side, so that'll be four counsel in my lobby with

9    the court reporter, and I will inquire as to what his

10   problem is and also express the great dissatisfaction

11   of the Court in his not having brought this to our

12   attention when we could have easily replaced him

13   yesterday in the six hours that it took us to impanel a

14   jury.

15         And I am inclined, if the report is as it is, if

16   he ends up having to be excused, to hold him in

17   contempt and to fine him, but that I'll make up my mind

18   later.

19         MR. LEVY:  Yes, Your Honor.

20         THE COURT:  All right.  I'll invite one counsel

21   from each side to be in my lobby right now.

22         MS. BARCLAY:  Your Honor, while we're at it --

23         THE COURT:  Yes?

24         MS. BARCLAY:  -- the Government -- Juror No. 7,

25   Roger ▮▮▮▮, he's seated in Seat 7, he's a Harvard

1    Admissions Officer.  I'm not sure if the Defendants

2    intend to introduce evidence that the Defendant,

3    Dustin DeNunzio, went to Harvard.  I don't see that it

4    necessarily would be relevant, but if they do intend to

5    introduce such evidence, we would ask the Court, out of

6    fairness to that juror, to let him know there may be

7    evidence that a Defendant went to Harvard possibly

8    during his tenure and ensure that, that does not put

9    him in a position where he doesn't believe he can be

10   fair and impartial.

11        MR. LEVY:  Your Honor, my client,

12   Mr. DeNunzio -- all of this was known yesterday.  We

13   absolutely want to introduce where Mr. DeNunzio went to

14   college.  They're saying he's part of organized crime.

15   Your Honor, that's a highly relevant fact.  If they had

16   a problem with Mr. Banks, they could have struck him

17   yesterday, but to pull him aside and call out evidence

18   by the Court at the outset of the case we think would

19   be extremely unfair to Mr. DeNunzio.

20        MS. BARCLAY:  Your Honor, I think it's more a

21   matter of fairness to the juror.  It might be something

22   that he's uncomfortable with, that he should have

23   notice ahead of time that there may be evidence that

24   one of the Defendants went --

25        THE COURT:  No, I'm not going to do that now.  I

1    spent six and a half hours impaneling a jury yesterday,

2    and any matters with respect to jurors that was going

3    to possibly come up should have been brought to my

4    attention yesterday.  One quarter of the courtroom

5    might have gone to Harvard, for all I know.  We're not

6    going to do that now.

7            So, I'll see counsel in chambers right now with

8    the court reporter.

9            (Discussion in chambers)

10           THE COURT:  All right.  Just for record,

11   Juror No. 17, John ████████, who's seated in Seat No. 3

12   has been asked to come in to chambers where counsel for

13   each party is present, and my Deputy will go get him.

14           THE COURT:  Mr. ████████, have a seat.

15           THE JUROR:  Good morning.

16           THE COURT:  Good morning.

17           Just so you understand, counsel for all the

18   sides are here, and I understand you now are expressing

19   a problem with serving as a juror.

20           THE JUROR:  Yes.  I'm a single dad, I'm a sole

21   provider, and I've never been through this process, so

22   I must have misinterpreted what you were asking me

23   yesterday.

24           THE COURT:  It took us six hours, and I asked

25   you at least 25 questions, and you were under oath when

2-8

Case 1:14-cr-10284-NMG Document 442 Filed 04/15/16 Page 8 of 185

1    you were answering them.

2         THE JUROR:  Yeah.

3         THE COURT:  And you didn't answer any of my

4    questions yes, except one that we had -- that we talked

5    about at sidebar; right?

6         THE JUROR:  Yes, correct.

7         THE COURT:  So, what is the problem now, after

8    I've impaneled a jury for almost a full day?

9         THE JUROR:  Just time restrictions.

10        THE COURT:  Why didn't you bring that to my

11   attention yesterday when I could have replaced you

12   easily?

13        THE JUROR:  Because I didn't understand your

14   question.  I thought you asked me if I could judge on

15   the jury, like was capable of making a decision.  I

16   didn't know it was -- yesterday, when you asked us to

17   go to one room or the other room, that's the last

18   question of the day, I think, I didn't understand you,

19   and that's when I should have went to the other room

20   and asked for -- not to be -- I mean, one or two days

21   would be fine, but it's just right now, Your Honor, I'm

22   financially struck.

23        THE COURT:  What do you do for a living?

24        THE JUROR:  I work for myself, I'm --

25   construction.  But the problem is, is I put my daughter

1    on the bus every morning, so it's hard for me to come

2    in and get a union job because I don't -- I can't start

3    work until 9:00, and I've been lucky enough to have

4    enough friends that keep me employed, so --

5         THE COURT:  So, you're telling me now that this

6    would cause you a financial hardship, to serve on this

7    jury?

8         THE JUROR:  That, because of this month I have

9    all my taxes due, I just bought a new truck, so I got

10   my excise tax due, I'm -- land tax due that I'm behind

11   on.  I own property in Maine.  But most importantly is

12   my daughter.

13        THE COURT:  And how old is he?

14        THE JUROR:  She is in second grade.

15        THE COURT:  And --

16        THE JUROR:  And I've missed -- like, we've

17   missed one day this year, and we got, like, three

18   tardies, and she -- I'm very punctual about school.

19        THE COURT:  Nobody else can take her?

20        THE JUROR:  No.  It's very hard for my -- like,

21   she just barely made the bus yesterday.  I live with my

22   sister, and my brother-in-law is an engineer, and he's

23   gone at 6:00 in the morning, 7:00 in the morning, and

24   my sister's a night person, so my sister takes care of

25   my daughter after school, but in the morning I take --

1    I make sure my niece and my daughter make it to school

2    every -- on time, dressing and brushing hair,

3    breakfast, the whole nine yards.

4            THE COURT:  So, you're asking to be excused from

5    this jury?

6            THE JUROR:  Yes, sir.

7            THE COURT:  Well, if you'll retire, I'm going to

8    have a conversation with counsel.  Ms. Patch will have

9    you sit down at the end of the hall.  Do not go back in

10   to the jury room but just sit down at the end of the

11   hall for a minute; okay?

12           THE JUROR:  Yeah.

13           THE COURT:  And I'll call you back.

14           THE JUROR:  I mean, Your Honor, I have no

15   problem volunteering in the summer and, you know --

16           THE COURT:  Yeah.  The problem is we went

17   through a very lengthy process yesterday, during which

18   you could have called this to our attention, and we

19   could have easily replaced you because we had lots of

20   people in the back of the courtroom.  Now we have no

21   recourse.  We cannot replace you without starting over.

22   This is going to cost the Government and people a lot

23   of time and effort and money.  That's what you've

24   caused by doing this.

25           THE JUROR:  I'm sorry, Your Honor.

1         THE COURT:  Well, have a seat outside, and I'll

2    talk to you in a minute.

3         THE JUROR:  Thanks.

4         THE COURT:  Counsel?

5         MS. BARCLAY:  It's the Government's position

6    that he should be struck for cause, unfortunately,

7    Your Honor.

8         THE COURT:  Mr. Rankin?

9         MR. RANKIN:  Well, is the Court's inclination to

10   go forward with 14?

11        THE COURT:  As opposed to what, starting over

12   again?

13        MR. RANKIN:  As opposed to coming back on Monday

14   and adding a 15th?

15        THE COURT:  No, I'm not going to do that.

16        Mr. Connolly?

17        MR. CONNOLLY:  This is a very difficult

18   situation, Your Honor.  I leave it in the hands of the

19   Court.

20        THE COURT:  Mr. Levy?

21        MR. LEVY:  Your Honor, I defer to the Court,

22   applying the standards you followed yesterday.  He

23   would have been excused for cause, so I guess my one

24   concern is I don't want other jurors thinking that

25   there's some sort of appeal process once the trial

1    starts, and obviously we're on day one, to lose an

2    alternate is a problem, but I defer to the Court's

3    judgment on this one.  It's a tough situation.

4           MR. RANKIN:  I'm inclined to object to

5    discharging him.  I don't know if -- I mean, given the

6    questioning, and it's hard for me to believe that he

7    didn't understand that he had an opportunity to say it

8    would be a hardship to sit on a three- or

9    four-week-long trial.

10          And I perceive him to be someone who wants to

11   get out of jury service, but I'm not sure that it's the

12   kind of hardship that others expressed yesterday.  He

13   didn't say why his sister couldn't take the daughter to

14   school for the -- or to the bus stop.  Next week is a

15   school vacation week.  So, it just seems like there are

16   the kind of ameliorative measures that could be taken

17   by him and his sister to accommodate him.

18          And I think that Mr. Levy's point that juror --

19   we may start losing jurors if they think they can get

20   out of it by pitching a fit is a real concern because

21   there were several people that were seated that, you

22   know, indicated it would be a severe inconvenience, but

23   they bit the bullet and said, We could do it.

24          So, that's my thinking on it, Your Honor.

25          MR. CONNOLLY:  Upon further reflection,

1    Your Honor, I want to join in Mr. Rankin's position.

2    It sounds like the biggest burden is the bringing the

3    two children to school, and it's -- but there's another

4    set of parents involved here, and for all we know, the

5    other relatives that are available to assist him in

6    relieving that burden.  And if that's the case, then

7    I'm inclined to agree with Mr. Rankin.  He should

8    serve.  It's the type of inconvenience that everybody

9    suffers.

10           MR. LEVY:  Your Honor, we didn't ask about

11   school vacation.  We're now talking, if we're talking

12   about a three-week trial, eight days that the daughter

13   has to go off to school.  And it's a tough call.  I

14   would lodge my objection with Mr. Rankin, though, as

15   well.

16           MS. BARCLAY:  Your Honor, just on the issue of

17   there are other people who are seated who also had

18   scheduling issues and this being sort of, you know, a

19   chain reaction, the Government's position is that the

20   Court was entirely clear with those people who

21   expressed an issue with scheduling and vetted those

22   issues and, you know, came to the conclusion that these

23   people could in fact serve despite the inconvenience,

24   as opposed to the hardship, and that this wouldn't

25   necessarily cause a chain reaction.

1      But I think having someone on the jury who has

2   expressed these issues and, you know, particularly in

3   earshot of the other jurors is cause for concern, and

4   it's still the Government's position that he be struck

5   for cause.

6      THE COURT:  Would you mind withdrawing for a few

7   minutes?  Of course you can't go that way because

8   that's where the juror is.

9      THE CLERK:  He's actually in the room next door.

10     THE COURT:  Thank you.  Maybe -- there's a

11  little alcove down beyond this next -- where you might

12  just have a seat, there's a couple of chairs, and I'll

13  be right back to you very shortly.

14     (Pause)

15     THE COURT:  Thank you, counsel.

16     I've thought about this, and I am going to

17  strike Mr. ███████.  I don't want to have poison in the

18  jury room from day one.  I think that he will be a

19  contrary aspect to the jurors if I force him to serve,

20  he's going to be bad-mouthing the entire system for

21  three weeks, and I think that would be

22  counterproductive to a serious sitting jury.

23     So, I am going to strike him.  You can be

24  present if you want when I call him back in, or you can

25  go out and let me do it myself.  What's your pleasure?

1          MR. LEVY:  I'm happy not to participate.  I just

2     don't want him to say anything else to the jurors.

3          THE COURT:  Well, he's not going to be back in

4     the jury room --

5          MR. LEVY:  Okay.

6          THE COURT:  -- ever.

7          MR. RANKIN:  I'm happy to be excused.  I would

8     just request --

9          THE COURT:  I'd be glad to have you here.  I'm

10     not asking you to be excused; it's just -- it's your

11     choice.

12          MR. RANKIN:  I would prefer to be here, then.

13          THE COURT:  All right.  Bring him in.

14          MR. RANKIN:  Thank you.

15          THE COURT:  I'm going to re-align the jury.  His

16     place will create a hole.  I'm just going to move the

17     first two jurors up so that everybody else will stay in

18     the same seat, but the first two jurors will be moved

19     that way so that we won't have a hole in the middle.

20          Good morning again, Mr. ██████.

21          THE JUROR:  Good morning.

22          THE COURT:  I am going to reluctantly excuse you

23     from this jury but with a strong admonition that I may

24     instruct the jury people to look in to some sort of a

25     fine for having caused this Court and this case serious

1    problems because of your failure to understand what was

2    going on and to pay attention.

3          I am going to excuse you for cause because I am

4    concerned about your financial ability to make a

5    living, but you should have brought that to our

6    attention.  So, you're excused from duty and are to

7    exit this Courthouse without going back in to the jury

8    room; do you understand?

9          THE JUROR:  Yes, Your Honor.

10         THE COURT:  You're excused.

11         THE JUROR:  All right.  Sorry about that.  I

12   didn't know --

13         THE COURT:  You should be sorry.  You're

14   excused.

15         THE JUROR:  All right.

16         THE COURT:  All right.  We'll have -- we have

17   some other issues to discuss, but I will do it back in

18   the courtroom.

19         MR. RANKIN:  Your Honor, will you make any

20   inquiry of the rest of the jury about whether whatever

21   interaction Mr. ███████ had --

22         THE COURT:  No.  I'm just going to instruct them

23   that Juror No. 3 has been excused for reasons that they

24   need not be concerned about, and we're going to go

25   forward.  I'm not going to bring it up.

1          (End of discussion in chambers)

2          THE COURT:  Good morning again, counsel.

3          There are some issues that need to be addressed

4    before we call the jury and have my initial

5    instructions.

6          Overnight there was filed a motion with respect

7    to the sequestration.  Has that been worked out between

8    counsel or not?

9          MS. BARCLAY:  The Government has no objection to

10   the proposed -- Defendants' proposed motion.

11         THE COURT:  All right.  Then that motion with

12   respect to limited exception from sequestration is

13   allowed.

14         Then there is the Defendant's objections

15   regarding scope of examination of Mr. Kradolfer.  Does

16   the Government oppose that?

17         MS. BARCLAY:  Yes, except for the last three

18   points on Page 2, Your Honor.

19         THE COURT:  The last three bullet points?

20         MS. BARCLAY:  Yes.  We don't anticipate

21   eliciting -- if the Defendants are not going to

22   challenge the fact that it's Charlie Lightbody's voice

23   on the call, then we do not need to listen to those

24   last three points.

25         But as to the other ones, Your Honor, this is

1    essentially the same motion repackaged again where

2    the Government -- where the Defendants are asking the

3    Court to exclude evidence of Lightbody's organized

4    crime association, which Your Honor has already

5    ruled on, and we've brought Mr. Kradolfer's --

6    Lieutenant Kradolfer's testimony to the attention of

7    the Court and to the Defendants several times.  They've

8    objected, and Your Honor has overruled those

9    objections.

10             THE COURT:  Yeah.  Who's going to speak for the

11   Defendant?

12             MR. RANKIN:  I will, Your Honor.

13             THE COURT:  Mr. Rankin.

14             MR. RANKIN:  I mean, the proposed testimony is

15   in the nature of expert testimony, such as they propose

16   to offer through Lieutenant Johnson, and for -- we

17   haven't had any disclosure about Lieutenant Kradolfer

18   offering expert testimony as to who is or isn't in

19   organized crime or associated with organized crime.

20             Certainly he should -- can be allowed to testify

21   that he monitored Mr. Bufalino's telephone calls and

22   these are the phone calls that he monitored, but to --

23   for them to put in organized crime in this fashion is

24   improper.  The fact that he --

25             THE COURT:  In what fashion?

1      MR. RANKIN:  The fact that he is assigned to the

2  FBI Organized Crime Task Force, that has nothing to do

3  with this case; the fact that he says that Mr. Bufalino

4  is a member of organized crime, apparently they want to

5  say that Mr. Lightbody is an associate of organized

6  crime, these are not facts that are susceptible to a

7  corrections officer/investigator.  That's expert

8  testimony.

9      THE COURT:  Well, let me hear from the

10  Government what you expect to elicit from -- how do you

11  pronounce his name? -- Kradolfer.

12      MS. BARCLAY:  Your Honor, we do expect to elicit

13  that it's his -- what his job is --

14      THE COURT:  Well, he can testify as to what his

15  job is and what it has been.

16      MS. BARCLAY:  -- and that he was involved in the

17  Bulger fugitive matter.  That's part of his background

18  and what he's done over the past several years.

19      And we do anticipate that he will testify that

20  his role with the Department of Corrections and with

21  the FBI is to keep track of organized-crime-affiliated

22  inmates within the Department of Correction and then

23  share the intelligence that's gathered from the prison

24  system with the FBI.  That's his job.  And that's why

25  he was listening to these calls, and that's why the

1    calls caught his attention, and that's why he reported

2    it to the FBI.

3              THE COURT:  He will be allowed to so testify.

4              MS. BARCLAY:  And then he will testify that, as

5    part of his job, he spends several hours a week

6    monitoring mostly organized-crime-affiliated inmates.

7    He's been instructed not to use the term "LCN, NELCN

8    mafia" or "mob."  He will use the term "organized

9    crime."

10             He will also testify that he has known Bufalino

11   and his background as a made member or soldier in

12   organized crime because of his job with the FBI

13   Organized Crime Task Force.  And I think that's -- I

14   think that's all that the Defendants have objected to

15   that he will testify to, Your Honor.

16             MR. RANKIN:  Well, two things, if I may,

17   Your Honor.  I take it from Ms. Barclay's description

18   that she's -- that the Lieutenant is not going to

19   testify that Mr. Lightbody is an associate or has any

20   other role with organized crime.

21             MS. BARCLAY:  No, Your Honor, we do not

22   anticipate eliciting from Lieutenant Kradolfer that

23   Lightbody is an associate of organized crime.  That's

24   an inference to be made from those calls.

25             THE COURT:  All right.

1    MR. RANKIN:  And furthermore, that -- to allow

2    him to testify that he's a made member seems highly

3    objectionable if this is not an expert witness.  That's

4    just --

5    THE COURT:  Yeah.  I don't want that being

6    brought forward.

7    MS. BARCLAY:  So, soldier is okay, then, soldier

8    of organized crime?

9    MR. RANKIN:  No.

10   THE COURT:  Soldier is not okay.

11   MS. BARCLAY:  So, an associate of organized

12   crime?

13   THE COURT:  Yes.

14   MS. BARCLAY:  That's fine, Your Honor.

15   THE COURT:  All right.

16   MR. LEVY:  Your Honor, on that point, I'd like

17   to lodge a hearsay objection.  For Mr. Kradolfer --

18   Lieutenant Kradolfer to testify about Mr. Bufalino's

19   being an associate of organized crime, it necessarily

20   is calling in to evidence hearsay information about

21   what's in the FBI files about Mr. Bufalino.

22   They proposed an expert on this, and then they

23   withdrew the expert.  To come in here and label an

24   individual as a member of organized crime is complete

25   hearsay evidence.  It's not -- if they have an expert,

1   put on an expert.  They can't have a fact witness

2   testify to what's in files about Mr. Bufalino's past.

3   That's hearsay.

4        MR. CONNOLLY:  Join in the objection,

5   Your Honor.

6        MS. BARCLAY:  Your Honor, the Government agreed

7   not to call Lieutenant Johnson but said we would be

8   putting this evidence in, and the Defendants haven't

9   raised an objection to this yet in response to those

10  motions.

11       THE COURT:  Yeah.  We're going to deal with the

12  questions -- if you believe there are hearsay

13  objections, you can so object during the trial.  But

14  generally, as I understand the offer of testimony from

15  Mr. Kradolfer, I'm going to allow the Government to

16  inquire with respect to his knowledge of these matters.

17  When we get to questions of hearsay, you can bring it

18  up at the time in context.

19       So, that disposes of that.

20       I believe there was only one other issue.  Has

21  the -- have you worked out how the Lightbody criminal

22  record will be introduced?  Will it be either through a

23  stipulation or through the --

24       MR. RANKIN:  I told Ms. Barclay that we would

25  not stipulate and that they will have to get certified

1      copies of the convictions.

2            THE COURT:  All right.  Those are all the

3      issues.  Call the jury in.

4            (The jury is present for the following)

5            THE COURT:  Good morning, Jurors, and welcome

6      back.  You'll notice that one of you in number is not

7      with us anymore.  He has been excused for reasons about

8      which you need not be concerned, but we are going to

9      move forward with this jury, and we need to do two

10     things before we start.  The first is that you all need

11     to stand and be sworn in as the jury in this case, so

12     if you'll all please stand.

13           (The Jury Was Sworn)

14           THE CLERK:  Thank you.  You may be seated.

15           THE COURT:  And I appoint Mr. ███████ to be

16     Foreman of this jury.

17           Ladies and Gentlemen, you have been chosen to be

18     the judges of the facts in this case, and your

19     responsibility in that role is to listen carefully to

20     the evidence so that you can properly judge the facts.

21     You must decide this case only on what you hear in this

22     courtroom and only upon the information which is

23     presented to you as evidence.  That evidence will be in

24     the form of witnesses' testimony, documentary evidence

25     such as tape-recordings and other things received as

1    exhibits.  You are not to judge the facts based on what

2    you hear outside of this courtroom.  You're not to base

3    your decision on any bias, prejudice or sympathy that

4    you may have.

5         Now, with respect to your fellow jurors, feel

6    free to get to know one another, but please do not talk

7    about the specifics of this case with each other before

8    you're asked to deliberate at the end of the case.

9    What you say to each other based only on some of the

10   evidence could put a slant on the case that would be

11   unfair.  You must not form any opinion until all of the

12   evidence has been admitted.  Keep an open mind until

13   you start your deliberations at the end of the case.

14        Now, during the course of the trial, if at any

15   time there is something that could assist you in

16   understanding the case or anything that detracts from

17   your understanding of the case, please raise your hand,

18   we'll stop the proceedings and try to take care of the

19   problem.

20        For instance, if a lawyer steps between you and

21   a witness and you cannot see the witness, raise your

22   hand, and we'll have the lawyer move.  If you cannot

23   hear a witness, raise your hand, and we'll have that

24   witness repeat his or her answer.  If you'd like a

25   glass of water, let us know, we'll have one brought to

1    you.  If you need a short break for any reason, we'll

2    take a short break.

3          Now, at the end of the trial, you will make your

4    decision based on what you remember about the evidence.

5    You will not have written transcripts of the testimony

6    to read, so I urge you to pay close attention to the

7    testimony as it is presented to you at this trial.  To

8    that end, however, I am going to permit you to take

9    notes during the course of the trial to aid your

10   recollection, and my Deputy Clerk will now provide each

11   of you with a notebook and a pen.

12         If there is a number on that notebook, you're to

13   cross it out and put your own seat number in as the

14   juror in that particular seat.  And just for your

15   information, of course Mr. ████████ will be Seat

16   No. 1; Ms. ████, No. 2; Ms. ████, No. 3 and so

17   forth down to Mr. ████ who's No. 6.  In the back row,

18   Ms. ████ is No. 7 and up through Ms. ████ who is

19   No. 14.  So, put your number on those notebooks, and

20   that will identify them for you.

21         Now, of course you are not obligated or obliged

22   to take any notes at all.  And if you do not take

23   notes, you should not be influenced by the notes of

24   another juror but should, instead, rely only upon your

25   recollection of the evidence.

1      You must not allow any note-taking to interfere

2  with the ongoing nature of the trial or to distract you

3  from what happens here in Court.  One of your most

4  important jobs is to observe the witnesses, and of

5  course you can't do that while you're taking notes.

6      Notes taken by any jury, moreover, are not

7  evidence in the case and must not take precedence over

8  your or someone else's independent recollection of the

9  evidence received in this case.  Notes are only an aid

10  to recollection and are not entitled to any greater

11  weight than actual recollection or to the impression of

12  each juror as to what is the evidence.

13      Any notes taken are solely for your own use and

14  cannot -- and you cannot take your notes outside of

15  this courtroom and the jury room.  You will leave your

16  notebooks in the jury room at the end of each session

17  and retrieve them the following morning.  So, again, I

18  ask you to put your own seat number on those notebooks.

19  They are for your use and yours only.

20      Now, I'm the judge of the law in the case, and

21  it is my job to provide you with the law, and you must

22  take the law from me as I define it for you.  You must

23  follow the law whether you agree with it or not.

24  Occasionally I will confer with the lawyers in this

25  case at sidebar where we may be discussing a matter of

1       law.  This is not evidence, and it's not relevant to

2       your deliberations.  It's not that we're trying to keep

3       secrets from you; we're talking about matters of law

4       about which you need not be concerned.

5               The lawyers in this case are presenting to you

6       the view of the things as their clients see them.  Let

7       me caution you right away that what lawyers say here is

8       not evidence of anything.  Statements, arguments and

9       questions by lawyers are not evidence.  The evidence

10      comes from the witnesses, from writings, from exhibits

11      and from any facts that the lawyers agree or stipulate

12      to or that the Court may instruct you to find.

13              With respect to the witnesses, you have broad

14      power.  You can believe everything a witness tells you,

15      you can believe some of what a witness tells you, or

16      you can disbelieve what a witness tells you.  Certain

17      things are not evidence and must not be considered by

18      you.  As I've already said, statements, arguments and

19      questions by lawyers are not evidence.

20              Objections to questions are not evidence.  You

21      should not be influenced by the objection or the

22      Court's ruling on it.  If the objection is sustained,

23      ignore the question.  If it is overruled, treat the

24      answer like any other.  Testimony that the Court has

25      excluded or told you to disregard is not evidence and

1    must not be considered, and anything you may have seen

2    or heard outside of this courtroom is not evidence and

3    must be disregarded.  You are to decide this case

4    solely on the evidence presented to you here in this

5    courtroom.

6            Now, this is a criminal case, and there are

7    three basic rules for you to keep in mind.

8            First, the Defendants are presumed innocent

9    until proven guilty.  All three Defendants start this

10   case as innocent.  You cannot draw any conclusions

11   against them because they happen to be here in Court

12   with us and the Government has made certain charges

13   against them.  The indictment makes only accusations,

14   nothing more.  The Defendants, therefore, start out

15   with a clean slate.

16           Second, the burden of proof is on the Government

17   throughout the case.  The Government must prove each

18   and every element of the offenses charged against each

19   Defendant.  The Defendants do not have any burden to

20   prove their innocence or to present any evidence or

21   even to testify.  Each of the Defendants has the right

22   to remain silent, and the law prohibits you from

23   considering the fact that any of the Defendants may not

24   have testified when arriving at your verdict.

25           Third, the Government must prove its case

1    against the Defendants beyond a reasonable doubt.  This

2    is a strict and heavy burden.  This standard requires

3    that the evidence leaves no reasonable doubt concerning

4    each of the Defendant's guilt.

5         Now, with respect to your conduct as jurors,

6    first, please do not discuss this case with anyone.

7    Until you retire to the jury room at the end of the

8    case to deliberate to your verdict, you simply are not

9    to talk about this case with anyone, including your

10   family members, your friends or your fellow jurors.

11        I know that many of you use cell phones, smart

12   phones, the internet and other tools of technology.

13   However, during this jury trial, you may not

14   communicate with anyone about this case using your cell

15   phone, e-mail, smart phone, text messaging, Twitter,

16   blogs or websites, internet chat rooms or social

17   networking websites such as Facebook, MySpace, LinkedIn

18   or You Tube.

19        If you did so, it would be a violation of your

20   oath as jurors and might even cause a mistrial at great

21   expense to the parties and to the Court.  I instruct

22   you, therefore, that as long as you are a juror on this

23   case, you are not to use any of the tools of technology

24   in connection with this case.

25        If you encounter the lawyers, witnesses or

1    parties involved in this case in the hallways,

2    cafeteria or anywhere else, please do not say anything

3    to them.  Your talking with them while the trial is

4    ongoing would be inappropriate.  In addition, do not

5    read or listen to anything which in any way relates to

6    this case, and do not try to do any independent

7    research or make any investigation about the case on

8    your own.

9         Finally, keep your minds open and do not form

10   any opinion until all of the evidence is presented.

11   Keep an open mind until you start your deliberations at

12   the end of this case.

13        Now, the trial will begin with opening

14   statements of the attorneys for the parties.  An

15   opening statement is neither evidence nor argument.  It

16   is an outline of what that party intends to prove, and

17   it is offered to help you follow the evidence.

18        Next, the Government will present its witnesses,

19   and the Defendants may cross-examine them.  Then the

20   Defendants will present their witnesses, if they choose

21   to do so, and the Government may cross-examine them.

22   After all of the evidence is in, the attorneys will

23   present their closing arguments to summarize and

24   interpret the evidence for you, and the Court will then

25   instruct you on the law.  You will then retire to

1    deliberate to your verdict.

2            And with that, I will invite the Government to

3    make its opening, and I believe that's going to be

4    Mr. Merritt.

5            MR. MERRITT:  Good morning members of the jury.

6            This case is about a scheme to hide the truth

7    fueled by greed.  You see, not too far from here in

8    Everett, these three Defendants and a fourth man owned

9    a vacant lot that was contaminated from its prior use

10   as a chemical plant.

11           But in 2012, this land suddenly became very

12   valuable to them because Wynn Resorts wanted to build a

13   casino and a hotel on it if they were awarded a gaming

14   license by the newly formed Massachusetts Gaming

15   Commission.

16           But there was one major obstacle keeping these

17   Defendants from hitting the jackpot of a $75 million

18   land sale to Wynn, something that was radioactive not

19   just to Wynn Resorts but to the Gaming Commission whose

20   mission it was was to keep legalized gambling in

21   Massachusetts squeaky clean, and that was that one of

22   the Defendants, Charlie Lightbody, was a convicted

23   felon with reputed ties to organized crime.

24           Not only would the truth hurt financially, but

25   it could have jeopardized the whole deal.  So, the

1      Defendants kept the Wynn folks in the dark about

2      Lightbody's partnership even when they were asked

3      specifically who the owners were.  But that wasn't

4      enough for the Defendants, so they decided to make

5      Lightbody's ownership disappear, on paper that is.

6           Documents were drafted to make it look like

7      Lightbody had transferred his interest to another

8      partner, Anthony Gattineri, and they first dated those

9      documents December of 2012, five days before the deal

10     with Wynn Resorts was closed.

11          And later, when it was time to be interviewed by

12     investigators from the Gaming Commission who were doing

13     background checks, each of the Defendants all lied to

14     investigators, and DeNunzio arranged to have those sham

15     transfer documents back-dated even further to August to

16     further distance Lightbody from the Wynn deal.

17          But what the Defendants didn't know or expect is

18     that the FBI was paying attention.  They were listening

19     to Lightbody's telephone calls.  And in those calls,

20     which you will hear, some to an organized crime figure

21     in prison, others to Lightbody's associates and

22     friends, he revealed his continued hidden ownership in

23     the Everett land sale.  And so the scheme was

24     uncovered, and here we are.

25          Now, let me briefly re-introduce myself.  My

1    name is Ted Merritt.  I'm an Assistant US Attorney,

2    along with my colleague, Assistant US Attorney

3    Kristina Barclay, and FBI Special Agent Matt Elio.

4    It's our job to present the evidence to you on behalf

5    of the United States.

6         And that evidence is going to prove to you

7    beyond a reasonable doubt that, in concealing

8    Lightbody's ownership interest from Wynn Resorts and

9    the Massachusetts Gaming Commission so that the

10   Defendants could get as much money as they could from

11   Wynn, that was the crux of their fraud.  That's why

12   they will be proven guilty beyond a reasonable doubt in

13   conspiring to and executing a scheme to defraud.

14        Now, the evidence in this case, like in many

15   trials, will come to you sort of in a disjointed

16   fashion, perhaps not chronological, so I'm going to put

17   up this timeline and ask you to just refer to it as I

18   go through the evidence --

19        THE COURT:  Could you turn that just a little

20   bit further this way?  That's fine.

21        MS. BARCLAY:  -- as I go through the evidence,

22   what I believe the Government's evidence will prove to

23   you.

24        In October, 2009, a 30-acre vacant lot in

25   Everett was bought for about $8 million by an entity

1     called FBT Everett Realty, LLC.  That's Limited

2     Liability Company.  Now, if you also look at your

3     monitors, the partners in FBT --

4           THE COURT:  In the back row, the monitors are --

5     have you found those, Jurors?

6           MR. MERRITT:  You can pull them up, I think,

7     from there.  There we go.

8           So, the partners of FBT, first, was a man named

9     Paul Lohnes who was kind of the absent money man; the

10    second one was Defendant, Anthony Gattineri, he was an

11    experienced real estate investor; the third was an

12    original partner named Gary DeCicco, and Gary DiCicco

13    was also a convicted felon, but he would be bought out

14    legitimately and for real long before any casino deal

15    was on the horizon, but as you'll hear, his name comes

16    up later; Dustin DeNunzio and his two-person company

17    originally managed FBT, the property, but later he

18    would get a small slice of the land; and, last,

19    Charlie Lightbody was a native of Revere with real

20    estate investments but also a criminal record that

21    spanned decades with convictions for things like

22    assault and battery with a dangerous weapon, grand

23    larceny and identity theft, and also Lightbody's

24    reputation as having ties to organized crime was known

25    to law enforcement, including to the lead investigator

1    for the Massachusetts Gaming Commission, who was also a

2    Massachusetts State Police Lieutenant.

3         Anyway, the owners the Everett land tried to

4    sell it unsuccessfully for a couple of years.  But in

5    the summer of 2012, the prospect of selling the land to

6    build a casino essentially fell into their lap because

7    the year before, the Massachusetts Legislature had

8    passed a law that provided for up to three what they

9    called casino -- destination casino resort licenses in

10   three areas of the State, one of which includes

11   Everett.

12        The law also set up the Massachusetts Gaming

13   Commission and its Investigation and Enforcement

14   Bureau, or the IEB as it was called, and the IEB had

15   the responsibility to conduct investigations in to the

16   suitability of any applicants for a license.

17        Anyway, a private equity firm by the name of

18   Och-Ziff, partnered with the Hard Rock Casino,

19   contacted FBT about buying the land so they could build

20   a casino on it.  And the parties entered in to a letter

21   of intent on August 22nd, 2012, which outlined the

22   terms and conditions under which Och-Ziff would

23   purchase the parcel.

24        And although the Defendants would later tell IEB

25   investigators that Lightbody had agreed to transfer his

1    interest to Gattineri before the Och-Ziff deal, you

2    will see ample evidence, including several e-mails,

3    that show that Lightbody was still a partner then and

4    after the Och-Ziff deal eventually fell apart.  But

5    even though Lightbody was still a partner, in fact the

6    Defendants knew from the start that having Lightbody's

7    name show up could be poison to a casino deal.

8            Now, let's listen to an excerpt from a prison

9    call between Charlie Lightbody and an organized crime

10   figure, Darin Bufalino, on August 16th, 2012.

11           (Audio played)

12           MR. MERRITT:  Well, one of those casinos who

13   wouldn't like seeing Lightbody's name was Wynn Resorts

14   headed by Steve Wynn.  Wynn Resorts already had casino

15   licenses in other places, including the State of

16   Nevada, which required them to vet anybody who they did

17   substantial business with, and knowingly doing business

18   with someone who had a record of convictions and

19   reputed ties to organized crime could affect their

20   license in Nevada.

21           Well, they were looking for a place to build a

22   casino in Massachusetts, and they focused their

23   attention on the Everett parcel in November of 2012.

24   The Chief Financial Officer and the General Counsel of

25   Wynn Resorts started negotiation with Dustin DeNunzio,

1       as the representative of FBT, to option the land.  In

2       other words, they were going to pay FBT $100,000 a

3       month for the exclusive right to buy the land if they

4       were awarded the gaming license and then pay a purchase

5       price of $75 million.

6              And during those negotiations with Wynn Resorts,

7       they had no reason to believe that the owners of FBT

8       were anyone but those that were listed on the Secretary

9       of State filings, Gattineri, Lohnes and DeNunzio.  And

10      DeNunzio was not about to tell them that a convicted

11      criminal was one of them.

12             But you'll see that DeNunzio kept that convicted

13      criminal and hidden partner, Charlie Lightbody, up

14      to date through e-mails about what was going on.

15      Here's an e-mail dated November 14th, 2012, and

16      you can see the e-mail is from Dustin DeNunzio to two

17      partners, Anthony Gattineri, Anthony Olive Oil;

18      Charles Lightbody, the date November 14th; "Subject,

19      FBT partner call," and one of the things they wanted to

20      discuss was the casino.  And you will also see phone

21      records that show calls between Lightbody, DeNunzio and

22      Gattineri that closely correlate to the developments in

23      the Wynn deal.

24             Well, the parties signed a letter of intent, and

25      they were working towards an option agreement when

1    something happened that caused the Defendants to take

2    more proactive steps to hide Lightbody's interest.  On

3    December 10th, 2012, a reporter from the "Boston

4    Business Journal" contacted the Wynn Resorts

5    representative in Boston here and asked about

6    Gary DiCicco.  Now, remember, he was one of the

7    original partners.  And they asked about DiCicco's

8    interest in the land and his criminal history.

9          Well, the Wynn people asked DeNunzio about it,

10   and he told them truthfully that DiCicco was no longer

11   a partner.  But the Defendants figured, well, it was

12   just a matter of time before questions might get asked

13   about Lightbody, so DeNunzio falsely told the lawyer

14   for FBT that Lightbody had transferred his interest to

15   Gattineri and to tell the local lawyer for Wynn about

16   that as well.

17         And Lightbody, he became a little more savvy on

18   these calls to the prison with Bufalino, which he knew

19   were recorded by the prison, sometimes mixing in

20   contradictory statements as well.  And Gattineri, well,

21   he became a little bit more cautious also.

22         While the Defendants were trying to scramble to

23   fix this problem that now was highlighted by this

24   "Boston Business Journal" article, Gattineri and

25   DeNunzio tried to arrange a meeting about the casino

1    deal, and Gattineri, who was worried about leaving any

2    kind of electronic trail in e-mails in the future, had

3    this to say -- there's an e-mail dated December 11th,

4    2012, from Gattineri to DeNunzio -- "Anything that we

5    do that's hot, we meet in person."

6         On December 19th, 2012, believing that the FBT

7    partners were Lohnes, Gattineri and DeNunzio, Wynn

8    Resorts sent by e-mail a signed option agreement to buy

9    the land for $75 million and pay FBT $100,000 a month

10   until then.  DeNunzio forwarded that e-mail to

11   Lightbody, and the next day, Lightbody reported to

12   Bufalino the good news.  Here's another excerpt from

13   the recorded prison calls on December 20th, 2012.

14        (Audio played)

15        MR. MERRITT:  So, the deal was done.  But the

16   Defendants weren't done trying to paper Lightbody's

17   purported buy-out, so they had the lawyer from FBT

18   draft a promissory note and a memorandum of transfer

19   that represented that Gattineri had bought out

20   Lightbody for $1.7 million, plus interest, and they

21   dated it December 14th, 2012, even though it wasn't

22   signed until the end of January, 2013.

23        But in the interim, there had been another press

24   inquiry about the ownership of FBT, which prompted the

25   General Counsel of Wynn Resorts, Kim Sinatra -- no

1     relation -- to ask specifically and definitively who

2     had a financial interest in FBT.  Well, this was

3     DeNunzio's reply in an e-mail: "Subject:  Equity

4     holders in FBT," and he says, "Per our conversation,

5     below are the three people who have interest in FBT

6     Everett Realty, LLC.  Let me know if there are any

7     issues."  And he lists those three names.

8          Well, not only did DeNunzio leave out Lightbody

9     deliberately; he was a bit cute, entitling the e-mail

10    "equity holders" because he also concealed that they

11    had agreed to give a man named Jamy Russo, who was a

12    business partner of Lightbody in other ventures, three

13    percent on the sale of the Everett land for no apparent

14    reason, except that he was a political insider in

15    Everett and Revere.

16         So, DeNunzio's affirmative lie to General

17    Counsel Kim Sinatra was just an extension of their

18    ongoing scheme to hide Lightbody's interest from Wynn

19    and the Gaming Commission.  And this scheme, by

20    necessity, continued in to 2013 when the IEB was

21    conducting its suitability investigation of Wynn

22    Resorts.

23         But when the Defendants let their guard down or

24    were comfortable or felt comfortable in telling it, the

25    truth found its way to light.  For example, Lightbody

1    was trying to refinance some properties, and he told

2    the loan officer in December, 2012, that he and his

3    partners had just signed an agreement with Wynn

4    Resorts to sell the property they owned and, with his

5    13.5 percent interest, it may be worth more than

6    $10 million in a year.

7         On the other hand, Gattineri submitted a

8    financial statement in March of 2013, and he did not

9    show any increase in his interest in the land, nor any

10   liabilities for this supposed $1.7 million that he owed

11   to Lightbody in December of 2012.

12        And Charlie Lightbody was not too careful

13   talking to friends and associates, obviously unaware

14   that, pursuant to a Court-authorized wiretap, the FBI

15   was listening to his telephone calls in July, 2013.  He

16   told one friend, talking about the $100,000 monthly

17   payments they were getting under the option agreement,

18   "Hey, like I told my partner, let's look at it this

19   way:  If we get to February, March, it's another

20   $800,000."

21        And in another call, Lightbody told an associate

22   what he was doing with his profits from the sale of the

23   land.  He said, "I'm 1031'ing all my money," and then

24   went on to talk about buying a building with his

25   partner.  You see, 1031 is a reference to the IRS tax

1    code that allows you to avoid tax consequences if you

2    sell a piece of real estate and then you immediately

3    reinvest in buying another piece of real estate.

4         And Lightbody wasn't just imagining this because

5    just two weeks before that phone call, in a meeting at

6    the FBT lawyer's office where some of the principals of

7    FBT were there, they discussed this very same 1031

8    procedure about how to sell the Everett land.  And

9    although Lightbody was not present, his hidden

10   ownership and continued ownership was still on the

11   agenda, as shown by these notes that were

12   contemporaneously taken at that meeting.

13        As you'll see, there's the reference to 1031,

14   "The nominee trust owns the property with TIC" -- that

15   means tenants in common -- "and the beneficiaries being

16   CL," Charlie Lightbody; "PL," Paul Lohnes; "AG,"

17   Anthony Gattineri.  And shortly after this meeting,

18   phone records will show that DeNunzio briefed Lightbody

19   in a 13-minute telephone call.

20        So, while the Defendants were thinking of ways

21   to reinvest what they expected to be this huge

22   windfall, the regulatory process of the Gaming

23   Commission was underway.  In early July, 2013, the IEB

24   investigators who had now been briefed by the FBI about

25   the prison calls between Lightbody and Bufalino, they

began to reach out to the Defendants to schedule interviews.

This set off a flurry of activity among the Defendants to get their stories straight. And they should have been worried because, unbeknownst to them, the FBI was listening to Lightbody's telephone calls. And as you'll hear, there wasn't a lot of love lost between some of these Defendants, as you'll hear in this excerpt between Gary DiCicco and Charlie Lightbody where they discuss their concerns about Gattineri.

(Audio played)

MR. MERRITT: In early July, 2013, DeNunzio was interviewed by Lieutenant Kevin Condon who was one of the IEB investigators, and he told him that Lightbody had been an owner but that he had transferred his interest to Gattineri, but he said the summer of 2012, not December. So, this set in motion an effort to back-date the promissory note and the memorandum of transfer to August.

So, DeNunzio met with Lightbody at a Dunkin' Donuts, and he had him sign the changed documents, documents that DeNunzio himself changed, and then DeNunzio directed his employee, Mike Flood, to go to Gattineri and get his signature on the changed documents, which he did.

1          DeNunzio also tried to cover all the bases,

2     calling Lightbody and telling him that investigators

3     might reach out to DiCicco and to warn DiCicco not to

4     meet with them.  Lightbody then called DiCicco to give

5     him the message, and DiCicco asked Lightbody, "Did they

6     get you yet?"  And Lightbody responded, "No 'cause I'm

7     not on anything, so they're not going to find me

8     anywhere, you know what I mean?"

9          Gattineri, he was interviewed by IEB

10     investigators, and he gave the same company line, that

11     he had bought Lightbody out in the summer of 2012, but

12     he was kind of sketchy on the terms of the note and the

13     dates.  Lightbody, when he was interviewed just days

14     after he had signed these new changed documents, he

15     gave roughly the same fabricated story, but when asked

16     if he had recently signed any documents related to FBT,

17     Lightbody answered flatly and falsely that he was a

18     hundred percent sure he had not.

19          But the Defendants' efforts to paper Lightbody's

20     exit from FBT weren't done because the lawyer for FBT

21     discovered that the new documents, which were signed at

22     Dunkin' Donuts and Gattineri's house, still had the law

23     firm's document-control number on it, and the law firm

24     had not created those new documents.

25          So, DeNunzio had Flood get the new documents

1    signed.  But this time the FBI wasn't just watching;

2    they intercepted Flood, and he had the unsigned

3    documents in his possession, and they asked him to

4    cooperate in the investigation, which he did for a

5    while, and then he changed his mind, and he told

6    Dustin DeNunzio, who was his friend, his mentor, all

7    about it.

8         And he told Charlie Lightbody about the FBI, and

9    Lightbody said, "So they know, then they know

10   everything."  And when you hear the evidence, you'll

11   know exactly what Lightbody meant by that.

12        Anyway, needless to say, the IEB and the Gaming

13   Commission were very concerned that Lightbody, a

14   convicted felon with reputed ties to organized crime,

15   was a hidden owner.  So, they ended up confronting the

16   Wynn Resorts people, taking depositions, getting sworn

17   statements, holding hearings until they were

18   comfortable in finding that Lightbody's hidden interest

19   was never known to any of the Wynn Resorts people.

20        But that still wasn't enough for the Gaming

21   Commission.  They wanted to make sure that nobody like

22   Lightbody would profit from a casino-related

23   transaction, so they threw the ball back in to Wynn's

24   court to come up with some kind of satisfactory

25   solution.  So, the Wynn people proposed one.  They

1    would pay FBT only as much as an independent assessor

2    said the property was worth if it was sold to a

3    non-casino business, like a Wal-Mart or a Lowes or

4    something like that, and that way, if Lightbody

5    still -- even still had a hidden interest, he would not

6    profit from any sale that was related to a casino.

7           Now, of course this benefited Wynn financially.

8    The price dropped to $35 million, but the Massachusetts

9    Gaming Commission voted unanimously to accept it.  But

10   they also demanded that the listed FBT partners certify

11   under oath who would benefit from the sale.  This time,

12   DeNunzio disclosed the three percent interest to

13   Jamy Russo, but at this point, there was no rewriting

14   the script about Lightbody.  He was not disclosed.

15          But you'll hear evidence that DeNunzio and

16   Lightbody used this same script in another business

17   venture.  Two of them, along with Jamy Russo, wanted to

18   buy an ongoing business and building in Chelsea called

19   King Arthur's, which offered adult entertainment along

20   with alcohol and food.  But they had the same problem.

21   Lightbody's shady background would kill their chances

22   in getting the licenses they would need to have adult

23   entertainment and alcohol.

24          So, they came up with the same solution,

25   concealing Lightbody's hidden interest from the Chelsea

1    City Manager who DeNunzio went to try to enlist his

2    support for the license.  And although they never ended

3    up buying King Arthur's or operating it, this evidence

4    will show you that they knew exactly what they were

5    doing, hiding Lightbody's interest from the

6    Massachusetts Gaming Commission and Wynn Resorts.

7         Now, I'm sure there'll be some questions raised

8    during this trial, for example, Did Lightbody's hidden

9    interest, if known to the Wynn people, really matter to

10   Wynn Resorts?  Well, the evidence will show that, once

11   the IEB investigators gave Lightbody's name to the Wynn

12   Resorts people, their head of security did a quick

13   background check, and he saw the one thing that was

14   poison to a regulated licensed gaming company,

15   suspected organized crime ties.  Not only could their

16   suitability to get a license in Massachusetts be

17   jeopardized, but it could have affected their license

18   in Nevada.

19        And what about the Gaming Commission?  Did it

20   really matter to them?  Well, the evidence will show

21   you that you bet it mattered because they did not want

22   the first awarded destination casino license in

23   Massachusetts to have the whiff of any connection to

24   organized crime, which had happened in other states

25   that legalized gambling.

1        Now, is there anything illegal about merely

2    back-dating a document?  No.  There's no dispute that

3    you can put a date in the past on something, on a

4    document, if that's when it really happened.  The

5    question for you in this case is not to decide whether

6    to choose August or December as to when the date the

7    Defendants decided to paper Charlie Lightbody's exit;

8    it's whether they got him out at all before their

9    scheme was uncovered.

10       And how can the Defendants have committed fraud

11   when Wynn ended up getting less -- excuse me -- ended

12   up paying less than the $75 million that the Defendants

13   set out to get?  Well, the fact of the matter is they

14   got caught in the act.  But their criminal intent and

15   their criminal purpose and conduct would be just the

16   same under the charges they are facing if the FBI had

17   not discovered and disrupted their deceptive plan.

18       So, as I said at the beginning of this case,

19   it's about a scheme of concealment and lies to get the

20   big payday for all of them.  And at the end of the

21   case, after you've heard all the evidence, applied your

22   good common sense to it, we will back to you and ask

23   you to return a verdict of guilty.

24       Thank you.

25       THE COURT:  Mr. Levy for the Defendant DeNunzio.

1          MR. LEVY:  Thank you, Your Honor.

2          May I proceed, Your Honor?

3          THE COURT:  Yes.

4          MR. LEVY:  Counsel, Ladies and Gentlemen of the

5     jury, my name, again, is Joshua Levy.  And with

6     Aaron Katz and Todd Foster, it's our privilege, it's

7     our honor to represent Dustin DeNunzio.

8          Dustin, would you stand, please, and face the

9     jury.  Let me say this loud and clear:  Dustin DeNunzio

10    is an innocent man.  He is not guilty of the charges

11    the Government has leveled against him.  You may be

12    seated, Dustin.

13         The Government, in their opening, accused

14    Dustin DeNunzio of engaging in a scheme to hide the

15    truth about Charlie Lightbody.  That's what they have

16    alleged.  And Dustin, and we are so glad that his day

17    in Court has finally come because today is the day the

18    Government has to start turning over its cards and

19    showing a fair and impartial jury -- we spent a whole

20    day yesterday striving to get a fair and impartial

21    jury -- to examine the facts.

22         And when this case is over and you've seen the

23    Government's hand, you will see they have not proven

24    beyond a reasonable doubt that Dustin DeNunzio,

25    Anthony Gattineri and Charlie Lightbody conspired to

1    cheat Wynn Resorts, to defraud Wynn Resorts.   The

2    evidence will show you several things.   Facts matter.

3    Details matter.   The evidence will show you that

4    Charlie Lightbody, Anthony Gattineri, working with a

5    lawyer, a very prominent lawyer in Boston, arranged a

6    buy-out of Mr. Lightbody's interest prior to the option

7    agreement ever being signed.

8        The facts will tell you that Mr. Paul Feldman,

9    the lawyer for FBT, he told Wynn Resorts, at the

10   insistence of this man, Dustin DeNunzio, he told Wynn

11   Resorts about Charlie Lightbody, the fact that he was

12   getting out, all before the option agreement was

13   signed.

14       The facts will show that, at no point prior to

15   signing that option agreement, did anyone from Wynn ask

16   this question, Who are the owners of FBT?   They never

17   asked prior to signing the option agreement.   That

18   informs what these men thought about the importance of

19   that question.

20       And the evidence will show that the supposed

21   victim of this fraud, as Mr. Merritt pointed out, the

22   victim of this fraud, Wynn Resorts, one of the most --

23   Steve Wynn is the most powerful casino magnates in the

24   world, a very savvy businessman, he got exactly what he

25   wanted.   He owns 35 acres of land in Everett, ten

1    minutes from downtown Boston, where he's building a

2    casino, a world-class casino.

3        Ladies and Gentlemen, we thank you for your

4    service on this jury.  It is so critical.  Outside of

5    something that directly affects you or your family,

6    you're embarking on one of the most important decisions

7    of your life.  The fate of Dustin DeNunzio is in your

8    hands.  And Judge Gorton instructed you on the

9    presumption of innocence.  It's a critical part of our

10   justice system.  We all learn about it in grade school.

11       But it's hard.  You're coming in to this

12   magnificent Federal Courthouse, you're in this

13   beautiful courtroom, we're before a distinguished

14   Federal Judge, more lawyers than you can count, the

15   gallery is full.  You might be thinking to yourself,

16   Wow, someone must have done something wrong or we

17   wouldn't be here.

18       Nothing could be further from the truth.  You're

19   here, drawn from the community, to decide if the

20   Government can prove that strict and heavy standard

21   Judge Gorton mentioned, prove beyond a reasonable doubt

22   that these men committed the crimes they've alleged.

23   That's what this trial is about.

24       So, before getting into the facts about the

25   case, and I do want to spend some time on the facts, I

1    want to tell you a little bit about Dustin DeNunzio, my

2    client.  He lives in Cambridge, Massachusetts.

3    Dustin's mom and dad, who are in the courtroom today,

4    they grew up in the Boston area, then they relocated to

5    Florida, and that's where Dustin grew up.

6            Dustin's very close to his family, close to his

7    mom and dad, he's close to his younger brother Dominic,

8    his sister Karen, his loving uncle and their three

9    kids.  And Dustin was a great wrestler in high school.

10   He was all-state champion, State champion in Florida,

11   heavily recruited by colleges, and he came back to

12   Boston for college, to Harvard University, undergrad.

13   And Dustin excelled in the classroom and in the gym,

14   graduated with honors with his degree in economics.

15           And he also was a hell of a wrestler, two time

16   all-American, two time captain of the wrestling team.

17   He represented the United States in international

18   wrestling all around the world.

19           And after Dustin graduated from Harvard, he

20   followed in his dad's footsteps in to the real estate

21   business, started working in real estate development in

22   the Boston area.  And then Dustin decided he wanted to

23   further his education, so he went to get a Masters at

24   MIT, Massachusetts Institute of Technology.  And after

25   graduating there, Dustin returned to the world of real

1    estate, and he was fortunate enough to meet a man named

2    Paul Lohnes -- you heard about him in the Government's

3    opening -- Paul Lohnes, a very successful, highly

4    respected real estate developer in Boston.  He took

5    Dustin under his wing.  He saw a kid who was smart, who

6    hustled, who had integrity.

7         And Paul Lohnes became a mentor for Dustin.  And

8    it's through Paul Lohnes that Dustin gets connected to

9    this property in Everett, Massachusetts, a 35-acre

10   parcel of land, one of many projects Dustin worked on

11   with Mr. Lohnes and others, but this project was -- it

12   was an old Monsanto chemicals plant, and that land was

13   contaminated, but the partnership decided to buy it for

14   $8 million in 2009.

15        And we don't have much dispute with the

16   Government of who owned what when.  There was a guy

17   name Mr. DiCicco.  He got out.  And by the fall --

18   excuse me.  By the summer of 2012, there's no dispute

19   that this is the ownership interest of FBT -- and

20   Your Honor, I believe you have copies of these up

21   there -- Paul Lohnes owned over 50 percent;

22   Mr. Gattineri owns over 34 percent; Charlie Lightbody,

23   12 percent; Dustin DeNunzio, three percent.  DeNunzio,

24   Lohnes, Gattineri, no criminal record, nothing like

25   that in their past.  But Mr. Merritt's right,

1    Mr. Lightbody did have a record, and that becomes very

2    relevant in this case.

3           There's another individual who doesn't own a

4    lick of FBT, but he's very relevant to this story.  His

5    name Paul Feldman.  I'm going to write him up here.

6    Paul Feldman -- never had good handwriting.  Hope you

7    can read that.  Paul Feldman is a lawyer in Boston.

8    He's managing partner of a prominent downtown Boston

9    law firm, Davis, Malm & D'Agostine.

10          Paul Feldman had been working with Paul Lohnes

11   for years.  Too many Pauls in this case.  Feldman and

12   Lohnes have been working together for years, advising

13   him on real estate projects, and Paul Feldman was

14   advising FBT every step of the way.

15          Mr. Merritt didn't cover that in the opening, so

16   I want to talk to you about what Feldman's involvement

17   was in each step of this chronology.  So, you heard

18   about the Gaming Act passed, the Massachusetts Gaming

19   Act passed in 2011.  You'll hear a lot about the Gaming

20   Act.  It boils to this:  Under Massachusetts law, if

21   you're going to own, operate, have a financial stake in

22   a casino, you undergo a vigorous background check, and

23   you can't have a felony record and be an owner or

24   operator of a casino.  That's the law.

25          The law says nothing about people who are

1    selling their land to some third party, a casino

2    developer who's going do develop it.  You're selling

3    your dirt to a developer.  The law says nothing about

4    the background of that seller.

5           So, what happened with this land in Everett,

6    that initially they were talking about maybe a

7    Wal-Mart, maybe a Lowes, maybe a recycling center, but

8    the casino law generated interest from casinos.  And so

9    the first casino was this group Och-Ziff that

10   Mr. Merritt mentioned, and they represent the Hard

11   Rock.  Hard rock has casinos all around the world too.

12   And they came, and they toured the Everett site.

13          They were interested initially, and

14   Mr. Dustin DeNunzio and Mr. Paul Schwartz had

15   discussions, and initially FBT was talking about having

16   an ownership stake in that casino.  They were going to

17   sell the land to Och-Ziff, but they were going to have

18   a revenue stream going forward, they were going to be

19   partners in the casino.

20          That was the initial idea, and that led to

21   discussions among the FBT partners,  Well,

22   Mr. Lightbody has a record.  He can't be involved if

23   we're going to be a partnership in a casino.  And

24   that's the summer of 2012.  Let me put up this

25   timeline.  I hope you can follow as I'm going along

1    here the sequence of events.

2           So, we have initially October, 2009, they

3    purchase the land, the Gaming Act passes in November of

4    2011, and these conversations with Och-Ziff was the

5    following summer, 2012, before Wynn ever shows up.  And

6    that leads to a discussion about Lightbody getting out.

7    But they never follow up on that.  Why?  Because

8    Och-Ziff loses interest.  They're concerned about the

9    traffic, they're concerned about the contamination, so

10   FBT goes back to looking for other alternative sites.

11          Now we're in the fall of 2012, and that's when

12   Wynn Resorts shows up on the scene.  They initially try

13   to put a casino down in Foxboro, down with Mr. Kraft in

14   Patriot Place, but the voters of Everett -- excuse

15   me -- the voters of Foxboro, they voted down the

16   casino, and they weren't able to move forward because

17   the law required that the communities pass a vote to

18   approving the casino.

19          And so when Mr. Wynn heard about this land, he

20   sent out one of his top representatives out to look at

21   the land.  Now, Mr. Merritt mentions a local lawyer

22   working with Wynn.  Wynn hires the top talent in the

23   City.  They're working with Mintz-Levin, one of the

24   best law firms in Boston.  That's who Wynn's hiring to

25   represent them, and they also hired ML Strategies.

1    That's Mintz-Levin's lobbying and political arm,

2    Steve Tocco, former head of Massport, Governor Weld --

3    former Governor Weld at ML Strategies.

4          Wynn's got really good talent, and they sent out

5    their top executive, Matt Maddox, to look at the land

6    in the fall of 2012.  And Mr. Maddox loves what he

7    sees.  He sees it's close to Boston, he sees the

8    potential, he knows he's struck gold.  He tours the

9    site with Mr. DeNunzio.  He learns about the setbacks

10   and the easements, learns about the contamination, and

11   he goes back to Nevada -- he has a discussion with

12   Mr. DeNunzio about partnering with FBT.

13         Mr. Maddox makes it clear, Thanks, but no

14   thanks.  We're going to buy that land outright.  We

15   don't have partners.  We're going to develop our

16   casino.  But he knows he struck gold.  Within days of

17   being back in Las Vegas, Maddox has put an offer down

18   to buy FBT, and Maddox puts his lawyers at Mintz-Levin

19   in touch with FBT's lawyers, Paul Feldman.

20         He says, Work out this option agreement,

21   Mr. Merritt describes it, pay $100,000 a month, it

22   basically covers the $50,000 a month in taxes and

23   environmental costs, and FBT will lock up the land and

24   not sell it to anybody else.  And they start working on

25   that option agreement.

1          And Mr. Maddox had this vision, along with Wynn,

2     for what land was going to be.  They had a vision for a

3     19-story hotel and casino, river walk with shops.

4     You'll see documents in this case.  Wynn's estimated

5     that they would make $800 million a year from this

6     casino, over $2 million a day.  They really wanted this

7     casino.

8          So, they had their folks at Mintz-Levin,

9     Dan Gaquin, who was the lead lawyer at Mintz-Levin,

10    working with Paul Feldman, getting ready to get this

11    date, December 19th, to sign that option agreement.

12    And Wynn is undertaking their homework.  They know what

13    they're doing.  They've built casinos before.  They're

14    looking at environmental surveys, they're looking at

15    title surveys, they're doing the things they need to do

16    to figure out what's the value of the land before they

17    sign that option agreement.

18          One question they never asked?  They never

19    asked, Who are the owners of FBT?  It doesn't come up.

20    But while they're negotiating these option agreements,

21    the "Boston Business Journal," as Mr. Merritt mentions,

22    they call, and they're asking about this fellow,

23    Gary DiCicco.

24          And it's Wynn's PR people, his media people who

25    are calling and asking Mr. Feldman and Mr. DeNunzio,

1          Who is Gary DiCicco?  And what does Dustin tell him

2    them?  What does Paul Feldman tell them?  He's a former

3    partner, and he was bought out.  And that was the

4    truth, and that was the end of the discussion.

5          But that led to the partners of FBT saying,

6    Well, we should really revisit that issue about

7    Mr. Lightbody because he has a criminal record.  And

8    so, working with Paul Feldman, meetings in his office,

9    Mr. Feldman talking to Mr. Gattineri, Mr. Feldman

10   talking to Mr. Lightbody, they work out a buy-out

11   arrangement, and you'll hear about it.

12         They buy out Mr. Lightbody's interest, and

13   Mr. Gattineri's going to purchase it for 1.7 million.

14   That represents the 1.2 million Mr. Lightbody has

15   invested by that point, plus a reasonable rate of

16   return from 2009.  And Mr. Feldman drafts the legal

17   documents to effectuate that transfer.  Mr. Lightbody

18   transfers his 12 percent interest.  This is all before

19   December 19th.

20         And what is Dustin DeNunzio doing during this?

21   He's involved in negotiations with Wynn.  They're

22   trying to finalize an option agreement.  And Dustin's

23   commenting on the various terms, but Dustin knows all

24   about this buy-out.  And what does he say to his

25   lawyer?  What does he say to Paul Feldman?  Paul, make

1      sure you tell Wynn and Wynn's people about Lightbody,

2      make sure you tell them that we have another partner

3      that we're buying out.

4          The first few words in Mr. Merritt's opening, "a

5      scheme to hide Lightbody," you're going to -- don't

6      take my word for it because what the lawyers say isn't

7      evidence.  Evidence is what is on the stand and in the

8      documents.  And here, Ladies and Gentlemen, is an

9      e-mail Mr. DeNunzio wrote to his lawyer on

10     December 16th before the option agreement is signed.

11     Sunday, December 16th, he's commenting on the sections

12     of the option agreement, and what does he say to --

13     what does DeNunzio say to Feldman?  "Should Lightbody

14     stuff be written in, or is the conversation you had

15     enough?"  He's told Feldman, Tell them about Lightbody.

16     He's telling Feldman in e-mails, Tell them about

17     Lightbody.

18          The next day, what does DeNunzio say to Feldman

19     because they're talking on the phone as well?  Dustin

20     thinks that Paul is going to talk to Gaquin and tell

21     him about Lightbody.  Mintz is sending over the

22     documents, and they're ready to sign the option

23     agreement.  What does Dustin say?  "Let me know

24     what I need to sign."  Also, "Any resolution on

25     Charlie Lightbody?  Do we want to have that taken care

1     of before we get a check?"  That's Dustin.  I don't

2     want their money until you confirm for me that you've

3     told them about Lightbody.

4           So, what does Feldman do?  Paul Feldman,

5     respected lawyer, he calls Dan Gaquin, another very

6     good lawyer, he says, Dan, I've got to tell you

7     something.  That guy, DiCicco?  Well, there's a second

8     guy, his name's Lightbody, he was a member of FBT, and

9     he had a criminal record, and we're getting him out of

10    the deal, we're buying him out with a promissory note.

11    What does Dan Gaquin say?  Thank you.  Thanks for

12    letting me know.  Dan Gaquin doesn't call his clients

13    with this radioactive news.  He doesn't tell anybody.

14          So, Dustin, what does Dustin know when

15    December 19th comes around and that option is going to

16    be signed?  He knows that Lightbody has agreed to sell

17    his share to FBT, and he knows that his lawyer has told

18    Wynn and Wynn's people about Lightbody.  That's what's

19    in his head.  And he also knows that, up until the date

20    that option agreement is signed on December 19th, not

21    once, not once does anyone from Wynn say, Who are the

22    owners of FBT?  That's how important it was to them.

23    They never even asked the question.

24          So, moving ahead -- there's one other person,

25    actually, who -- so, Gaquin knows about Lightbody.

1    Excuse me.  Gaquin's told about Lightbody before the

2    option agreement.  There's another Wynn person who's

3    also told about Lightbody before the option agreement

4    is signed, and that's Steve Tocco, the head of

5    ML Strategies.

6           You'll hear evidence that he spoke to the Mayor

7    of Everett, and they were talking about the land.  And

8    the Mayor of Everett said, Well, that guy Lightbody has

9    a record.  He might be an owner.  What does Steve Tocco

10   do with that information?  He does nothing.  He doesn't

11   tell his client about it.

12          And then the application -- excuse me -- the

13   option agreement is signed on December 19th, and then

14   three weeks later, Wynn submits their license

15   application to the Mass. Gaming Commission,

16   January 14th, 2012.  And that, Ladies and Gentlemen --

17   they submit a $400,000 fee.

18          And then you get to the events of January 17th

19   and this e-mail that Mr. Merritt put up, and I'll put

20   it up for you here, a little less sophisticated, we've

21   got the old board going, but Mr. Merritt showed you

22   this e-mail electronically.  This is from January 17th

23   from Dustin DeNunzio to Kim Sinatra, General Counsel.

24          And what led to this e-mail?  Well, it was

25   another press inquiry, another call, this time from the

1    "Boston Herald" asking about Gary DiCicco.  And that

2    led to a call between Ms. Sinatra and Dustin DeNunzio.

3    They initially worked on a statement.  Wynn put out a

4    statement, It doesn't matter who the prior owners are.

5    We're building the casino ourselves.  And Ms. Sinatra

6    and Mr. DeNunzio talked for two minutes, you'll see,

7    and she said, Dustin, can you send me the names of the

8    owners of FBT and their addresses?

9         Dustin shoots an e-mail to Anthony Gattineri,

10   Hey, can you give me your home address, please?  And

11   then he forwards this e-mail to Kim Sinatra, the three

12   owners that Dustin thinks are the three owners as of

13   January 17th, Lohnes, Gattineri, DeNunzio.

14        This e-mail is the crux of the fraud.  This

15   e-mail is the wire fraud charge in this case.  When

16   Dustin DeNunzio sends that e-mail, he believes, because

17   his lawyers told him, that Mr. Lightbody is out and

18   those are the three owners.

19        So, what's the proof, the proof that

20   Mr. Lightbody's in?  You heard some tapes, you're going

21   to hear more tapes in this case, and there's tapes

22   where Mr. Lightbody's bragging about his ownership

23   interest.  He's not bragging to Dustin DeNunzio.  None

24   of those tapes are with Dustin DeNunzio bragging about

25   his interest, and there's other tapes where

1    Mr. Lightbody is saying, I've sold my interest.  He's

2    all over the place on the tapes.  He's in, he's out.

3          And let me pause for a moment on this organized

4    crime figure that he's on the phone with because this

5    is really important.  You're not going to hear a shred

6    of evidence in this case that Dustin DeNunzio has ever

7    met, spoken with or heard of this guy, Darin Bufalino,

8    who Mr. Lightbody's talking to in jail.  He wouldn't

9    recognize him if he took my seat right now and walked

10   in this courtroom.  He never met the man.

11         And organized crime, those are powerful words,

12   powerful words in a Federal courtroom.  Listen

13   carefully.  You'll hear no evidence, no evidence in

14   this case that Dustin DeNunzio has anything to do with

15   organized crime, never has.

16         So, we get to the Mass. Gaming Commission

17   investigation in the summer of 2013.  But there's two

18   things that I want to point out that happened in the

19   spring of 2013 before there's any whiff of an

20   investigation.  Dustin DeNunzio first talks to FBT's

21   tax preparer in March of 2013.  He's going to do the

22   taxes for 2012.  What does DeNunzio tell the tax

23   preparer?  Something you should know about 2012,

24   Mr. Gattineri purchased Mr. Lightbody's interest.

25   You'll hear from that tax preparer.  That's what's in

1    Dustin's head.

2            Second, I told you about the vote in Foxboro.

3    There was going to be a vote in Everett.  Remember,

4    Dustin DeNunzio is accused of hiding Charlie Lightbody

5    from Wynn.  What happens around that vote?  Well, Wynn

6    hires a guy named John Tocco to run their effort in

7    Everett to get out the vote.  He's the son of

8    Steve Tocco.  John Tocco's working for Wynn.

9            What does Dustin do?  He introduces John Tocco

10   to Charlie Lightbody.  He says, Charlie Lightbody can

11   help you get out the vote, help you drive people to the

12   polls.  Think about that.  He introduces the person

13   he's supposedly hiding from Wynn to a Wynn guy, the son

14   of the top Wynn guy?  You'll have to decide if that

15   makes sense, Ladies and Gentlemen.

16           So, you get to the IEB investigation in July

17   of 2013 and these interviews of Dustin DeNunzio.

18   You'll hear in the first interview that the IEB

19   investigators never actually mention or ask the name

20   Charlie Lightbody.  They sit down with him, they call

21   him up, they say, Will you talk to us?  We're doing our

22   background investigation.

23           Dustin says, Sure.  He calls Paul Feldman

24   because that's what he does.  Feldman's on vacation,

25   and he goes in for the interview anyway.  And the

1   investigators never ask him about Charlie Lightbody,

2   the whole interview.  So, Dustin leaves the interview,

3   and he calls Paul Feldman down on the Cape -- seeing a

4   pattern here? -- calls Paul Feldman, calls him on the

5   Cape, tells him about the interview.  And Feldman says,

6   You know what, Dustin, I think you should go back and

7   talk to them and mention Lightbody.  And what does

8   Dustin say?  Sure, good idea.

9        And they get in to a discussion of --

10   Mr. Merritt talked about back-dating.  It sounds like

11   Dustin is in his office at home cutting and pasting

12   documents.  The back-dating of the promissory note?

13   Dustin asked Mr. Feldman about that.  He said, Paul,

14   you know, we really agreed to have Lightbody sell his

15   interest in the summer of 2012.

16        What does Feldman say?  It doesn't matter.  It

17   doesn't matter if it's August or December.  Dustin

18   said, I want it to be accurate.  Remember Och-Ziff?

19   That's when he he first agreed to get out.  So, Feldman

20   says to Dustin, Okay, if that's when he agreed to get

21   out, you can change the documents .  Dustin's not off

22   on his own changing documents; he's talking to his

23   lawyer, he's getting the lawyer's permission.  So,

24   Dustin does change the documents.

25        Mr. Merritt then talks about lies to the

1    investigators.  You know what?  On July 11th when

2    Dustin did call back and say, I didn't tell you about

3    Lightbody, let me tell you about Lightbody, he went to

4    an interview, and that interview was pretty intense,

5    and he was alone again, didn't have a lawyer, and he

6    did some stupid things in that interview.  He said some

7    things that weren't true about how long Mr. Lightbody

8    had been out.  But Ladies and Gentlemen, that's not

9    what he's charged with here.  Stupid mistakes in that

10   interview is not a Federal crime.  He's charged with

11   hiding Lightbody from Steve Wynn.  That's the charge

12   here.

13        And now, Ladies and Gentlemen, I want to talk

14   about the proof that Lightbody's still an owner and

15   this 1031 exchange.  That's an important aspect of what

16   the Government mentioned in their opening.  1031,

17   Mr. Merritt accurately described it, it's a perfectly

18   legal mechanism under the Tax Code, and there was a

19   meeting.

20        What's the evidence of the 1031 as being the

21   vehicle for hiding the secret interest?  Listen

22   carefully to that evidence.  There was a meeting at

23   the office of Paul Feldman.  That's where those notes

24   are from.  It's a meeting with Paul Feldman and

25   Paul Lohnes.  And it's a phone call, another phone call

1    in which Mr. Lightbody is again talking a big game,

2    talking about buying a $200 million building.  You'll

3    have to decide if you can credit that.  That's the call

4    where he said, I'm doing a 1031.

5         And then there's the meeting in Mr. Feldman's

6    office, and what you won't hear in this case is those

7    1031 discussions going any further.  They have the

8    meeting, they discuss it, and no one ever follows up on

9    the 1031.  They decide it's not a practical way to go

10   forward.  They're not revealing Mr. Lightbody has a

11   hidden interest in that meeting; they're simply

12   discussing ways to defer revenue.

13        What Mr. Merritt didn't tell you is

14   Mr. Gattineri paid Mr. Lightbody off on that note, paid

15   him 1.9 million.  That note is done.  That's the 1.7

16   plus interest.  So, there's nothing wrong with talking

17   about whether Mr. Lightbody could defer his gain on the

18   property.  There is no evidence that Mr. Lightbody was

19   still in the deal in that meeting in Mr. Feldman's

20   office.  And think about the logical extension of

21   Mr. Merritt's argument that, that meeting at Davis,

22   Malm & D'Agostine was where they were discussing the

23   fraud, discussing -- they were hiding this from

24   Steve Wynn.

25        If you're going to believe that, you have to

1     believe that Paul Feldman was in on the deal, that

2     Paul Feldman lied to Gaquin, Paul Feldman lied to the

3     Gaming Commission, Paul Feldman was part of the fraud.

4     Well, here, consider these facts, Ladies and Gentlemen:

5     You'll hear evidence that, before this FBT deal,

6     Paul Feldman had never met Charlie Lightbody, never met

7     him once.  He didn't have any -- Paul Feldman had no

8     stake in this deal, and now he's supposed to be

9     going and committing fraud to put more money in

10    Charlie Lightbody's pocket?  You'll have to decide if

11    that makes sense.

12         Think about something else.  Paul Feldman,

13    30-year career at Davis-Malm, Paul Feldman, recognized

14    year after year, he's one of the top lawyers in

15    Massachusetts in his field, managing partner of his law

16    firm, an august career, he's married, he has kids, he's

17    going to put all that on the line, he's going to risk

18    all that for a virtual stranger?  That's the case the

19    Government's presenting to you today and in this

20    courtroom.

21         Ladies and Gentlemen, this case is not about

22    whether or not you think Dustin DeNunzio made some bad

23    mistakes, exercised some bad judgment, it's not about

24    whether he panicked in that interview; this case is

25    about hiding Charlie Lightbody from Wynn Resorts.

1     Dustin believed that Lightbody had sold his interest to

2     Gattineri.  Dustin believed that his lawyer had told

3     Wynn's lawyer about Lightbody getting out of the deal,

4     about Lightbody having a checkered past.  Dustin

5     believed that Wynn wasn't even asking about who the

6     owners were.  How would he know that months later the

7     Mass. Gaming Commission would think it's important?

8     The people he was dealing with wasn't asking the

9     questions.  Dustin believed that his lawyer was giving

10    him good advice at every step of the way.

11          Ladies and Gentlemen, the Government's case here

12    is a house of cards, and it's going to collapse under

13    the weight of the facts and your common sense.  And

14    when this trial is over, I'll have an opportunity to

15    stand up before you again, and I'm going to ask you to

16    return a verdict of not guilty for Dustin DeNunzio.

17          Thank you very much for your time and for your

18    service.

19          THE COURT:  Mr. Rankin -- or is it Mr. Connolly?

20          Mr. Connolly --

21          MR. CONNOLLY:  Thank you, Your Honor.

22          THE COURT:  -- for the Defendant Gattineri.

23          MR. CONNOLLY:  Your Honor, counsel, Ladies and

24    Gentlemen of the jury, I want to re-introduce myself.

25    I'm Michael Connolly.  And it's my pleasure to be

1    working with Laura Angelini seated to my right at

2    counsel table in this case.  It is our privilege to

3    represent Anthony Gattineri.

4         Anthony, would you please stand and face the

5    jury.  Ladies and Gentlemen, Anthony Gattineri is

6    innocent.  He is not just not guilty; Anthony Gattineri

7    is innocent.  Thank you, Anthony.

8         Now, I want to start with a general comment that

9    I'd ask you to focus on during the course of this

10   trial.  This case is about a hidden ownership.  This is

11   a hidden-ownership case.  The Government claims that

12   Charlie Lightbody had a hidden-ownership interest in

13   FBT, an ownership that at the beginning he paid

14   $1 million for but which, after notes were entered in

15   to and a transfer memorandum was signed showing that it

16   was given to Mr. Gattineri, the Government wants to say

17   that he still held that ownership interest in this very

18   valuable piece of real estate.

19        Now, if that hidden-ownership interest was real,

20   doesn't your common sense tell you that there must be

21   some type of concrete evidence that he still had that

22   ownership interest, some type of a financial

23   transaction or a cash transaction, an exchange of

24   property or a writing showing that Mr. Lightbody,

25   despite the note and the transfer memorandum, actually

1        still has his investment in that property?

2              Well, in fact you'll see evidence that that's

3        exactly what the Government investigators on this case

4        sought to prove at the beginning of the case.  After

5        they listened to those tapes that Mr. Merritt told you

6        about, the calls between Mr. Bufalino and

7        Mr. Lightbody, they wrote a memo, and that memo is

8        going to come in to evidence.  You'll see it.  They

9        wrote that they expect to find evidence about payments,

10       possibly through a blind trust.  Well, that makes

11       sense.  It's exactly what you would expect to find if

12       the references during these prison calls referred to

13       something real.

14             The fact that there must be something real is

15       what drove the Government's investigation in this case.

16       The Government, Ladies and Gentlemen, has been

17       investigating this case for three years, for three

18       years.  The evidence will show that the Government has

19       conducted an unbelievably comprehensive investigation.

20       You might call it a scorch-earth investigation.

21             Listen to this:  They have issued dozens and

22       dozens of subpoenas for accounting records, banking

23       records, telephone records; they've subpoenaed dozens

24       of people to testify before the Grand Jury; they

25       conducted any number of FBI interviews; they executed

1    search warrants; they tapped telephone lines; they

2    combed through hundreds of thousands of e-mails of the

3    Defendants and others; they conducted surveillance,

4    following people around; and they used cooperating

5    witnesses, all to try to find some evidence of this

6    hidden-ownership interest, which they maintain still

7    existed after Mr. Gattineri and Mr. Lightbody signed

8    those documents.

9         Well, what do they have three years later?

10   What's the concrete proof that this interest, which

11   Mr. Lightbody paid a million dollars for, that he still

12   held that interest?  The evidence, Ladies and

13   Gentlemen, is nothing.  They exhausted every imaginable

14   investigative resource, and they came up with

15   absolutely nothing.

16        What we're left with is what I would suggest to

17   you is a late-in-the-game desperation pass, this

18   so-called 1031 exchange meeting, a meeting where

19   supposedly the criminal ownership interest is being

20   hidden by everybody present, not the least of which is

21   Attorney Feldman.  But an interesting thing about that

22   meeting is neither Mr. Gattineri nor Mr. Lightbody were

23   even present.  But that's it, that's what we have.

24   Three years later, dozens and dozens of agents, tens of

25   lawyers, and that's what we have.

1          Now, I'm going to say more about that 1031

2    meeting, but first I want to say a few things about

3    Mr. Gattineri.  At the time this alleged conspiracy

4    occurred, Mr. Gattineri was a 54-year-old man, happily

5    married for 31 years to his wife, Lisa.  Lisa and

6    Anthony are the proud parents of three daughters who

7    they adore.  And Anthony himself has achieved great

8    success as the very hard-working owner of a food

9    products company and in his real estate investments.

10   And Anthony's achieved his success the old-fashioned

11   way, he's kept his principles intact, his priorities

12   straight, and he's earned what he has through honest

13   hard work.

14         The premise of the Government's case is that

15   Anthony would throw all of this away, throw all of

16   it away to conceal the ownership interest of

17   Charlie Lightbody, a man who Anthony didn't even know

18   before this land deal came up.

19         Now, let me tell you about how Anthony's role in

20   this FBT investment came to be.  Anthony grew up in

21   Winchester, Massachusetts, and from the age of seven,

22   he worked at his father's dry cleaning business.  He

23   continued working there throughout college.  He

24   attended Bentley College, and after graduating from

25   college, he continued to work at his dad's dry cleaning

1    business.

2          That business was eventually sold.  So, then he

3    went to work for Lisa's father business, which was a

4    home heating oil business, and he worked many long and

5    hard hours working for Lisa's father's business.  But

6    then that business was eventually sold.  So, what did

7    Anthony do?  He pulled together his savings, he got a

8    loan, and he bought a company, a food products company

9    in Salem, Massachusetts, called California Olive Oils.

10         He built that company up through years of

11   tireless work, and eventually in 2003, he sold it for a

12   substantial amount of money.  For years prior to that

13   time and continuing afterward, Anthony invested in real

14   estate, and he's had some successful investments.

15         Anthony's real estate investments led him to

16   meet other successful real estate investors, such as

17   Alex Steinberg and Paul Lohnes, a name that you've

18   heard.  These two gentlemen entered in to joint

19   investments with Anthony and another person by the name

20   of Gary DiCicco.  Mr. Steinberg was the person who

21   introduced Gary DiCicco to Mr. Gattineri.  Now,

22   Mr. DiCicco is an important person in this case because

23   he's the person who brought Charlie Lightbody in to

24   FBT.

25         So, what's the evidence going to show about FBT?

1    Well, the evidence is going to show that, in the summer

2    of 2009, Mr. DiCicco approached Mr. Gattineri and said,

3    I'd like you to join this investment for this piece of

4    land in Everett, Massachusetts, along with myself and

5    Mr. Lohnes.  Mr. DiCicco didn't even mention anything

6    about Mr. Lightbody at that point in time.

7    Mr. Gattineri learned he was an investor in that

8    property about a year later.

9         What Mr. DiCicco didn't tell Mr. Gattineri,

10    however, at that time was that he didn't have any money

11    to pay for his share in the investment.  So, what did

12    he do?  He lied to Anthony about the purchase price so

13    that he could use Anthony's money to pay for his

14    interest.

15         The next lie came when, just before the closing,

16    Mr. DiCicco reaches out to Mr. Gattineri, and he says,

17    Hey, Anthony, my money's tied up.  I need a short-term

18    loan.  Can you loan me a 1.5 million so that I can pay

19    that money in to the closing costs?  And I'll pay you

20    back in a couple of weeks.  Anthony is trusting, and so

21    he and Lisa decided to put up the money for the loan.

22         Now, the evidence in this case is going to show

23    that Anthony is a little bit complicated, like most of

24    us are.  On the one hand, he's been successful, and

25    that suggests that he's pretty sophisticated.  On the

1    other hand, the evidence is going to show that Anthony

2    can be very naive and very trusting, and that makes him

3    vulnerable to people like Gary DiCicco.

4            Well, that short-term loan that Anthony made to

5    Gary DiCicco?  Anthony spent the next two years trying

6    to get that money back.  Anthony had to hire a lawyer

7    to go out and foreclose on Mr. DiCicco's interest,

8    which effectively kicked Mr. DiCicco out of the

9    partnership.

10           But he didn't foreclose before he got concerned

11   about the fact that Mr. DiCicco was ripping him off,

12   and he decided to look in to Mr. DiCicco's background.

13   What's interesting about this, Ladies and Gentlemen, is

14   how he did it.  What Anthony did was he called his

15   long-term high school buddy, a guy by the name of

16   Tom Zappala.  Well, Tom Zappala happens to work at the

17   US Attorney's Office.  He works with the people who

18   brought this case.

19           He called up Mr. Zappala, and he said, I'm

20   worried about the integrity of this guy, Gary DiCicco.

21   What did Mr. Zappala do?  Mr. Zappala found a public

22   record that showed that Gary DiCicco had been convicted

23   of insurance fraud.  Well, the interesting thing about

24   that little event is it tells you a lot about who

25   Anthony Gattineri is.  What does he do when he has

1    concerns about an investment partner?  He turns to

2    Federal law enforcement people to do a background check

3    on them.

4         Now, what does the evidence say about the

5    bogus -- the so-called bogus note arrangement in this

6    case?  Mr. Levy gave you an overview of the evidence

7    about the promissory note and the transfer memorandum,

8    so I'm not going to repeat that.  But I'd like to focus

9    for a minute or two about the two parties to these

10   written documents, Mr. Gattineri and Mr. Lightbody.

11        The evidence is going to show that Mr. Gattineri

12   and Mr. Lightbody really didn't know each other very

13   well, they didn't come from the same area, they don't

14   live in the same community, they've never gone to

15   school together, they've never worked together, they've

16   never socialized together.  In fact the evidence is

17   going to show that Mr. Lightbody really didn't like

18   Anthony Gattineri.

19        Now, I want to comment on that brief excerpt

20   that you heard Mr. Merritt play from the phone call,

21   the one where Mr. Lightbody's talking to Mr. DiCicco

22   and Mr. DiCicco says that Mr. Gattineri is a rat.  You

23   remember that?  A rat.  Well, there's a few things that

24   you may want to know about that phone call.  The first

25   thing is this:  Gary DiCicco, using that word "rat,"

1    had nothing to do with any hidden-ownership interest in

2    FBT.  Gary DiCicco had no knowledge whatsoever of any

3    hidden-ownership interest in FBT.

4         In fact he was interviewed by the FBI, and he

5    told the FBI, I don't know anything about

6    Mr. Lightbody's ownership interest in FBT.  But the

7    Government is now suggesting that the word "rat"

8    suggests that Mr. Gattineri might rat that out.

9         The second thing that you might want to know

10   about that phone call is Mr. DiCicco had a very good

11   reason to be calling Mr. Gattineri a rat.  Remember I

12   told you about the money dispute where Gattineri spent

13   two years trying to get his money back from

14   Mr. DiCicco?  Well, what Mr. DiCicco became aware of

15   was that, at that time, Mr. Gattineri threatened to

16   blow the whistle on Mr. DiCicco, to go to the Attorney

17   General's Office and report him for fraud.  That's what

18   the rat reference referred to, Ladies and Gentlemen.

19   It had nothing to do with Mr. Lightbody or what's at

20   issue in this case.

21        Now, there's a third thing about that phone

22   call, which I want to point out to you.  You will hear,

23   when you hear a greater portion of that phone call,

24   that Mr. Lightbody refers to Anthony -- and I want to

25   ask you to excuse me for the profanity, but this is the

1    evidence that you're going to hear in this case --

2    Mr. Lightbody refers to Anthony as a fucking maggot, a

3    fucking maggot.

4         Why am I pointing this evidence out to you?

5    Because this call occurred precisely when the

6    Government wants you to believe that Mr. Gattineri and

7    Mr. Lightbody were immersed in this criminal

8    conspiracy, this elaborate conspiracy involving

9    complicated tax transactions and coordinated lies

10   to the Gaming Commission and a scheme to dupe a

11   multi-billion-dollar corporation.  Would

12   Charlie Lightbody do that with a rat, a rat who he

13   calls an F'ing maggot?  Does that make any sense at

14   all?

15        Now, Mr. Merritt talked about the Gaming

16   Commission interviews.  Well, Mr. Gattineri, even

17   though he was on his way to a vacation, was contacted

18   on the afternoon of July 10, 2013, and asked to be

19   interviewed.  And what did he do?  He said, No problem.

20   He met him, and he was interviewed in the back of a

21   pick-up truck by these two investigators behind a

22   McDonald's on an 86-degree afternoon in July.

23        Now, the Government says that interview is

24   critical evidence of Mr. Gattineri's guilt, but I'm

25   going to ask you to pay careful attention to the

1      sequence of events that occur at this time.  The first

2      thing I want you to focus on, Mr. Gattineri's interview

3      is July 10, well, it was the day before, July 9, that

4      Mr. DeNunzio was interviewed by the Gaming Commission

5      investigators.

6             And Mr. DeNunzio, as you just heard Mr. Levy

7      say, after the interview, he called Mr. Feldman, and he

8      decided to re-date the note, the note that had been

9      dated in December, he decided to re-date the note, and

10     in fact he created a second note.

11            Now, I want you to think about this.  That whole

12     day, July 9, the Government put a lot of time of

13     putting together every e-mail and every phone call, and

14     you know what you're going to see, Ladies and

15     Gentlemen?  There isn't a single phone call from

16     Mr. DeNunzio to Mr. Gattineri that day.  The next thing

17     that Mr. Gattineri learns about this interview is when

18     he's called the next morning.

19            But what does Mr. Gattineri do when he's at that

20     interview?  Mr. Gattineri tells the Gaming

21     Commissioners exactly where to find the December note,

22     the first note.  The Government's case is the second

23     note was created to deceive the Gaming Commission, but

24     Mr. Gattineri, in his interview, says, Hey, you want

25     that note?  Go get it from the lawyer's office, it's

1    either at Tom Falwell's office or Paul Feldman's

2    office, he couldn't remember which one.  But you know

3    what?  That's exactly where it was, the December note.

4    How can Mr. Gattineri be involved in a scheme to

5    defraud the Gaming Commission based on an August note

6    when he tells him exactly where to find the first note?

7          And the other thing you'll hear about those

8    notes, Ladies and Gentlemen, is that nobody ever,

9    neither Mr. Gattineri nor anybody else in this case,

10   ever made an effort to destroy that first note in order

11   to only present to the Gaming Commission the fraudulent

12   second note.  This was a legitimate change in business

13   documents that has nothing to do with criminal conduct.

14         Now, what's the Government's -- the centerpiece

15   of their case?  The centerpiece of the Government's

16   case are these Charlie Lightbody/Darin Bufalino phone

17   calls, and I'm going to be repeating in a way what

18   Mr. Levy just said.  Mr. Gattineri never heard of

19   Darin Bufalino in his life.  If Mr. Gattineri fell over

20   Mr. Bufalino, he wouldn't have known it.

21         And if this wasn't such a serious proceeding, it

22   would be a joke to suggest that Mr. Gattineri has

23   anything to do with organized crime.  He hasn't come

24   within a million miles of it in his entire life, and

25   the Government won't offer a shred of evidence to

1     refute that.

2              Now, what are you going to hear when you hear

3     these phone calls?  Well, what you're going to learn is

4     a big problem in the Government's case, and that is

5     Mr. Lightbody doesn't always tell the truth.

6     Mr. Lightbody is somebody who boasts, who exaggerates,

7     who says things that he knows are not true.  He

8     particularly does that when he's saying things to

9     people who he wants to impress about his wealth.

10             Now, there's an even bigger problem with the

11    centerpiece of the Government's case.  During these

12    recorded prison calls and then some later wiretapped

13    calls when Mr. Lightbody doesn't know that he's being

14    recorded, he says that his interest in FBT has been

15    bought out.  On some calls, he says, Oh, I'm going to

16    make a lot of money off of this, you know, when he

17    wants to impress his rich friends; but on other

18    occasions, numerous occasions, when he doesn't know

19    he's being recorded, he says, I've been bought out or

20    I'm being bought out, depending on when the call came.

21             Here's another interesting thing about these

22    intercepted phone calls that you're going to hear

23    evidence of, or this is kind of an absence of evidence

24    really.  The Government had that wiretap up and running

25    in -- from June, I think it was June 24, to July 24,

1    2013, recording all of Charlie Lightbody's phone calls.

2    You know how many phone calls you're going to hear

3    between Charlie Lightbody and Anthony Gattineri during

4    that time period talking about this sham arrangement?

5    Zero.  You know how many phone calls talking about any

6    subject at all you're going to hear about between

7    Mr. Lightbody and Mr. Gattineri during that period?

8    Zero.  Nothing, Ladies and Gentlemen.

9         So, where is the evidence, the evidence of a

10   hidden-ownership interest in this case?  Well, the

11   Government tells you it's in this 1031 meeting, and

12   they point to that Mike Flood note like it's a smoking

13   gun.  That's your smoking-gun evidence in this case.

14   Well, what happened at that meeting, June 19, 2013?

15         Well, again, the first thing I want to point out

16   is two of the three conspirators in this case,

17   Mr. Gattineri and Mr. Lightbody, weren't even at the

18   meeting.  The second thing I want to point out is that

19   one of the FBT partners who was at that meeting is this

20   gentleman you've heard about, Mr. Lohnes.  Mr. Lohnes

21   is a highly respected businessman.  He's not only a

22   highly respected businessman; he's worth somewhere far

23   north of $100 million, $100 million.  And like Anthony,

24   he has no real personal relationship at all with

25   Charlie Lightbody.

1          Third, the lawyer running this meeting is

2    Mr. Feldman.  And Mr. Levy has it right, Mr. Feldman is

3    one of the most highly respected lawyers in this City.

4    He has spent an entire career earning the respect of

5    his clients, his partners in the Bar and his partners

6    who have made him the managing partner of the firm for

7    ten years.  And the Government would have you believe

8    that he would simply cast that to the wind for a guy

9    he's never even met?  Does that make any sense

10   whatsoever?  For you to believe that, that 1031

11   transaction was a criminal transaction, you must find

12   that Mr. Feldman and Mr. Lohnes, worth a hundred

13   million dollars, were in on the scheme.

14          Now, so what's the Government's case left to?

15   As far as Mr. Gattineri's concerned, it's this "hot"

16   e-mail you heard about, the e-mail where

17   Mr. Gattineri -- I think Mr. Merritt said Mr. Gattineri

18   had learned how to avoid creating electronic evidence,

19   and so there's an e-mail saying, "Anything that's hot,

20   we meet in person."

21          Well, what I'm going to show you in evidence in

22   this case is you're going to see e-mail after e-mail,

23   after e-mail, after e-mail where Mr. Gattineri says to

24   his partners in this investment and other investments,

25   Anything that's important, I want to meet in person, I

1      want to have a face-to-face meeting, I want to meet

2      with you in person.

3          He's kind of demanding that way, and maybe

4      that's a little abrasive, but that's who he is.  And

5      the word "hot"?  He uses that to describe any number of

6      things.  When you look at that e-mail in the context of

7      the evidence and the way that Mr. Gattineri

8      communicates with his business partners, the

9      Government's argument will have no credibility at all.

10         Now, Ladies and Gentlemen, what's the most

11     telling way to investigate a fraud case?  It's the old

12     rule of thumb, follow the money.  Follow the money,

13     that's what the fraud case is about.  Well, what does

14     the money trail show you in this case?  Here's what it

15     shows:  Anthony paid off the promissory note to

16     Charlie Lightbody for $1.9 million in June of 2014,

17     exactly what the documents prepared by Attorney Feldman

18     said he should do.

19         Two, Wynn was awarded the license, and he was --

20     he bought the land from FBT, ended up paying something

21     north of $30 million, and that money came in to the

22     accounts of FBT.  What did FBT do with that money?  FBT

23     paid the money out to Paul Lohnes, to Anthony Gattineri

24     and Dustin DeNunzio and held some money back for future

25     expenses.  But that's it.  Charlie Lightbody?  He

1    didn't get one penny from that money, Ladies and

2    Gentlemen.

3         It is the Government's burden of proof,

4    Ladies and Gentlemen, to prove to you through

5    credible evidence beyond a reasonable doubt that

6    Anthony Gattineri engaged in a criminal conspiracy and

7    a scheme to defraud, and that is going to require you

8    to find at least the following two things:  That

9    Charlie Lightbody had a continuing ownership interest

10   in FBT after Anthony agreed to buy him out and that

11   Anthony somehow intended to defraud Wynn Resorts of

12   money.

13        Ladies and Gentlemen, it will be impossible for

14   the Government to prove that because neither of those

15   assertions are true.  And so, at the end of the trial,

16   after you've heard all the evidence in this case, I'm

17   going to come back before you to ask for verdicts of

18   not guilty on both counts.

19        I want to thank you in advance for all of your

20   careful attention that you're going to be paying to the

21   evidence during this case.  Thank you.

22        THE COURT:  All right.  Mr. Rankin for the

23   Defendant Lightbody.

24        MR. RANKIN:  Thank you, Your Honor.

25        THE COURT:  You have ten.

1          MR. RANKIN:  Thank you, Your Honor.  Appreciate

2     it.

3          Good morning, members of the jury.  By now,

4     you're probably tired of sitting.  You've heard a huge

5     amount of details from the prosecutor and the two other

6     defense lawyers.  I'm going to give you a few details,

7     but rest assured that, over the next two or three

8     weeks, you're going to hear a huge amount of details.

9          But actually, the case is very simple, it's very

10    simple.  My client, Charlie Lightbody, seated at the

11    end of the table, ,actually sold his interest to

12    Mr. Gattineri in December of 2012.  That was it.  It

13    was done.

14         Moreover, Mr. Lightbody's involvement in the

15    Everett land parcel was not concealed from Wynn.  Wynn

16    was told about it by Mayor DeMaria of Everett in

17    December of 2012.  Wynn was told about it by Dan Gaquin

18    and Paul Feldman, the lawyers negotiating the deal in

19    December of 2012.

20         When Wynn first came to Massachusetts in

21    November of 2012, they went to see Mayor DeMaria.

22    Mayor DeMaria has known Charlie Lightbody since they

23    were kids.  He knew that Charlie Lightbody was involved

24    in FBT Everett partnership, owning the land in Everett.

25    This was a huge parcel of land in Everett.  It was very

1    important to the future development of Everett.

2            And if you think that Wynn Casino, the most

3    profitable, expansive casino company in the world, with

4    the top law firm in Boston, if not the United States,

5    coming in to the tiny town of Everett didn't know right

6    away who owned that parcel, I've got a bridge in

7    Brooklyn for you.

8            Now, this started in 2009 when Charlie Lightbody

9    bought in to FBT Partners for about a million bucks,

10   thinking that it would be a profitable investment

11   because it was ideally situated near lots of highways,

12   lots of people and probably good for a big box store

13   like the adjacent mall in Somerville.

14           By 2012, the casinos came calling.  Lightbody

15   thought that, with his criminal record, he might pose a

16   problem if the casinos were interested in doing

17   business with FBT, and so he agreed to sell his

18   12 percent to one of the other investors.  He signed a

19   memo of transfer drafted by Paul Feldman, Mr. Gattineri

20   signed the note drafted by Paul Feldman, Mr. Feldman

21   kept those documents, promising to pay $1,700,000 in

22   five years at an interest rate of seven percent.

23           And once that agreement was reached in December,

24   Lightbody was out.  And no amount of bragging to his

25   friends, puffing himself up, exaggerating his wealth to

1    a bank to try to get a loan, no amount of that could

2    change the fact that he didn't have an ownership

3    interest in FBT after 2012.  That's the simple fact of

4    the case.

5         Charlie grew up in Revere.  It's a small town.

6    Pretty much everybody knows each other, and everybody

7    knows or they think they know their business.  Charlie

8    grew up in a modest household.  He's the oldest of

9    three brothers and a sister.  He played sports in high

10   school.  He always had a job while he was in school.

11        He eventually graduated from Revere High School,

12   didn't have a big formal education, but he made up for

13   that with a lot of hard work.  He started an auto body

14   shop that he still operates.  He's been married, he's

15   been divorced, he's got three daughters and a

16   girlfriend of 22 years.  And he's done pretty well for

17   a kid from Revere.  He bought a house in Revere, he

18   rehabbed it, he sold it.  He bought another house,

19   rehabbed it and sold it.  He went to an auction, and he

20   bought a house, he rehabbed it, and he sold it.  He

21   bought another house, he rented it out.  He developed a

22   small condo building and tried to increase the size of

23   his holdings and his investments.

24        So, in 2009, Gary DiCicco comes on the scene.

25   Charlie knew Gary DiCicco.  He did similar kinds of

1    deals, but Gary had a magic touch where he attached

2    himself to wealthy people, and unlike Lightbody, he

3    attached himself to a guy like Paul Lohnes, described

4    as a very wealthy individual, and that's how this deal

5    at FBT came about.

6         And one of the reasons that Charlie was brought

7    in to it was because DiCicco didn't have any money.

8    So, he got Gattineri to put in an extra 1.5 million

9    loan and Lightbody to put in about a million bucks to

10   join the project, and he got a 12 percent interest in

11   the property.

12        Now, in addition to thinking that it might be

13   profitable, Lightbody also thought that this might be a

14   good opportunity for him to ingratiate himself or get

15   to meet people such as Mr. Lohnes because, if you're

16   involved in a successful development like FBT

17   developing a big box store, then maybe another deal

18   would come along.  So, he borrowed the money from a

19   bank to invest in FBT.

20        Now, as you've heard, Charlie has a criminal

21   record, thefts, assaults, some of them many years ago.

22   And when the prospect in 2012 of investing -- selling

23   the land to a casino came along, Charlie recognized

24   that this was not going to work out for him.  And there

25   was a company called Och-Ziff, you've heard mention of

1    them, they were snooping around in August of 2012,

2    thinking about investing, and Lightbody said at the

3    time, If this is -- my record is going to be a problem,

4    I'll get out.  He was willing to do that.  Och-Ziff

5    eventually walked away from it.  They were concerned

6    about traffic issues, they were concerned about issues

7    of the public support in Everett and whether there

8    would be enough public support.

9         But in November, Wynn came along, and they

10   expressed an interest in developing the land.  And

11   while they were negotiating an agreement, the "Boston

12   Business Journal" inquired about DiCicco's former

13   interest.  DiCicco had been bought out or foreclosed by

14   Mr. Gattineri months or if not a year before this.

15        But the "Boston Business Journal" assumed that

16   it was a problem for FBT and for Wynn because they

17   believed that the seller of land couldn't have a

18   criminal record.  Now, one of the crazy things about

19   this case is that the seller of land who doesn't have

20   an ongoing interest in the operation of the casino does

21   not need to be qualified in the language of the Gaming

22   Commission's statute; that is to say, they don't have

23   to fill out this onerous personal history questionnaire

24   that would reveal Mr. Lightbody's criminal record.

25   Nevertheless, Lightbody said, Look, I'm not going to

1      stand in the way of you guys making out.  I'll get out.

2            And so that inquiry by the "Boston Business

3      Journal," in the space of a week, led Feldman to create

4      this agreement between Gattineri and Lightbody.  He

5      transferred his interest, got a note, and that was it.

6      Those documents that documented that transaction,

7      you'll see them, you could walk in to any court in the

8      Commonwealth and enforce that agreement.  There was no

9      hidden clause in those agreements that said, Oh, by the

10     way, Lightbody can get back in.

11            So, no matter how many times Lightbody says it

12     on a tape-recorded call with someone in prison or on a

13     wiretapped call that he's going to make out like a

14     bandit, he's getting $100,000 a month, it's going to be

15     $200 million, it doesn't make it so.

16            Now, the other thing that you should keep in

17     mind is, in December of 2012, it wasn't at all clear

18     that Wynn was going to win the license.  You'll hear

19     evidence that there was a competing casino interest

20     trying to develop a casino at Suffolk Downs in Revere.

21     And the political handicappers, so to speak, thought

22     that the Revere project at Suffolk Downs had the inside

23     track because they had the support of Speaker of the

24     House, DeLeo, who represented that district and was

25     very invested in the success of Suffolk Downs, and

1    Mayor Menino -- then Mayor Menino, who was very much in

2    favor of the casino going to Suffolk Downs.

3         So, the idea that Lightbody was giving away his

4    interest in this multi-million dollar thing was not so

5    crazy in December of 2012.  It wasn't at all clear that

6    Wynn was going to succeed in getting the license.

7         THE COURT:  You need to wrap up, Mr. Rankin.

8         MR. RANKIN:  May I wrap up, Your Honor?

9         THE COURT:  Yes.

10        MR. RANKIN:  Thank you.

11        So, I want to tell you, you're going to hear a

12   lot of calls between Bufalino and Lightbody.  Listen to

13   them carefully.  Mr. Merritt played an excerpt of one

14   of the calls, and you listen to the whole context of

15   that call, and you see if the meaning he assigned to

16   that excerpt is a fair reading.

17        Fairness in our system does not depend on

18   calling people names, it doesn't depend on evidence,

19   their allegation that Darin Bufalino is associated with

20   organized crime.  We don't believe in guilt by

21   association in our country; we believe in jurors

22   hearing the evidence and deciding the facts in a

23   factual, unbiased, non-emotional way.

24        Members of the jury, Charlie Lightbody may be

25   guilty of having a big mouth, of bragging, of lying to

1    the IEB about when his ownership interest ended, but

2    he's not guilty of defrauding Wynn, of attempting to

3    defraud Wynn or of conspiring to defraud Wynn.  He's

4    innocent of those charges.

5         Thank you very much.

6         THE COURT:  All right, Jurors.  We will take a

7    short recess at this stage and come back at quarter of.

8    We'll be out for 15 minutes.

9         (Recess at 11:30 a.m.)

10        (Resumes at 11:50 a.m.)

11        THE COURT:  Counsel asked to see the Court

12   before we call the jury.

13        MR. RANKIN:  Yes, Your Honor.  There were two

14   issues.  Maybe I'll address one, and Mr. Katz will

15   address the other.  The government proposes to play

16   Exhibit 3 with Lieutenant Kradolfer.  And at the end of

17   its proposal it includes an excerpt, it talks about

18   bookmakers, and I think that's not relevant to the

19   case.  There's just four lines.  I can read it to you

20   if that's all right with the Court.

21        It says, "You ran out of bookmakers to f-ing get

22   it through that dollar."  That was Mr. Bufalino.  Then

23   Mr. Lightbody says, "Exactly.  That's all it is, baby.

24   You know, and the answer is that no one trusts you.

25   They think you're going to beat them and f-ing run."

1    Bufalino then says, "Yeah, yeah, yeah."  Lightbody

2    says, "And the casino kicked me out, so they did me a

3    favor."  I think that's referring to something that

4    happened in Connecticut some years earlier.  It's not

5    -- it doesn't go with the excerpt that the government

6    proposes to play on that, so I would ask them to stop

7    playing the tape at that point and not include the

8    bookmaker and casino reference.

9            THE COURT:  Ms. Barclay.

10           MS. BARCLAY:  Your Honor, we gave the defendants

11   the excerpts we intended to play three weeks ago.  We

12   heard nothing from them despite repeated calls and

13   e-mails about this issue until 8:45 last night.  We

14   can't change the transcripts.  This is what we're

15   playing.  This is what we had offered to play.

16           MR. RANKIN:  We didn't know until yesterday

17   morning at 7:30 that Kradolfer was going to be on the

18   stand today.  That's what we're dealing with.  Last

19   night was the first opportunity to look at Kradolfer.

20           THE COURT:  Motion is denied.  Anything else?

21           MR. FOSTER:  May I be heard, sir?

22           THE COURT:  Yes.

23           MR. FOSTER:  Sir, I'm going to be handling the

24   cross-examination of Lieutenant Kradolfer for the

25   DeNunzio group.  I've had conversations with the

1    government.  We are going to, under Rule 106, play an

2    additional excerpt of Exhibit 3, which is a tape.  So

3    during our cross-examination, we will play an

4    additional excerpt that the government did not play

5    during their direct.

6         As a second matter, there's another call from

7    February 25, 2012 that I don't believe the government

8    is going to put in.  But in this call from February of

9    2012 -- this is between Mr. Lightbody and Mr. Bufalino.

10   And in this call from February of 2012, Mr. Lightbody

11   is telling Mr. Bufalino that he is putting his interest

12   in a blind LLC because this gentleman, Paul Lohnes, who

13   he describes as a very legitimate person, has asked him

14   to do so.  So I intend to put that in also during the

15   cross-examination of Lieutenant Kradolfer.  The

16   government suggests we need to put in the whole tape or

17   the whole call.  I don't believe we do, and we believe

18   that we can just put in this excerpt which we are

19   prepared to do at that time.

20        THE COURT:  Ms. Barclay?

21        MS. BARCLAY:  With all the jail calls, the

22   government has proposed putting in the entirety of the

23   call into evidence and playing certain excerpts.  Since

24   that's the rule we're following, we ask the defendants

25   to follow the same rule.

1          MR. FOSTER:  If I may, sir, the problem is that

2    when it goes back to the jury room, if the whole call

3    is in evidence, then the jury will be listening and

4    considering things which have been kept out of the

5    transcripts by agreement or based upon relevance or

6    other evidentiary objections.  That's the problem with

7    putting the entire call in there.

8          MS. BARCLAY:  Again, Your Honor, we fronted this

9    with the defendants three weeks ago.  This was the plan

10   all along.  We said we were going to put the jail calls

11   in their entirety into evidence and play the parts of

12   the calls for which --

13         THE COURT:  If the call goes in, the whole call

14   goes in.  You can play part of it, but the whole call

15   goes in.

16         MR. RANKIN:  I object to that.

17         THE COURT:  Your objection is noted.  Let's go.

18         MR. FOSTER:  Sir, does that mean the entire call

19   goes back to the jury room?

20         THE COURT:  If it's in evidence, it does.  Call

21   the jury.

22         (Jury enters.)

23         THE COURT:  Good morning, Jurors.  We're ready

24   to resume with the evidence in the case.  The

25   government will put on its case and call its first

1    witness.

2            MS. BARCLAY:  Thank you, Your Honor.  The

3    government calls Lieutenant Michael Kradolfer.

4            (MICHAEL KRADOLFER, sworn)

5            THE CLERK:  Would you please state your name for

6    the record, spelling your last.

7            THE WITNESS:  My name is Michael Kradolfer.

8    Last name is K-r-a-d-o-l-f-e-r.

9            MS. BARCLAY:  May I proceed, Your Honor?

10   DIRECT EXAMINATION BY MS. BARCLAY:

11   **Q.**   Good afternoon, Mr. Kradolfer.  Could you please

12   tell the jury how you're employed.

13   **A.**   I'm a lieutenant with the Massachusetts Department

14   of Correction.

15   **Q.**   How long have you been with the Massachusetts

16   Department of Corrections?

17   **A.**   I'll be starting my 30th year next month.

18   **Q.**   And how long have you been a lieutenant with the

19   Department of Corrections?

20   **A.**   Little over 15 years.

21   **Q.**   Do you have any additional titles?

22   **A.**   I do.  I'm actually --

23           MR. RANKIN:  Objection, Your Honor.

24           THE COURT:  Sorry?

25           MR. RANKIN:  Objection.

1      THE COURT:  Overruled.

2  **A.**   I'm a federal task force officer assigned to the

3  FBI here in Boston.

4  **Q.**   And are you assigned to a particular squad on the

5  FBI?

6      MR. RANKIN:  Objection.

7      MR. FOSTER:  Join the objection.

8      THE COURT:  Overruled.

9  **A.**   I am.  It's the organized crime squad.

10  **Q.**   How long have you been assigned to the organized

11  crime squad with the FBI?

12  **A.**   A little over 14 years.

13  **Q.**   Talking about the Department of Corrections, what

14  unit of the DOC are you currently assigned to?

15  **A.**   I'm assigned to the office of investigative

16  services, which is based out of headquarters.

17  **Q.**   How long have you been assigned to that unit?

18  **A.**   Little over 14 years.

19  **Q.**   And what is the office of the investigative

20  services?

21  **A.**   It's a unit comprised of approximately 25 officers

22  of various rank.  Investigations with that unit include

23  fugitive investigations, central intelligence, internal

24  affairs, criminal prosecution, general intelligence for

25  the entire department.

1    **Q.**    And what are your duties and responsibilities with

2    regard to your position with the FBI and with the

3    Department of Corrections?

4    **A.**    I'm assigned as the liaison for organized crime

5    intelligence gathered within the DOC facilities which

6    then in turn I disseminate to my FBI task force.

7    **Q.**    And what are your duties and responsibilities

8    specifically as a lieutenant with the Department of

9    Corrections?

10    **A.**    Again, I'm assigned to the intelligence unit.  My

11    role is predominantly inmates that are affiliated with

12    organized crime.  As such, I monitor their activities,

13    monitor their telephone activity, their associations,

14    conduct interviews with such inmates and share that

15    with my boss at headquarters.

16    **Q.**    Do you also sometimes share that information with

17    the FBI?

18    **A.**    If it reaches a criminal level.  My main goal with

19    the Department of Correction is intelligence within the

20    Department of Correction, safety for staff.  If in fact

21    it reaches a criminal matter to the street, we then

22    share that with our local, state and federal partners,

23    yes.

24    **Q.**    You mentioned that part of your responsibilities

25    were to monitor inmate phone calls?

1    A.    That is correct.

2    Q.    And so you're familiar with the inmate phone

3    system in various Department of Correction facilities?

4    A.    I am, yes.

5    Q.    Can you just explain how it works generally?

6    A.    When an inmate is committed to the Department of

7    Correction, he is assigned a five-digit PIN number.

8    Once he's assigned that number, he is then allowed to

9    submit a slip which includes ten telephone numbers of

10   family members, friends, associates, as well as five

11   attorney numbers.  The ten numbers of his friends and

12   family, those numbers are then placed within the

13   system, and all those calls are subject to being

14   recorded.

15   Q.    And the inmate can only call people on their phone

16   list; is that accurate?

17   A.    That is correct, yes.

18   Q.    Are you familiar with an individual named Darin

19   Bufalino?

20   A.    I am, yes.

21   Q.    Have you ever met him?

22   A.    I have.

23   Q.    You've spoken to him?

24   A.    Several times, yes.

25   Q.    And is Mr. Bufalino currently imprisoned in a DOC

1    facility?

2    A.    He is.  He's currently incarcerated at MCI

3    Plymouth.

4    Q.    And how long has he been incarcerated with the

5    DOC?

6    A.    He came into the DOC in January of 2010.

7    Q.    Where was he being held in 2012 and 2013?

8    A.    He was at MCI Shirley.

9    Q.    Is Mr. Bufalino someone whose phone calls you

10   monitored as part of your role with the DOC?

11   A.    Yes.  Mr. Bufalino has been designated --

12         MR. RANKIN:  Objection, Your Honor.

13         THE COURT:  He answered the question.

14   Q.    Why do you monitor Mr. Bufalino's calls?

15         MR. RANKIN:  Objection.

16         THE COURT:  Overruled.

17   A.    Mr. Bufalino has been identified as what we term a

18   security threat group member, which are gang members,

19   organized crime members.  His affiliation security

20   threat group is organized crime.

21         MR. RANKIN:  Objection and move to strike that.

22         THE COURT:  Overruled.

23   Q.    Are you familiar with the name Charles Lightbody?

24   A.    I am.

25   Q.    Was Mr. Lightbody someone on Bufalino's phone list

1    in 2012 and 2013?

2    **A.**   Yes, he was.

3    **Q.**   So Mr. Bufalino was then allowed to place calls

4    from the DOC facility to Mr. Lightbody; is that

5    accurate?

6    **A.**   That's correct, yes.

7    **Q.**   And did Mr. Bufalino, in fact, make calls to

8    Mr. Lightbody?

9    **A.**   He did.

10   **Q.**   Did you monitor some of those calls?

11   **A.**   Yes, I did.

12   **Q.**   Approximately how frequently did Mr. Lightbody and

13   Mr. Bufalino talk?

14   **A.**   Maybe once a week, once every ten days.

15   **Q.**   How would you describe the relationship between

16   Bufalino and Lightbody, having listened to those calls?

17        MR. RANKIN:  Objection, Your Honor.

18        THE COURT:  Sustained.

19   **Q.**   Mr. Kradolfer, are you also familiar with what's

20   called a canteen account or a treasurer's account for

21   inmates?

22   **A.**   Yes, I am.

23        MS. BARCLAY:  Your Honor, may I approach?

24        THE COURT:  Yes.

25   **Q.**   If you can take a look at what's been marked for

1    identification as Exhibit 1.  Do you recognize that?

2    **A.**   I do.

3    **Q.**   What is it?

4    **A.**   This is an inmate transaction report for Darin

5    Bufalino.  It shows incoming income, outgoing income.

6    Do you want me to read what is marked?

7    **Q.**   No.  That's fine.

8         MS. BARCLAY:  Your Honor, the government moves

9    to admit Exhibit 1.

10        THE COURT:  It will be admitted.

11        (Exhibit 1 received in evidence)

12        MS. BARCLAY:  I just -- Madam Clerk, I just want

13   to make sure that that's going to the jury as well.

14        THE CLERK:  Yes.

15   **Q.**   Lieutenant Kradolfer, you might be able to tilt up

16   the screen there, or you can turn to page 5 as well.

17        MS. BARCLAY:  Mr. Merritt, can you scroll down

18   the page.  Thank you.

19   **Q.**   Lieutenant Kradolfer, could you read on the

20   highlighted portion there, one, two, three -- I think

21   it's the fourth line down there.  Could you read who

22   that payment was from?

23   **A.**   There was a payment of $300 that came in from

24   Cal's Auto Body.

25   **Q.**   Are you familiar with what Cal's Auto Body is?

1    **A.**    I am.

2    **Q.**    What is Cal's Auto Body?

3    **A.**    It's an automotive repair shop owned by

4    Mr. Charles Lightbody.

5    **Q.**    Again, this is a deposit into Mr. Bufalino's

6    prison canteen account in the amount of $300; is that

7    right?

8    **A.**    That is right, yes.

9    **Q.**    Is that the only money that Mr. Lightbody sent to

10    Mr. Bufalino?

11    **A.**    Do you want me to review this entire list?

12    **Q.**    Well --

13    **A.**    I know of other deposits.

14    **Q.**    Right.  So let me put this way.  If that's the

15    only deposit on this list that's associated with

16    Mr. Lightbody, does that mean that's the only deposit

17    Mr. Lightbody made on behalf of Mr. Bufalino?

18    **A.**    No.

19    **Q.**    Why not?

20    **A.**    Because you can send money in anonymously.  If you

21    send a money order with no return address, no name, it

22    would still be placed into the inmate's account.  You

23    don't have to put who sent it.

24    **Q.**    There's no way of tracking it?

25    **A.**    That's correct.

1    **Q.**    In the course of monitoring Mr. Bufalino's calls,

2    did you hear conversations about a casino and land in

3    Everett?

4    **A.**    Yes, I did.

5    **Q.**    And approximately when did you start hearing those

6    calls?

7    **A.**    I believe it was in August of 2012.

8    **Q.**    At that time, when you first started hearing that,

9    did you do anything with that information?

10   **A.**    Initially, no.

11   **Q.**    Did you eventually do something with the

12   information?

13   **A.**    Yes, I did.  I forwarded the information to my

14   associates on my FBI squad.

15   **Q.**    And what prompted you to forward that information

16   to the FBI?

17   **A.**    There was talk between Mr. Bufalino and

18   Mr. Lightbody regarding a possible issue with the

19   property due to the fact that Mr. Lightbody is a

20   convicted felon and a convicted felon cannot be --

21   cannot gain any interest from properties relative to a

22   casino.

23   **Q.**    And what happened next?

24   **A.**    I contacted my supervisor in the FBI, advised him

25   of the statements that were made.  And then I was asked

1    to download that particular phone call to a disc, which

2    I did, and I brought that into FBI headquarters the

3    next day.

4              MS. BARCLAY:  Your Honor, may I approach?

5              THE COURT:  Yes.

6    **Q.**    Lieutenant Kradolfer, I've placed in front of you

7    Exhibits 2 through 12 and Exhibits 163 and 164.  Do you

8    recognize those exhibits?

9    **A.**    I do.  These are downloaded phone calls, discs of

10   phone calls between inmate Darin Bufalino and

11   Mr. Charles Lightbody.

12   **Q.**    And could you please the read the exhibit number

13   and date for each of those?

14   **A.**    Exhibit Number 2 is August 16, 2012.  Exhibit

15   Number 3 is August 22, 2012.  Exhibit Number 4 is

16   September 4, 2012.  Exhibit Number 5 is November 13,

17   2012.  Exhibit Number 6 is November 26, 2012.  Exhibit

18   Number 7 is December 5, 2012.  Exhibit Number 8 is

19   December 11, 2012.  Exhibit Number 9 is December 20 --

20   yeah, December 20, 2012.  Exhibit Number 10 is January

21   10, 2013.  Exhibit Number 11 is February 21, 2013.

22   Exhibit Number 12 is February 28, 2013.  Exhibit Number

23   163 is January 16, 2013.  And Exhibit Number 164 is

24   June 27, 2013.

25             MS. BARCLAY:  Your Honor, the government moves

1      to admit Exhibits 2 through 12, 163 and 164.

2            MR. RANKIN:  Objection, Your Honor.

3            MR. FOSTER:  Same, and may we adopt the

4      objections of Mr. Rankin?

5            THE COURT:  Yes.  Objection is overruled.  They

6      will be admitted, 2 through 12 and 163 and 164.

7            MS. ANGELINI:  Your Honor, we would adopt the

8      same objection.

9            THE COURT:  Yes.

10           (Exhibits 2 - 12, 163, 164 received in

11     evidence)

12           MS. BARCLAY:  Your Honor, with the Court's

13     permission I'd like to play a portion of Exhibit 2,

14     which was the August 16, 2012 call which takes place at

15     2:59 p.m.

16           THE COURT:  Yes, you may do so.

17           MS. BARCLAY:  I'm going to start it at the

18     beginning at first and then move to -- Your Honor,

19     before I do that, we actually have transcript binders

20     for the jury and for the Court, so we should probably

21     pass those out.

22           MR. RANKIN:  Your Honor, may we ask the Court to

23     give an instruction to the jury about the use of

24     transcripts as opposed to the --

25           THE COURT.  Yes.  The transcripts are not going

1    to be exhibits.  They are an aid while you are

2    listening to the tape.  If what you hear on the tape is

3    different from what you see in the transcript, then you

4    are to honor the tape, not the transcript.  They're an

5    aid for you to follow along as you listen to the tapes

6    themselves.

7           Which one are we going to be starting with?

8           MS. BARCLAY:  Your Honor, this is Exhibit 2.

9    It's under Tab 2A in the transcript binder.  May I

10   proceed?

11          THE COURT:  Yes, you may.

12          (CD played.)

13   Q.   Mr. Kradolfer, just stopping for a second, do you

14   recognize the voice that just said, "Hello"?

15   A.   Yes.  It's the voice of Mr. Lightbody.

16          (CD played.)

17   Q.   And again, the person who said "D"?

18   A.   That's Darin Bufalino.

19          MS. BARCLAY:  And skipping ahead to 10:24, ten

20   minutes and 24 seconds into this call.

21          (CD played.)

22          MR. BARCLAY:  Just stopping that call at 14:58

23   approximately.  Your Honor, I'd like permission to play

24   Exhibit 3, a portion of it as well.  This is the August

25   22, 2012 call at 10:32 a.m.

1          THE COURT:  It's under Tab 3A?

2          MS. BARCLAY:  Yes, Your Honor.  The transcript

3      is under Tab 3A.

4          THE COURT:  You may play it.

5          MS. BARCLAY:  Thank you.  And again, I'm going

6      to skip ahead to 4:53 in that call.

7          (CD played.)

8          MS. BARCLAY:  And that is ending at 6:01 on that

9      call.  I'm going to skip ahead to 12 minutes and 30

10     seconds into the call.

11         (CD played.)

12         MS. BARCLAY:  Stopping that at 15:05.  Your

13     Honor, I'd like permission to also play Exhibit 5.  The

14     transcript for that is behind 5A, and this is the

15     November 13, 2012 call at 10:39 a.m.  And again I'll

16     skip ahead to two minutes and 13 seconds into that

17     call.

18         THE COURT:  It may be played.

19         (CD played.)

20         MS. BARCLAY:  Stopping it there at five minutes

21     and 45 seconds into the call.  Your Honor, I'd like to

22     skip to Exhibit 7, so it will be Tab 7A in the

23     transcript binder.  This is the December 5, 2012 call

24     which is at 10:36 a.m.  And with the Court's

25     permission, I'd like to play that call.

1          THE COURT:  It may be played.

2          (CD played.)

3          MS. BARCLAY:  Your Honor, I'm sorry.  That was

4    Exhibit 8, I believe, so I was playing the wrong call.

5    I'm sorry.  We're on Exhibit 7.  I'm just going to go

6    back to that call, so it will be under Tab 7A.

7          (CD played.)

8          MS. BARCLAY:  I apologize.

9          (CD played.)

10   Q.   Just stopping there at two minutes and 13 seconds

11   into that call.  Is that the only call you listened to

12   between Mr. Bufalino and Mr. Lightbody where they

13   reference Mr. Lightbody making payments to

14   Mr. Bufalino's canteen account?

15   A.   No.  There are additional calls.

16         MS. BARCLAY:  Skipping ahead to nine minutes and

17   55 seconds into that call.

18         (CD played.)

19         MS. BARCLAY:  For now, Your Honor, I'm going to

20   stop that at 11 minutes and 51 seconds into the call.

21   That's marked as Exhibit 7.

22   Q.   Lieutenant Kradolfer, the date on that call, is

23   that December 5, 2012?

24   A.   Exhibit 7?

25   Q.   Yes.

1    **A.**    December 5, 2012.

2    **Q.**    I'm sorry.  December 5, 2012, yes.

3          MS. BARCLAY:  And now turning to Exhibit 8,

4    which would be the transcript marked as Exhibit 8A in

5    the binders, with the Court's permission I'd like to

6    play the call from December 11, 2012 from the

7    beginning.

8          THE COURT:  It may be played.

9          (CD played.)

10   **Q.**    Just stopping right there at nine minutes and six

11   seconds into the call.  Lieutenant Kradolfer, this

12   was the call from Exhibit 8, December 11, 2012.  Is

13   that the call that prompted you to notify your

14   supervisor and ultimately the FBI?

15   **A.**    That is correct.

16   **Q.**    And was there a particular part of the call that

17   prompted you to notify them?

18         MR. RANKIN:  Objection, Your Honor.

19         THE COURT:  Overruled.

20   **A.**    When they were talking about a felon could not,

21   you know, gain any money from a casino, and then Darin

22   Bufalino, you can hear him sighing, knowing that his

23   friend is --

24         MR. RANKIN:  Objection, Your Honor.

25         THE COURT:  Yes.  Sustained.

1    **A.**    -- then Mr. Bufalino --

2         THE COURT:   No.   There's no question before you

3    now.

4         MS. BARCLAY:   I'm sorry.

5         THE WITNESS:   Okay.

6    **Q.**   Was it also Mr. Bufalino's instruction to double

7    blind and triple blind it that caused to you contact

8    the FBI?

9    **A.**   That is correct --

10        MR. FOSTER:   Objection, Your Honor.

11        THE COURT:   That objection is sustained.

12        MS. BARCLAY:   Your Honor, with the Court's

13   permission, I'd like to play Exhibit 9.   That's under

14   Tab 9A in the binders.   That's a call from December 20,

15   2012 at 4:00 in the afternoon.   I'm going to start it

16   at two minutes and four seconds into the call.

17        (CD played.)

18        MS. BARCLAY:   Stopping it right there, Your

19   Honor.  Mr. Merritt.  There we go.  Sorry about that.

20        Then, Your Honor, with the Court's permission,

21   I'd like to play Exhibit 10, which is a call on January

22   10, 2013 at 2:55, and the time that we're going to jump

23   to is nine minutes and 35 seconds into the call.

24   That's at Tab 10A.

25        (CD played.)

1          MS. BARCLAY:  Stopping that at ten minutes and

2     27 seconds into that call.  That was Exhibit 10.  Your

3     Honor, with the Court's permission, I'd like to play

4     Exhibit 12.  That's a call on February 28, 2013 at 3:11

5     p.m., and the transcript for that is behind Tab 12A.

6          THE COURT:  It may be played.

7          (CD played.)

8          MR. RANKIN:  Excuse me.  Was that Exhibit 12, or

9     was that another mistake?

10          MS. BARCLAY:  I think it was a mistake.  I'm

11     trying to get to Exhibit 12.  Hold on one second.  I

12     apologize to the Court.  Your Honor, could I just have

13     one minute?  I apologize.

14          THE COURT:  Yes.

15          MS. BARCLAY:  Thank you.

16          Your Honor, I'm going to move ahead to Exhibit

17     164.  So that is at the very end of the binder under

18     Tab 164A, the transcript for that.  This is a June 27,

19     2013 call at 3:40 in the afternoon.

20          (CD played.)

21          MR. RANKIN:  Your Honor, I have an objection.

22          THE COURT:  Stop the tape.

23          MS. BARCLAY:  Yes.

24          MR. RANKIN:  I see it's 1:00.  Would that be --

25     I have an objection to what's being played now.  So

1  could we recess for lunch and take it up before we

2  resume?

3        THE COURT:  Yes.  We'll do that.  We're going to

4  recess for lunch for an hour.  We'll be back at 2:00.

5  I remind you that if you see anybody involved in the

6  case, if you're out in the hallways, if you're going to

7  the cafeteria, that you are not to have any

8  conversation with anyone associated with this case.

9  That would be totally improper, and I hope you will

10 honor my instructions.  Leave your notebooks in the

11 jury room, and I'll see you back here at 2:00.

12       MR. RANKIN:  Should the exhibit books be left

13 here?

14       THE COURT:  Yes, leave the exhibit books.  Thank

15 you.

16 (Jury exits.)

17       THE COURT:  All right.  Be seated, counsel.

18 Mr. Rankin.

19       MR. RANKIN:  Your Honor, I'm sorry to interrupt.

20 This 164 contains a lot of material that I have not

21 seen before.  I mean, I know there's been a raft of

22 stuff given to us, but the version of what they wanted

23 to play at 164 was much shorter and it had none of this

24 information about Mr. Bufalino requesting all these

25 files from these agencies and Mr. Lightbody talking

1    about a million dollar fraudulent fence at L&L

2    Collisions from years ago.  I don't know what to say.

3            THE COURT:  Ms. Barclay?

4            MS. BARCLAY:  It's my understanding that we

5    re-sent them this entire transcript on the exhibit

6    discs that we sent to them.  They were included on

7    there, the entire transcript was.  And I did not

8    receive any objection to it, Your Honor.

9            THE COURT:  When did you send it to him?

10           MS. BARCLAY:  I believe originally we sent a

11   shorter one, but the other one I believe we sent last

12   week.

13           MR. RANKIN:  I mean, I don't know if I have it

14   or not.  But I just -- I object to this material

15   because it's not relevant to this case, and it's very

16   prejudicial.

17           THE COURT:  By "this material," what are you

18   referring to exactly by reference to the transcript?

19   Of course the transcript pages are not numbered.  But

20   this is a long call --

21           MR. RANKIN:  It is --

22           THE COURT:  -- five or ten minutes, right.

23           MR. RANKIN:  Yes, Your Honor.  If you look at

24   the second page, which is unnumbered, a third of the

25   way down --

1         THE COURT:  Second --

2         MR. RANKIN:  Second page of the exhibit.

3         THE COURT:  On the left-hand side.

4         MR. RANKIN:  Correct.  A third of the way down

5    it says, "Charles Lightbody:  It's pretty f-ing cool."

6         THE COURT:  All right.

7         MR. RANKIN:  That's where the original

8    transcript stopped, and then it picks up -- I'm just

9    doing this by rote.  It picks up at the top of two,

10   three, four, the fourth unnumbered page, which is also

11   the left-hand side.  It says -- Darin Bufalino on the

12   third line says, "What's that?"

13        THE COURT:  So everything between the second

14   page and the top of the fourth page?

15        MR. RANKIN:  Yes, Your Honor.  And then that

16   goes on for about a page, and it ends at the bottom of

17   page 4 with Mr. Bufalino saying, "All right."

18        THE COURT:  Wait a minute.  Okay.

19        MR. RANKIN:  Then the new part begins at the

20   bottom of page 4 and goes quite a ways until they get

21   to talking about Mahoney Circle.

22        THE COURT:  What page are we on then?

23        MR. RANKIN:  Let's see.  Well, let me just

24   number the pages.  So this would be the 13th page,

25   which is -- I'm sorry -- the 14th page, and two-thirds

1    of the way down on the fourth page of the right-hand

2    side, it says, "Charles Lightbody: Yeah." So all the

3    new material there, and then it begins, "Hey, how about

4    the piece I cut from the paper?"

5         THE COURT: Wait a minute. I'm not yet with

6    you. I'm on page 14. Whereabouts?

7         MR. RANKIN: Two-thirds of the way down,

8    Lightbody says, "Yeah."

9         THE COURT: I don't have that, so I'm not on the

10   right page.

11        MS. BARCLAY: Your Honor, if I could propose we

12   can check the transcript and confer with Mr. Rankin.

13   And if there are -- the entire call is in evidence,

14   right? But if there are portions that he does not want

15   to play, I'm happy to talk to him about it during the

16   lunch break and come to an agreement.

17        THE COURT: I think that will be helpful, and

18   we'll talk about it at 2:00 when we get back. All

19   right. We're in recess then until 2:00.

20        (Recess at 1:08 p.m.)

21        (Resumes at 2:02 p.m.)

22        THE COURT: Counsel, Mr. Rankin?

23        MR. RANKIN: Yes, your Honor, I think over the

24   break we determined that we did not get this

25   transcript, period. And in talking with Ms. Barclay,

1    she's agreed to stop at this point.  If she wants to

2    play it with another witness, she will address our

3    differences then, and I think we would ask the Court to

4    let us reserve on a motion to strike what we think was

5    improperly played to the jury.

6            THE COURT:  That's fine.  Ms. Barclay?

7            MS. BARCLAY:  That's fine, your Honor.  I would

8    just point out that the whole call was admitted into

9    evidence; but to the extent that there is an issue with

10   the transcript, we'll fix that and play it again.

11           THE COURT:  Fine.  You're going to go back and

12   play the one you couldn't get?

13           MS. BARCLAY:  Well, your Honor, we weren't able

14   to technically get it, but we'll play it with a

15   different witness.

16           THE COURT:  All right, call the jury.

17           (Jury enters the courtroom.)

18           THE COURT:  Good afternoon, jurors.  We're ready

19   to resume.

20           You're reminded that you remain under oath, and

21   you may continue with direct examination.

22           MS. BARCLAY:  Your Honor, the government has no

23   further questions of Lieutenant Kradolfer.

24           THE COURT:  Mr. Foster, cross-examination, or

25   Mr. Rankin?

1       MR. RANKIN:  If that's all right, your Honor.

2       THE COURT:  Yes.

3  CROSS-EXAMINATION BY MR. RANKIN:

4  **Q.**  Good afternoon, Lieutenant Kradolfer.

5  **A.**  Good afternoon, sir.

6  **Q.**  Did you review the transcripts as you prepared for

7  your testimony?

8  **A.**  No.

9  **Q.**  Have you seen the transcripts?

10  **A.**  No.

11  **Q.**  So you basically listened to the calls in

12  realtime?

13  **A.**  No.  Usually a couple --

14  **Q.**  A few days later?

15  **A.**  A few days later, yes.

16  **Q.**  So you listened to the calls way back then?

17  **A.**  Correct.

18  **Q.**  And then in preparation for today's testimony, you

19  listened to the excerpts that were going to be played?

20  **A.**  I reviewed some of the calls, yes.

21  **Q.**  Okay.  And were you able to identify the two

22  voices of the individuals in the conversations,

23  Mr. Lightbody and Mr. Bufalino?

24  **A.**  Yes.

25  **Q.**  Now, I think the first call that was played was

1    Exhibit 2, August 16.  Do you recall that call?

2    **A.**   You'd have to give me an excerpt of it.  I don't

3    recall.

4          MR. RANKIN:  Maybe I can pass up a book.

5          (Witness examining transcript.)

6    **Q.**   And if you could just take a second to familiarize

7    yourself with Exhibit 2.  That appears to be a

8    transcript of that call that we listened to when you

9    first got on the stand?

10   **A.**   Yes, it does.

11   **Q.**   Okay.  And that's August 16, 2012, right?

12   **A.**   That's correct.

13   **Q.**   And I think you testified that it was about that

14   time that you first heard any reference to a casino in

15   these calls between Mr. Lightbody and Mr. Bufalino?

16   **A.**   That is correct.

17   **Q.**   And is this the very first call?

18   **A.**   I don't recall, sir.

19   **Q.**   But it's in that time period?

20   **A.**   Yes.

21   **Q.**   Okay, August?

22   **A.**   August, yes.

23   **Q.**   And in this call, if you look on Page 1 of the

24   transcript, kind of in the middle, it says

25   "Mr. Lightbody," and there's a reference, "You know the

1    Mayor is all for it."  Do you see that about halfway on

2    Page -- I'm sorry, I skipped to Exhibit 3.  No, that's

3    Exhibit 2.  Do you see that in the middle of the page

4    on Page 1 of Exhibit 2?

5    A.    Page 1?

6    Q.    Yes.  Do you see a quote from Mr. Lightbody that

7    says, "You know the Mayor is all for it"?

8              MR. RANKIN:  May I approach, your Honor?

9              THE COURT:  Yes.

10   Q.    I'm pointing you to the middle of the page.

11   A.    Okay, okay.

12   Q.    And it's by Mr. Lightbody; is that right?

13   A.    Yes.

14   Q.    And part of that entry is, it says, "It's going to

15   be a real home run if we get the permits through, and,

16   you know, the Mayor is all for it"?

17   A.    That's correct.

18   Q.    And you heard that on the tape when it was played

19   this morning?

20   A.    Yes.

21   Q.    And if you turn to Page 3 of that transcript,

22   still on Exhibit 2, towards the bottom you see there is

23   mention by Mr. Lightbody of an LLC?

24   A.    Yes.

25   Q.    And could you read what Mr. Bufalino says

1    immediately before Mr. Lightbody refers to the LLC.

2    **A.**    Mr. Bufalino states, "Right, right, every Tom,

3    Dick and Harry is going to be calling you."

4    **Q.**    So Mr. Bufalino is saying to Mr. Lightbody, "If

5    the news breaks about the Och-Ziff casino, every Tom,

6    Dick and Harry is going to be calling you"?

7             MS. BARCLAY:  Objection.

8             THE COURT:  Overruled.

9    **A.**    It could also be construed that "Every Tom, Dick

10   and Harry is going to be calling you because you're

11   going to be very wealthy."  That's the way I took it.

12   **Q.**    You interpret that.  Is that how you're

13   interpreting it?

14   **A.**    Well, it's just an opinion.

15   **Q.**    That Mr. Bufalino is saying to Mr. Lightbody that

16   everybody in Everett and Revere and everywhere else is

17   going to be calling Mr. Lightbody because they think

18   he's going to be loaded?

19   **A.**    Correct.

20   **Q.**    And then Mr. Lightbody responds, "I put it in an

21   LLC so my name don't show up"?

22   **A.**    That's correct.

23   **Q.**    Okay.  Now, I wanted to ask you if you recall

24   hearing earlier references to an LLC, not associated

25   with the casino but other things that Mr. Lightbody and

1    Mr. Bufalino talked about earlier that year?

2    **A.**   In the exhibits or in other general calls?

3    **Q.**   Other calls.

4    **A.**   I don't recall.

5    **Q.**   Do you recall there was a time in February of 2012

6    in which Mr. Bufalino said that Paul, meaning Paul

7    Lohnes, had asked him to put his interest in the land

8    in an LLC?

9            MS. BARCLAY:  Objection.

10            THE COURT:  Grounds?

11            MS. BARCLAY:  Your Honor, this is all hearsay at

12    this point, and Lieutenant Kradolfer didn't have these

13    calls.

14            THE COURT:  Sustained.

15    **Q.**   Now, turning to Exhibit 5, do you have that there?

16    **A.**   5-A?

17    **Q.**   Yes.

18    **A.**   Yes.

19    **Q.**   Okay.  And do you see a quote in the middle of the

20    page by Mr. Lightbody, "No, he's coming in from Vegas"?

21    Do you see that?

22    **A.**   I do.

23    **Q.**   What's he responding to?  Mr. Bufalino says what?

24    **A.**   "Steve wins with the Hard Rock?"  He's questioning

25    that.

1    **Q.**   Okay.  And what does Mr. Lightbody say?

2    **A.**   Mr. Lightbody says, "No.  He's coming in from

3    Vegas with some other company now.  Now it's open

4    season because the Hard Rock never paid us the money

5    they promised us.  You know, it's typical," and it says

6    inaudible, "talking to somebody else.  "What was I

7    going to say that, yeah, they're coming in tomorrow.

8    Steve Wynn."

9    **Q.**   And then Mr. Bufalino says, "They didn't pay you?"

10   asking a question?

11   **A.**   That's correct.

12   **Q.**   And did that appear to be Mr. Bufalino expressing

13   surprise that Wynn -- that Hard Rock didn't pay FBT?

14        MS. BARCLAY:  Objection.

15        THE COURT:  Grounds?

16        MS. BARCLAY:  Is he asking for Mr. Kradolfer's

17   opinion?

18        THE COURT:  Sustained.

19   **Q.**   Now, turning to Exhibit 7, please.  You got that?

20   **A.**   I do, sir.

21   **Q.**   And if you could turn over to Page 3, at the top

22   of Page 3, do you see Mr. Bufalino asking, "Yeah, well,

23   you still got the Hard Rock boys in there too, right?"

24   **A.**   I see that, yes.

25   **Q.**   And what does Mr. Lightbody respond?

1    A.    Mr. Lightbody responds, "Well, yeah, but we

2    basically kicked them to the curb because they weren't

3    performing and we took on Wynn.  Now Wynn is supposed

4    to start paying us $100,000 a month December 14."

5    Q.    And this a call that's dated December 5, is

6    that right, if you look on the first page of Exhibit 7?

7    A.    December 5, 2012, yes, sir.

8    Q.    And now turning to Exhibit 8, or 8-A, this is

9    dated December 11, 2012?

10   A.    That's correct.

11   Q.    And do you recall on Page -- if you turn to

12   Page 3, please, and do you see the one, two, third

13   entry by Mr. Lightbody, "So, so, so"?  Do you see that?

14   A.    Yes.

15   Q.    Could you read that for us, please.

16   A.    Mr. Lightbody states, "So, so, so, what they're

17   saying is that any proceeds that come from the sale of

18   a casino or a casino cannot go to a felon."

19   Q.    And then Mr. Bufalino says "Ah" or a noise, and

20   then what does Mr. Lightbody say?

21   A.    Mr. Lightbody says, "But the only good thing is

22   nobody knows who is involved, which makes it good

23   because now I can just move on.  You know what I mean?"

24   Q.    All right, and Mr. Bufalino agrees?

25   A.    He says, "You need to move on."

1    Q.    And so Mr. Lightbody then says?

2    A.    "So basically they're going to buy me out and --"

3    Q.    And then Mr. Bufalino adds something about double

4    blinding it and triple blinding it?

5    A.    That's correct.

6    Q.    And Mr. Lightbody says, "That's what we're doing"?

7    A.    Correct.

8    Q.    Now, if you would turn to the bottom of that page,

9    you see Mr. Bufalino turns the subject to Wynn.  Do you

10   see that at the bottom of Page 3?

11   A.    Mr. Lightbody references Mr. Wynn at the bottom.

12   Q.    So the fourth line up from the bottom on Page 3,

13   Mr. Bufalino says, "I know, I explained this to you

14   once before, at least I think I did," and then

15   Mr. Lightbody says what?

16   A.    "Yeah, you did about Wynn, yeah, yup, in

17   New Jersey."

18   Q.    And then they both say "Yeah," and then if you

19   turn to the top of Page 5, what does Mr. Bufalino tell

20   Mr. Lightbody?

21   A.    "Sure, sure, well, you know where that came from,

22   right?"

23   Q.    I'm sorry, did I say Page 5?  Page 4.  Sorry, I

24   didn't mean to skip.

25   A.    At the top of Page 4 Mr. Bufalino says, "He's

1    going to have a hard time.  That broad, that broad,

2    that's where she comes from.  She ran New Jersey, and

3    they're the ones that threw him the fuck out."

4    **Q.**    Referring to Mr. Wynn?

5    **A.**    Correct.

6         MS. BARCLAY:  Objection.

7         THE COURT:  Sustained.

8    **Q.**    And then, finally, if you turn to Page 7, and do

9    you see the second entry about Mr. Lightbody?  Would

10   you read that for us.

11   **A.**    Mr. Lightbody says, "Yeah, we'll see what happens,

12   but I'll stay clear of it, and we'll work on it now,

13   but like I said, at least we got a heads-up on it.  You

14   know what I mean?"

15   **Q.**    And then the next-to-the-last line, would you read

16   that, Mr. Lightbody, what he says.

17   **A.**    Mr. Lightbody says, "Yeah, well, now I'm not in it

18   no more, so --"

19   **Q.**    Thank you.

20        THE COURT:  Are you through, Mr. Rankin?

21        MR. RANKIN:  Oh, yes, your Honor, I'm sorry.

22        THE COURT:  Mr. Foster?

23        MR. FOSTER:  Thank you.  Madam Clerk, can we

24   turn this on please.

25   <u>CROSS-EXAMINATION BY MR. FOSTER:</u>

1    **Q.**   Lieutenant Kradolfer, good afternoon.

2    **A.**   Good afternoon.

3    **Q.**   Good afternoon to the Court, ladies and gentlemen,

4    may it please the Court.  Sir, you and I have never

5    spoken before, have we?

6    **A.**   I don't believe so.

7    **Q.**   We've never met each other?

8    **A.**   I don't believe so.

9    **Q.**   I represent Dustin DeNunzio along with these other

10   lawyers here to the left.

11   **A.**   Okay.

12   **Q.**   You testified -- well, it's my understanding that

13   you've listened to hundreds and hundreds of hours of

14   telephone calls of Darin Bufalino; is that correct?

15   **A.**   That's correct.

16   **Q.**   And you've never heard a single telephone

17   conversation between Darin Bufalino and Dustin

18   DeNunzio, have you?

19   **A.**   I have not.

20   **Q.**   And over how many years have you listened to

21   Mr. Bufalino's telephone calls?

22   **A.**   Right after he came into our custody, which was in

23   2010.

24   **Q.**   Do you still listen?

25   **A.**   Yes, I do.

1   **Q.**   So that's about ten years?

2   **A.**   Uhm, correct.  I'm sorry, six years, six years.

3   **Q.**   I was thinking 2006.  About six years.  And I

4   think you testified also about the visitors' list, that

5   there's a way that somebody can present a visitors'

6   list to the Department of Corrections, correct?

7   **A.**   I don't understand your question.

8   **Q.**   Okay, an inmate can receive visitors; is that

9   right?

10  **A.**   Yes.

11  **Q.**   And in order for the inmate to receive visitors,

12  the inmate has to produce a list of people he or she

13  wants to have visit, correct?

14  **A.**   No, that's not correct.

15  **Q.**   Okay, how does somebody arrange to visit an inmate

16  within the Massachusetts Department of Correction?

17  **A.**   They just show up at the facility, produce

18  identification, and they're allowed to visit.

19  **Q.**   Do you have any records whatsoever during the six

20  years that Mr. Bufalino has been in the Department of

21  Correction of Mr. DeNunzio ever visiting with

22  Mr. Bufalino?

23  **A.**   No, I do not.

24  **Q.**   You testified also about a call log, correct, an

25  inmate call?

1    A.   I'm not sure what the question is.

2    Q.   Well, an inmate has to create a list of people

3    that he or she would like to call, correct?

4    A.   Correct.

5    Q.   And can that list be altered from time to time?

6    A.   Yes.  Quarterly you can delete or add members.

7    Q.   So over six years, that's about 24 quarters.  In

8    any of those quarters, does Mr. DeNunzio's name appear

9    on the list of people that Mr. Bufalino wanted to

10   telephone?

11   A.   No, it does not.

12   Q.   You monitor inmates' mail too, do you not?

13   A.   Very rarely.

14   Q.   Occasionally?

15   A.   Myself, very rarely.

16   Q.   How about the Department of Corrections?

17   A.   All incoming mail is scanned.

18   Q.   Do you have any information to tell us today about

19   any letters that were sent to Mr. Bufalino by Dustin

20   DeNunzio?

21   A.   I do not.

22   Q.   Does outgoing mail get scanned too?

23   A.   Uhm, it normally does not unless it is on an

24   authorized superintendent's approval listing.  There

25   has to be an underlying reason to read outgoing mail.

1    **Q.**   So do you know whether Mr. Bufalino's outgoing

2    mail was monitored?

3    **A.**   I'm sure at some point it was, based on the status

4    of who he is, yes.

5    **Q.**   Do you have any evidence to present us today of

6    any outgoing mail from Mr. Bufalino going to Dustin

7    DeNunzio?

8    **A.**   No, I do not.

9    **Q.**   Do you have any evidence of any money going from

10   Dustin DeNunzio to Mr. Bufalino's canteen account?

11   **A.**   No, I do not.

12   **Q.**   You're aware through your investigation in this

13   case that Mr. DeNunzio has no prior criminal history?

14   **A.**   I'm not aware of that, sir.

15   **Q.**   Now, I want to talk with you a little bit about

16   these transcripts, and Mr. Rankin asked you about

17   Exhibit 2, which I think you have before you, the

18   transcript?  Do you not?

19   **A.**   Yes, sir.

20   **Q.**   And I want to pick up where he left off.  Do you

21   see the bottom here where I have -- it's on the screen

22   or you can look at --

23   **A.**   Yes.

24   **Q.**   -- the bottom of Page 3 -- and I've highlighted my

25   copy in yellow, but the original is not highlighted --

1    where Mr. Lightbody is saying, "Oh, yeah, well, I put

2    it in an LLC, so my name don't show up because between

3    you and I, I think I told you my partner was, like, you

4    know, we can take your name off and just put it in a

5    blind LLC?  I go, listen, I have no problem with that,

6    you know?  I want to be the guy."

7         Do you see that?

8  **A.**   I do.

9  **Q.**   You listened to that call, correct?

10 **A.**   That's correct.

11 **Q.**   And this call was in August of 2012?

12 **A.**   August 16, 2012, yes, sir.

13 **Q.**   And Mr. Rankin asked you -- well, let me preface

14 it.  You've listened to Mr. Bufalino's calls going back

15 a long time, correct?

16 **A.**   I have.

17 **Q.**   And Mr. Rankin asked you if sitting here right now

18 you had any present recollection of Mr. Bufalino and

19 Mr. Lightbody speaking, wherein Mr. Lightbody

20 references Paul Lohnes as having made that suggestion.

21 Do you recall that question by Mr. Rankin?

22 **A.**   I do.

23 **Q.**   Okay, if I were to show you a prior transcript, do

24 you think that might refresh your recollection as to a

25 prior conversation?

1          MS. BARCLAY:  Objection.

2          THE COURT:  He can say whether he thinks it

3    might refresh his memory.  Overruled.

4    **A.**   As we agreed, I've listened to hundreds of hours

5    of calls.  If you can give me one little snippet.  I

6    listened to that call four years ago.  I don't recall.

7          MR. FOSTER:  May I approach?

8          THE COURT:  Yes.

9          MR. FOSTER:  This is marked for identification

10   as Defendants' Exhibit 385.

11         THE COURT:  There aren't any defendants'

12   exhibits.

13   **Q.**   If you could read that to yourself and let me know

14   when you've finished.

15              (Witness examining document.)

16   **A.**   I'm finished, sir.

17   **Q.**   Does that refresh your recollection as to whether

18   or not you recall a prior conversation between

19   Mr. Bufalino and Mr. Lightbody regarding the LLC?

20         MS. BARCLAY:  Objection, your Honor.  This is

21   hearsay.

22         THE COURT:  Overruled, if it refreshes his

23   memory.

24   **A.**   It does.

25   **Q.**   It does?

1    **A.**   Yes.

2    **Q.**   Okay.  So do you recall that prior conversation

3    where Mr. Lightbody advises Mr. Bufalino that it was

4    Paul Lohnes who suggested that his interest go into the

5    LLC?

6             MS. BARCLAY:  Objection, hearsay.

7             THE COURT:  Sustained.

8    **Q.**   What do you recall about that conversation?

9             MS. BARCLAY:  Objection.

10            THE COURT:  He can testify as to what he recalls

11   from it.

12   **A.**   Just from reading the transcripts, I remember

13   Mr. Lightbody talking about, "You can Google it, and he

14   gives millions for charities."  I do call that.

15   **Q.**   So he's talking about a third person, correct?

16   **A.**   Yes.

17   **Q.**   He's talking about Mr. Lohnes?

18   **A.**   I don't know who Mr. Lohnes is.

19   **Q.**   But is he talking about this third person is who

20   made the suggestion for him to put his interest in an

21   LLC?

22   **A.**   It appears so, yes.

23   **Q.**   Now, Mr. Kradolfer, did you have -- excuse me.

24   And you recall that that conversation involving the

25   millions of dollars and the Googling occurred earlier

1    than Exhibit 2?

2    **A.**    I'm sorry, I don't understand the question.

3    **Q.**    The call that you just refreshed your recollection

4    on, was that call earlier in time than August, 2012,

5    which is the date of Exhibit 2?

6    **A.**    I don't recall.

7    **Q.**    Now, the transcripts which the ladies and

8    gentlemen of the jury have and which you still have

9    your book of transcripts in front of you --

10   **A.**    I do, yes.

11   **Q.**    -- did you have anything to do with the

12   preparation of those transcripts?

13   **A.**    I did not.

14   **Q.**    Did you have anything to do with the excerpting;

15   that is, where to stop and where to start and where to

16   leave out?

17   **A.**    I did not.

18   **Q.**    You agree that there's a lot more conversation on

19   these calls than appears in these transcripts, correct?

20   **A.**    I don't understand your question.

21   **Q.**    Take a look at Exhibit 3.  Do you have it in front

22   of you?

23   **A.**    I do, yes.

24   **Q.**    Exhibit 3 starts at ticker 453, correct?

25   **A.**    Ticker time 453, yes.

1    Q.   That means that there's some conversation between

2    0 or 1 and 453, correct?

3    A.   That's correct.

4    Q.   And you had nothing to do with deciding whether

5    all that conversation up through 453 was on the

6    transcript or not, correct?

7    A.   I did not, no.

8    Q.   Okay, now, let's take a look at Page 2, and do you

9    see where Page 2, it starts with 12:30?  Do you see

10   that?

11   A.   I do.

12   Q.   Was it you who made that cutoff point?

13   A.   No, it was not.

14   Q.   So there's conversation prior to that; is that

15   correct?

16   A.   That is correct.

17        MR. FOSTER:  And, Judge, at this point in time,

18   please, sir, we'd like to play an excerpt from that

19   time frame, and I'd like to use the overhead to go

20   through the call, the transcript of the call.

21        THE COURT:  Have you shown it to counsel?

22        MR. FOSTER:  I have.

23        THE COURT:  All right, it may be done.  You

24   can't have the overhead on at the same time you're

25   playing from the computer.

1      THE CLERK:  I can't do both.  I need to hook up

2  to your computer.

3      MR. FOSTER:  Well, let's just play the tape, and

4  then we'll come back to this.

5      (CD played.)

6      MR. FOSTER:  Okay, thank you.  If we could go to

7  this now.

8  Q.   Sir, in this conversation, which is the other part

9  of Exhibit 3 -- and Exhibit 3 was dated August 22,

10  2012.  Do you see that?

11  A.   I do.

12  Q.   So in this conversation with Exhibit 3,

13  Mr. Bufalino is telling Mr. Lightbody, "It looks like

14  Suffolk Down is probably going to get the thing,"

15  correct?

16  A.   That's correct.

17  Q.   He's expressing confidence that a competitor is

18  going to get the casino, correct?

19      MS. BARCLAY:  Objection.

20      THE COURT:  Sustained.

21  Q.   Do you recall hearing something like that in the

22  conversations?

23      MS. BARCLAY:  Objection.  Something like what?

24      THE COURT:  Yes, sustained.

25  Q.   Do you recall hearing Mr. Bufalino expressing that

1    Suffolk Down was going to get the casino?

2            MS. BARCLAY:  Objection.

3            THE COURT:  Overruled.

4    **A.**   I do.

5    **Q.**   Do you recall Mr. Bufalino and Mr. Lightbody

6    talking about it's a political deal and that the Mayor

7    and the Attorney General and everybody else was in

8    favor of Suffolk Down?

9            MS. BARCLAY:  Objection.

10           THE COURT:  Grounds?

11           MS. BARCLAY:  Your Honor, I'm confused as to

12   whether he's showing the witness the transcript, asking

13   him to recall something, just to be clear.

14           THE COURT:  Yes, if he's using it to refresh his

15   memory, then he ought not be looking at the document.

16   **Q.**   Okay.  Do you recall that?  Do you recall a

17   conversation where they talked about it was a political

18   deal and the Mayor was behind Suffolk Downs?

19   **A.**   I remember because I just read it verbatim, but I

20   wouldn't if you asked me that, but, yes.

21   **Q.**   But as you sit here now, do you have that

22   recollection?

23   **A.**   Yes.

24   **Q.**   Do you have any recollection of them saying that

25   everyone in politics wanted Suffolk Down?

1    **A.**   I don't remember that quote, no.

2    **Q.**   Now, there's another exhibit, I believe, before

3    you in your book.  Do you have a transcript for an

4    Exhibit 4?

5    **A.**   I do.

6    **Q.**   And that wasn't played during the government's

7    direct examination, was it?

8    **A.**   I don't believe so.

9         MR. FOSTER:  Okay, judge, if we could, we'd like

10   to play No. 4 now.

11        (CD played.)

12   **Q.**   Okay, sir, in this conversation, Mr. Bufalino is

13   pretty much saying that he doesn't think that Wynn has

14   a chance to get the license, is he not?

15        MS. BARCLAY:  Objection.

16        THE COURT:  Sustained.

17   **Q.**   Mr. Lightbody makes the statement, "The thing is,

18   I don't own it no more."  Do you see that?

19   **A.**   I do.

20   **Q.**   And what did you interpret it to be when he said,

21   "I don't own it no more"?

22        MS. BARCLAY:  Objection.

23        THE COURT:  Sustained.

24   **Q.**   Did you turn this telephone conversation over to

25   the FBI?

1     **A.**    All the phone calls were subpoenaed from a certain

2     date range.

3     **Q.**    Do you have Exhibit 7 before you?

4     **A.**    I do.

5     **Q.**    Now, do you recall during your direct examination

6     the government played part of this tape and stopped it

7     at the bottom of Page 3?  Do you recall that?

8     **A.**    I do.

9     **Q.**    If we just flip through the transcript to the

10    bottom of Page 7, three lines from the bottom, what

11    does Mr. Bufalino say?

12    **A.**    I don't have a Page 7, sir.

13    **Q.**    Page 4.  I apologize.

14    **A.**    I'm sorry, the question?

15    **Q.**    What did he say three lines from the bottom?

16    **A.**    Mr. Bufalino or Mr. Lightbody?

17    **Q.**    Mr. Bufalino.

18    **A.**    Mr. Bufalino states, "Steve Wynn will not get, ah,

19    he won't get licensed here in Massachusetts."

20    **Q.**    And this call is on December 5, 2012, correct?

21    **A.**    That is correct.

22    **Q.**    Have you read the indictment in this case?

23            MS. BARCLAY:  Objection.

24            THE COURT:  Sustained.

25    **Q.**    Do you recall other conversations where

1   Mr. Bufalino is telling Mr. Lightbody about his doubts

2   that Mr. Wynn will get a license in Massachusetts?

3   **A.**   I do.

4          MR. FOSTER:  Judge, may I have one moment,

5   please?

6          THE COURT:  Yes.

7          (Pause.)

8   **Q.**   I want to take you back for the moment to

9   Exhibit 2, which is a telephone call, the transcript

10  that everybody has and you have in front of you that's

11  dated August 16, 2012.  Do you see that?

12  **A.**   I do.

13  **Q.**   And if we go to the bottom of Page 3, could you

14  read from where it says "Charlie Lightbody" starting

15  with "Oh, yeah."

16  **A.**   Mr. Lightbody states, "Oh, yeah, well, I put it in

17  an LLC so my name don't show up because, ah, between

18  you and I, I think I told you my partner was, like, you

19  know, we can take your name off and just put it in a

20  blind LLC?  I go, listen, I have no problem with that,

21  you know?  I want to be the guy" -- inaudible -- "a

22  hundred million."

23  **Q.**   Is Paul Lohnes the $100 million guy?

24         MS. BARCLAY:  Objection.

25         THE COURT:  Sustained.

1    MR. FOSTER:  One more moment, please, sir?

2    (Discussion off the record between defense

3 counsel.)

4    MR. FOSTER:  Thank you.

5    THE COURT:  Mr. Connolly?

6    MR. CONNOLLY:  Ms. Angelini.

7    THE COURT:  Ms. Angelini.

8 CROSS-EXAMINATION BY MS. ANGELINI:

9 Q.   Good afternoon, Lieutenant Kradolfer.

10 A.   Good afternoon.

11 Q.   My name is Laura Angelini, and I represent Anthony

12 Gattineri.  Lieutenant, you've testified about your

13 familiarity with the inmate phone call system today,

14 correct?

15 A.   That's correct.

16 Q.   And you testified that you've listened to

17 Mr. Bufalino's calls for many years, correct?

18 A.   That's correct.

19 Q.   And you've testified that that's been hundreds of

20 hours of calls, correct?

21 A.   Correct.

22 Q.   And, Lieutenant Kradolfer, you've never listened

23 to a call between Darin Bufalino and Mr. Gattineri,

24 correct?

25 A.   I don't believe so.

1    **Q.**   Okay.  And you're not aware of Mr. Bufalino ever

2    putting Mr. Gattineri's name on his list of friends

3    that he can call, correct?

4    **A.**   No, I'm not.

5    **Q.**   And, Lieutenant Kradolfer, in listening to years

6    of Mr. Bufalino's calls and hundreds of hours of these

7    calls, you're not aware of anything that would suggest

8    that Mr. Bufalino and Mr. Gattineri are friends, would

9    you?  Correct?

10   **A.**   That's correct.

11   **Q.**   It's fair to say you've never heard them speaking

12   about a casino?

13   **A.**   That is correct.

14   **Q.**   And, Lieutenant Kradolfer, you're not aware of

15   Mr. Gattineri ever putting any money in Mr. Bufalino's

16   canteen account, are you?

17   **A.**   I am not, no.

18   **Q.**   Or sending any mail to Mr. Bufalino?

19   **A.**   No.

20   **Q.**   Or ever visiting Mr. Bufalino?

21   **A.**   No.

22   **Q.**   And I believe you testified a few minutes earlier

23   that you've never heard the name Paul Lohnes, or you

24   don't know who Mr. Lohnes is?

25   **A.**   I've never heard that name before today.

1    **Q.**   Okay, so it's fair to say, you don't have any

2    recollection of ever listening to a call between a Paul

3    Lohnes and Mr. Bufalino, correct?

4    **A.**   That's correct.

5    **Q.**   How about the name Paul Feldman, is that name

6    familiar to you in connection with your work listening

7    to Mr. Bufalino's calls?

8    **A.**   I don't believe so.

9    **Q.**   Okay, so you can't recall ever listening to a

10   conversation between Mr. Feldman and Mr. Bufalino,

11   correct?

12   **A.**   I don't believe so.

13   **Q.**   Lieutenant Kradolfer, you're aware that

14   Mr. Gattineri has no criminal record, correct?

15   **A.**   I'm not aware of that.

16        MS. BARCLAY:  Objection.

17        THE COURT:  Sustained.

18        MS. ANGELINI:  Thank you.

19        THE COURT:  Any redirect?

20        MS. BARCLAY:  Just briefly, your Honor.

21   REDIRECT EXAMINATION BY MS. BARCLAY:

22   **Q.**   Lieutenant Kradolfer, you were asked some

23   questions by Mr. Rankin, I believe, about Exhibit 11.

24   If you could turn to 11-A, the transcript in your

25   binder, and Page -- sorry 7, 7-A.  At the top of

1    Page 3 -- one more time, Exhibit 8-A, sorry, Transcript

2    8-A, Page 3.

3    **A.**   Okay.

4    **Q.**   Okay.  And I believe that Mr. Rankin had you read

5    some of these lines here.  Lightbody starts, "So, so,

6    so, what they're saying is that any proceeds that come

7    from the sale of a casino or a casino cannot go to a

8    felon."

9         Darin Bufalino says "Ah."

10        Charles Lightbody says, "But the only good thing

11   is nobody knows who's involved, which makes it good

12   because now I can just move on, you know what I mean?"

13        Darin Bufalino:  "You need to move on."

14        Charlie Lightbody:  "So basically they're going

15   to buy me out and --"

16        Darin Bufalino:  "You need to move on.  You need

17   to double blind it."

18        Charles Lightbody:  "Exactly."

19        Darin Bufalino:  "You need to triple blind it

20   actually."  Charles Lightbody:  "Well, that's what

21   we're doing."        Darin Bufalino:  "I know I

22   explained this to you once before, at least I think I

23   did."

24        The double blind/triple blind, isn't that what

25   prompted you to turn these calls over to the FBI?

1   **A.**   That is correct.

2   **Q.**   And why?

3          MR. RANKIN:  Objection.

4          THE COURT:  Overruled.

5   **A.**   It seemed like there was some type of concealment,

6   a lack of subterfuge regarding Mr. Lightbody's

7   ownership in the casino by the words "double blind,

8   triple blind."

9   **Q.**   You were asked some questions by Mr. Foster about

10  Exhibit 4, so turning to 4-A in your binder where there

11  is some issues, a question about Wynn winning the

12  license.  Do you see those?

13  **A.**   I'm sorry, what page?

14  **Q.**   Exhibit 4-A or No. 4-A in your transcript binder.

15  I think it was Page 1 over onto Page 2.

16          (Witness examining transcript.)

17  **Q.**   I guess my only question is, they're talking about

18  Wynn and the casino and questions about whether he'll

19  get the license, correct?

20  **A.**   That's correct.

21  **Q.**   And the date of this call is what?

22  **A.**   September 4, 2012.

23  **Q.**   So it's not in December or after?

24  **A.**   That is correct.

25  **Q.**   It's in September of 2012?

1       MR. FOSTER:  Objection to the leading.

2       THE COURT:  Sustained.

3   Q.   You were asked some questions by Mr. Foster about

4   Exhibit 3, which is an August 22, 2012 call, and in

5   particular I believe he read a page of a transcript to

6   you that was not in the transcript binder.  Do you

7   remember that?

8   A.   Yes.

9   Q.   Okay.  And I'm just going to read one line from it

10  that you were already read to before.  Charles

11  Lightbody says, "You know, fuck everybody else, you

12  know what I mean, but we're part of Boston, not a big

13  part.  We're only like ten percent of Boston."  Do you

14  remember hearing that?

15  A.   I do, yes.

16  Q.   Are you aware that part of the parcel of land

17  where the casino is going is in Boston?

18      MR. FOSTER:  Objection to the leading.

19      THE COURT:  Overruled.

20  A.   Just from what I've read in the media.

21      MS. BARCLAY:  No further questions, your Honor.

22      THE COURT:  Any recross, Mr. Rankin?

23      MR. RANKIN:  No, your Honor.

24      THE COURT:  Mr. Foster?

25      MR. FOSTER:  No, your Honor.

1    THE COURT:  Ms. Angelini?

2    MS. ANGELINI:  No, your Honor.

3    THE COURT:  Thank you.  You may step down.

4    THE WITNESS:  Thank you, sir.

5    (Witness excused.)

6    MR. MERRITT:  The government calls Mark

7    Schwartz.

8                       MARK SCHWARTZ

9    having been first duly sworn, was examined and

10   testified as follows:

11   THE CLERK:  Would you please state your name for

12   the record, spelling your last.

13   THE WITNESS:  Mark Schwartz, S-c-h-w-a-r-t-z.

14   DIRECT EXAMINATION BY MR. MERRITT:

15   **Q.**  Good afternoon, Mr. Schwartz.  Can you tell us

16   where you live.

17   **A.**  New York, New York.

18   **Q.**  And how are you employed?

19   **A.**  I work for Och-Ziff Real Estate.

20   **Q.**  Can you tell us what Och-Ziff Real Estate is?

21   **A.**  It's a real estate private equity fund.

22   **Q.**  And how long have you been with Och-Ziff?

23   **A.**  Since November of 2007.

24   **Q.**  And do you have a particular title there?

25   **A.**  I'm an managing director.

1    **Q.**   And what do you do as the managing director?

2    **A.**   My primary responsibilities are evaluating

3    opportunities that casinos face.

4    **Q.**   What did you do before you went to work for

5    Och-Ziff?

6    **A.**   I was employed at Goldman Sachs.

7    **Q.**   And what did you do there?

8    **A.**   I was in the real estate investment banking group.

9    **Q.**   Now, can you tell the jury what Och-Ziff does with

10   respect to casinos or potential casinos.

11   **A.**   Some of the ways we invest in casinos are lending

12   money to casinos which are owned by third parties or

13   owning casinos ourselves, and, in those cases,

14   typically hiring third parties to oversee or manage the

15   casino.

16   **Q.**   Now, did you follow the legislation in

17   Massachusetts regarding the casino industry?

18   **A.**   Yes.

19   **Q.**   And in the summer of 2012, was Och-Ziff looking

20   for opportunities in Massachusetts?

21   **A.**   Yes.

22   **Q.**   And in connection with that, did you get connected

23   with a real estate broker?

24   **A.**   Yes.

25   **Q.**   Who was that?

1    A.    Michael Manzo.

2    Q.    Could you spell his name for us.

3    A.    M-a-n-z-o.

4    Q.    And in what particular geographic area did

5    Mr. Manzo focus?

6    A.    The region which included the Boston area.

7    Q.    And did you look at sites in that region?

8    A.    Yes.

9    Q.    And was there one in particular that interested

10   Och-Ziff?

11   A.    Yes, the site in Everett.

12   Q.    And why was the site in Everett of particular

13   interest?

14   A.    In particular, proximity to population.

15   Q.    You mean it's near a lot of people?

16   A.    Yes.

17   Q.    Were there other issues, though, that were

18   involved with that particular parcel?

19   A.    Can you repeat the question?

20   Q.    Were there any other issues with the parcel itself

21   when you looked at it?

22   A.    There were issues from a development perspective,

23   yes.

24   Q.    What were those?

25   A.    There were various concerns that came up during

1    our review of the property, including whether there is

2    enough buildable area on the site, including whether

3    there's environmental remediation work that had to be

4    done.  We were concerned about access to the site.

5    There were various concerns that we had.

6    **Q.**   And at some point, did you come to find out how

7    the land was held in an LLC, the name of an LLC?

8    **A.**   I believe it was FBT Everett Realty, LLC.

9    **Q.**   And how did you learn this?

10   **A.**   As we were negotiating a letter of intent, I

11   believe it was the counterparty to the letter of

12   intent.

13   **Q.**   All right.  And did you know who the owners or

14   principals of FBT were?

15   **A.**   My understanding is that it was Anthony Gattineri

16   and Paul Lohnes.

17   **Q.**   And how did you learn this?

18   **A.**   Through conversations with Mr. Manzo.

19   **Q.**   Now, were you, Och-Ziff, were you partnering with

20   anybody in this potential opportunity?

21   **A.**   We discussed the opportunity with Hard Rock.  They

22   could have been a potential manager for the site or for

23   the project, but we didn't have an agreement with them.

24   **Q.**   And is Hard Rock one of the national casino

25   operators?

1    **A.**    Yes.

2    **Q.**    Now, I think you mentioned negotiations.  In July

3    and August of 2012, did you negotiate some kind of

4    agreement with FBT?

5    **A.**    Yes.  We began negotiating the letter of intent in

6    late July of 2012, and I believe the letter of intent

7    was finally executed on August 21 or 22 of 2012.

8    **Q.**    Now, who negotiated for Och-Ziff?

9    **A.**    I was the primary.  I had primary responsibility

10   over that.

11   **Q.**    And who negotiated for FBT?

12   **A.**    As I recall, most of the discussions were directly

13   with Mr. Manzo.  I also recall a conversation with

14   their lawyer, Paul Feldman.

15   **Q.**    Now, did you ever meet Dustin DeNunzio during this

16   process?

17   **A.**    Yes.

18   **Q.**    And was he introduced to you as somebody involved

19   with the FBT?

20   **A.**    Yes.  I believe he was introduced as the project

21   manager.

22   **Q.**    All right, now, if I can ask you to look at the

23   folder that's -- or an e-mail marked Exhibit 18.

24   **A.**    Yes.

25              MR. MERRITT:  All right, can you bring that up

1    for me, Ms. Patch.

2    Q.   Do you recognize this particular e-mail marked

3    Exhibit 18?

4    A.   Yes.

5         MR. MERRITT:  I'll move it into evidence at this

6    point, your Honor, if there's no objection.

7         (Exhibit 18 received in evidence.)

8    Q.   All right, and just to get us oriented,

9    Mr. Schwartz, looking at the bottom of Exhibit 18, that

10   is an e-mail from you to DJD at The DeNunzio Group?

11   A.   Yes.

12   Q.   And who did you understand that to be?

13   A.   Dustin DeNunzio.

14   Q.   All right, can you just quickly read us the e-mail

15   to him.

16   A.   Sure.  "Dustin, Thanks again for your time

17   earlier.  Mike and I wanted to follow up to see if you

18   had a couple of minutes tomorrow to jump on the phone.

19   See attached.  It would be helpful to go through the

20   lot lines/buildable areas on a simple map like the

21   attached.  Please let us know times that work for you

22   tomorrow.  Thanks."

23   Q.   All right, and that's Monday, July 16, 2012?

24   A.   Correct.

25   Q.   And just focusing you at the top of the e-mail

1    chain, that was a response from Mr. DeNunzio to you?

2    **A.**    Yes.

3    **Q.**    All right, can you just quickly read the e-mail.

4    **A.**    "Mark, Good to speak with you today.  Tomorrow

5    around 10:00 a.m. would work best for me.  That will

6    give me the morning to sketch a few things out before

7    we talk.  If that time does not work, please suggest a

8    few other times, and I'll do my best to accommodate.

9    Thanks.  Dustin."

10   **Q.**    All right, so after these preliminary exchange of

11   e-mails and things, what was the next item in the

12   negotiating process?

13   **A.**    I believe we sent them an initial draft of a

14   letter of intent in late July of 2012.

15   **Q.**    And can you tell us what a letter of intent is.

16   **A.**    For us, a letter of intent is typically a

17   nonbinding letter which lays out major terms and

18   conditions of the transaction.

19   **Q.**    So when they use the term "letter of intent," is

20   that then your intent to perhaps buy the property,

21   "you" being Och-Ziff?

22   **A.**    Yes.

23   **Q.**    Now, was there more than one draft of these

24   letters of intent?

25   **A.**    Yes.  The negotiation went on between the end of

1     July and when it was finally executed on August 21, 22,

2     so there were multiple drafts in the meantime, as I

3     recall.

4     **Q.**   Let me ask you to pick up the next exhibit marked

5     Exhibit 19, which is another e-mail with some

6     attachments.

7     **A.**   Yes.

8          MR. MERRITT:  And if there's no objection, I

9     will move in Exhibit 19, your Honor.

10          THE COURT:  It will be admitted.

11          (Exhibit 19 received in evidence.)

12    **Q.**   So I'm going to ask you to take a look first, if I

13    can scroll down to Page 7 of this exhibit.  All right,

14    do you recognize what this is, Mr. Schwartz?

15    **A.**   Yes.  This is the form of a letter of intent that

16    we would send.  This version, it appears it includes

17    comments from a third party, which I believe are in

18    capital letters.

19    **Q.**   All right.  And this one is addressed to FBT

20    Everett Realty, as we can see?

21    **A.**   Correct.

22    **Q.**   All right, if we can just hit the next page.  And

23    just jumping down to, at this point in this draft, the

24    cash purchase price was offering $30 million; is that

25    right?

1    **A.**    Yes.

2    **Q.**    Now, this was not the final draft of the letter of

3    intent; is that right?

4    **A.**    Correct.

5    **Q.**    All right.

6           MR. MERRITT:  Let me ask you to bring up

7    Exhibit 20, if you might.

8    **Q.**    And is this another e-mail with certain

9    attachments?

10          (Witness examining document.)

11   **A.**    Yes.

12   **Q.**    All right.  And if I could ask you to look at --

13          MR. MERRITT:  What I would actually do is move

14   in Exhibit 20, if there's no objection, your Honor.

15          THE COURT:  It will be admitted.

16          (Exhibit 20 received in evidence.)

17   **Q.**    All right, just looking at the top of Exhibit 20,

18   again, this is now actually a reply from Mr. DeNunzio

19   to you and copied to some other people, as you can see.

20   It's dated August 22, 2012, and it says, "Mark,

21   Attached is the fully executed letter of intent."  Is

22   that what LOI stands for?

23   **A.**    Yes.

24   **Q.**    "Please let me know how we can assist OZ during

25   the due diligence."

1          Now, attached to this e-mail is the signed

2     letter of intent; is that right?

3          (Witness examining document.)

4     **A.**   The exhibit that I'm looking at, Mr. DeNunzio's

5     signature doesn't show up, but I believe this was the

6     final executed letter of intent.

7     **Q.**   All right, but let me ask you to look at -- if we

8     could scroll down to the last page or the

9     second-to-last page, it does not have his signature,

10    but it has the signature of -- who is that individual?

11    **A.**   Steven Orbuch.

12    **Q.**   And was he your boss?

13    **A.**   Yes.

14    **Q.**   All right.  Scrolling back up to the second page

15    of this exhibit, this e-mail chain, if I might -- oh,

16    excuse me, third page.  All right.  Do you see this

17    e-mail here from an Attorney Paul Feldman?

18    **A.**   Yes.

19    **Q.**   To you?

20    **A.**   Yes.

21    **Q.**   And was Mr. Feldman representing FBT as the lawyer

22    in this transaction?

23    **A.**   I believe so.

24    **Q.**   And in connection with this, he said to you that

25    he had some adjustments, "See the attached redraft that

1    addresses the points from the call as follows."  So you

2    had a telephone call with him?

3    A.   Yes.

4    Q.   All right, "18 months to close," what did that

5    mean?

6    A.   I believe that was a reference to the option

7    period prior to closing.

8    Q.   All right.  And No. 3 says "45 days to complete

9    definitive agreements."  What was that a reference to?

10   A.   That was a -- the way this LOI, this letter of

11   intent was drafted, there was a 45-day period during

12   which the definitive agreements were to be finalized,

13   if they were finalized; and during that period of time,

14   there is exclusivity, which meant that the existing

15   landowners weren't permitted to market the opportunity

16   to others.

17   Q.   All right, so if we understand you correctly, when

18   you say "exclusivity," that means they could only deal

19   with you for that period of time?

20   A.   Correct.

21   Q.   And what was the significance of the 45 days

22   again?

23   A.   It was the period of time during which definitive

24   agreements were supposed to be negotiated and executed.

25   Q.   And what is a definitive agreement in this

1    context?

2    **A.**    That would be the final agreement which would lay

3    out all the terms and conditions for the transaction.

4    **Q.**    All right.  Now, if I can take you back to the --

5    a little bit scroll up to the -- excuse me -- down to

6    Page 6 of this exhibit.  All right, and what is the

7    date of this letter of intent?

8    **A.**    August 21, 2012.

9    **Q.**    And can we scroll down to Page 8, please.  All

10   right, now at this point now the purchase price was how

11   much?

12   **A.**    $50 million.

13   **Q.**    And was that a result of negotiating with FBT?

14   **A.**    Yes.

15   **Q.**    And looking at this clause here, "Option period

16   payments," can you just maybe explain to the jury what

17   these option period payments were.

18   **A.**    The concept was that after entry into the

19   definitive documents but prior to closing, we would

20   make option payments to the existing landowners.  The

21   option payments would be $100,000 per month until we

22   were awarded the license, if we were awarded the

23   license, and after that point, at our option, either

24   $250,000 per month with $150,000 of that applied to the

25   purchase price, or $150,000 per month with no amount

1    applied to the purchase price.

2    **Q.**    All right, so there would be $100,000 a month, but

3    it could escalate to $250,000 once you got the license?

4    **A.**    If we were awarded the license.

5    **Q.**    Now, looking at the next page, if I might, Page 9,

6    there is a clause that talks about "Ongoing interest,"

7    and perhaps you can explain to the jury what that

8    provision was.

9    **A.**    That meant that the existing landowners would

10   receive ongoing interest, whereby they would receive

11   12.5 percent of cash flows from the project after we,

12   Och-Ziff, had received a stipulated return.

13   **Q.**    And is that something that Och-Ziff had

14   entertained in other potential deals?

15   **A.**    This construct is one that is customary in private

16   equity transactions.

17   **Q.**    Does that include casino deals or others as well?

18   **A.**    Uhm, it's hard to say.

19   **Q.**    All right, so just to see if we understand then,

20   so this allowed the sellers to have an ongoing interest

21   in the casino essentially?

22   **A.**    An ongoing interest, yes.

23   **Q.**    And if I might just ask you to look at Page 9 and

24   where we have this clause here having to do with the

25   agreements.  And this is now, you have incorporated the

1    request of FBT's lawyer that the definitive agreements

2    must be executed within 45 days of this letter of

3    intent; is that right?

4    A.   Correct.

5         MR. MERRITT:  Now, can we bring up Exhibit 3,

6    and if you could take us to 1350, which is also in the

7    transcript as Exhibit 3-A.

8    Q.   I'm just going to ask you to listen to this

9    excerpt for a second, Mr. Schwartz.

10        MR. RANKIN:  I'm going to object to this, your

11   Honor.  It's already been played with

12   Lieutenant Kradolfer.

13        THE COURT:  He can play it again.  Overruled.

14        (CD played.)

15   Q.   Now, Mr. Schwartz, you heard the reference to "45

16   days, they give us a hundred a month"?

17   A.   Yes.

18   Q.   Now, was that consistent with the clause in the

19   contract, the letter of intent, about the definitive

20   agreements that you talked about?

21        MR. RANKIN:  Objection, your Honor.

22        THE COURT:  Overruled.

23   A.   That timing and the amount per month is consistent

24   with what's in the LOI.

25   Q.   And you heard the reference to it could rise to

1      $250,000?

2      A.   Yes.

3      Q.   Was that consistent with the option payment clause

4      in your letter of intent?

5           MR. RANKIN:  Objection, your Honor.

6           THE COURT:  Overruled.

7      A.   Yes.

8      Q.   Now, after this letter of intent was signed on

9      August 22, 2012, what was the next step in the process?

10     A.   We continued our diligence on the site.  I believe

11     the last week of August I was out of town, so really

12     not that much happened during that period.  In the

13     beginning of September, we did a site visit, and that

14     was the major next step in the diligence process.

15     Q.   And did you go on the site visit?

16     A.   Yes.

17     Q.   And who else was there that you recall?

18     A.   As I recall, there was another colleague of mine

19     from Och-Ziff.  There were representatives from an

20     architecture firm, an engineering firm, a general

21     contractor firm.  There were representatives from Hard

22     Rock who were there.  There was a representative from a

23     political consulting firm that was there, and

24     Mr. DeNunzio was there, and I believe that one of the

25     owners was there, but I don't know -- I don't know

1    which one.

2    **Q.**   When you say which one, was it between two people

3    you don't recall which one?

4    **A.**   Yes.  My understanding is that the owners were

5    Anthony Gattineri and Paul Lohnes, and I don't recall

6    which one of them was there.

7    **Q.**   And subsequent to the site visit, what was the

8    next thing Och-Ziff did?

9    **A.**   Coming out of the site visit, our primary concern

10   at the time was access to the site, so we were

11   concerned about that.  Additionally, later in September

12   we hired a firm to do a poll to see whether people in

13   Everett would be in support of or against a casino.

14   **Q.**   All right, and was that poll conducted?

15   **A.**   Yes.

16   **Q.**   And what was the result?

17   **A.**   As I recall, the results were 46 percent were

18   opposed, 41 percent were for, and I believe the balance

19   is undecided.

20   **Q.**   And how did that affect Och-Ziff's decision about

21   going forward?

22   **A.**   It concerned us a lot.

23   **Q.**   And did you make a decision?

24   **A.**   At the beginning of October, we made a decision

25   that we didn't want to pursue the transaction any

1    longer and at that point terminated the letter of

2    intent.

3    Q.   All right, let me ask you to look in front of you

4    at Exhibit 21.  Is that an e-mail or actually an e-mail

5    chain dated September 19, 2012, at the top?

6    A.   Yes.

7         MR. MERRITT:  Your Honor, if there's no

8    objection, I'd move in Exhibit 21.

9         THE COURT:  It will be admitted, Exhibit 21.

10        (Exhibit 21 received in evidence.)

11   Q.   And just if we could go first to the bottom e-mail

12   here, this is from you to Dustin DeNunzio?

13   A.   Correct.

14   Q.   All right, and maybe you could just read it as we

15   look at this e-mail entry.

16   A.   "Dustin, Wanted to give you an update on our

17   progress.  Do you have some time this evening or in the

18   morning to catch up?  I'm running out to a meeting but

19   could talk later tonight or first thing tomorrow.

20   Short story equals, one, polling did not come back as

21   positive as we would have liked, around 5 percent more

22   against than for, with around 15 percent undecided,

23   albeit  it's still early; and, two, major issue from

24   Tetra Tech's perspective is traffic, not surprisingly.

25   On two in particular, I want to talk through with you

1    what work we can do quickly to get our arms around

2    timing, process, and cost for improvements, shopping

3    center entrance.  Anyways, just let me know the best

4    time to reach out to you.  Thanks."

5    **Q.**   All right, and then at the top of this e-mail

6    chain, there is an e-mail back from Mr. DeNunzio to you

7    on September 19?

8    **A.**   Correct.

9    **Q.**   And he indicates that he can meet with you or talk

10   with you essentially?

11   **A.**   I believe it would have been a phone conversation,

12   yes.

13   **Q.**   All right.  And what was the result of that?

14   **A.**   I don't recall that conversation specifically,

15   but, again, our concerns at the time were primarily on

16   the polling, which had come back negative, and the

17   access issues, or concerns about access.

18   **Q.**   All right, if I may ask you to look at

19   Exhibit 170.

20        MR. MERRITT:  And, again, if there's no

21   objection, I'd move in Exhibit 170.

22        THE COURT:  It will be admitted.

23        (Exhibit 170 received in evidence.)

24   **Q.**   And again now focusing at the bottom of an e-mail

25   chain here, it's an e-mail from Michael Manzo, and he

1    was the real estate broker?

2    **A.**   Correct.

3    **Q.**   To AG and Dustin J. DeNunzio?

4    **A.**   Correct.

5    **Q.**   And what does he tell them in this e-mail?

6    **A.**   Do you want me to read it?

7    **Q.**   Yeah, quickly.

8    **A.**   "Anthony and Dustin, I have had a number of

9    discussions with OZ over the past few days, including a

10   conference call with WorldTech regarding traffic

11   issues.  OZ is not prepared to sign the agreement and

12   beginning to incur monthly costs.  They have asked me

13   to prepare a timeline overlaying the engineering and

14   other approvals with the dates and deposits at the

15   Gaming Commission.  They remain very interested, and it

16   is the only site they are looking at.  The complexities

17   of the Mass. gaming legislation is the timing gives

18   them pause.  I'm in and out of meetings today, but

19   let's schedule a time to discuss in more detail."

20   **Q.**   All right.  And then at the top, if I'm correct,

21   of Exhibit 170, this is Mr. DeNunzio's response to you

22   about this?

23   **A.**   Correct.

24   **Q.**   And if you want to just read quickly the top part

25   of that.

1    **A.**   "Mark, I hope all is well.  I'm sorry to hear that

2    Och-Ziff is not ready to move forward at this time.

3    According to the contract, the LOI expires on Saturday,

4    45 days from the signing on August 22.  Can you please

5    do us the courtesy of having Steven Orbuch write us a

6    letter releasing us from the remaining date of the

7    contract.  If at any time Och-Ziff is interested in

8    pursuing the site and it's still available, we would be

9    happy to resume discussions.  Thank for the quick

10   attention to this, and good luck with your future

11   endeavors.  Best, Dustin."

12   **Q.**   All right, so they're asking you to kind of cancel

13   it earlier so that they can have other people look at

14   it potentially?

15   **A.**   Yes.

16   **Q.**   All right, I'm going to now ask you, just look at

17   Exhibit 22.

18        MR. MERRITT:  And if there's no objection, I'd

19   move in Exhibit 22.

20        THE COURT:  It will be admitted.

21        (Exhibit 22 received in evidence.)

22   **Q.**   And looking at the bottom of Exhibit 22 or the

23   e-mail -- as part of this e-mail, this is the e-mail

24   from Mr. Manzo to Mr. Gattineri and DeNunzio that we

25   already looked at in the previous exhibit?

1    **A.**   Yes.  It appears to be the e-mail that I just

2    read.

3    **Q.**   All right.  And then the top of this e-mail,

4    that's from Dustin DeNunzio to a C.A. Lightbody at

5    AOL.com forwarding Och-Ziff, and it says on October 22,

6    2012, "I will call you in a few minutes."  Is that

7    right?

8    **A.**   Yes.

9    **Q.**   Now, at any point in your experience with the

10   Everett deal, did you ever hear any other names

11   associated with the Everett parcel besides Lohnes,

12   Anthony Gattineri or Dustin DeNunzio?

13   **A.**   When you say "associated," you mean ownership?

14   **Q.**   Either way.

15   **A.**   No.

16   **Q.**   Did you ever hear the name Charlie Lightbody?

17   **A.**   No.

18       MR. MERRITT:  No other questions, your Honor.

19       THE COURT:  Cross-examination.  Mr. Connolly?

20       MR. CONNOLLY:  Yes, your Honor.

21   CROSS-EXAMINATION BY MR. CONNOLLY:

22   **Q.**   Good afternoon, Mr. Schwartz.  I'm Michael

23   Connolly, and I represent Anthony Gattineri in this

24   proceeding.

25       Mr. Schwartz, you testified that you learned the

1  names of the two people whom you believe to be the

2  owners from Mr. Manzo; is that correct?

3  **A.**  Yes.

4  **Q.**  And you testified that you were aware that the

5  land was held by an entity called FBT Everett Realty,

6  LLC, correct?

7  **A.**  Yes.

8  **Q.**  And in the business that you do, you deal with --

9  an LLC is a limited liability company, correct?

10  **A.**  I believe so.

11  **Q.**  And it's a form of corporate ownership, correct?

12  **A.**  I believe so.

13  **Q.**  There's corporations, partnerships, LLPs, LLCs.

14  There are different ways for individuals to have an

15  ownership interest in an organization, correct?

16  **A.**  Yes.

17  **Q.**  And you know, sir, don't you, that with an LLP or

18  a limited liability company, there is a way to figure

19  out who the owner is, correct?

20  **A.**  I don't know if that's correct.

21  **Q.**  Well, let me ask you, have you ever seen something

22  called a limited liability company operating agreement?

23  **A.**  Yes.

24  **Q.**  And so you're familiar then that in the operating

25  agreement, there is a section which sets forth who the

1    members are of the LLC, correct?

2    **A.**    Can you repeat the question?

3    **Q.**    Okay.  Well, let me take a step back.  Do you know

4    what a member of an LLC is?

5    **A.**    To me, a member of an LLC is typically one who has

6    an ownership interest in the LLC.

7    **Q.**    Okay, fair enough, so let's work with that.  Now,

8    are you familiar with the fact that when there's a

9    limited liability company, there is ordinarily an

10   operating agreement associated with the limited

11   liability company?

12   **A.**    In my experience, typically limited liability

13   companies have operating agreements.

14   **Q.**    Okay.  And, now, in those operating agreements,

15   isn't it also typical that it sets forth who the

16   members or the owners are of the limited liability

17   company?

18   **A.**    Yes.

19   **Q.**    Okay.  Now, when you started your discussions with

20   Mr. Manzo and you mentioned you talked to Mr. DeNunzio

21   and you dealt with Mr. Feldman, did you ever ask for

22   the FBT operating agreement?

23   **A.**    I don't recall asking for it.

24   **Q.**    Because it was never -- you never got to a stage

25   in your negotiations where you actually had a strong

1    interest in knowing who the owners of FBT were; isn't

2    that correct?

3    **A.**   We were more focused on other parts of the

4    feasibility of the development.

5    **Q.**   Correct.  So these discussions, which commenced in

6    July and ended as of early October, never got to the

7    point where you had -- and we'll get to this more in a

8    moment -- negotiations of a definitive agreement,

9    correct?

10   **A.**   I don't believe we ever negotiated a definitive

11   agreement, that's correct.

12   **Q.**   Okay.  And the definitive agreement, that's the

13   agreement that would have triggered the payments of

14   $100,000 a month initially, correct?

15   **A.**   Yes.

16   **Q.**   Because under this LOI or this letter of intent,

17   there wasn't an obligation for Och-Ziff to pay FBT a

18   dime, correct?

19   **A.**   The terms of the letter of intent did not provide

20   for us to pay anything for entering into the letter of

21   intent.

22   **Q.**   There was basically a 45-day negotiation period,

23   correct?

24   **A.**   Correct.

25   **Q.**   And so what Och-Ziff did during that time frame

1    was, you did at least one site visit, correct?

2    A.    Correct.

3    Q.    And you looked into environmental issues, correct?

4    A.    Correct.

5    Q.    Now, before I leave that, did Och-Ziff get a sense

6    as to how severe the environmental contamination was of

7    this property in Everett?

8    A.    I recall that we were sent an environmental report

9    at some point during the diligence.

10   Q.    Okay.  And did somebody from Och-Ziff do an

11   approximation as to what the cleanup cost would be in

12   order to make that parcel of land developable as a

13   casino?

14   A.    I don't remember doing that.

15   Q.    Did you ever get a sense as to, kind of in an

16   order of magnitude, how much money would have had to be

17   spent on the environmental cleanup costs alone to make

18   that property usable as a casino?

19   A.    I don't recall.

20   Q.    Okay, but there was the environmental issue that

21   was learned, and then there was also, you mentioned a

22   buildable envelope issue which was of concern, correct?

23   A.    Correct.

24   Q.    What do you mean by that?

25   A.    We were concerned about whether there was enough

1    space on the site to develop what we would

2    ultimately -- to develop a casino property there.

3    **Q.**   Okay.  And then you mentioned after the September

4    visit, the site visit, that you had concerns about

5    ingress and egress, correct?

6    **A.**   Yes.

7    **Q.**   In other words, moving traffic/individuals on and

8    off the property, correct?

9    **A.**   Correct.

10   **Q.**   And then you also mentioned that you became

11   familiar that under the Massachusetts Expanded Gaming

12   Act, that there was a requirement of host community

13   approval, correct?

14   **A.**   Can you restate the question?

15   **Q.**   Well, you gained some general familiarity with the

16   Massachusetts Expanded Gaming Act, correct?

17   **A.**   What do you mean by "general familiarity"?

18   **Q.**   You know what, I don't want to confuse you.  Let

19   me take a step back.  Didn't Och-Ziff conduct a poll in

20   Everett as to whether people were thumbs up or thumbs

21   down?

22   **A.**   We hired a third party to conduct a poll, and that

23   third party conducted a poll, yes.

24   **Q.**   Okay, and why did Och-Ziff do that?

25   **A.**   I believe one requirement of the gaming

1    legislation was a positive vote in the local

2    jurisdiction.

3    **Q.**    Okay.  And the outcome of that was 41 percent in

4    favor, 46 percent opposed, correct?

5    **A.**    Yes.

6    **Q.**    So that was a negative finding, correct?

7    **A.**    Correct.

8    **Q.**    So, now, I just want to be clear.  You learned the

9    names Anthony Gattineri and Paul Lohnes from Mr. Manzo

10   in July, correct?

11   **A.**    I don't remember when I learned those names.

12   **Q.**    But do you remember that it was from Mr. Manzo?

13   **A.**    Yes.

14   **Q.**    Okay.  And you never did any due diligence into

15   who the owners of FBT were, correct?

16   **A.**    Can you repeat the question?

17   **Q.**    Well, you never asked for some type of definitive

18   proof or definitive evidence as to who the owners were

19   of FBT Everett Realty, LLC, correct?

20   **A.**    I don't remember asking for any definitive proof,

21   correct.

22   **Q.**    Okay, so you moved along this process, you

23   identified these four issues we've talked about, and

24   then in early October, you just testified you lost

25   interest, or Och-Ziff lost interest, correct?

1    **A.**   We lost interest.  I don't know if it was in early

2    October or before then.

3    **Q.**   Is that the general time frame?

4    **A.**   Yes.

5    **Q.**   Okay.  So, in any event, you lost interest,

6    correct?

7    **A.**   We were not prepared to move forward with

8    definitive agreements.

9    **Q.**   Okay.  Now, a couple more questions.  You have

10   Exhibit 20 in front of you?  Exhibit 20, sir, it's an

11   e-mail chain, and it has attached to it --

12   **A.**   Yes.  Yes, I have it in front of me.

13   **Q.**   -- the LOI that has the signature from Mr. Orbuch

14   of Och-Ziff but no signature from FBT.  Do you have

15   that, sir?

16   **A.**   Yes.

17   **Q.**   And on Page 8 of 12, we see that that's the letter

18   of intent reflecting a $50 million purchase price,

19   correct?

20   **A.**   Correct.

21   **Q.**   And there was also on the next page something

22   called an "Ongoing interest" clause, which would have

23   given FBT a revenue participation of 12.5 percent after

24   Och-Ziff was repaid a certain amount of money, correct?

25   **A.**   It was 12.5 percent, I believe, of net cash flow

1    after debt service from the project and capital

2    proceeds from sales and refinancings but not revenue.

3    Q.   Okay.  And on top of that, there is a provision

4    under the "Environmental condition" which in effect

5    provided that if Och-Ziff went forward and decided to

6    develop the project, it would reimburse FBT for all of

7    the environmental cleanup costs that it incurred,

8    correct?

9    A.   This provides that the remediation costs will be

10   the project costs for the project, and FBT will be

11   reimbursed for such costs upon commencement of

12   construction of the project.

13   Q.   Okay, so essentially what this LOI envisioned was

14   50 million bucks, correct?

15   A.   Correct.

16   Q.   A 12 percent interest after Och-Ziff was repaid a

17   certain amount, correct?

18   A.   12.5 percent of net cash flows.

19   Q.   And environmental reimbursement, and would you

20   read me, sir, that the environmental reimbursement on

21   this property could easily run into the eight-figure

22   range.

23   A.   I have no idea.

24   Q.   You have no idea?

25   A.   No.

1    **Q.**   Would you agree with me that it's at least in the

2    seven-figure range?

3    **A.**   I don't know.

4    **Q.**   Fair enough.  Now, I'm going to ask you to take a

5    look at something that I know you've never seen before,

6    but it's another excerpt from a tape which Mr. Merritt

7    showed you, something from a Charlie Lightbody/Darin

8    Bufalino tape.  This is another one of those, and this

9    is from -- it's marked as Exhibit 7 in evidence, and

10   it's December 5, 2012, and it says on Page 3 of that

11   transcript, "Mr. Bufalino."  Do you see that on the

12   screen, sir?

13   **A.**   Yes.

14   **Q.**   It says, "Yeah, well, you've still got the Hard

15   Rock boys in there too, right?"  And just to get a time

16   frame, the first page of this shows this is December 5,

17   2012.  Do you see that, sir?

18   **A.**   Yes.

19   **Q.**   Okay.  And in response, Mr. Lightbody says, "Well,

20   yeah, but we've basically thrown them to the curb

21   because they weren't performing."

22         Did FBT kick Och-Ziff to the curb, Mr. Schwartz?

23   **A.**   I believe that we terminated the letter of intent.

24   **Q.**   Thank you, sir.

25         MR. CONNOLLY:  No further questions, your Honor.

1         THE COURT:  Any cross-examination?

2         MR. KATZ:  I will be very quick, your Honor.

3         THE COURT:  All right.

4  CROSS-EXAMINATION BY MR. KATZ:

5  **Q.**   Mr. Schwartz, my name is Aaron Katz.  I represent

6  Dustin DeNunzio.  We've never met before, correct?

7  **A.**   Correct.

8  **Q.**   We've never spoken before?

9  **A.**   I've never spoken to you.

10  **Q.**   All right, well, thank you for being here today.

11  I just have a few questions for you.  It's correct,

12  isn't it, that Dustin DeNunzio in all your dealings

13  with him never refused to answer any questions that you

14  had if he had the information; is that right?

15  **A.**   Can you restate the question?

16  **Q.**   Do you remember Dustin DeNunzio ever refusing to

17  answer a question that you had about the property?

18  **A.**   I can't remember an instance where he refused to

19  answer a question.

20  **Q.**   Do you ever remember Dustin DeNunzio acting

21  anything less than professional in his phone calls with

22  you, face-to-face meetings, and e-mails with you?

23  **A.**   In my interactions with Dustin, he was, as I

24  recall, fairly responsive and provided information we

25  asked for.

1    **Q.**    And one of the things he did was gave you access

2    to not only Mr. Manzo but also Attorney Paul Feldman;

3    is that correct?

4    **A.**    As I recall, during the negotiations of the letter

5    of intent, Mr. Feldman was on a call -- I was on a call

6    with Mr. Feldman.  I don't remember who else was on

7    that call.

8    **Q.**    You may have been on the phone call just you and

9    Mr. Feldman, as far as you recall?

10    **A.**    I don't remember.

11    **Q.**    Okay, did you ever ask Dustin DeNunzio to provide

12    you the names of FBT's members?

13    **A.**    I don't remember asking that.

14    **Q.**    And in fact on direct examination you testified

15    that your impression was that Dustin DeNunzio was

16    simply a project manager, correct?

17    **A.**    My impression was that he was a project manager,

18    correct.

19    **Q.**    Did you ever ask Paul Feldman to give you the

20    names of FBT's members?

21    **A.**    I don't remember asking.

22    **Q.**    And the reason you didn't is because it didn't

23    even occur to you at that point that that was something

24    that you might need to be interested in; is that

25    correct?

1    **A.**    Can you restate the question?

2    **Q.**    The reason you didn't ask for the names of FBT's

3    members is because at that point in time, you did not

4    even know that that was something you should be

5    interested in; is that correct?

6    **A.**    We were more focused on other issues regarding the

7    site.

8            MR. KATZ:  That's all.  Thank you.

9            THE COURT:  Mr. Rankin?

10           MR. RANKIN:  No questions, your Honor.

11           THE COURT:  Any redirect?

12           MR. MERRITT:  No questions.

13           THE COURT:  Thank you, Mr. Schwartz.  You may

14   step down.

15           (Witness excused.)

16           THE COURT:  We will break here for the day.  It

17   happens to be exactly at 3:30, so we hit our goal.  But

18   tomorrow we'll be back at 9:00 o'clock.  We'll have a

19   full day tomorrow.  I want you to remember not to talk

20   about this case.  As we go forward, I'll keep reminding

21   you of that until you probably get sick of hearing it,

22   but it's important for you to honor that instruction.

23   You're going to decide this case solely on the basis of

24   the evidence that comes into this courtroom and not on

25   the basis of anything else that you learn outside of

1    this courtroom.

2         Please leave your notebooks -- actually the

3    transcripts here leave in the courtroom, but take your

4    notebooks and leave them in the jury room, and I'll see

5    you tomorrow morning at 9:00 a.m.

6         THE CLERK:  All rise for the jury.

7         (Jury excused.)

8         THE COURT:  All right, please be seated,

9    Counsel.  Do you have a rough outline of tomorrow's

10   testimony, Ms. Barclay?

11        MS. BARCLAY:  Yes.  A rough outline, your Honor,

12   is Frederick Trip McCoy.  That's one witness.

13        THE COURT:  I'm sorry, who is it?

14        MS. BARCLAY:  Frederick Trip McCoy, Karen Wells.

15        THE COURT:  What's the length of Mr. McCoy's

16   direct, approximately?

17        MS. BARCLAY:  Approximately a half an hour.

18        THE COURT:  Okay.  And then after him?

19        MS. BARCLAY:  Karen Wells.

20        THE COURT:  And her direct?

21        MS. BARCLAY:  I would think hers would be

22   approximately an hour, your Honor.

23        THE COURT:  And that cross-examination is

24   roughly the equivalent of the direct; is that fair to

25   say, defendants?  Mr. Levy?

1      MR. LEVY:  I think that's pretty rule of thumb,

2   your Honor.  If it's different, we'll let you know.

3      THE COURT:  All right, agreed Mr. Connolly,

4   Mr. Rankin?

5      MR. RANKIN:  Yes, your Honor.

6      THE COURT:  Okay, after Ms. Wells?

7      MS. BARCLAY:  Nancy Sterling.

8      THE COURT:  And her direct?

9      MS. BARCLAY:  I think about a half an hour.

10      THE COURT:  And if we get that far, the next

11   witness?

12      MS. BARCLAY:  Daniel Gaquin.

13      THE COURT:  How do you spell that?

14      MS. BARCLAY:  G-a-q-u-i-n.

15      THE COURT:  And his direct?

16      MS. BARCLAY:  I believe his will be about an

17   hour as well.

18      THE COURT:  All right, so it's not likely we

19   would get beyond him with cross-examination, right?

20   Anything else that needs to come to my attention before

21   we adjourn for the day?  If not, I'll see you tomorrow

22   morning at 9:00 a.m.

23      THE CLERK:  All rise.

24      (Adjourned, 3:33 p.m.)

25

1

2              C E R T I F I C A T I O N

3

4

5

6

7        We, Debra D. Lajoie, RMR, FCRR;

8   Kelly Mortellite, RMR, CRR; and Lee A. Marzilli, RMR,

9   CRR, do hereby certify that the foregoing pages are a

10  true and accurate transcription of our stenographic

11  notes in the above-entitled case.

12

13

14

15

16              /s/ Debra D. Lajoie

17              /s/ Kelly Mortellite

18              /s/ Lee A. Marzilli

19

20

21

22          4/12/16

23

24

25